IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Andrew Behrend, Marc Dambrosio, Marc Weinberg, Kenneth Saffren and Stanford Glaberson, ) ) ) | No. |
| Plaintiffs, ) ) ) | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE SHERMAN ANTITRUST ACT** |
| v. ) ) | |
| Comcast Corporation, ) ) ) | |
| Defendant. ) ) ) | |

Plaintiffs, on their own behalf and on behalf of the Class of those similarly situated, bring

this action for treble damages under the antitrust laws of the United States against Defendant

Comcast Corporation ("Comcast" or "Defendant").

## <u>INTRODUCTION</u>

1.      Congress has attempted to protect the public against the growing market

dominance of cable television companies by encouraging competition in local markets as a

matter of national policy.  In doing so, Congress passed the Cable Television Consumer

Protection Act of 1992 to promote competition among cable operators.  A cornerstone of this

legislation was a prohibition against exclusive cable franchises for a particular geographic area,

so that cable companies would directly compete against each other.  In 1996 Congress

deregulated cable television, once again for the express purpose of promoting competition.

Despite passage of the 1992 and 1996 Congressional legislation, large cable companies,

including Defendant, have violated federal antitrust law and carved out their own respective areas

44303

of operation to the exclusion of competition from other cable companies.  As a consequence of this illegal activity, cable prices have increased significantly beyond the rate of inflation.

2.      Rather than compete against one another, large cable companies such as Defendant have divided and allocated markets through a series of agreements "swapping" customers and "clustering" cable systems in geographic areas.  Such conduct has allowed a cable company, including Defendant, in a particular "cluster" to acquire or maintain monopoly power, raise prices, engage in anticompetitive conduct and limit choice for cable consumers to effectively the only game in town--the cable services of the "cluster" monopoly cable company. This lawsuit seeks an injunction, treble damages and other relief against Comcast for its violations of federal antitrust law arising from Comcast's  imposition of horizontal market restraints by entering into and implementing agreements with competitors to "swap" their respective cable customers, in violation of Section 1 of the Sherman Act and Comcast's unlawful acquisition or maintenance of monopoly power, or its attempted monopolization of the relevant market, in its "cluster" in the Philadelphia, Pennsylvania area, in violation of Section 2 of the Sherman Act.

## NATURE OF THE ACTION

3.      Plaintiffs bring this action against Defendant, the owner and operator of multiple cable television systems, for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

4.      Defendant has imposed horizontal market restraints by entering into and implementing agreements with competitors to exchange or "swap" their respective cable television assets, including subscribers.  Through the imposition of such horizontal market restraints, Defendant has been able to avoid meaningful competition and Defendant's cable

subscribers in Defendant's Philadelphia, Pennsylvania "cluster" have paid higher prices for cable television services than they would have absent Defendant's unlawful conduct.  Defendant's conduct in entering into and implementing agreements allocating markets, territories and customers for cable television services constitutes a *per se* violation of Section 1 of the Sherman Act.

5.     Comcast also has engaged in conduct constituting unlawful monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.  Defendant has willfully acquired or maintained monopoly power in the relevant product market (multichannel video programming services) within the relevant geographic market (Comcast's Philadelphia cluster, as defined below).  Defendant's willful acquisition or maintenance of monopoly power in the relevant market is the result of exclusionary, anticompetitive conduct, including, without limitation: 1) entering into and implementing illegal agreements with competitors to allocate territories, markets and customers through the "swapping" of cable television subscribers; 2) refusing to provide a competitor reasonable, long-term, nondiscriminatory access to essential local sports programming controlled by Defendant and needed by the competitor to compete against Defendant; 3) interfering with a competitor's access to contractors needed by the competitor to build competing cable television facilities and systems in the relevant market; and 4) engaging in anticompetitive targeted pricing and sales practices aimed at areas in which Comcast may face potential competition.   Through such unlawful conduct, Defendant has excluded potential competitors from within the relevant geographic market and Plaintiffs and members of the Class, as a result of Defendant's unlawful conduct, have been forced to pay higher prices for cable television in the relevant market than they would have paid in the absence of Defendant's unlawful conduct.

6.      Through such unlawful conduct, Defendant has attempted to monopolize the relevant market.  Defendant has engaged in such conduct with the specific intent to monopolize and, through such conduct, has demonstrated a dangerous probability of achieving monopoly power in the relevant market.   Defendant's attempt to monopolize the relevant market also violates Section 2 of the Sherman Act.

## PARTIES

### PLAINTIFFS

7.      Plaintiff Andrew Behrend is an individual who resides in Newtown, Pennsylvania. During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

8.      Plaintiff Marc Dambrosio is an individual who resides in Philadelphia, Pennsylvania and has a second residence in Atlantic County, New Jersey.  During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber, at each of his residences, of non-basic cable programming services provided by Comcast.

9.      Plaintiff Marc Weinberg is an individual who resides in Holland, Pennsylvania. During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

10.      Plaintiff Kenneth Saffren is an individual who resides in Holland, Pennsylvania. During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

11.      Plaintiff Stanford Glaberson is an individual who resides in Montgomery County, Pennsylvania.  During the time period covered by this complaint, Plaintiff has been and continues to be a subscriber of non-basic cable programming services provided by Comcast.

**DEFENDANT**

12.     Comcast, formally known as AT&T Comcast Corporation, is a Pennsylvania corporation with its principal place of business at 1500 Market Street, Philadelphia, Pennsylvania 19102.  Comcast was formed through the acquisition on November 18, 2002 by Comcast Holdings Corporation of AT&T Broadband, the cable business of AT&T Corp., a New York corporation with its office and principal place of business at 900 Routes 202-206 North, Bedminster, New Jersey.  The acquisition occurred in several steps.  First, AT&T contributed its cable business, including substantially all the assets, liabilities and businesses represented by AT&T Broadband Group, to a newly formed holding company, AT&T Broadband Corp.  Next, AT&T Broadband was spun off from AT&T Corp.  Finally, Comcast and AT&T Broadband combined to form the new Comcast Corporation.

13.     Before combining, AT&T Broadband and Comcast were two separate, independent owners and operators of multiple cable systems, operating at the same level of competition in the cable industry.  At the time of the transactions described in paragraph 12, Comcast was the third largest cable operator in the United States, and AT&T owned the largest cable operator in the United States.  Upon acquiring AT&T's cable business on November 18, 2002, Comcast became the largest cable operator in the country.  Comcast serves over twenty-one million cable subscribers.

14.     During the Class Period alleged herein, Defendant has provided and continues to provide cable television services in the United States by means of interstate commerce.

15.     Defendant's business activities as described in this Complaint were within the flow of and substantially affected interstate trade and commerce.

## JURISDICTION AND VENUE

16.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, for injunctive relief, treble damages, and Plaintiffs' costs of this suit, including reasonable attorney fees, against Defendant for the injuries sustained by Plaintiffs and other similarly situated Class members by reason of Defendant's violations of Sections 1 and 2 of the Sherman Act.

17.     Jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

18.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15, 22, and 26, and 28 U.S.C. § 1391(b) and (c), because Defendant transacts business, maintains offices, or otherwise is found within this District.

## CLASS ALLEGATIONS

19.     a.     As used in this paragraph and Complaint:

(1)     "Basic Cable Services" means the separately available basic tier of video programming services to which subscription is required for access to other tiers of cable service offered by Defendant and which includes the retransmission of local television broadcast signals and public, educational and governmental access channels.

(2)     "Defendant's Philadelphia cluster" includes the following counties in which Comcast's cable franchises are located:  Berks, Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania; Kent and New Castle, Delaware; and Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer and Salem, New Jersey.

b.       Plaintiffs bring this class action pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3) on behalf of the following class:

> All cable television customers who subscribe or subscribed since
> December 1, 1999, to video programming services (other than solely to
> basic cable services) from Comcast in Comcast's Philadelphia cluster.  The
> class excludes governmental entities, Comcast, Comcast's subsidiaries and
> affiliates and this Court.

20.      Plaintiffs do not yet know the exact size of the Class and such information is in

the exclusive control of Defendant.  However, based on the nature of the trade and commerce

involved, Plaintiffs believe that the total number of Class members exceeds two million persons,

and that the members of the Class are located throughout the Philadelphia, Pennsylvania and

surrounding area.  Consequently, joinder of all members of the Class would be impracticable.

21.      Plaintiffs will fairly and adequately protect the interests of the Class members, and

has engaged counsel experienced and competent in antitrust and class action litigation.  Plaintiffs

have no interests antagonistic to those of the other members of the Class.

22.      Plaintiffs' claims are typical of the claims of the Class in that each paid for non-

basic or cable programming services and was injured by the same wrongful conduct of Defendant

alleged in this Complaint.  The violations of the antitrust laws, the effects of such violations and

the relief sought are common to Plaintiffs and the members of the Class.

23.      The rights of Plaintiffs and the Class members involve common questions of law

and fact that would predominate over questions affecting only individual members of the Class.

Whatever difficulties may exist in the management of the Class are generally outweighed by the

advantage of that procedure, including but not limited to providing claimants with a method for

redress of claims that might otherwise not warrant individual litigation.

24.      The questions of law and fact common within the Class include, but are not

limited to:

a.     whether Defendant's conduct in entering into and implementing agreements with competitors allocating markets, territories and customers for cable television services constitutes a *per se* violation of Section 1 of the Sherman Act;

b.      whether Defendant's conduct in possessing and willfully acquiring or maintaining monopoly power in, or attempting to monopolize,  the relevant market and engaging in the acts and practices alleged in this Complaint constitute violations of Section 2 of the Sherman Act, 15 U.S.C. § 2;

c.     whether Defendant's acts caused prices for cable television services in the relevant market to be artificially high and not competitive;

d.     whether Plaintiffs and the members of the Class were injured by Defendant's acts;

e.     the measure of damages by which Defendant's conduct injured all members of the Class; and

f.     whether the Class is entitled to injunctive relief as a result of Defendant's continuing conduct.

25.     Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy, because it permits a large number of injured persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence and effort.  Class treatment will also permit the adjudication of claims by smaller Class members, who could not afford individually to litigate antitrust claims against the large corporate defendant.

## GENERAL ALLEGATIONS

## DEREGULATION OF CABLE INDUSTRY

26.     In 1992, to address the increasing market power of cable operators and "to promote competition in the delivery of diverse sources of video programming and to assure that the widest possible diversity of information sources are made available to the public," Congress passed the Cable Television Consumer Protection Act of 1992.  To further and encourage competition, Congress prohibited local jurisdictions from awarding exclusive franchises for cable systems.  47 U.S.C. § 541(a)(1).

27.     In 1996, Congress passed the Telecommunications Act of 1996, 47 U.S.C. § 251 (the "1996 Act"), to encourage competition, including competition among cable television providers.  Through the 1996 Act, Congress sought to "provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition."  H.R. Cong. Rep. 104-458, 1996 WL 46795, at 1 (1996), U.S. Code Cong. & Admin. News 1996, at 124.

28.     Pursuant to the 1996 Act, 47 U.S.C. § 543, the FCC's authority to regulate the rates charged for non-basic, or cable programming services (those channels that are not on a cable system's basic tier and for which there is no per-channel or per-program charge) was terminated for services provided after March 31, 1999.  Therefore, the rates charged for such cable services are determined by the cable companies themselves.  Neither the FCC nor any state or local entity has the authority to review rates for such cable services or to investigate allegations that such rates are excessive.

## CABLE INDUSTRY:  INCREASED CONSOLIDATION, SKYROCKETING PRICES AND LIMITED CONSUMER CHOICES

29.     Despite Congress' intention of promoting competition in the cable industry to benefit the public, the cable industry has become increasingly consolidated, consumers' choices among cable operators have been eliminated or substantially narrowed, and in monopoly "clusters" created by large cable companies, including Defendant, cable prices have increased significantly more than in areas where competition exists.

30.     In its 2002 report on competition in the cable market, the FCC found that cable companies continue to dominate the market for multichannel video services.  As of June 2002, the FCC determined that cable operators provided video programming to more than three-quarters (76.5%) of all multichannel video subscribers nationwide.  *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Ninth Annual Report*, MB Docket No. 02-145, released December 31, 2002, ("Ninth Video Competition Report") ¶4.   As a result of increased consolidation within the cable industry, as cable operators acquired and traded cable systems and subscribers, the ten largest cable operators serve approximately 85% of all cable subscribers.  *Id.* ¶14.  In 1995, prior to passage of the Telecommunications Act of 1996, the top ten cable companies served approximately 73.22% of all cable subscribers.  *In the Matter of Annual Assessment of the Status of Competition in the Market for Delivery of Video Programming, Second Annual Report*, App. G at Table 2 (1995). In its 2002 report on video competition, the FCC concluded, "The market for the delivery of video programming to households continues to be highly concentrated."  *Ninth Video Competition Report* ¶113.

44303                                              10

31.     The FCC has determined that only approximately 2% of all cable consumers reside in areas with effective competition and only approximately 1.3% of cable consumers are served by an overbuilder (a competing cable system operator).

32.     Studies confirm that competition from another cable company is essential to restrain the prices of a dominant cable provider.   For example,  in its October 2002 report, the United States General Accounting Office (GAO) determined that "the presence of a second cable franchise (known as an overbuilder) does appear to restrain cable prices" and that  "in franchise areas with a second cable provider, cable prices are approximately 17 percent lower than in comparable areas without a second cable provider."  GAO, *Report to the Subcommittee on Antitrust, Competition, and Business and Consumer Rights, Committee on the Judiciary, U.S. Senate: Telecommunications, Issues in Providing Cable and Satellite Television Service (2002) (GAO's 2002 Cable Report),* at 9.  In its October 2003 report, the GAO found that competition from a wire-based cable provider (a competitor using a wire technology, such as a second cable company) is limited to very few (about 2% of) markets; however, in markets where such competition from a second wireline cable company exists, cable rates are significantly lower—by approximately 15%--than cable rates in markets without competition from a second wireline cable operator.  GAO, *Report to the Chairman, Committee on Commerce, Science, and Transportation, U.S. Senate: Telecommunications, Issues Related to Competition and Subscriber Rates in the Cable Television Industry ("GAO's 2003 Cable Report),* at 3, 9 and 10.

33.     The FCC has also found that the prices charged by large cable companies are restrained by the presence of an overbuilder in the market.  In its 2001 annual report on cable prices, the FCC determined, solely based on information provided by cable operators, that cable prices on average were 6.3% lower in areas where the incumbent cable operator faced effective

competition from overbuilders. *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Service, and Equipment,* (2001) ("*2001 Report on Cable Prices*") ¶8. In its 2002 report on cable prices, the FCC determined, again solely based on information provided by cable operators, that cable prices were on average 6.4% lower in areas where the incumbent cable operator encounters effective competition from an overbuilder. *In the Matter of Implementation of Section 3 of the Cable Television Consumer Protection and Competition Act of 1992, Statistical Report on Average Rates for Basic Service, Cable Programming Services, and Equipment* ("*2002 Report on Cable Prices*") ¶28.

34.     By contrast, the presence of competition from a direct broadcast system (DBS) provider does not restrain, or restrains only slightly, the prices of cable services provided by large cable companies. The FCC has determined that in areas where DBS has achieved a degree of market presence, there is no significant effect on prices for cable service. *FCC's 2002 Report on Cable Prices* ¶45. In its October 2002 report, the GAO also found that the presence of DBS companies has not led to lower cable prices. *GAO's 2002 Cable Report,* at 9. In its October 2003 report, the GAO determined that DBS competition is associated with only a slight reduction in cable rates. *GAO's 2003 Cable Report,* at 11.

**DEFENDANT'S CLUSTERING SCHEME**

35.     Defendant's clustering scheme has been perpetrated in part by Defendant's entering into and implementing agreements to exchange or "swap" Defendant's cable customers in other areas of the country for the cable customers of competitor cable system operators in Defendant's cluster in and around Philadelphia, Pennsylvania. Examples of such "swap" agreements entered into by Defendant include the following:

      a.     Comcast and Adelphia Communications Corporation, a Delaware corporation with its office and principal place of business at One North Main Street, Coudersport, Pennsylvania ("Adelphia"), swapped cable television systems, including customers. As part of the swap agreement, which closed on or about December 29, 2000, Comcast received from Adelphia its cable systems and subscribers located mainly in the Philadelphia, Pennsylvania and adjacent New Jersey areas.  In exchange, Adelphia received from Comcast its cable television systems and subscribers in areas in and around Los Angeles, California and in Florida.  (On June 25, 2002, Adelphia filed a petition for reorganization under Chapter 11 of the Unites States Bankruptcy Code.)

      b.     In or about December 2000, Comcast acquired cable television systems and subscribers in Eastern Pennsylvania (Bucks and Berks Counties) and New Jersey through a swap agreement with AT&T's former cable business.  This swap was part of the first stage of an exchange of cable systems, including subscribers, pursuant to which Comcast acquired AT&T cable subscribers in New York, New Jersey, Washington, D.C., Florida, Michigan and in parts of Pennsylvania, and AT&T acquired Comcast cable subscribers in Chicago, Illinois and parts of California, Colorado, Florida, Georgia and Pennsylvania.  In the second stage of this exchange, in or about April 2001, Comcast acquired additional cable systems and subscribers from AT&T, including AT&T subscribers in the Philadelphia area.

36.     Defendant further perpetrated its clustering scheme through a series of acquisitions or purchases of cable systems previously owned by Defendant's competitors, including the following:

      a.     In approximately January 2000, Comcast acquired Suburban Cable (owned by Lenfest Communications, Inc.) in Pennsylvania, including its cable subscribers in

Berks, Bucks, Chester, Delaware and Montgomery Counties, and in New Castle County, Delaware.

b.      In approximately January 2000, Comcast acquired Garden State Cable systems and its subscribers in Southern New Jersey, including Atlantic, Burlington, Camden, Cape May, Cumberland, Gloucester, Mercer and Salem Counties.

c.      In approximately February 1999, Comcast acquired Greater Philadelphia Cablevision, a subsidiary of Greater Media, Inc., thereby acquiring its cable television systems and subscribers in Philadelphia.

d.      In or about April 1998, Comcast acquired Marcus Cable cable television systems and its subscribers in Harrington, Delaware.

37.     As a result of such unlawful "swapping" agreements and transactions described above in paragraph 35, Defendant's potential competitors were removed from Defendant's Philadelphia cluster and Defendant was able to exclude competitors from, and raise prices within, Defendant's Philadelphia cluster.

38.     The purpose and effect of Defendant's conduct in entering into and implementing such unlawful "swapping" agreements and transactions was unreasonably to restrain, suppress and eliminate competition for cable television service in Defendant's Philadelphia cluster.

39.     Defendant's conduct in imposing horizontal territory, market and customer allocations in the manner alleged in this Complaint has had the following effects, among others:

a.      Competition, including price competition, for cable television service has been, and will continue to be restrained, suppressed, and/or eliminated;

b.      Competitors have been, and will continue to be restrained from entering into the areas subject to the allocation agreements;

c.      Defendant has increased prices for cable programming services to artificially high, non-competitive levels and, unless enjoined, will continue to maintain prices at such levels; and

d.      Cable subscribers have been, and will continue to be deprived of the benefits of free and open competition.

40.      Pursuant to the swapping agreements described above in paragraph 35, Defendant has not competed in the cable television markets in which it exchanged subscribers in the "swap" agreements, and the other cable operators involved in such "swapping" agreements have not competed against Comcast in its cluster in and around Philadelphia, Pennsylvania.

41.      According to their own submissions to the FCC in connection with Comcast's acquisition through merger of AT&T's cable business, Comcast and AT&T did not compete against each other in their respective cable television markets before the companies combined, the companies did not study or evaluate the feasibility of such competition and the companies did not intend to compete in each other's cable markets.

42.       Within its cluster in and around Philadelphia, Pennsylvania, Defendant has raised its rates for non-basic cable services above the rates that would be charged in a competitive environment.

## VIOLATIONS ALLEGED

## COUNT I

### *Per Se* Violation of Section 1 of the Sherman Act

43.      Plaintiffs incorporate paragraphs 1-42 as if fully set forth herein.

44.      Defendant has engaged in a strategy of allocating territories, markets and customers among competitors at the same level of the cable television market structure.

45.     Defendant has imposed horizontal market restraints, specifically the allocation of territories, markets and customers through agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies.  Examples of such "swapping" agreements and transactions are set forth above in paragraph 35.

46.     Defendant's conduct of imposing horizontal territory, market and customer allocations by entering into and implementing unlawful "swapping" agreements, arrangements or devices constitutes a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

47.     As a proximate result of the horizontal territory, market and customer allocations effected through the "swapping" agreements entered into and implemented by Defendant, Plaintiffs and members of the Class have paid more, and will continue to pay more for cable programming services than they would have otherwise paid, and accordingly have suffered, and will continue to sustain injury and damages in an amount to be determined according to proof at the time of trial.

## COUNT II

### Monopolization

48.     Plaintiffs incorporate paragraphs 1 through 47 as if fully set forth herein.

49.     The relevant geographic market is Defendant's Philadelphia cluster, as defined in paragraph 19. a. (2).

50.     The relevant product market is defined as multichannel video programming services, which are distributed by multichannel video programming distributors ("MVPDs"), including cable television operators such as Defendant, overbuilders and direct broadcast satellite operators.

51.     Defendant possesses monopoly power in the relevant product market within the relevant geographic market.

52.    Upon information and belief, Defendant controls approximately 85% of cable subscribers within the relevant geographic market.  Upon information and belief, Defendant possesses at least an 80% share of the relevant product market within the relevant geographic market.

53.    Defendant has willfully obtained or maintained its monopoly through anticompetitive means as set forth in this Complaint, including, without limitation, the following paragraphs 54 - 65.

54.    Defendant has imposed unreasonable, horizontal market restraints, specifically the allocation of territories, markets and customers through agreements to "swap" or exchange cable television assets, including subscribers, with other cable companies in order to monopolize the relevant geographic market.  Examples of such "swapping" agreements and transactions are set forth above in paragraph 35.

55.    As a result of such unlawful "swapping" agreements and transactions, Defendant's potential competitors were removed from the relevant geographic market and Defendant was able to exclude competitors from, and raise prices within, the relevant geographic market.  The purpose and effect of such "swapping" agreements and transactions was unreasonably to restrain, suppress and eliminate competition for cable television service in the relevant geographic market.

56.    Defendant's conduct of imposing horizontal territory, market and customer allocations by entering into swapping agreements, arrangements or devices, which is unlawful as a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1, constitutes anticompetitive conduct through which, in part, Defendant has willfully acquired or maintained monopoly power in the relevant market.

57.     Defendant has further engaged in conduct excluding or preventing competition in the relevant market, including competition from an overbuilder, RCN Telecom Services, Inc. ("RCN"), based in Princeton, New Jersey.

58.     Upon information and belief, Defendant initially refused to provide to, and then provided only on a short-term basis to RCN, a competitor of Defendant, access to essential video programming, including sports programming, controlled by Defendant and needed by competitors such as RCN in order to gain entry into, and compete against Comcast in the relevant geographic market.

59.     Defendant holds a majority ownership interest (a 78% ownership interest) in "Comcast Sportsnet," a regional sports network which provides professional sports video programming in the Philadelphia area.  Defendant owns a majority interest in two major-league sports franchises, the Philadelphia Flyers National Hockey League franchise and the Philadelphia 76ers National Basketball Association franchise; Philadelphia's two major indoor sports arenas; and several minor league baseball and hockey teams.  Defendant's "Comcast Sportsnet" carries a majority of the regular season games of the Philadelphia Flyers and the Philadelphia 76ers', as well as Philadelphia Phillies' baseball games.  Upon information and belief, Defendant owns exclusive rights to broadcast games of the Philadelphia Kixx of the national soccer league, and football and basketball games of regional colleges and universities.  Defendant distributes its "Comcast Sportsnet" video programming terristerially, thereby allowing Defendant to avoid the program access rules of the Cable Television Consumer Protection and Competition Act of 1992, which are designed to provide competitive access to vertically integrated satellite service programming, and which require vertically integrated cable operators such as Defendant to make satellite-delivered cable programming available to rival MVPDs at reasonable and non-

discriminatory terms.  "Comcast Sportsnet" offers a significant competitive marketing advantage, access to which is critically important for competitors to be able to compete against Defendant.

60.     Upon information and belief, Defendant has refused to provide access to Comcast Sportsnet to RCN on a long-term basis.  Defendant has refused to enter into a stable, multi-year contract for local sports programming via "Comcast Sportsnet" in Philadelphia with RCN, but, instead, has provided such essential programming to RCN only on the basis of short-term contracts, denying RCN access to a long-term contract that is standard in the industry.

61.     Upon information and belief, Defendant has interfered with RCN's access to contractors needed by RCN to build and offer competing cable television services in Defendant's cluster in the Philadelphia area.  Upon information and belief, Defendant has prevented, or attempted to prevent, certain contractors in the Philadelphia, Pennsylvania market from doing business with RCN by entering into or enforcing non-compete clauses in contracts between Defendant (or its predecessor, Suburban Cable) and contractors, by threatening contractors with loss of work from Comcast if the contractors perform work for RCN, and/or by otherwise interfering with access by RCN to needed contractor and construction services in the relevant geographic market.

62.     Defendant has targeted marketing campaigns and price discounts to areas in which an overbuilder has begun providing competitive services.  For example, in or about the summer of 2000, RCN entered Delaware County, Pennsylvania communities served by Defendant, including Folcroft, Pennsylvania.  Upon information and belief, in an attempt to prevent or delay competition from, or lock out RCN, Defendant, beginning in or around March 2000 and prior to RCN's entry into the market, organized a "Swat Team" of sales representatives and directed sales representatives to sign up Comcast's customers in Folcroft, Pennsylvania, to eighteen-month

contracts in exchange for lower prices for their cable services.  Defendant paid its sales

representatives special commissions and bonuses for signing up such customers to eighteen-

month contracts.  These contracts provided for a penalty in the event the customer subsequently

canceled the contract and switched cable providers.  Defendant directed its sales representatives

not to inform Comcast customers who were signing up to the eighteen-month contracts of RCN's

anticipated entry into the market.

      63.    In approving the joint applications filed by Comcast Corporation and AT&T for

approval to transfer control of certain licenses, the FCC stated that it was not limited by antitrust

law principles and applied standards different from those of antitrust enforcement authorities.  *In

the Matter of Applications for Consent to the Transfer of Control of Licenses from Comcast

Corporation and AT&T Corp., Transferors, to AT&T Comcast Corporation, Transferee*, MB

Docket No. 02-70, Memorandum Opinion and Order, released November 14, 2002, at ¶ 28.

Nevertheless, in its Memorandum and Order, the FCC, in its discussion of complaints by certain

overbuilders, including RCN, alleging that Comcast engaged in targeted pricing discounts,

reported as follows:

> ¶ 120.  *Discussion*.  Although the Applicants deny that they have engaged in
> predatory pricing behavior, their representations leave open the substantial
> possibility that the Applicants may well have engaged in questionable marketing
> tactics and targeted discounts designed to eliminate MVPD competition and that
> these practices ultimately may harm consumers. We also disagree with
> Applicants' claim that targeted discounts merely reflect healthy competition; in
> fact, although targeted pricing between and among established competitors of
> relatively equal market power may be procompetitive, targeted pricing discounts
> by an established incumbent with dominate market power may be used to
> eliminate nascent competitors and stifle competitive entry.
>
> ¶ 121 … We do not agree with Applicants that targeted pricing enhances
> competition.  To the contrary, targeted pricing may keep pricing artificially high
> for consumers who do not have overbuilders operating in their areas because of
> the overbuilders' inability to compete against an incumbent who uses such

> strategies.  Thus, we believe that targeted pricing as described in this record could harm MVPD competition.
>
> …
>
> ¶ 122.  Mounting consumer frustration regarding secretive pricing practices and the threat that such practices pose to competition in this market suggests, however, that regulatory intervention may be required either at the local, state, or federal level ….

*Id.*, at 47-48.

64.     Potential cable company competitors, including overbuilders, to large incumbent cable operators such as Defendant face significant barriers to entry into the market.  These high barriers to entry into the MVPD market faced by potential cable company competitors, include, among other things, overcoming the significant capital costs required for entry; obtaining the necessary cable franchises from local governmental authorities; accessing essential video programming, including local sports programming; overcoming the "clustering" scheme engaged in by Defendant and other large cable operators; and overcoming anticompetitive acts and practices of the incumbent monopolist cable company, including Defendant's acts and practices as set forth in this Complaint.

65.     Defendant's willful acquisition or maintenance of monopoly power in the relevant market was the result of the exclusionary, anticompetitive conduct alleged in this Complaint. Such conduct by Defendant includes, among other things, entering into and implementing illegal agreements with other cable companies to allocate territories, markets and customers through the "swapping" of cable television systems and subscribers, in order to create Defendant's Philadelphia cluster; threatening to deny or withhold from RCN, an overbuilder, essential sports programming and providing such programming only on a short-term basis, contrary to industry standard long-term programming contracts; interfering with RCN's access to contractors needed to build competing cable television facilities and systems in the relevant geographic market; and

engaging in targeted pricing and sales practices aimed at areas in which Comcast may face competition from an overbuilder, such as RCN.

66.     Defendant exercised its monopoly power by raising prices for its cable television subscribers to artificially high, noncompetitive levels within the relevant geographic market.

67.     Defendant's anticompetitive conduct in the relevant market, as set forth in this Complaint, has had the following effects, among others:

a.     Competition, including price competition, for cable programming services has been, and will continue to be restrained, suppressed and/or eliminated;

b.     Competitors or potential competitors have been, and will continue to be restrained from entering into the relevant market;

c.     Defendant has increased prices for cable services to artificially high, noncompetitive levels and, unless enjoined, will continue to maintain prices at such levels; and

d.     Subscribers to cable services have been, and will continue to be deprived of the benefits of free and open competition.

68.     Defendant's willful acquisition or maintenance of monopoly power was not the result of a superior product, business acumen or historical accident.

69.     There is no legitimate procompetitive business justification for the anticompetitive actions and conduct which facilitated Defendant's monopolization of the relevant market.

70.     Defendant's possession and willful acquisition or maintenance of monopoly power in the relevant market and Defendant's exclusionary, anticompetitive conduct as alleged in this Complaint violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

71.     Plaintiffs and members of the Class were injured in their business or property by Defendant's monopolization of the relevant market as alleged in this Complaint.  Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to pay higher prices for cable television in the relevant market than they would have paid in the absence of Defendant's unlawful conduct.

## COUNT III

### Attempted Monopolization

72.     Plaintiffs incorporate paragraphs 1 - 71 as if fully set forth herein.

73.     Defendant has engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to monopolize the relevant product market in the relevant geographic market.

74.     Defendant's conduct as set forth in this Complaint constitutes and demonstrates a dangerous probability of Defendant achieving monopoly power in the relevant product market in the relevant geographic market.

75.     Defendant's attempt to monopolize the relevant product market in the relevant geographic market constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

76.     Plaintiffs and members of the Class have been injured in their business or property by Defendant's attempt to monopolize the relevant market as alleged in this Complaint.  Without limiting the generality of the foregoing, Plaintiffs and members of the Class have been forced to pay higher prices for cable television in the relevant market than they would have paid in the absence of Defendant's unlawful conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request:

A.      That this action may be maintained as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and that reasonable notice to the Class be provided in compliance with Fed. R. Civ. P. 23(c)(2);

B.      That the Court adjudge and decree that the horizontal territory, market and customer allocation agreements alleged in this Complaint are unreasonable restraints of trade in violation of Section 1 of the Sherman Act;

C.      That the Court adjudge and decree that Defendant Comcast Corporation's conduct as alleged in this Complaint constitutes unlawful monopolization, or attempted monopolization, in violation of Section 2 of the Sherman Act;

D.      That judgment be entered against Defendant and in favor of the Plaintiffs and the members of the Class for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

E.      That the judgment so entered include trebling of damages determined to have been sustained by Plaintiffs and the members of the Class for damages as allowed by law, together with costs of suit (including expert costs), and reasonable attorney fees as provided by law;

F.      That Defendant be enjoined from continuing the unlawful monopolization, or attempt to monopolize conduct alleged in this Complaint;

G.      That the Court award Plaintiffs and members of the Class pre-judgment and post-judgment interest as permitted by law; and

H.      That the Court award Plaintiffs and members of the Class such other and further relief as may be necessary and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues triable of right by a jury.

DATED: December 8, 2003, 2003.

_____
Anthony J. Bolognese (#36937)
Joshua H. Grabar (#82525)
BOLOGNESE & ASSOCIATES, LLC
1617 JFK Blvd., Suite 650
Philadelphia, PA  19103
Tel:  (215) 814-6750
Fax:  (215) 814-6764

Marc H. Edelson (#51834)
HOFFMAN & EDELSON
45 West Court Street
Doylestown, PA  18901
Tel:  (215) 230-8043
Fax:  (215) 230-8735

Ann D. White
Carol A. Mager
MAGER WHITE & GOLDSTEIN, LLP
One Pitcairn Place, Suite 2400
165 Township Line Road
Jenkintown, PA 19046
Tel:  (215) 481-0273
Fax:  (215) 481-0271

Samuel D. Heins
Stacey L. Mills
Alan I. Gilbert
Daniel C. Hedlund
David Woodward
HEINS MILLS & OLSON, P.L.C.
3550 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
Tel:  (612) 338-4605
Fax:  (612) 338-4692

Barry Barnett
Max Tribble, Jr.
SUSMAN GODFREY LLP
901 Main Street, Suite 4100
Dallas, TX  75202
Tel:  (214) 754-1900
Fax:  (214) 754-1933

44303

Jonathan Shaw
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3100
Seattle, WA  98101
Tel:  (206) 516-3836
Fax:  (206) 516-3883

Robert N. Kaplan
Gregory K. Arenson
Christine M. Fox
KAPLAN FOX & KILSHEIMER LLP
805 Third Avenue, 22nd Floor
New York, NY  10022
Tel:  (212) 687-1980
Fax:  (212) 687-7714

Lynn Lincoln Sarko
Mark A. Griffin
John H. Bright
Raymond J. Farrow
KELLER ROHRBACK, L.L.P.
1201 Third Avenue, Suite 3200
Seattle, WA  98101
Tel:  (206) 623-1900
Fax:  (206) 623-3384

Michael Hausfeld
Stewart Weltman
COHEN, MILSTEIN, HAUSFELD
& TOLL, P.L.L.C.
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Tel:  (202) 408-4600
Fax:  (202) 408-4699

**Counsel for Plaintiffs**