# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLINE BEHREND, et al. | : | CIVIL ACTION |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| COMCAST CORPORATION, et al. | : | NO. 03-6604 |

## MEMORANDUM

**Padova, J.**                                                      **October 9, 2007**

## I.    INTRODUCTION

In a Memorandum and Order dated May 2, 2007, the Court certified a class consisting of all cable television customers who subscribed at any time since December 1, 1999, to video programming services other than just basic cable ("Expanded Basic cable") from Comcast Corporation in the so-called Philadelphia cluster.  Behrend v. Comcast Corp., Civ. A. No. 03-6604, 2007 WL 1300725 (E.D. Pa. May 2, 2007) ("the Philadelphia certification.")  Presently before the court is a motion to certify a similar class of Comcast subscribers who reside in the so-called Chicago cluster.  For the following reasons, we grant the motion.

## II.   BACKGROUND

The named Chicago Plaintiffs, Joan Evanchuk-Kind and Eric Brislawn, seek to represent a class comprised of:

All cable television customers who subscribe or subscribed at any time since December 1, 1999, to the present to video programming services (other than solely

> to basic cable services) from AT&T and/or Comcast, or any of their subsidiaries or affiliates in Comcast's Chicago cluster. The class excludes government entities, Defendants, Defendants' subsidiaries and affiliates and this Court.

(Third Amended Complaint ¶ 31.b(2)). The claims of the Chicago Class, which are nearly identical to the claims of the Philadelphia Class, are brought pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, for violations of Sections 1 (Count I) and 2 (Counts II and III) of the Sherman Act, 15 U.S.C. §§ 1, 2. The Third Amended Complaint (the "Complaint") alleges that Comcast, through its predecessor in interest AT&T, acquired cable systems and cable subscribers from its competitors in the Chicago cable market until the number of competing cable providers in those markets was substantially reduced. (Complaint ¶¶ 3, 49, 51, 53.) Comcast and AT&T then entered into agreements to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers. (Id. ¶ 4.) (The challenged acquisitions and swap agreements are collectively "the Transactions.") The alleged result of the Transactions was that Comcast willfully obtained and maintained monopoly power in the relevant Philadelphia geographic market and, through its predecessor in interest AT&T, in the relevant Chicago geographic market. The Classes define the geographic markets as Comcast's cable franchises located in Philadelphia and Chicago and geographically contiguous areas and areas in close geographic proximity to Philadelphia and Chicago in designated counties (hereinafter the Philadelphia and Chicago "clusters"). (Id. ¶ 31.)

## III.   CLASS CERTIFICATION

### A.   Burden of Proof

A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Federal Rule of Civil Procedure 23. Johnston v. HBO Film Mgmt., Inc.,

265 F.3d 178, 183-84 (3d Cir. 2001).  To meet this burden, Plaintiffs must satisfy the four prerequisites of Rule 23(a) and show that the action can be maintained under at least one of the subsections of Rule 23(b).  Id.; (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997)).

The United States Court of Appeals for the Third Circuit has recognized the utility, and often the necessity, of looking beyond the pleadings at the class certification stage of litigation.  See Newton v. Merrill Lynch, Pierce Fenner & Smith, Inc., 259 F.3d 154, 168-69 (3d Cir. 2001) ("In reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action.").  However, "it is not necessary for the plaintiffs to establish the merits of their case at the class certification stage."  Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir.2004).  Moreover, "in determining whether a class will be certified, the substantive allegations of the complaint must be taken as true."  Id.  In addition, "'the interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing a class action."  Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985) (quoting Kahan v. Rosenstiel, 424 F.2d 161, 169 (3d Cir. 1970).

B.  The Class Certification Record

The Chicago Plaintiffs rely upon the same expert report submitted with the Philadelphia Class certification motion, along with excerpts of their, and their expert's, depositions.  Comcast has submitted an updated report from its own expert, along with attorney declarations, exhibits and deposition excerpts.  Finally, Plaintiffs have submitted a new rebuttal expert report in response to the updated expert report submitted by Comcast.

1.  <u>Dr. John C. Beyer</u>

The Chicago Plaintiffs rely on reports submitted by John C. Beyer, Ph.D. in support of the Motion for Certification of the Philadelphia Class, which we summarized in our May 2, 2007 opinion.  Dr. Beyer has been an economist for 36 years, employed by the Ford Foundation and was a guest scholar at the Brookings Institution.  He is now president of Nathan Associates, Inc.  His received his Ph.D. from Tuft's University Fletcher School of Law and Diplomacy.  (Updated Dec. Of John C. Beyer at ¶¶ 1-2.)  He was retained to determine whether Comcast violated §§ 1 and 2 of the Sherman Act through "the imposition of horizontal market restraints arising from the swapping of cable systems with actual and potential competitors, and acquiring cable systems from actual and potential competitors, and the alleged unlawful acquisition and maintenance of monopoly power by building clusters of cable systems" in the Philadelphia and Chicago areas.  (<u>Id.</u> ¶ 4.)

Dr. Beyer based his opinions on an examination of the economic characteristics of the market for subscription television programming.  (<u>Id.</u> ¶ 6.)  He reached the following conclusions based on that examination:

1.  The product supplied is essentially the same for all Class members within each cluster area.  They all purchased packaged cable TV programming from Comcast, which included at least Comcast's "expanded basic" tier of television channels and which is fundamentally the same for all subscribers in each cluster.  (<u>Id.</u> ¶¶ 7(a), 23-25.)

2.  Comcast has market power in the Philadelphia and Chicago markets as a consequence of its building clusters of cable systems, which increased its monopoly power and raised entry barriers for potential competitors (multiple cable system operators, companies that previously competed in the markets but were removed and did not reenter those markets, other cable

-4-

companies and overbuilders[1]).  Comcast also has market power because it does not face

sufficient competition to constrain prices.[2]  Dr. Beyer considers competition from satellite

providers and overbuilders in the relevant clusters to be insufficient to constrain prices; since

purchasers of Comcast's services can not avoid its exercise of market power, prices for its

services are higher as a result of the alleged antitrust violations.[3]  (Id. ¶¶ 7(b), 26-32.)

3.      Class members in each cluster are similarly impacted by Comcast's pricing decisions, with

        each paying the same price for Expanded Basic, that price becoming common under Comcast

        ownership, and having increased as a consequence of Comcast's increased market power.[4]

        (Id. ¶¶ 7(c), 23, 33-36.)

4.      Price increases for Expanded Basic has been nearly the same across all systems in each

        cluster.  (Id. ¶ 7(d).)

5.      Subscribers would benefit from effective competition in each market area, because it would

        result in lower prices.  (Id. ¶ 7(e).)

Dr. Beyer also states that there are accepted methodologies available to quantify damages related to

---

[1] "Overbuilder" is the term given for a cable company engaged in the business of constructing cable infrastructure for the purpose of competing directly against other cable providers in the same franchise zone.

[2] According to Beyer, Comcast controls 87% of the market in the Philadelphia cluster and 61% in the Chicago cluster.  (Id. ¶ 27.)

[3] Beyer states that systems within clusters have prices 2.4% higher than non-cluster systems. (Id. ¶ 29.)  When a system is affiliated with a multiple system operator ("MSO"), prices are 13.7% higher.  (Id.)  When there is competition from an overbuilder, prices are 15% lower.  (Id. ¶ 30.)

[4] Beyer opines that prices in the Philadelphia cluster have increased at an average annual rate of 10.8%, and in Chicago at 9.7%.  The average for price increases for systems facing "effective competition" was only 5.8%.  (Id. ¶ 36.)

the antitrust violations.  (Id. ¶ 8.)  He has identified two benchmarks from pricing patterns of other cable systems to estimate the class-wide economic impact of Comcast's activities: the supra-competitive overcharge and the supra-competitive rate of price increase.  (Id. ¶¶ 8; 40.)  He opines that the supra-competitive overcharge is 15%, which percentage was established by comparing the prices of systems with overbuild competition.  He opines that the supra-competitive rate of price increase for the "expanded basic tier" of programming in the Chicago and Philadelphia clusters has been almost double the average rate of increase for equivalent cable systems across the United States since 1999.  (Id.)

### 2.  Dr. Stanley Besen

Comcast has submitted a report from its expert, Dr. Stanley Besen, which is specific to the antitrust issues raised in the formation of the Chicago cluster.  Dr. Besen holds a Ph.D. in economics from Yale, has taught at Rice University, and is now vice-president of CRA International.  (Expert Report of Dr. Stanley M. Besen at ¶ 1.)  He was previously employed by the Federal Communications Commission and the RAND Corporation.  (Id.)  Dr. Besen was retained by Comcast to assess and respond to Dr. Beyer's expert report.

Dr. Besen opines that Dr. Beyer's analysis presents no convincing evidence to support the claim that the Transactions that led to the formation of the Chicago cluster have eliminated potential competitors and increased Comcast's ability to raise prices.  (Id. ¶ 7.)  He further opines that Beyer' analysis is both misleading and incomplete because:  (1) he does not explain how the acquisitions and the Transactions have resulted in a class-wide impact (Id. ¶ 9(a));  (2) the data does not show that Comcast's behavior led to higher prices throughout the cluster; indeed one-third of class members have experienced a *decrease* in price per channel (Id. ¶ 9(b));  (3) he has presented no evidence that

the Transactions eliminated Comcast's most likely potential competitors, incumbent local exchange operators and broadband service providers (Id. ¶ 10); (4) Dr. Beyer's methodology for determining class-wide impact, the "supra-competitive overcharge," is flawed because it is based on an analysis of *actual* competition, while the class allegations concern *potential* competition (Id. ¶ 12); and (5) Dr. Besen's own review of Dr. Beyer's data indicates that a substantial number, and probably all of the members of the Class have experienced no impact from Comcast's behavior and have benefitted in terms of increased channel offerings (Id. ¶¶ 13.).

Dr. Besen opines that the three transactions that resulted in Comcast's position in the Chicago cluster – AT&T's acquisitions of TCI and Media One and its swap with Comcast to acquire the former Prime Cable franchises – have affected neither actual nor potential competition because the transactions did not eliminate any overbuilders.  (Id. ¶ 20-21.)  He states that the evidence of class-wide price increases on which Beyer relies is unrelated to these acquisitions.  He states that approximately one-third of the members of the proposed Class experienced actual price decreases when price is analyzed in conjunction with channel offerings, a price per channel analysis.  (Id. ¶ 20.)  He estimates that as many as 19% of the putative Chicago class members live in franchise areas that are served at least in part by a cable overbuilder, and thus those subscribers continue to have a choice of cable providers irrespective of Comcast's acquisitions and swaps.  (Id. ¶ 24.)  Dr. Besen also contests Dr. Beyer's conclusion that the acquired cable systems were potential overbuilder entrants into areas served by Comcast because there was no realistic possibility that they "would actually enter in an effective way," given the time and expense entry barriers specific to the cable industry.  (Id. ¶ 25-26.)  He argues that a proper analysis of common impact must take into consideration his price per channel metric, which would show that one-third of Chicago subscribers, including

Plaintiff Evanchuk-Kind, have experienced a decrease in price per channel, and that there is substantial variability in the change in price per channel across the cluster.  (Id. ¶ 36-43.)

Besen also takes issue with Beyer's two methods for gauging common impact, the supra-competitive overcharge and supra-competitive rate of price increase.  He opines that both methods are based on comparisons between overbuilt and non-overbuilt areas, implicitly assuming that, but for Comcast's behavior, overbuilding would have occurred.  (Id. ¶ 48.)  He rejects these methods based on his own opinion that overbuilding is extremely rare, and because the methods are based on the effects of actual overbuilding and thus do not measure the effects of a change in the extent of potential competition.  (Id.)

    3.    <u>Dr. Beyer's Response</u>

Dr. Beyer has prepared a Declaration in response to Dr. Besen's report in which he opines that Dr. Besen's conclusions regarding his common impact and common damages methodologies are flawed because Dr. Besen erroneously focuses upon:  (1) his own metric of price per channel; (2) each acquisition and swap individually, rather than their cumulative effect, i.e., the totality of activity resulting in the formation of the Chicago cluster, which enhanced Comcast's market power and raised entry barriers, further suppressing competition and entry by competitors; (3) the proximity of each acquired system and the timing of the acquisition, neither of which Dr. Beyer uses as bases for his analysis; (4) a distinction between "actual" and "potential" competition, which Dr. Beyer asserts is irrelevant to his proposed benchmark methods for estimating class-wide impact from Comcast's alleged acquisition of market power because he uses potential competition from eliminated overbuilders only to demonstrate the price constraining effect of competition; and (5) the scope of overbuilder competition because Besen considers an entire franchise area as impacted by

an overbuilder in his analysis, even if the overbuilder offers service to only a portion of the subscribers in that area.  (Beyer Resp. Decl. ¶ 4(a)-(e).  Rather, Dr. Beyer asserts, his opinions on class-wide impact are based on: (1) his observation and assessment of Comcast's acquisition of the Chicago cluster; (2) its elimination of actual and potential competition from those cable companies who have exited the cluster region; and (3) its effect of raising entry barriers for other potential competitors, resulting in increased market power in the cluster region, and enabling the further increase in already supra-competitive prices to higher levels than would have prevailed otherwise. (Id. ¶ 6.)  He reiterates that the price constraining effect of potential competition, and the increase in market power from the reduced threat of potential competition, are concepts that are commonly understood and accepted by economists.  (Id.)

     C. The Requirements of Rule 23(a)

To be certified as a class, plaintiffs must satisfy Federal Rule of Civil Procedure 23(a).  Rule 23(a) provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  Commonly referred to as numerosity, commonality, typicality, and adequate representation, these four requirements are "meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances." Baby Neal v. Casey, 43 F.3d 48, 55 (3d Cir. 1994).

1. Numerosity

"Numerosity requires a finding that the putative class is so numerous that joinder of all members is impracticable." Newton, 259 F.3d at 182 (quoting Fed. R. Civ. P. 23(a)(1)). "No magic number exists satisfying the numerosity requirement. . . ." Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D.Pa. 1989) (citations omitted). However, classes of forty or more are generally approved. See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).

We find that the numerosity requirement of Rule 23(a)(1) is clearly satisfied in this case. The number of individuals in the putative Class – literally millions[5] – would make joinder of all members impracticable.

2. Commonality

To satisfy the commonality requirement, plaintiffs must show the existence of at least one question of law or fact common to the class. Fed. R. Civ. P. 23(a)(2); Johnston, 265 F.3d at 184. "Commonality does not require an identity of claims or facts among class members; instead, the commonality requirement will be satisfied if the named plaintiffs share at least one common question of fact or law with the grievances of the prospective class." Johnston, 265 F.3d at 184 (quoting In re Prudential Ins. Co. of Am. Sales Practices Litig., 148 F.3d 283, 310 (3d Cir. 1998) (internal quotations omitted). With respect to the related criteria of commonality and typicality, the Third Circuit has recognized that courts have "set a low threshold for satisfying both requirements." Newton, 259 F.3d at 183.

Plaintiffs assert that they have identified numerous common questions of law and fact

---

[5]Plaintiffs allege the number exceeds 1.7 million based on Comcast's 2005 and 2006 Annual Report estimating its cable subscribers in the Chicago market at 1.6 million.  (Pl. Supp. Mem. at 7.)

including:

- whether Comcast's conduct in entering into the agreements allocating markets with competitors violates Sherman Act § 1, including as a per se violation;

- whether Comcast's acquisitions of competitor cable companies and subscribers in the Chicago cluster constitute contracts and conduct in restraint of trade in violation of Sherman Act § 1;

- whether Comcast's actions, in possessing and willfully acquiring or maintaining monopoly power in, or attempting to monopolize, the Chicago market violates Sherman Act § 2;

- whether Comcast's conduct caused prices for cable to be artificially high and not competitive;

- whether Plaintiffs and the Class were injured by Comcast's conduct;

- the measure of damages by which Comcast's conduct injured Plaintiffs and the Class; and

- whether Plaintiffs and the Class are entitled to injunctive relief.

(Pl. Supp. Mem. at 8.)  These are the same common questions the Philadelphia Class identified in its motion to certify.  See Behrend, 2007 WL 1300725, *7.

Although Comcast raises significant arguments under Fed. R. Civ. P. 23(b) that common questions do not predominate, it does not argue that there are no common questions.  We find that the commonality requirement of Rule 23(a)(2) is clearly satisfied since named plaintiffs share common questions of fact or law with the grievances of the prospective class.

### 3. Typicality

To satisfy the typicality requirement, "the claims of the class representatives must be typical of the class as a whole." Johnston, 265 F.3d at 184. Typicality "entails an inquiry whether 'the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based.'" Eisenberg, 766 F.2d at 786.

Even if there are pronounced factual differences among the plaintiffs, typicality is satisfied as long as there is a strong similarity of legal theories and the named plaintiffs do not have unique circumstances. See Johnston, 265 F.3d at 184 ("Indeed, so long as the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences.") (quotation omitted); Baby Neal, 43 F.3d at 58 ("Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice."); Hoxworth v. Blinder, Robinson & Co. Inc., 980 F.2d 912, 923 (3d Cir. 1992) ("'Factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the [absent] class members, and if it is based on the same legal theory.'" (quoting Grasty v. Amalgamated Clothing & Textile Workers Union, 828 F.2d 123 (3d Cir. 1987)). Typical does not mean identical, and if necessary a court may sever claims or use subclasses to treat individual issues separately. Eisenberg, 766 F.2d at 786.

Plaintiffs argue that their antitrust claims are based on the same legal theories as those of all class members and arise from the same course of conduct that underlie the class claims. (Pl. Supp. Mem. at 11-13.) Thus, they satisfy typicality. (Id. at 12-13.) Comcast argues that the Sherman Act

§ 1 *per se* claim, being predicated solely on the swap transaction between Comcast and AT&T in December 2000, in which AT&T acquired only two franchises in the Chicago cluster, cannot be the basis for certifying a class of 1.7 million subscribers across 313 franchise areas.  In addition, Comcast asserts that, because neither of the named plaintiffs resided in one of the two swapped franchise areas, they are atypical of the remainder of the class because proof of their claims would not necessarily prove the *per se* claims of those who resided in the two franchise areas actually swapped.

The named plaintiffs respond that they, like all members of the proposed class, were injured not just by the swap of the two franchise areas, but more broadly by the formation of the Chicago cluster which permitted Comcast to attain market power and charge supra-competitive prices to all subscribers, regardless of the franchise area in which they reside.  They rely on Dr. Beyer's response to Dr. Besen's report, in which Dr. Beyer opined that focusing on the acquisitions and swaps individually and in isolation was improper.  Dr. Beyer opined that the violations impacted all members of the proposed class through the payment of higher prices than would have otherwise prevailed in a competitive market.

We find that Comcast seeks to create a distinction among class members that the Class itself does not rely upon in formulating its antitrust claims.  The Chicago Class's legal theories do not vary based on where the proposed class members reside.  Rather, Plaintiffs assert class-wide impact based on the totality of Comcast's conduct with respect to the formation of the Chicago cluster.  They maintain, based upon Dr. Beyer's analysis, that it is irrelevant where a cable system is located within the cluster or whether a subscriber lives in a "legacy" franchise area, because location within the cluster has no impact on the prices Comcast charges its customers, and thus has no relevance to the

Class's damage analysis.  (Pl. Reply Mem. 4-5.)

We agree that an individual class member's location within the Chicago cluster does not impact typicality.  Comcast's argument is based on an interpretation of the § 1 *per se* claim that is far narrower than what the Complaint alleges.  Plaintiffs allege that the horizontal market allocation arose from the formation of the cluster, not just Comcast's first two acquisitions.  As we previously stated,

> [w]e perceive no reason how living near a border can create antagonism between the named Plaintiffs and the class when the Plaintiffs do not themselves seek to differentiate their damages based on proximity.  Plaintiffs claim that they are merely passive victims of Comcast's allegedly anticompetitive activity.

Behrend, 2007 WL 1300725, *9.  As Plaintiffs' *per se* claim is based upon the entirety of the conduct that led to the acquisition of the Chicago cluster, the subscribers that resided in the first components of the cluster are not differently situated merely because they were the first Comcast, nee AT&T, subscribers in Chicago.  Typicality bars a "marked difference" between the class and the named plaintiff's individual circumstances or legal theory.   Hassine, 846 F.2d at 177.  Factual differences – such as living in the first franchise area the former AT&T acquired versus living the last – are insufficient to defeat typicality so long as there is a strong similarity of legal theories and the named plaintiffs do not have unique circumstances.  Johnson, 265 F.3d at 184.  We find that there is nothing about the location in which they reside within the Chicago cluster that markedly differentiates the named plaintiffs from the class in regard to the theory upon which their § 1 *per se* claim is based.

Comcast also argues, based on Dr. Besen's statistics, that, because as many as 19-20% of the putative Chicago Class are subscribers who reside in franchise areas that are also served by an

overbuilder, a substantial portion of the class is differently situated under the Plaintiffs' own legal theory.  Plaintiffs argue that the 20% figure is fallacious.  According to Dr. Beyer, Dr. Besen jumped to the conclusion that 20% of subscribers had a choice of cable provider by including *every* subscriber in a franchise area that had *any* coverage by an overbuilder, not just those subscribers that actually had access to cable service by an overbuilder, and thus any real competition for their business.  Dr. Beyer opines that Dr. Besen artificially inflated this percentage by assuming, without basis, that every subscriber had a choice when there is nothing in the record to suggest that each franchise with an overbuilder was 100% overbuilt.  Dr. Besen has, in fact, acknowledged that "what limited [overbuilder] entry has occurred took time and, when it occurred, it was often partial rather than complete."  (Def. Ex. 8 ¶ 33.)

On the basis of the class certification record, we cannot say that Dr. Besen's assertion of the extent of overbuild competition is sufficient to negate a conclusion that the Class has met its burden of demonstrating typicality.   Dr. Besen's focus on the percentage of subscribers covered by an overbuilder to attack typicality, even if accurate, simply does not address whether all member of the class have paid higher prices as a result of the formation of the Chicago cluster, the *sine quo non* of the Class's antitrust theory.  Accordingly, we find that the legal theories upon which the claims of the named plaintiffs are based are typical of the claims of class.

### 4.  Adequacy of Representation

Class representatives must "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  The adequate representation requirement of Rule 23(a)(4) guarantees "that the representatives and their attorneys will competently, responsibly, and vigorously prosecute the suit and that the relationship of the representative parties' interests to those of the class are such that there

-15-

is not likely to be divergence in viewpoint or goals in the conduct of the suit." Bogosian v. Gulf Oil Corp., 561 F.2d 434, 449 (3d Cir. 1977).    Adequacy of representation depends on all of the circumstances surrounding each case. Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975).  The burden is on the defendant to prove that the representative plaintiffs will not adequately represent the class.  See Shamberg v. Ahlstrom, 111 F.R.D. 689, 693 (D.N.J. 1986); see also Lewis v. Curtis, 671 F.2d 779, 788 (3d Cir. 1982) abrogated on other grounds by Garber v. Lego, 11 F.3d 1197 (3d Cir. 1993).  The Court must therefore determine "whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class." Johnston, 265 F.3d at 185.

a.  Joan Evanchuk-Kind

Comcast argues that Plaintiff Joan Evanchuk-Kind was never a cable subscriber, and thus is not a member of the class she seeks to represent.  Comcast relies on the following excerpts from her deposition:

> Q.    Could you tell me how long you've been a cable subscriber?
> A.    Since the late '80s.  Sometime in the late 1980s.
> Q.    Okay.  So about 20 years?
> A.    Um-hum, yes.
> Q.    And are you a cable subscriber as of today?
> A.    Yes.
> Q.    **Is your current cable account listed in your name?**
> A.    **My husband's name**.
> Q.    **All right.  And has that account always been listed in his name?**
> A.    **Yes.**

(Def. Ex. B at 56:11-57:1 (emphasis added).)

On June 18, 2007, Evanchuk-Kind signed an Errata Sheet making three changes to her deposition testimony.  First, to clarify a preliminary question concerning her residence, she asserts

-16-

that: "from November 2003 to May 2004 I lived at 1312 Blanchard Street, Downers Grove, Illinois, 60516 while my house at 5619 Dunham Road was being restored from a fire."  Second, she made a change to her answer at Page 57, Line 1 (the last line quoted above) as follows:

> Yes.  However, when we lived at the 1312 Blanchard Street address from November 2003 to May 2004, the cable account at that address was in my name.  I am not certain whether the cable account we had prior to November 2003 was in my name or my husband's name.

(Decl. of Jessica N. Servais, Ex. E.)  Third, she clarified a question concerning whether she or her husband paid the household bills with the additional information that household bills were paid from joint funds.  (Id.)

Plaintiffs' have also submitted the June 18, 2007 Declaration of Joan Evanchuk-Kind, wherein she restates and expands upon the additional information contained in the Errata Sheet. Evanchuk-Kind states that her residence and family home of 26 years, 5619 Dunham Road, Downers Grove, Illinois, was damaged by fire, causing the family to relocate from November 2003 to May 2004 to an apartment located at 1312 Blanchard Street in Downers Grove.  (Decl. ¶ 3.)  The family received cable services from Comcast at 1312 Blanchard Street.  (Id. ¶ 4.)  She asserts the account was in her name, as evinced by copies of the Comcast subscriber information she attaches, showing the account in the name of "J Kind" and containing the last four digits of her social security number. (Id. ¶ 4, Ex. A.)  She also attached copies of her Comcast bills showing the account in the name of "J Kind," and her Comcast telephone bill showing the account in the name of "Joan Kind."  (Id. ¶ 4, Exs. A-D.)  She states that she is uncertain whether the Comcast cable account prior to November 2003 was in her name or the name of her husband, Joshua Kind.  (Id. ¶ 5.)  Another exhibit, a bill from December 2006, shows the account listed in her husband's name, but also listing her social

security number.  (Id. ¶ 6, Ex. E.)  Finally, she states that she and her husband are both Comcast

subscribers, both have authority to make changes to the account, and pay their bill from their joint

bank account.  (Id. ¶ 8-9.)

Comcast argues that the declaration is insufficient to show Evanchuk-Kind is a subscriber

because the name on the account "J Kind" could indicate her husband Joshua.  It also asserts that the

declaration directly contradicts her deposition testimony, raising credibility issues that disqualify her

as an adequate class representative.  Given that Evanchuk-Kind amended her deposition testimony

in her Errata Sheet, we find that Comcast's argument, that she should be disqualified because she

contradicted her deposition testimony, is not a sufficient basis upon which to conclude that her

interests would be in conflict with those of the class.

Comcast is correct when it argues that, "as part of the inquiry into whether a class

representative will fairly and adequately represent the interests of the class, courts have considered

whether the plaintiff is credible."  Buzoiu v. Risk Management Alternatives, Inc., Civ. A. No. 03-

3579, 2004 WL 1505061, *5 (E.D. Pa. June 14, 2004) (citing Savino v. Computer Credit, Inc., 164

F.3d 81 (2d Cir. 1998)).  "Courts have denied class certification where putative class representatives

are so lacking in credibility that they are likely to harm their case."  Buzoiu at *5 (quotation and

citations omitted).  However, the Federal Rules of Civil Procedure provide that, a deponent "shall

have 30 days after being notified [that the transcript of the deposition is available to make] changes

in form or substance . . . ."[6]  Fed. R. Civ. P. 30(e).  As Evanchuk-Kind timely amended her

---

[6]The deposition was taken in May 2007.  Rule 30(e) was amended, effective December 1,
2007, to clarify that "the deponent *must* be allowed 30 days" to review the transcript and "if there
are changes in form or substance, to sign a statement listing the changes and the reasons for making
them."  Fed. R. Civ. P. 30(e) (Dec. 1, 2007) (emphasis added).

testimony, the effect of impeachment is greatly lessened.

We find that Evanchuk-Kind is qualified to be a class representative. It is clear that a class representative must actually be a member of the class:

> As this Court has repeatedly held, a class representative must be a part of the class and "possess the same interest and suffer the same injury" as the class members. . . . The district court found upon abundant evidence that these plaintiffs lacked the qualifications to be hired as line-drivers. Thus, they could have suffered no injury as a result of the alleged discriminatory practices, and they were, therefore, simply not eligible to represent a class of persons who did allegedly suffer injury.

East Texas Motor Freight Systems, Inc. v. Rodriguez, 431 U.S. 395, 403 (1977). Evanchuk-Kind's testimony, and the Declaration and documents submitted with her Declaration, show she was an actual Comcast subscriber during the class period and thus suffered the same antitrust injury as the class. Even if we accept as accurate Comcast's assertion that she was not the named subscriber at the family's primary residence, Evanchuk-Kind has shown without opposition that she was the named subscriber at least during the time her family relocated after the fire at her primary residence. As this time period was within the class period – defined as December 1, 1999 to present – she is a class member.[7] While Evanchuk-Kind may not have been a class member for the entire class period, the issues raised by Comcast do not disqualify her as a representative.[8]

---

[7]The evidence is admittedly less clear with respect to Evanchuk-Kind's primary residence. First, the name on the Comcast *telephone* bill is irrelevant to whether she was a *cable* subscriber. Second, the named subscriber on the cable bill could be either her or her husband Joshua, since only the first initial, "J," is used. However, Evanchuk-Kind's social security number is the one used as the subscriber's identification, even though the December 2006 bill lists Joshua's name as the subscriber. None of this evidence, however, affects Evanchuk-Kind's status as the named subscriber at the Blanchard Street apartment, and thus her status as a class member.

[8]We note briefly that Comcast also argues that Evanchuk-Kind is not typical of the class because she experienced a *decrease* in her cable prices when measured under Dr. Besen's price per channel metric. We reject this argument because it relies on Dr. Besen's theory that damages in this case must be measured under a price per channel metric. See Behrend, *9, n.28 (holding that

b.  Eric Brislawn

Comcast contends that Plaintiff Brislawn is "unfit" to serve as class representative because he stated at his deposition that he no longer subscribes to expanded basic cable service from Comcast.  Sometime in 2003, Brislawn became a DirectTV subscriber.  (Cain Decl. Ex. C at 57:4-20.)  He does, however, continue to subscribe to Comcast basic cable service.  (Id. at 80:5-19.) Comcast argues that Brislawn's decision to switch to a satellite service contradicts the Class's assertion that the creation of the Chicago cluster left Comcast as the "only game in town."  (Def. Mem. 17.)

We find that the fact that Brislawn dropped his expanded basic cable service after the class period began does not place him in conflict with the interests of the class.  Comcast does not contend that Brislawn was not a Comcast expanded basic cable subscriber during the class period.  The fact that he switched to satellite service after the class period began does not change his status as a class member or make his interests antagonistic to those of the class as a whole.

Accordingly, we find that Evanchuk-Kind and Brislawn will fairly and adequately protect the interests of the class.  We also find, as we did in the Philadelphia certification, that their counsel will competently, responsibly, and vigorously prosecute the suit and should be appointed class counsel.

---

Comcast's argument that named Plaintiffs Behrend and Glaberson were atypical because Glaberson experienced smaller increases in prices per channel than subscribers in the United States as a whole, and Behrend actually experienced a decrease, had to be rejected because Dr. Beyer rejected price per channel as an artificial measure that is not used by the industry, and affirmatively opined that, based on the change in average monthly prices for expanded basic cable reported by the FCC, Glaberson and Behrend experienced increased prices due to the cable transactions).

D. Rule 23(b)

In addition to satisfying the requirements of Rule 23(a), Plaintiffs must show that the putative class falls under at least one of the three subsections of Rule 23(b).  In this case, Plaintiffs assert that the proposed class satisfies Rule 23(b)(3), which requires that "questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3) (emphasis added).  To assist in this inquiry, courts consider: "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action."  Id.

1. Predominance of common questions

The Rule 23(b)(3) requirement that common issues predominate ensures that a proposed class is "sufficiently cohesive to warrant certification."  Newton, 259 F.3d at 187 (citing Amchem Prods., 521 U.S. at 623).   The predominance requirement of Rule 23(b) is more rigorous than the commonality requirement of Rule 23(a).  See Amchem Prods., Inc., 521 U.S. at 623-24 (holding that although a proposed class of asbestos plaintiffs shared the goal of reaching a settlement, the commonalities did not predominate over individual questions of causation regarding each plaintiff's degree of asbestos exposure under different conditions, pre-existing medical conditions, and tobacco use).

"Common issues may predominate when liability can be determined on a class-wide basis,

-21-

even when there are some individualized damage issues." In re Community Bank of Northern Virginia, 418 F.3d 277, 306 (3d Cir. 2005) (quoting In re Visa Check / MasterMoney Antitrust Litig., 280 F.3d 124, 139 (2d Cir. 2001)). "Rule 23(a)(2)'s *commonality* element requires that the proposed class members share at least one question of fact or law in common with each other." In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 527-28 (3d Cir. 2004) (emphasis added). The *predominance* element, in turn, requires that the common issues predominate over issues affecting only individual class members; it incorporates the commonality element but is more demanding. Id. at 528. Common issues must constitute a "significant part" of the individual cases. Chiang, 385 F.3d at 273. "The presence of individual questions as to [each class member] does not mean that the common questions of law and fact do not predominate over questions affecting individual members as required by Rule 23(b)(3)." Id. (quoting Eisenberg, 766 F.2d at 786). However, the Third Circuit has recognized that "there are cases where the question of damages is so central that it can, in some sense, overtake the question of liability." Id. at 273 (citing Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).

The requirement that a Section (b)(3) class action be the "superior" method of resolving the claims ensures that there is no other available method of handling it which has greater practical advantages. See Fed. R. Civ. P. 23, advisory committee note, 1966 Am. to subdivision 23(b)(3); Johnston, 265 F.3d at 194 ("A class action must represent the best available method for the fair and efficient adjudication of the controversy.") (quotation omitted). "Superiority must be looked at from the point of view (1) of the judicial system, (2) of the potential class members, (3) of the present plaintiff, (4) of the attorneys for the litigants, (5) of the public at large and (6) of the defendant. . . . Superiority must also be looked at from the point of view of the issues." Katz v. Carte Blanche

Corp., 496 F.2d 747, 760 (3d Cir. 1974).   Courts must address "the difficulties likely to be

encountered in the management of a class action," Fed. R. Civ. P. 23(b)(3)(D), and may consider

alternatives to class certification, such as holding separate trials with combined discovery or

certifying the class with respect to liability but not damages.   See Fed. R. Civ. P. 23, advisory

committee's note, 1966 Am. to subdivision 23(b)(3).

        2. Discussion

    The Chicago Plaintiffs assert that common issues predominate in this case because they can

prove their Sherman Act § 1 conspiracy[9] and § 2 monopolization[10] claims by relying on the

Transactions to show conduct on the part of Comcast affected all class members; specifically that

the acquisition of competitor cable companies was an attempt to allocate the market and monopolize.

(Pl. Mem at 15-16.)   Relying on Dr. Beyer's opinions, they also argue that there is a common

---

    [9]Under the rule of reason, to establish a § 1 violation, a plaintiff must prove: (1) concerted
action by the defendants; (2) that produced anti-competitive effects within the relevant product and
geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured
as a proximate result of the concerted action.   Rossi v. Standard Roofing, 156 F.3d 452, 464-65 (3d
Cir. 1998) (citations omitted).   The per se approach applies to certain agreements or practices that
"because of their pernicious effect on competition and lack of any redeeming virtue are conclusively
presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm
they have caused or the business excuse for their use." Northwest Wholesale Stationers, Inc. v.
Pacific Stationery and Printing Co., 472 U.S. 284, 289 (1985).

    [10]In order to state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must
plead facts indicating "'(1) the possession of monopoly power in the relevant market and (2) the
willful acquisition or maintenance of that power as distinguished from growth or development as a
consequence of a superior product, business acumen, or historic accident.'" Schuylkill Energy Res.,
Inc. v. Pa. Power & Light Co ., 113 F.3d 405,412-13 (3d Cir. 1997) (quoting Fineman v. Armstrong
World Indus., Inc., 980 F.2d 171, 197 (3d Cir. 1992)).   In order to state a claim for attempted
monopolization, a plaintiff must allege that the defendant has "(1) engaged in predatory or
anticompetitive conduct with (2) [a] specific intent to monopolize and with (3) a dangerous
probability of achieving monopoly power.'"   Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124
F.3d 430, 442 (3d Cir. 1997) (quotations and citation omitted).

antitrust injury resulting from that conduct because it caused the Class to pay higher cable prices than they would have paid absent Comcast's antitrust violations.  (Id. at 19.)  Plaintiffs rely on the following conclusions reached by Dr. Beyer:

- Comcast has dominant market power in the Chicago cluster.

- Class members are impacted by its cable pricing practices.

- Comcast's cable price increases have been essentially the same across the Chicago cluster.

- Comcast's subscribers would all benefit from effective competition in the form of lower cable prices.

- Thus, all members of the proposed class have been adversely affected by Comcast's unlawful conduct.

- The supra-competitive overcharge and the supra-competitive rate of price increase are accepted methodologies available to quantify damages on a class-wide basis.

(Pl. Mem. at 19-20.)  Plaintiffs also assert that the class action is a superior method of adjudicating the claims because it is the only practical means the class members have to litigate their claims given the large up-front cost needed to prosecute this antitrust suit.  Finally, they assert that, in light of the size of the class, certification will promote judicial economy while presenting no significant manageability problems.

Comcast argues that common issues do not predominate with respect to class members in the Chicago cluster because, unlike the Philadelphia cluster, the Transactions that led to the formation of the Chicago cluster were materially different, making common proof impossible. Comcast points to two of the four transactions alleged in the Complaint, wherein AT&T, and later Comcast, separately entered the Chicago market for the first time: (1) in March 1999, AT&T –

previously a telephone company – acquired TCI and in August 2000, Comcast acquired Prime Cable's two franchises in the Chicago cluster.  Because these transactions constituted a first entry into the market, merely constituting a "name change in the view of the subscriber," Comcast asserts that there can be no claim that the transaction eliminated an actual or potential competitor from the market.  (Def. Mem. 18-19.)  Thus, it argues, class members that live in franchise areas once owned by TCI experienced a materially different type of impact than class members residing in other franchise areas, preventing common questions from predominating.  (Id.)

We find that this argument must fail.  This argument, which seeks to differentiate subscribers based on whether they lived in a franchise area that was acquired early in the consolidation process, rather than late in the process, ignores the essence of Plaintiffs' allegations.  The thrust of the Complaint, and Dr. Beyer's opinions, focuses on the overall impact and cumulative effect of Comcast's activities, not the individual transactions in isolation.  Dr. Beyer opined that examining each transaction in isolation,

> ignores the cumulative effect of the cluster building accomplished by the acquisitions and swap, which was to enhance Comcast's market power, enabling larger price increases.  The acquisitions and swap removed existing cable operators from the Chicago area, thereby eliminating the threat that those cable companies would overbuild in the area, and raised entry barriers for other potential competitors by increasing the geographic scope and market dominance of Comcast's Chicago cluster.

(Beyer's Resp. Decl. ¶ 20.)  We agree that a subscriber who lives in the former TCI franchise acquired by AT&T in its first entry into the cable industry is no different from one who became a subscriber through the later executed swap transaction whereby AT&T acquired Comcast's two Chicago franchises in exchange for AT&T franchises in Philadelphia.  Both – following Comcast's reacquisition of AT&T's Chicago franchises and its entire cable business – experienced the same

alleged diminution in potential competition arising from the elimination of the other market players.

Comcast also argues that "local issues" rather than common issues predominate.  Comcast contends that since it is undisputed that none of the counterparties to the Transactions were actual competitors of AT&T or Comcast, the Plaintiffs have failed to show that putative Chicago Class members were impacted *at all*, much less commonly, by the purported elimination of actual competitors from the Chicago cluster.  (Def. Mem. 21-22.)  Comcast also contends: (1) that the Plaintiffs have failed to show that a theory of potential competition applies to the cable industry; (2) that under a potential competition theory they cannot show that all class members were impacted by the Transactions; (3) that Supreme Court decisions require that potential competition be assessed on a franchise by franchise basis; and (4) that Dr. Beyer's method for calculating class-wide impact from the lack of potential competition is faulty.  (Def. Mem. 22-32.)

In asserting that a potential competition theory cannot be applied to the cable industry, Comcast argues that the theory is predicated on ease of entry into the market.  See United States v. Marine Bancorporation, Inc., 418 U.S. 602, 628 (1974) ("[E]ase of entry . . . is a central premise of the potential-competition doctrine."))) Comcast asserts that Dr. Beyer has not provided  any empirical support for his assertion that the Transaction counterparties were potential competitors that were eliminated.  Indeed, Comcast maintains that entry into a cable franchise area can only be accomplished via overbuilding, which is expensive, time-consuming, risky and extremely rare.  Moreover, Comcast asserts that competing for cable subscribers as an overbuilder is an entirely different business from the one in which the Transaction counterparties were engaged.

Comcast also argues that the Supreme Court in Marine Bancorporation has held that a merger transaction between non-competitors cannot be enjoined unless it is probable that the parties would

otherwise have competed.  While Comcast acknowledges that we have "already recognized that [Marine Bancorporation and its progeny] establish the legal standards by which Plaintiffs' claims must be evaluated," we have also held that Comcast's alleged conduct and Dr. Beyer's expert report were sufficient to show that the elimination of potential competition qualified as a predominant common question.  See Behrend, 2007 WL 1300725,  *13-15 (holding that Comcast's potential competition argument ignored the fact that Dr. Beyer opined that potential overbuilders included not only the former incumbent cable operators, but also independent overbuilders; the intent and preparedness of overbuilders to enter the market was an issue for trial but the fact that there were no prior attempts by the former incumbent operators to re-enter the market did not negate common proof of the Class's attempted monopolization claim).

Comcast avers that Plaintiffs cannot show that all class members were commonly impacted by the Transactions so as to support a potential competition theory.  It contends that Dr. Beyer has merely assumed, rather than actually demonstrated, common impact based upon his finding that Comcast charges uniform prices, and has uniformly increased prices.  Comcast asserts that Beyer skipped a critical step, by assuming that the Transaction counterparties were potential competitors, and that their elimination gave rise to alleged increase prices across the cluster.  (Id. 25-26.)

Comcast asserts that Dr. Beyer conducted his analysis backwards:  based upon his finding that Comcast charges uniform prices, and has uniformly increased prices, he "reversed-engineered the conclusion that the Transactions were the common cause of that condition."  (Def. Mem. 25.) Comcast asserts that Beyer merely assumed that the Transaction counterparties were potential competitors, and that their elimination gave rise to alleged increase prices across the cluster.  (Id. 25-26.) Comcast misinterprets Dr. Beyer's conclusion regarding the result of Comcast's anticompetitive

activity as a mere assumption.  Beyer has opined that class-wide impact can be demonstrated from Comcast's acquisition of the Chicago cluster, its elimination of actual and potential competition from those cable companies who have exited the cluster region, and its effect of raising entry barriers for other potential competitors, which resulted in increased market power in the cluster region, enabling the further increase in already supra-competitive prices to higher levels than would have prevailed otherwise.  (See Beyer Chicago Reply Decl. ¶ 6.)  He states that the price constraining effect of potential competition, and the increase in market power from the reduced threat of potential competition, are concepts that are commonly understood and accepted by economists.  (Id.)  In other words, increased prices and uniform pricing structures, according to Dr. Beyer, are proof of Comcast's market power derived from its anticompetitive conduct.  It was the creation of its market power – the building of the cluster through the acquisitions and swap transactions – that caused the class-wide impact.  The fact that Beyer analyzed the effect of that behavior and concluded that Comcast was thereby able to exercise market power does not mean that he "assumed" common impact; it means that he established it for purposes of demonstrating predomination.

The ability to charge uniform prices and engage in uniform increases in pricing, according to Beyer, demonstrate market power.  His opinion that the class was commonly impacted by Comcast's acquisition of market power was based on his examination of pricing statistics compiled by the FCC that showed that the U.S. average price for expanded basic cable rose 39.6%, while the price Comcast charged rose 68.4%.  This evidence of larger average price increase in the Chicago cluster, Beyer opined, was evidence of increased market power that commonly impacted the class.  (Id. ¶ 31.)  We find that this analysis is sufficient to show common impact from the Chicago clustering activity, and thus predomination.

Finally, Comcast asserts that Dr. Beyer's methodology for determining class-wide damages, the supra-competitive overcharge, in insufficient, because, as he himself testified, that the method is only "illustrative."  Comcast also asserts that the supra-competitive overcharge is inappropriate because it measures the effect of actual, overbuild competition.  As none of the Transaction counterparties were overbuilders, Comcast contends that this benchmark does not address the impact, if any, of its activities.  Comcast also argues that the benchmark does not account for other salient facts, such as programming quality, the availability of other services, and the quantity of channels offered.

Comcast's contention that Dr. Beyer testified that his method was merely illustrative derives from the following excerpt from his deposition:

> Q.  Okay. Let's talk about the methodologies that you have come up with for assessing damages on a class-wide basis, and those begin in paragraph 38 and you come up with two yardsticks, right?
> A.  It is presented as two yardsticks, but in fact I think I look at it as being basically one generic kind of benchmark, which is other geographic areas than Philadelphia and Chicago, and as compared to time before and after which is often used.
> 
> . . .
> 
> Q.  Well – well, isn't what you're comparing in both yardsticks is what you call a but-for price, right?
> A.  Yes.
> Q.  Okay.  And isn't the but-for price that you look at is a but-for price in areas that have effective competition as defined by the FCC?
> A.  Yes and no.  The illustration – underline illustration – that I use is based on accepting the rate of increase in effective areas of communities, franchise areas of effective competition as defined by the FCC and compared it to actual rates of increase and that is – and I've used that as an illustration of how one aspect of this methodology could be used.
> Q.  It's the only example you give, isn't it?
> A.  Well, I haven't done – I or another economist haven't actually done the estimate of damages.
> Q.  No, but what you say is that the way you would do it is you would compare the prices in the cluster to those areas where there is effective competition, isn't that what you say in your report?

-29-

A.  Well, if I do say it, then other than for purposes of illustration –

Q.  Yes?

A.  – it's wrong.

Q.  Okay.  So that's not what you intend to do?

A.  Well, the comparison is straightforward.  It is –

Q.  No, let's –

A.  No.

. . .

THE WITNESS: It is a comparison of the rate of increase of actual prices in the Philadelphia and Chicago clusters in the final estimation process and the prices – the rate of price increase that would have prevailed but for the anticompetitive behavior alleged by the defendants [sic].

As an illustration, the rate of price increase in these communities that the FCC defines as having effective competition is used as a proxy for the but-for price.

. . .

Q.  Well, isn't effective competition found in only 3 percent of communities in the United States?

A.  Yes.  I'm not estimating damages.  I'm showing how it would be done.

(Beyer Dep. 182:1-185:10.)  The testimony that Beyer's proposed methods are "illustrative" only and that it would be "wrong" to actually use them in this case, when read in context, do not have the meaning Comcast ascribes to them.  Beyer was merely trying to explain that he hadn't yet "done the math;" i.e., that he had not yet tried to calculate the actual dollar amount of the Plaintiffs' loss.  His statement that the illustration was "wrong" appears to be a misstatement, which he subsequently corrected, following an objection that counsel cut off the answer and did not allow him to explain his answer (the first elided section).  In his explanation, Beyer makes clear that his benchmark is an appropriate illustration of the class-wide damages resulting from the anticompetitive activity.

In his initial Philadelphia certification report, Beyer opined that the effectiveness of competition in lowering prices was contingent on the "degree of system overlap," which Beyer applied to the cable industry to infer that increasingly large cable system clusters reduce, proportionately, the extent of overbuild overlap, and consequently, the effectiveness of price

-30-

competition from the overbuild competitor.  Comcast argues that Beyer's methodologies are irrelevant because they measure to effect of actual, direct overbuild competition, whereas the Complaint is based entirely upon the alleged elimination of potential competition.  We do not agree. Beyer opines that, but for Comcast's behavior, actual competition would have occurred.  His comparison between areas of actual competition and the Comcast clusters is clearly relevant to show the impact of the alleged anticompetitive behavior on the class.

Finally, Comcast argues that Beyer's methodologies do not take into account other salient factors such as the quality of programming, availability of advanced services like digital cable, the number of channels offered, and the effect of the presence of overbuilders in as much as 20% of the franchise areas.  As we discussed previously, these arguments go the weight accorded to Beyer's opinions, not their admissibility.  See Behrend 2007 WL 1300725, *17 ("it must be remembered that it is not necessary at the class certification stage for the Plaintiffs to establish the merits of their case. Nor are we conducting a Daubert analysis.  Comcast's arguments go to the weight to be accorded Beyer's metrics, not to whether Plaintiffs have been able to state a common impact.").  It is sufficient at this stage that Beyer has set forth an accepted methodology and provided data to support it.  As Dr. Beyer's methodologies are based on his comparison of Comcast's prices with Government and academic statistics from areas with overbuilt competition, showing a 15-20% differential in price, and statistics showing an average annual rate of price increase of 9.7% in the Chicago cluster, in contrast to 5.8% where cable systems face effective competition, the Class may rely on his opinions of class-wide damages.

## IV. CONCLUSION

We find that the Chicago Class should be certified.  Plaintiffs have satisfied the four

requirements of Fed. R. Civ. P. 23(a) and the predominance requirement of Rule 23(b).  The class

definition, as proposed by Plaintiffs, is:

> All cable television customers who subscribe or subscribed at any time since
> December 1, 1999, to the present to video programming services (other than solely
> to basic cable services) from AT&T and/or Comcast, or any of their subsidiaries or
> affiliates in Comcast's Chicago cluster.  The class excludes government entities,
> Defendants, Defendants' subsidiaries and affiliates and this Court.

The Chicago cluster is defined by Plaintiffs to mean:

> those areas covered by Comcast's cable franchises or any of its subsidiaries or
> affiliates, located in Chicago, Illinois and geographically contiguous areas, or areas
> in close geographic proximity to Chicago, Illinois, which is comprised of the areas
> covered by Comcast's cable franchises, or any of its subsidiaries or affiliates, located
> in the following counties: Cook, DeKalb, DuPage, Grundy, Kane, Kankakee,
> Kendall, Lake, LaSalle, McHenry and Will, Illinois; Jasper, Lake, LaPorte and Porter,
> Indiana.

We find these definitions are appropriate.  We also find that Plaintiffs Evanchuk-Kind and Brislawn

are adequate class representatives and that their counsel should be appointed class counsel.

An appropriate order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


**CAROLINE BEHREND, et al.**           :     **CIVIL ACTION**
                                       :
                                       :
            **v.**                     :
                                       :
                                       :
**COMCAST CORPORATION, et al.**        :     **NO. 03-6604**

<u>**ORDER**</u>

    **AND NOW**, this 9th day of October 2007, upon consideration of Plaintiffs' Motion for

Certification of the Chicago Class (Docket # 201), and all documents submitted in connection

therewith, **IT IS HEREBY ORDERED** as follows:

1.    The Motion is **GRANTED**.

2.    The Court **CERTIFIES** the following plaintiff class pursuant to Fed. R. Civ. P. 23(a) and

    (c)(4)(B):

> All cable television customers who subscribe or subscribed at any
> time since December 1, 1999 to the present to video programming
> services (other than solely to basic cable services) from Comcast,
> or any of its subsidiaries or affiliates in Comcast's Chicago cluster.  The
> class excludes governmental entities, Defendants, Defendants'
> subsidiaries and affiliates and this Court.

For purposes of this class definition, the term "Comcast's Chicago cluster" is be defined to

mean:

> those areas covered by Comcast's cable franchises or any of its
> subsidiaries or affiliates, located in Chicago, Illinois and
> geographically contiguous areas, or areas in close geographic
> proximity to Chicago, Illinois, which is comprised of the areas
> covered by Comcast's cable franchises, or any of its subsidiaries or
> affiliates, located in the following counties: Cook, DeKalb, DuPage,

Grundy, Kane, Kankakee, Kendall, Lake, LaSalle, McHenry and Will,
Illinois; Jasper, Lake, LaPorte and Porter, Indiana.

3.      Plaintiffs Joan Evanchuk-Kind and Eric Brislawn are **APPOINTED** as representatives of the

Chicago Class.

4.      Pursuant to Fed. R. Civ. P. 23(g), the law firms of Heins Mills & Olson, P.L.C. and Susman

Godfrey, L.L.P. are **APPOINTED** Co-Lead Counsel for the Chicago Class.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.