IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLINE BEHREND, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION, et al. | : | NO. 03-6604 |

**MEMORANDUM**

**Padova, J.**                                                                                    **June 4, 2009**

I.      INTRODUCTION

        Comcast Corporation has moved to strike the Expert Declaration submitted by the Class

Plaintiffs' expert Dr. Hal Singer, as well as portions of the Expert Declarations of Dr. James T.

McClave and Michael A. Williams, Ph.D., to the extent that the latter rely upon Dr. Singer's

Declarations.  Comcast seeks to preclude Plaintiffs from complaining of, arguing injury or common

impact resulting from, or seeking damages based in whole or in part upon, the non-carriage of

Comcast-affiliated regional sports programming by DirecTV and/or Echo Star (a/k/a Dish Network)

in the Philadelphia area.  Comcast argues that the experts' discussion of the antitrust impact of its

alleged refusals to provide its affiliated regional sports programming channels – Comcast Sportsnet

("CSN") and CN8[1] – to direct broadcast satellite (DBS) providers such as DirecTV and Dish

Network, is a new claim or a new theory of liability that was never pled by the Class, and for which

Comcast has not been properly placed on notice.  It also argues that the experts have altered the

product and geographic markets previously alleged by the Class.  For the following reasons, we deny

the motion.  However, because we recognize that the Class has presented new expert opinion that

relies in part on DBS foreclosure of regional sports programming to support its claims under

_____

        [1]CN8 carries overflow regional sports programming when it is impossible for CSN to
accommodate two events.

Sections 1 and 2 of the Sherman Act, we will, as a matter of fairness, permit Comcast to conduct additional discovery on the factual basis of that new expert opinion.

II.     BACKGROUND

        The Class's Third Amended Complaint ("TAC") alleges that Comcast acquired cable systems and cable subscribers from their competitors in the Philadelphia and Chicago cable markets until the number of competing cable providers in those markets was substantially reduced.  (TAC ¶¶ 3, 49, 51-53.)  Comcast then entered into agreements with those companies to avoid competition by allocating the nation's regional cable markets amongst themselves through swaps of their respective cable assets, including subscribers (collectively, the "Cable System Transactions").  (TAC ¶ 4.)  The alleged result of the Cable System Transactions was that Comcast willfully obtained and maintained monopoly power in the relevant geographic market, defined as Comcast's cable franchises located in Philadelphia and geographically contiguous areas and areas in close geographic proximity to Philadelphia in designated counties (hereinafter, the Philadelphia "cluster").  (TAC ¶¶ 6, 31.)  The TAC also contains allegations that Comcast further violated § 2 of the Sherman Act by engaging in conduct excluding and preventing competition, including competition from an overbuilder, RCN Telecom Services, Inc. ("RCN") (TAC ¶¶ 86-97.)[2]

        The TAC mentions DBS providers in only three paragraphs.  In TAC ¶ 47, the Class alleges that "the presence of competition from a [DBS] provider **does not restrain, or restrains only slightly**, the prices of cable services provided by large cable companies."  (TAC ¶ 47 (emphasis added).)  This allegation supplements the Class's contentions in the prior two paragraphs "that

───────────────

        [2] "Overbuilder" is the term for cable companies engaged in the business of constructing cable infrastructure for the purpose of competing directly against other cable providers in the same franchise zone.

competition from another cable company is essential to restrain prices of a dominant cable provider" (TAC ¶ 45), and that the "FCC has also found that the prices charged by large cable companies are restrained by the presence of an overbuilder in the market." (TAC ¶ 46.) The Class goes on to assert that the "FCC has determined that in areas where DBS has achieved a degree of market presence, there is no significant effect on prices of cable services . . . [and] the presence of DBS companies has not led to lower cable prices." (TAC ¶ 47.)

After setting forth the factual basis of its claims, the Class again mentions DBS providers in its definition of the relevant product market in its monopolization claim, Count II. The Class states the "relevant product market is defined as multichannel video programming services, which are distributed by multichannel video programming distributors ("MVPDs"), including cable television operators such as Defendants, overbuilders and direct broadcast satellite operators." (TAC ¶ 79.) Finally, later in Count II, in describing the monopolization claim involving overbuilder RCN, the Class avers that Comcast "initially denied RCN access to 'Comcast Sportsnet' programming in Philadelphia . . . then provided RCN access to 'Comcast Sportsnet' programming only on a short-term basis and refused to provide access to 'Comcast Sportsnet' to RCN on a long-term basis." (TAC ¶ 90.) As a predicate to this allegation about RCN, the Class averred that "Comcast has stated in its promotional materials: 'Sportsnet provides a significant marketing advantage against satellite TV and other competition.'" (TAC ¶ 89.)[3]

_____

[3]The Class avers that Comcast holds a 78% ownership interest in CSN; owns a majority interest in the Flyers and the 76ers and several minor league franchises; and owns exclusive rights to broadcast soccer games of the Philadelphia Kixx. (TAC ¶ 88.) In the same paragraph, the Class contends that Comcast distributes CSN video programming terrestrially, thereby allowing it to avoid the program access rules of the Cable Television Consumer Protection and Competition Act of 1992 (the "terrestrial exception rule"), which the Class asserts were designed to provide competitive access to vertically integrated satellite service programming, and which require vertically integrated

In no instance does the Class specifically contend that the denial of regional sports programming to DBS competitors was itself anticompetitive conduct. The Class also did not raise any assertion about DBS competition in the extensive prior motions practice or the prior class certification process. Specifically, its expert did not opine in the report appended to the first certification motion that denial of regional sports programming to DBS competitors was a predominating common issue.

Rather, the TAC and the Class's position in dispositive motions and the prior certification motion has been that Comcast's acquisition of wireline cable competitors that could have acted as potential overbuilders, created a lack of overbuilder competition, resulting in insufficient restraint on the price of wireline basic cable service because competition from DBS did not restrain prices, or restrained prices only slightly. It should also be noted that, while the TAC extensively alleges that Comcast engaged in specific anticompetitive conduct against RCN, including denying RCN access to CSN, it makes no similar averments with regard to Comcast's DBS competitors.

III.   DISCOVERY RESPONSES

A review of the discovery materials shows that the Class's initial document requests and initial responses to Comcast's merits interrogatories do not mention DBS competitors or regional sports programming. However, in subsequent depositions of Comcast witnesses and third party witnesses the Class specifically asked questions on the issue of DBS foreclosure of regional sports programming. Based on the information discovered in these depositions, the Class filed supplementary responses to the merits interrogatories in March and April 2009, which clearly placed

cable operators to make satellite-delivered cable programming available to rival MVPDs on reasonable and non-discriminatory terms. (Id.)

Comcast on notice that the Class considered competition from DBS providers to be a price constraint, and that the denial of regional sports programming to its DBS competition was an act of attempted monopolization.

A.    The initial production requests and responses

The Class's initial document production requests, submitted on May 3, 2007, focused on Comcast documents relating to the Cable System Transactions, pricing strategies, infrastructure contractors, RCN, non-uniform discount price offers, and market share.  (Ex. D to Reply Mem. at 12-24.)  Notably, however, the Class also asked for all documents relating to "any barriers to entry for the provision of multichannel video programming or cable services"; "any request by any person for access to programming in any portion of [the Philadelphia cluster that] was or is controlled by" Comcast; and any document that Comcast provided to any government agency concerning "any refusal by you to provide any other person or company access to cable programming services, including sports programming."  (Id. at 24-25.)[4]  In a supplemental disclosure submitted on August 7, 2007, Comcast disclosed to the Class that it intended to use documents concerning the distribution of CSN as part of its defense.  (Ex. 5 to Decl. of Daniel H. Charest at 4.)

The Class submitted its initial responses to Comcast's merits interrogatories in January 2008.  When the Class was asked to identify each and every actual or potential competitor that Comcast allegedly removed from the market, the Class identified only those competitor wireline cable

_____

[4]Comcast initially declined to produce any documents responsive to the request for documents relating to barriers to entry.  (Ex. 8 to Decl. of Daniel H. Charest at 28.)  Although the Class's request for documents concerning Comcast's refusal to provide access to cable programming services, including sports programming, was open-ended, in its response Comcast specifically refused to produce any documents that did not involve one of the Cable System Transactions.  (Id. at 33.)

companies referred to in the TAC.  (Ex. C to Reply Mem. at 8.)  When asked if it was the Class's contention that MVPDs that operate in Comcast franchise areas or adjacent areas exerted price restraint and, if so, to identify each such MVPD, the Class responded only that the competitors removed through the Cable System Transactions exerted price restraint.  The Class did not mention DBS providers in this initial response.  When asked to state the factual bases for its claims that the Cable System Transactions were unlawful and lacked any legitimate pro-competitive justification, the Class offered only generic references to the allegations of the TAC and the declaration of its former expert.  (Id. at 12-13, 21.)[5]

In a letter dated October 2, 2008, Class counsel for the first time specifically requested documents submitted by Comcast to the FCC in 2005 that referenced the "CSN Philly Model."  According to counsel, such documents recognized that exclusive distribution of CSN resulted in the "'Con' of foregone revenue but also results in the 'Pro' that satellite penetration is much lower in

---

[5]Also of note with regard to the initial responses and document production is a series of emails and letters dating from April 16, 2008.  In the first email, counsel for Comcast insisted that computerized search terms Comcast proposed to use to find documents responsive to the Class's document production request include such terms as "DBS w/50 compet*," "Satellite w/50 compet*," "DirecTV w/50 compet*," "Echostar w/50 compet*," and "Dish w/50 compet*."  Comcast asserted that such terms were directly related and integral to locating documents responsive to a number of the Class's document requests.  (Ex. 11 to Decl. of Daniel H. Charest.)  It is apparent from the context of the email that the Class did not want these search terms to be employed.  A responsive letter drafted by Class counsel on April 21, 2008, agreed to drop the term "DBS" from the computerized search parameters. (Ex. E to Reply Mem.)  By letter dated April 22, 2008, Comcast's attorneys stated that while "Plaintiffs may disagree that Verizon and DBS are Comcast's competitors, Plaintiffs cannot require Comcast to exclude search terms that Comcast believes are necessary to produce the universe of documents responsive to Plaintiffs' broad document requests, particularly where both the Third Amended Complaint and Dr. Beyer's declarations in connection with class certification make allegations concerning competitive threats from these sources."  (Ex. 6 to Decl. of Daniel H. Charest.)

While the Class argues that this exchange shows that Comcast was aware that competition from DBS providers was considered by Comcast from early on to be an issue in the case, it likewise shows that the Class was not particularly interested in DBS foreclosure at that point in the lawsuit.

Philadelphia than elsewhere in the country." (Ex. 9 to Decl. of Daniel H. Charest at 2.) The Class also sought documents Comcast had received as discovery from DirecTV in an FCC action, which apparently quoted a Comcast employee as stating that the company "wants to dominate the sports world," and admitting that the CSN model had artificially reduced DBS penetration in Philadelphia. (Id. at 3.)

B.     The merits depositions

Following document production, the parties began taking merits depositions sometime in late 2008. At their depositions, at least eight Comcast officers and employees were asked about DBS foreclosure of regional sports programming.[6] Brian Roberts testified on September 13, 2008, that, although DBS providers have asked Comcast for the rights to CSN, Comcast has declined their offers to provide the programming. (Ex. 15 to Decl. of Daniel H. Charest at 263.) Joseph Donnelly, a Comcast employee who performed evaluations for purposes of the Cable System Transactions, testified at his November 19, 2008 deposition to an email in which he listed companies that competed with Comcast. Among those he listed was DirecTV. (Ex. 18 to Decl. of Daniel H. Charest at 113.) He also testified that Comcast had never offered CSN to satellite companies. (Id. at 158.) Michael Doyle, a Comcast employee, testified in his deposition on November 20, 2008 about Comcast's refusal to provide CSN to satellite companies. (Ex. 17 to Decl. of Daniel H. Charest at 187-88.) He disagreed that CSN gave Comcast a competitive advantage, but conceded that the fact that local sports contests are on Comcast was "certainly something that is an advantage

---

[6]DBS foreclosure of regional sports programming was also mentioned at the deposition of Gerry Lenfest, owner of one of the cable companies acquired by Comcast in the Cable System Transactions. He stated that it was his opinion that CSN gave Comcast a competitive advantage due to the terrestrial exception rule. (Ex. 4 to Decl. of Daniel H. Charest at 9.)

for Comcast versus satellite." (Id. at 189-90.)  He was also asked if his coworkers believed that CSN was the reason that DBS penetration has been so low in Philadelphia, and testified to company emails discussing CSN's impact on DBS penetration.  (Id. at 193-200.)  David Scott, in a deposition taken on December 3, 2008, was asked whether Comcast considered the rates charged by DBS providers in setting its own rates.  (Ex. 19 to Decl. of Daniel H. Charest at 108-09.)  Steve Burke testified on December 5, 2008 that Comcast refused to offer CSN to DBS providers because, under the terrestrial exception rule, it was not required to do so.  (Ex. 14 to Decl. of Daniel H. Charest at 122-23.)  He also conceded that CSN gave Comcast a competitive advantage and that this advantage was the primary reason for Comcast's decision not to provide the programming to DBS providers. (Id. at 123-24.)  Burke admitted that CSN charges Comcast less for its programming than it charges to those Comcast terrestrial competitors to whom it makes its programming available.  (Id. at 130-31.)

Jack Williams, the chief executive officer of CSN, also testified at his December 16, 2008 deposition that Comcast refused to provide CSN to DBS providers because of the terrestrial exception rule.  (Ex. 20 to Decl. of Daniel H. Charest at 40-41.)  He stated that he determined that Comcast could maximize revenue by selling to terrestrial cable companies but not to DBS providers. (Id. at 62-63.)  Julian Brodsky testified on January 27, 2009 that CSN was not made available to DBS providers because Comcast was permitted to withhold it from these providers under the terrestrial exception rule, and because it was not in Comcast's business interests to make it available to the satellite providers.  (Ex. 21 to Decl. of Daniel H. Charest at 37-38.)  He stated that CSN exclusivity made Comcast more competitive with DBS operators who had exclusive sports programming of their own.  (Id. at 39.)  Finally, Ralph Roberts testified on January 28, 2008 that the

-8-

terrestrial exception rule gave Comcast control over what it could do with CSN, and that the consideration of making a profit on CSN was not a factor in denying the programming to DBS competitors because being able to offer exclusive content to its own subscribers was more important. (Ex. 22 to Decl. of Daniel H. Charest at 16-17.)

At her deposition, Susan Eid, DirecTV's corporate designee, stated in response to questioning from Class counsel that DirecTV has asked permission to carry CSN; Comcast has never permitted DirecTV to carry CSN; to her knowledge, Comcast has never permitted any DBS provider to carry CSN; CSN is must-have programming; sports fans are more likely to switch MVPD providers in order to obtain regional sports programming; there is no alternative to regional sports programming; and competing MVPDs are at a competitive disadvantage because they cannot offer CSN, resulting in lower penetration rates. (Ex. 13 to Decl. of Daniel H. Charest at 11-14.)[7] On cross-examination, Comcast sought to elicit testimony that DirecTV can create competitive advantages with its own exclusive sports content, namely NFL Sunday Ticket, which provides coverage of all out-of-market games, and could, if it so chose, acquire programming rights to local sports teams. (Id. at 30-31.) Ms. Eid testified, however, that because DirecTV broadcasts nationally, acquiring its own rights to local sports programming would not be economically viable. (Id.)

C.     The Class's supplemental responses

In March 2009, following the completion of the depositions, the Class filed timely supplements to its initial responses to Comcast's merits interrogatories. Based on the deposition testimony,

---

[7]Nearly identical testimony was elicited from Eric Sahl, the corporate designee of Dish Network. (Ex. 12 to Decl. of Daniel H. Charest at 8-14.)

- the Class identified as an act of monopolization or attempted monopolization Comcast's conduct in withholding, denying or unreasonable limiting access to essential sports programming it controlled to both RCN and the DBS providers. (Ex. 1 to Decl. of Daniel H. Charest at 4.)

- the Class stated that "Comcast impaired the ability of its DBS competitors . . . to compete in the Philadelphia [designated marketing area ("DMA")] and Philadelphia Cluster by completely refusing to provide Comcast SportsNet Philadelphia, a critical local input, to those competitors." (Id. at 15, 19.)

- when Comcast's merit interrogatories asked if it was the Class's contention that MVPDs that operate in Comcast franchise areas or adjacent areas exerted price restraint, and if so to identify each such MVPD, the Class listed DirecTV and Dish Network as MVPDs that exerted price constraint. (Id. at 23.)

- the Class also stated that Comcast entered into the Cable System Transactions "to allow Comcast to engage in a vertical foreclosure strategy with respect to critical local inputs necessary for its competitors, including RCN, EchoStar (Dish Network), DirecTV, and Verizon to effectively compete and expand their competitive presence in the Philadelphia DMA and the Philadelphia Cluster." (Id. at 26.)

- the Class stated that the penetration rates of DBS providers were "suppressed and remain at low levels due to Comcast's complete foreclosure of those competitors' access to Comcast SportsNet Philadelphia." (Id. at 46.)

- the Class stated that "Comcast's purposeful foreclosure of or limitation on its competitors' (including RCN, Echostar (Dish Network) and DirecTV) access to 'must have' regional

sports programming (Comcast SportsNet Philadelphia) in the Philadelphia DMA and the

Philadelphia Cluster, also indicates a specific intent to monopolize the relevant product

market . . . ." (Id. at 56.)

Similar statements were made in the Class's Second Supplemental Responses. (Ex. 2 to Decl. of

Daniel H. Charest.)

IV.    THE EXPERT REPORT

        In his report dated April 10, 2009, Dr. Singer focuses on "Comcast's unilateral exclusionary

conduct with respect to three localized inputs" in the production of MVPD services, which he

identifies as: (1) imposed exclusivity with regard to CSN's programming of local sports; (2)

requiring customers to abjure switching to RCN for certain periods of time in order to earn

discounts; and (3) demanding exclusivity of independent contractors within its service area as a

condition of working for Comcast. (Singer Decl. ¶ 13.) Comcast's motion to strike only addresses

Dr. Singer's discussion of enforced exclusivity with regard to the denial of regional sports

programming to the DBS competitors.[8]

---

        [8]Dr. Singer also included a substantial analysis of how Comcast's clustering strategy denied
overbuilders access to the relevant market. (Id. ¶¶ 95-136.) This analysis includes discussion of
Comcast's alleged strategy to initially deny overbuilders access to CSN and then, after the FCC ruled
it was required to offer CSN to wireline but not satellite competitors, to artificially inflate the price
of CSN to those competitors. (Id. ¶¶ 97-110.) Dr. Singer also has analyzed Comcast's alleged
interference with overbuilder RCN's efforts to construct rival systems by limiting RCN's access to
local contractors through the enforcement of non-compete clauses. (Id. ¶¶ 62-63; 111-12.) Finally,
Dr. Singer has analyzed the effect on customers of Comcast's Comcast Advantage Plan ("CAP"),
through which Comcast offered discounts or rate freezes to consumers who agreed not to switch to
RCN, noting that this offer was never made to customers before RCN began to enter the area, or to
customers in areas not served by RCN. (Id. ¶¶ 113-118.)
        While Comcast moves to strike Dr. Singer's report in its entirety, it makes no arguments
concerning his other analyses, which are clearly based upon allegations contained in the TAC.

Dr. Singer defines the relevant "downstream" product market as "all MVPD service."[9] (Id. ¶ 28.)  This includes MVPD service provided by the incumbent wireline cable operator, cable overbuilders, and DBS providers.  (Id.)  He justifies including DBS providers by noting that all three providers directly compete with each other in the supply of MVPD services, the services distributed by all three are reasonably interchangeable and thus meet the Department of Justice's interpretation of a properly defined product market, and numerous government and non-government studies indicate the presence of overbuilders and DBS providers constrain the price charged by an incumbent cable provider.  (Id.)  He opines that regional sports programming is the relevant upstream product market.  (Id. ¶ 29.)  Dr. Singer defines the geographic market as the Philadelphia DMA.  He notes that, while the consistency of MVPD provider choice – typically one cable operator and two DBS providers – remains constant beyond the confines of any particular DMA, the demand for regional sports programming necessarily varies by geography.  (Id. ¶ 32.)  Thus, the geographic market is a function of the product market and must be defined by the upstream product.[10]

Dr. Singer asserts that, using its control of upstream inputs, which Comcast secured by virtue of its clustering strategy, Comcast denies downstream rivals, principally the two DBS operators,

---

[9]Dr. Singer defines the relevant "upstream" product market as regional sports programming of interest to MVPD subscribers in the Philadelphia DMA.  (Id. ¶¶ 27, 29.)  He asserts that an upstream market is an "input market," while a "downstream" market is an output market.  (Id. ¶ 32.)  Dr. Singer defines the upstream market as the right to carry televised professional regional sports events such as the Philadelphia 76ers, Flyers and Phillies games.  (Id. ¶ 29.)  This content, he opines, is impossible to duplicate because there is only one professional franchise for each sport; fans generally follow their local team; and regional sports programming is not interchangeable with national sports programming, such as the NCAA basketball tournament, sports programming from another region, or non-sports programming.  (Id.)

[10]Singer goes on to note that FCC decisions and Comcast itself analyze MVPD competition at the DMA level.  (Id. ¶¶ 33-36.)

access to Comcast's affiliated sports programming in the Philadelphia DMA and other markets.  (Id. ¶ 64.)  This forecloses DBS competitors from regional sports programming,[11] and causes DBS providers to experience significantly lower than expected penetration rates in the Philadelphia DMA.  (Id. ¶ 66.)  According to Dr. Singer, this demonstrates clear anticompetitive motivation to stifle competition in the downstream market by using market power in the upstream market.  (Id. ¶ 68.)  He points to evidence that Comcast does not seek to maximize profit in the upstream regional sports network market, but rather restricts output to gain market power vis-a-vis DBS competitors.  (Id. ¶ 68.)[12]

## V.   DISCUSSION

### A.   Foreclosure of regional sports programming is a not a new "claim"

Comcast argues that the new expert opinion relying in part on foreclosure of regional sports programming to DBS providers asserts a new claim that was not pled in the TAC, is now untimely, and would create prejudice to Comcast if permitted to be joined.  It argues that the Class should have sought leave to further amend the pleadings under Fed. R. Civ. P. 15(a) prior to the close of discovery.  Further, had the Class so moved, Comcast argues that any such amendment would have been subject to denial in our discretion based on either undue prejudice to Comcast, or the Class's bad faith, dilatory motives, undue delay, or failure to cure by the amendments previously allowed,

---

[11]Dr. Singer explains that Comcast is able to do this by exploiting the terrestrial exception rule, which allows programmers to deny terrestrially, as opposed to satellite, delivered programming to any MVPD. (Id. ¶¶ 65, 67.)

[12]Nonetheless, Dr. Singer concedes that the FCC has specifically **permitted** Comcast to refuse to supply its DBS competitors with CSN.  Comcast had shown the FCC that it chose to use terrestrial delivery because it was cheaper, rather than because it was attempting to evade program access rules.  Dr. Singer contends that Comcast misled the FCC about its intent and conduct.  (Id. ¶ 69.)

or on the ground of futility.

The Class denies that the new expert opinion is a new "claim" or an attempt to amend the pleadings. It responds that allegations concerning CSN in the TAC were sufficient to put in issue the subject of whether withholding CSN from DBS providers, as well as overbuilders, was an act of monopolization. It focuses specifically on the allegation that the relevant product market pled in the TAC was multichannel video programming services distributed by MVPDs, "including cable television operators, such as Defendants, overbuilders, and **direct broadcast satellite operators.**" (TAC ¶ 79 (emphasis added).) The Class contends that it sufficiently placed Comcast on notice that the Class claims included the allegation that the Cable System Transactions gave Comcast the market power to deny CSN to DBS providers by including in the TAC the allegations that:

1) CSN offered Comcast a significant marketing advantage (TAC ¶ 89);

2) Comcast made the decision to offer CSN only through terrestrial means so as to avoid program access rules mandating distribution to DBS providers (TAC ¶ 88); and

3) barriers to entry into the marketplace include "accessing essential video programming, including local sports programming" (TAC ¶ 96); as well as

4) the fact that the Class never **excluded** DBS competition from allegations of anticompetitive conduct.

The Class also notes that:

• Its Supplemental Responses to Comcast's contention interrogatories included contentions emphasizing DBS foreclosure, including its contention that Comcast impaired the ability of DBS competitors by refusing to provide CSN to those competitors. Resp. at 5-6 (quoting Pl. Supp. Resp. to Def. First Set of Merits Interrogatories (March 2, 2009), at 14-15 (resp. to

interrogatory no. 4) (attached as Ex. 1 to Decl. of Daniel H. Charest)).[13]

- The Class submitted its own discovery requests on the point as early as May 2007.  Resp. at 9 (citing Document Request No. 33).

- Depositions were taken of corporate representatives of the two major DBS providers without objection by Comcast, and eight Comcast witnesses gave testimony on DBS foreclosure. Resp. at 26-30.

- Comcast's initial disclosures before the start of discovery recognized that documents concerning the distribution of CSN, and documents concerning DBS providers could be relevant to its defenses.  Resp. at 30.

- Comcast's own expert devotes two sections of his report to the effectiveness of DBS competition.  Resp. at 7, 24-26.

The Class does concede that Dr. Singer identifies an "upstream/downstream market to explain the phenomenon of DBS foreclosure through local sports programming" that is not discussed in the TAC, but contends that Singer's analytical tool cannot be construed to be an amendment to the pleadings because 1) the definition of the relevant product market – multichannel video programming distribution – has not changed; and 2) multichannel video programming distribution is the "downstream" market that Singer analyzes.  Resp. at 12.  The Class also concedes that the relevant geographic market described in the Expert Report has been expanded.  While the Class

---

[13]Comcast asked: "Identify each and every actual or potential competitor that you allege Comcast removed from the Philadelphia Cluster . . . ."  The Class responded: "Comcast impaired the ability of its competitors, . . . EchoStar (Dish Network) [and] DirecTV . . . to compete in the Philadelphia DMA and Philadelphia Cluster. . . .  Plaintiffs further contend that Comcast impaired the ability of its DBS competitors . . . to compete in the Philadelphia DMA and the Philadelphia Cluster by completely refusing to provide Comcast SportsNet Philadelphia, a critical local input, to those competitors."  Id. at 12, 14-15 (interrogatory no. 4 and answer).

defined the Philadelphia cluster as sixteen contiguous counties, the experts' designation of the Philadelphia DMA contains two additional counties.  The Class points out, however, that Comcast does not compete in the two added counties, and thus the differences are immaterial.  Resp. at 13.

        We find that the Class's new expert opinion relying in part on DBS foreclosure does not attempt to assert new claims.  Comcast is correct that the Class did not seek to emphasize DBS foreclosure of regional sports programming in the prior class certification.  It is also correct that the Class did not make the DBS foreclosure explicit in prior dispositive motions practice.  Nonetheless, the TAC does support the experts' reliance on DBS foreclosure of regional sports programming as proof of anticompetitive intent.  Moreover, it is not unusual for information obtained in merits discovery to enlarge the scope of a party's trial proofs.

        The relevant product market is defined as multichannel video programming services, which are distributed by MVPDs, including cable television operators such as Defendants, overbuilders and DBS operators.  (TAC ¶ 79.)  One of the specific results of the allegedly anticompetitive Cable System Transactions was Comcast's ability to foreclose the overbuilder RCN from regional sports programming.  (TAC ¶ 90.)  While not stated in equally explicit terms vis-a-vis the DBS providers, the Class did allege that the foreclosure of regional sports programming provided Comcast "with a significant marketing advantage against satellite providers."  (TAC ¶ 89.)  Comcast's ability to foreclose competitors is alleged to be a function of its market power, gained illegally through the Cable System Transactions.  DBS foreclosure is one of the ways the Class proposes to prove its antitrust claims; it is not itself the claim.  Because Comcast was on notice that foreclosure of regional sports programming was an issue in the case – shown by the interrogatory responses, depositions and disclosures – we find that Comcast can show no irreparable prejudice from the fact that the Class

-16-

did not explicitly emphasize DBS foreclosure of regional sports programming in the earlier motions practice.

The cases that Comcast cites to support its argument, several of which are non-precedential, all provide that district courts have broad discretion to disallow the addition of new liability claims after discovery has closed.  See e.g., Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641-42 (3d Cir. 1993) (upholding district court's rejection of a new disparate impact civil rights claim that had been raised after the close of discovery); Carr v. Gillis Assoc. Indus., Inc., 227 Fed. App'x 172 (3d Cir. 2007) (holding that district court did not abuse its discretion in refusing to permit a design defect products liability expert to submit an untimely addendum stating a new claim of failure to warn after defense expert refuted the basis of original design defect opinion) (not precedential); Spence v. City of Philadelphia, 147 Fed. App'x 289 (3d Cir. 2005) (upholding rejection of disparate impact claim raised for the first time on summary judgment) (not precedential); Brown v. Brown, Civ. A. No. 05-1130, 2008 WL 650021, at *7 (E.D. Pa. Mar. 10, 2008) (refusing to consider claim for excessive force raised for the first time in response to summary judgment motion on plaintiff's claims of false arrest and malicious prosecution).  As we find that the new expert opinion relying in part on DBS foreclosure does not state a new claim not pled in the TAC, these cases, as well as Comcast's arguments of bad faith, dilatory motives, undue delay, and failure to cure by the amendments previously allowed, are inapposite.[14]

---

[14]Comcast also states that any amendment to raise the "new claim" would be futile.  We have already determined in a prior opinion that the claims contained in the TAC survive Twombly review.  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).  As the new expert opinion relying in part on DBS foreclosure of regional sports programming is not an additional claim, Comcast's argument that it was prejudiced because it was unable to move to dismiss the "claim" has no merit. Additionally, Comcast may still challenge the legal efficacy of the Class's case in a future Rule 56(c) motion.

B.      Judicial Estoppel

Alternatively, Comcast argues that the Class is judicially estopped from taking inconsistent positions in: 1) the TAC, where it pled that competition from DBS does not constrain prices, or constrains prices only slightly; and 2) the Expert Report, where Dr. Singer cites three academic studies purporting to show that the opposite is true.

"Judicial estoppel bars 'playing fast and loose with the courts.'"  Mintze v. Am. Fin. Servs, Inc. (In re Mintze), 434 F.3d 222, 232 (3d Cir. 2006) (quoting Scarano v. Cent. R. Co. of N.J., 203 F.2d 510, 513 (3d Cir. 1953)).  Three factors "typically inform the decision of whether to apply" judicial estoppel in a particular case.  New Hampshire v. Maine, 532 U.S. 742, 750-51 (2001).  They are: (1) whether the party's position in the course of litigation is clearly inconsistent; (2) whether a court has adopted the party's earlier position, such that judicial acceptance of a later, inconsistent position would "create the perception that either the first court or the second court was misled;" and (3) whether the party asserting the "inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Id.  (internal quotes and citations omitted).

Judicial estoppel "is an extreme remedy, to be used only when the inconsistent positions are tantamount to a knowing misrepresentation to or even fraud on the court."  Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319-20 (3d Cir. 2003) (citation omitted).  A court's decision to apply judicial estoppel is not subject to "inflexible prerequisites or an exhaustive formula."  New Hampshire, 532 U.S. at 751.  The United States Court of Appeals for the Third Circuit's decisions instruct that judicial estoppel is only appropriate where a party has adopted irreconcilably inconsistent positions in bad faith, and, even then, "there must be

a showing that judicial estoppel is tailored to address the harm and that no lesser sanction would be sufficient." <u>Chao v. Roy's Constr., Inc.</u>, 517 F.3d 180, 185 n.5 (3d Cir. 2008) (citing <u>Krystal Cadillac-Oldsmobile GMC Truck, Inc.</u>, 337 F.3d at 319-20).

   1. Inconsistent positions

  The Class's first assertedly inconsistent position concerns a key discrepancy between the allegations in the TAC – that "the presence of competition from a [DBS] provider **does not restrain, or restrains only slightly**, the prices of cable services provided by large cable companies" (TAC ¶ 47 (emphasis added)) – and Dr. Singer's opinion that numerous government and non-government studies indicate the presence of overbuilders and DBS providers constrain the price charged by an incumbent cable provider. (Singer Decl. ¶ 28.) The Class argues there is no inconsistency because:

> In the past, class plaintiffs never made absolute pleading allegations about which specific categories of competitors could versus could not impose price constraints. Even Paragraph 47 of the Complaint – filed prior to fact discovery, and which Comcast has highlighted in moving papers – suggests that DBS providers may "restrain[] [if] only slightly" cable prices. Elsewhere in the Complaint, class plaintiffs clearly alleged DBS providers as relevant competitors.

Resp. at 35. This argument seriously rewrites the allegation of TAC ¶ 47. The Class did not plead that DBS providers "may" restrain cable prices; it averred the exact opposite position in absolute terms, as well as the less than absolute position that DBS providers restrains cable prices only slightly.[15] We find that this is an inconsistent position.

---

[15]In the first class certification, the Class's former expert, Dr. Beyer, similarly opined that "[c]ompetition from Direct Broadcast Satellite (DBS) providers is not sufficient to constrain Comcast's prices." Dr. Beyer also stated that "where DBS providers offer local channels, DBS competition is associated with more channels and improved digital service being offered by cable operators, but that DBS competition does not constrain the price charged by cable operators." The Class argues that this too did not constitute "any clear disavowal of an effective competition from DBS providers" because Dr. Beyer noted that a "more recent 2003 GAO study found that 'Competition from DBS operators has induced cable operators to lower cable rates slightly.'" Resp.

The Class's second allegedly inconsistent position concerns common antitrust impact. According to Comcast, in the first class certification proceeding, Dr. Beyer asserted that common impact could be shown by common proof that the Cable System Transactions eliminated the only source of price discipline on Comcast, namely the threat of potential competition from other wireline cable operators entering the market as overbuilders.  Dr. Singer, in contrast, focuses on a common antitrust impact premised on the notion that the Cable System Transactions permitted Comcast to grow large enough to be able to withhold regional sports programming from DBS providers, thereby impeding DBS penetration and eliminating DBS competition as a price restraint.  The Class argues that this is not an inconsistency; it has only added an additional alleged common impact and that adding an additional common impact does not alone render the two inconsistent.  We agree with the Class that these are not inconsistent positions.   Indeed, given that we vacated our original certification ruling, the Class has a renewed burden to demonstrate commonality and we will permitted it to marshal any argument it can.

The Class's third assertedly inconsistent position concerns the product market and geographic market definitions.  As noted, Dr. Singer discusses an "upstream/downstream market to explain the phenomenon of DBS foreclosure through local sports programming" that is not discussed in the TAC.  He also uses a slightly larger geographic designation, the Philadelphia DMA, which includes two counties not included in the Class's definition.  These are not inconsistent positions. The discussion of the upstream market did not change the definition of the relevant product market contained in the TAC.  Dr. Singer recognized that the downstream market, namely the distribution of MVPD service by the incumbent wireline cable operator, cable overbuilders and DBS providers,

---

at 35 (quoting Beyer Decl.).

is the relevant product market.  His use of the DMA as an analytical tool does not change the geographic market since Comcast does not compete in those two additional counties.

        2.      Bad faith; misleading the court

The next factor we examine is whether the Class has acted in bad faith or sought to mislead the court by arguing inconsistent positions.  Comcast argues that we relied on the Class's original characterization of its claims in deciding the dismissal motions and the first class certification, specifically that the claims were based upon the elimination of actual and potential competitors who previously exerted price constraint on Comcast within the cluster, as well as Comcast's conduct with regard to RCN.  Comcast also contends that: 1) we relied on the Class's original characterization when we vacated the certification order following the decision in In re Hydrogen Peroxide Antitrust Litig., 552 F.3d 305 (3d Cir. 2008); 2) it relied upon the Class's original characterization when it agreed to limit its arguments on a renewed class certification motion, believing that the Class still intended to adhere to Dr. Beyer's opinions on common impact; and 3) it agreed to an abbreviated briefing schedule based on that understanding because the Class was silent as to intention to emphasize DBS foreclosure of regional sports programming.  Comcast also argues that the Class's attempt to distance itself from the clear averment in TAC ¶ 47 was done in bad faith.

We find that Comcast makes cogent points, but does not establish that the Class has purposefully misled the court.  It cannot be denied that the Class has presented new expert opinion relying in part on DBS foreclosure as a common impact, and has possibly abandoned Dr. Beyer's original opinion on the elimination of actual or potential competition.  That does not itself establish that the Class has contradicted its prior representations to the court.  As we noted, Dr. Singer also included a substantial analysis – echoing that of Dr. Beyer – of how Comcast's clustering strategy

denied overbuilders access to the relevant market, including discussion of Comcast's alleged strategy to initially deny RCN access to regional sports programming, its alleged interference with RCN's access to local contractors, and its anti-RCN discount plans. In addition, the Class's position that the Cable System Transactions constituted a horizontal market allocation and gave Comcast market power have not changed.

What has changed is the manner in which the Class intends to show common antitrust impact. As we discussed above, the Class argues that it has not taken inconsistent positions; it has only added a new opinion on common impact, and that its propounding new expert opinion relying in part on DBS foreclosure of regional sports programming does not constitute bad faith. While the Class's addition of a new opinion on common impact was surprising to the Court, because the Class had not mentioned DBS foreclosure in any prior submission, we were not privy to the discovery that was taking place. The fact that the emphasis on DBS foreclosure is new to us does not establish that it is new to Comcast, or that the failure to emphasize DBS foreclosure earlier was an attempt to mislead the Court. Accordingly, we agree with the Class that this is not an instance of bad faith or an attempt to purposefully mislead the court.[16]

        3.        Unfair advantage / prejudice

Comcast asserts prejudice as a result of the new expert opinion because it will not have

---

[16]We note that, in arguing that the Class has misled the court, Comcast relies *inter alia* upon language we included in a discovery order. Def. Mem. at 13. In discussing the scope of permissible discovery we stated that "[t]o the extent the Class's document production request seeks pricing information on satellite and broadband providers, we agree with Comcast that it is outside the scope of Rule 26(b). The Class allegations concern only monopolization of the market for enhanced basic cable services. This definition excludes from the relevant product market satellite and broadband services." Order of Dec. 3, 2007, Docket Entry No. 249, p. 2 n.1. Because our exclusion of that discovery was not attributable to representations made by the Class, there is no merit in Comcast's contention that the order shows misleading or bad faith conduct.

sufficient time to prepare its defenses, had no opportunity to move to dismiss the DBS foreclosure claim, and would have taken extensive discovery on the issue had it been timely disclosed – including discovery of DBS providers' market penetration rates, internal penetration projections, profitability, and alleged stunted growth, the purported value to the DBS providers of regional sports programming, and depositions of the experts the DBS providers retained to submit studies to the FCC.  In addition, Comcast claims that is was prejudiced insofar as it wasted time and effort addressing Dr. Beyer's potential competition theories, noting that in responding to Comcast's de-certification motion, the Class continued to maintain that Dr. Beyer's opinions were sufficient to demonstrate common impact.

The Class does not directly address any of these contentions.  It only states that Comcast has suffered no prejudice since the Class pled the DBS foreclosure issue, albeit without making clear in its argument that it had pled the issue with respect to RCN, not the DBS providers; disclosed the issue in responses to contention interrogatories; served document production requests on the issue; deposed witnesses on the issue, including representatives of the DBS providers; and filed its expert reports on a timely basis.

We find that the discovery that has occurred in the case makes Comcast's claim of prejudice less than persuasive; nonetheless, we find that permitting Comcast to reopen fact discovery is fair and appropriate.  The issue of DBS foreclosure was raised during discovery.  However, the import that the new expert opinion now places on it may not have been apparent to Comcast at the time that depositions were taken.  While Comcast had the opportunity to cross-examine the DBS providers' corporate designees after the Class had raised the issue on direct examination, it cannot be faulted for failing to seek more extensive discovery when the Class had not explicitly emphasized DBS

foreclosure of regional sports programming before Dr. Singer filed his report.  Accordingly, we will reopen the discovery period for  four months to permit further inquiry into the bases for Dr. Singer's opinions.

In sum, then, we find no merit to Comcast's judicial estoppel argument.  While Comcast has succeeded in showing that the Class has taken an inconsistent position on whether the presence of DBS competition is a price restraint on cable services provided by large cable companies, it has failed to show bad faith or an intentional misrepresentation to the court, or incurable prejudice. Because judicial estoppel is an extreme remedy to be imposed only where a party purposefully misleads the court, we conclude that it should not be applied here.

VI.     CONCLUSION

Because foreclosure of regional sports programming is not a new claim, and because Comcast has not shown that judicial estoppel should apply to the one inconsistent position taken by the Class, the motion to strike the expert reports is denied.  We find, however, that it is fair and appropriate to reopen discovery to permit Comcast to discover facts to rebut Dr. Singer's opinions because Comcast plausibly asserts that it could not have been aware of the import of the earlier discovery on the issue.

An appropriate order will be entered.

BY THE COURT:

s/John R. Padova

_____

John R. Padova, J.

-24-