IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLINE BEHREND, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION, et al. | : | NO. 03-6604 |

**<u>MEMORANDUM</u>**

**Padova, J.**                                                                    **April 12, 2012**

## I.     INTRODUCTION

Presently before the Court in this class action suit alleging violations of sections 1 and 2 of

the Sherman Act, 15 U.S.C. §§ 1, 2, is the motion of Defendants Comcast Corporation, Comcast

Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications

Holdings, Inc., and Comcast Cable Holdings, LLC (collectively "Comcast") for summary judgment

pursuant to Fed. R. Civ. P. 56.  The Third Amended Complaint alleges that Comcast entered into

agreements with its competitors to allocate the nation's regional cable markets amongst themselves

through swaps of their respective cable assets.  The Class alleges that, as a result of all the swap

agreements, Comcast unreasonably restrained trade and willfully obtained and maintained monopoly

power in the relevant geographic market, the Philadelphia direct marketing area ("DMA").  The

Class contends that Comcast has used its monopoly power to raise cable prices to artificially high,

supra-competitive levels.  For the following reasons, we grant Comcast's motion for summary

judgment on the Class's section 1 claim, insofar as it charges that Comcast's conduct was a *per se*

violation of the antitrust laws.  We also grant the motion in part on the Class's section 2 claims.

## II.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute

is "material" if it might affect the outcome of the case under governing law.  Id.

"[A] party seeking summary judgment always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477

U.S. 317, 323 (1986).  When the moving party also bears the burden of proof at trial, that party must

support its motion with sufficient evidence that would entitle it to a directed verdict.  In re Bressman,

327 F.3d 229, 237 (3d Cir. 2003) (citations omitted).  Once the moving party has made such a

showing, the non-moving party can defeat the motion "with probative evidence that would

demonstrate the existence of a triable issue of fact."  Id. at 238 (citations omitted).

## III.   SECTION 1 *PER SE* LIABILITY BASED UPON HORIZONTAL MARKET ALLOCATION

In order to prove its antitrust claims, the Class must establish:  (1) a violation of the antitrust

laws, here sections 1 and 2 of the Sherman Act, (2) individual injury resulting from that violation

(antitrust impact), and (3) measurable damages.  15 U.S.C. § 15; In re Hydrogen Peroxide Antitrust

Litig., 552 F.3d 305, 311 (3d Cir. 2008) (citing Am. Bearing Co. v. Litton Indus., Inc., 729 F.2d 943,

948 (3d Cir. 1984)).   Section 1 of the Sherman Act condemns contracts, conspiracies, and

combinations in restraint of trade.  15 U.S.C. § 1.  Because even beneficial legitimate contracts or

combinations restrain trade to some degree, section 1 has long been interpreted to prohibit only those

contracts or combinations that are "unreasonably restrictive of competitive conditions."  Standard

Oil Co. of N.J. v. United States, 221 U.S. 1, 58 (1911).  "Three general standards have emerged for

determining whether a business combination unreasonably restrains trade under section 1."  United

States v. Brown Univ., 5 F.3d 658, 668 (3d Cir. 1993).

Under traditional "rule of reason" analysis, a fact finder "weighs all of the circumstances of

a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable

restraint on competition." Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49 (1977).  "The

inquiry is whether the restraint at issue 'is one that promotes competition or one that suppresses

competition.'" Deutscher Tennis Bund v. ATP Tour, Inc., 610 F.3d 820, 830 (3d Cir. 2010) (quoting

Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 691 (1978)).  To establish a section 1

violation under the rule of reason test, a plaintiff must prove: (1) concerted action by the defendants;

(2) that produced anti-competitive effects within the relevant product and geographic markets; (3)

that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of

the concerted action.  Rossi v. Standard Roofing, Inc., 156 F.3d 452, 464-65 (3d Cir. 1998) (citation

omitted).

> "The plaintiff bears an initial burden under the rule of reason of showing that the
> alleged combination or agreement produced adverse, anticompetitive effects within
> the relevant product and geographic markets." Brown [Univ.], 5 F.3d at 668.  "The
> plaintiff may satisfy this burden by proving the existence of actual anticompetitive
> effects," or defendant's market power. Id.  "If a plaintiff meets his initial burden of
> adducing adequate evidence of market power or actual anti-competitive effects, the
> burden shifts to the defendant to show that the challenged conduct promotes a
> sufficiently pro-competitive objective." Id. at 669.  "To rebut, the plaintiff must
> demonstrate that the restraint is not reasonably necessary to achieve the stated
> objective." Id.

Deutscher Tennis Bund, 610 F.3d at 830.

Certain restraints are *per se* illegal "'because of their pernicious effect on competition and

lack of any redeeming virtue. . . .'" Id. (quoting Brown Univ. 5 F.3d at 669); see also N.W. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co., 472 U.S. 284, 289-90 (1985). However, "'[p]er se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" Deutscher Tennis Bund, 610 F.3d at 830 (quoting Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) (stating "this Court presumptively applies rule of reason analysis. . . .") (quoting Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 692)); see also State Oil v. Khan, 522 U.S. 3, 10 (1997) ("Per se treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.'" (quoting Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 344 (1982) (alteration in original)). A horizontal market allocation agreement is one of the species of perniciously anticompetitive conduct that is *per se* illegal. See Palmer v. BRG of Ga., Inc., 498 U.S. 46, 49-50 (1990) (per curium); United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972).

Finally, courts apply an intermediate or "quick look" rule of reason analysis "in cases where *per se* condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." Deutscher Tennis Bund, 610 F.3d at 830 (quoting Brown Univ., 5 F.3d at 669 (internal quotation marks omitted)). "Under 'quick look' analysis, the competitive harm is presumed, and 'the defendant must promulgate 'some competitive justification' for the restraint.'" Id. at 831 (quoting Brown Univ., 5 F.3d at 669 quoting NCAA v. Bd. of Regents, 468 U.S. 85, 110 (1984)).[1]

---

[1]The selection of the mode of analysis to apply to an antitrust claim is a question of law for the court to determine. California ex rel. Harris v. Safeway, Inc., 651 F.3d 1118, 1124 (9th Cir. 2011) (holding that the selection of the proper mode of antitrust analysis is a question of law, to be reviewed *de novo* on appeal (citing XI Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1909b, at 279 (2d ed. 2005))); Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d

Comcast argues that application of the *per se* rule here is improper for several reasons. First, it asserts that courts are increasingly reluctant to apply the *per se* label, especially where the economic impact of the challenged business practice is not immediately obvious. Second, no court has previously condemned as a *per se* violation transactions that have been approved by federal antitrust or regulatory agencies.[2] Third, it asserts that the alleged market allocation here was not among competing firms.[3] Finally, Comcast contends that the swap transactions were not naked restraints on trade because no markets were actually allocated since the swap agreements did not contain no-compete clauses restricting the Counterparties from re-entering the market and competing

---

57, 61 (1st Cir. 2004) (stating that whether a plaintiff's alleged facts comprise a *per se* claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment); Deutscher Tennis Bund, 610 F.3d at 833 (holding that the "application of the quick look analysis is a question of law to be determined by the court," and therefore has no application to jury inquiry (citing ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases A–8 n. 2 (2005))).

[2]Comcast's argument about *per se* liability and regulatory approval is not new. In deciding Comcast's Rule 12(b)(6) motion, we rejected – both on initial review and on reconsideration – its argument that the initial Class Complaint failed to state a *per se* violation, finding that the allegations supported a claim that the swap agreements constituted a horizontal market allocation. Addressing one of Comcast's main arguments, we held that "[t]he mere fact that regulatory and law enforcement agencies may have reviewed and approved the challenged transactions is not ground for dismissal of Plaintiffs' claims." Glaberson v. Comcast Corp., Civ. A. No. 03-6604, 2006 WL 2559479, at *10 (E.D.Pa. Aug. 31, 2006) *modified by* Glaberson v. Comcast Corp., Civ. A. No. 03-6604, 2006 WL 3762028 (E.D.Pa. Dec. 19, 2006) (citing Otter Tail Power Co. v. United States, 410 U.S. 366, 372 (1973) (explaining that "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless maybe subject to scrutiny under the antitrust laws"); Cableamerica Corp. v. Fed. Trade Comm'n, 795 F. Supp. 1082, 1092 (N.D. Ala.1992) (stating that "'[a]ntitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct'" and that "'[t]here is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry'" (quoting Phonetele, Inc. v. Am. Tel. & Tel. Co., 664 F.2d 716, 729 (9th Cir. 1981)))).

[3]Comcast argues that because the transactions were not among competitors, the entire section 1 claim fails, even if analyzed under the rule of reason. We will return to this issue *infra*.

with one another.  The Class responds that the summary judgment record establishes a horizontal allocation of markets between competitors that is a naked restraint on trade constituting a *per se* violation of section 1.

    A.      Comcast's Acquisition of Cable Companies and Cable Assets

Beginning in 1998, Comcast embarked upon a course of conduct to create a cable "cluster" in the Philadelphia DMA by acquiring the cable systems of other large multi-system operators ("MSOs") that operated and offered multichannel video programming distributor ("MVPD") service in various franchise areas in the Philadelphia DMA.  (See Class Certification Memorandum Opinion, Doc. No. 430, entered January 7, 2010 ("Class Cert. Mem."), at 7-8 n. 8; Def. Ex. 59, Deposition of Michael A. Williams, Ph. D. on May 29, 2009 ("Williams Dep."), at 104-105.)   In the first acquisition transaction, occurring in April 1998, Comcast acquired from Marcus Cable certain cable systems operating as the incumbent wireline MVPD provider in franchise areas located in Kent County, Delaware, serving approximately 27,000 subscribers.  (See Compl., ¶ 52(a)[4]; Class Cert. Mem., p. 7-8 n.8.)  In June 1999, Comcast acquired from Greater Philadelphia Cablevision, Inc. certain cable systems operating as the incumbent wireline MVPD provider in franchise areas located in one of the four franchise areas in the City of Philadelphia. The system had approximately 79,000 subscribers.  (Compl. ¶ 52(b); Class Cert. Mem., p. 7-8 n.8.)

In January 2000, Comcast acquired certain cable systems previously owned and operated by Lenfest Communications, Inc. ("Lenfest") in the Philadelphia region.  The Lenfest systems operated as the incumbent wireline MVPD operator in franchise areas located in Berks, Bucks, Chester, Delaware, and Montgomery Counties, Pennsylvania; Atlantic, Camden, Burlington, Cape May,

---

[4]All references herein to the Complaint are to the Class's Third Amended Complaint.

Cumberland, and Salem Counties, New Jersey; and New Castle County, Delaware.  These cable systems served approximately 1.1 million cable subscribers.  (See Compl., ¶ 52(c); Class Cert. Mem., p. 7-8, n.8.) Comcast also acquired Lenfest's ownership interests in Garden State Cablevision L.P. and its 212,000 subscribers located in the Philadelphia DMA.  (Expert Decl. of Michael Williams, Ph.D. ¶ 113 ("Williams Decl.").)  Thus, Comcast acquired a total of approximately 1.25 million subscribers from Lenfest.

Comcast's acquisition of the Lenfest systems was part of a larger course of conduct of swapping cable assets to build Comcast's cable cluster in the Philadelphia DMA.  In December 2000 and April 2001, Comcast and AT&T Corporation swapped certain cable system assets that were previously owned by MediaOne Group, Inc., including AT&T-owned systems operating as the incumbent wireline MVPD provider in franchise areas located in the Philadelphia region.  (See Compl., ¶ 55(a), (c); Class Cert. Mem., p. 7-8, n. 8.)  Prior to the transaction, Comcast had sought a merger agreement with MediaOne, but AT&T had made a superior bid.  (Pl. Ex. 32 at COM-PA1151021.)  Rather than engage in "another round of competitive bidding," Comcast and AT&T "reach[ed] an amicable and acceptable alternative" calling for Comcast to terminate its proposed merger and for the two companies to divide the MediaOne assets between themselves.  (Id.)  In the transaction, Comcast acquired from AT&T approximately 1.365 million MediaOne and legacy AT&T subscribers in the Philadelphia DMA – representing all of AT&T's cable assets and subscribers in the Philadelphia DMA – in exchange for AT&T's receipt of all of Comcast's cable assets and subscribers in Chicago and certain parts of California, Colorado, Florida, Georgia and Pennsylvania (all of which were outside the Philadelphia DMA).  (Williams' Decl. ¶ 113; Compl. ¶ 55(b).)  As a result of the transaction, AT&T exited the Philadelphia DMA.

Leo Hindery, the former CEO of TCI, as well as AT&T Broadband after it acquired TCI, authored a book in which he described how Comcast's acquisition of Lenfest was intimately tied to the AT&T/Comcast/MediaOne swap transaction.  At that time, AT&T owned 50% of Lenfest, with the other 50% owned by the company's founder, Harold "Gerry" Lenfest, and his family.  Hindery, who wanted to acquire MediaOne to both build AT&T's cable business and to create cross-marketing opportunities for AT&T's branded telephone service, developed a strategy to combat Comcast's bid for MediaOne by attempting to purchase the other half of Lenfest in order to offer it as "trade bait" to Comcast in exchange for Comcast dropping its pursuit of MediaOne.  (Pl. Ex. 52, Hindery, The Biggest Game of All, p. 133, 146-151.)  Hindery was successful, and the combined result of the transactions gave Comcast control of its own legacy franchises in the Philadelphia DMA, the much larger holdings of Lenfest, and AT&T's former legacy franchises in the Philadelphia DMA.

In January 2001, Comcast and Adelphia Communications Corporation swapped certain cable system assets, including Adelphia-owned systems operating as the incumbent wireline MVPD provider in franchise areas located in Chester, Delaware and Montgomery Counties, Pennsylvania, involving 464,000 subscribers – representing all of Adelphia's cable assets and subscribers in the Philadelphia DMA.  As a result of the transaction, Adelphia exited the Philadelphia DMA.  (See Compl., ¶ 55(b); Class Cert. Mem., p. 7-8, n. 8; Williams Decl. ¶ 113.)

In July 2006, Time Warner Cable, Inc. ("Time Warner") and Comcast acquired, pursuant to a joint bid, certain cable systems from the bankruptcy estate of Adelphia (the "Time Warner/Comcast/Adelphia Transaction").   As part of the Time Warner/Comcast/Adelphia Transaction, Comcast and Time Warner swapped certain cable systems, including both self-owned

systems as well as Adelphia-owned systems.  One of the systems Comcast acquired was a Time Warner-owned cable system operating as the incumbent wireline MVPD provider in the city of Philadelphia, serving approximately 40,000 subscribers.  (See Adelphia Comm'ns Corp., 21 FCC Rcd 8203 (2006) ("Time Warner/Comcast/Adelphia Order"), ¶ 12; see also Class Cert. Mem., p. 7-8, n. 8.)  The transaction involved all of Time Warner's cable assets and subscribers in the Philadelphia DMA.  As a result of the transaction, Time Warner exited the Philadelphia DMA.

Finally, in August of 2007, Comcast acquired from Patriot Media & Communications ("Patriot") certain cable systems operating as the incumbent wireline MVPD provider in franchise areas located in Somerset, Hunterdon, Morris and Mercer counties in New Jersey, serving approximately 81,000 subscribers.  (See Class Cert. Mem., p. 7-8, n. 8; Def. Ex. 38, Plaintiffs' Class Certification Hearing Ex. 91; see also Def. Ex. 27, Comcast Press Release, Comcast Corporation to Acquire Patriot Media, April 3, 2007.)

B.      The Class's Evidence of Comcast's Anticompetitive Intent in Forming the Philadelphia Cluster.

The Class presents evidence in several areas to support its contention that there are genuine issues of material fact concerning whether Comcast had anticompetitive intent in entering into the swap transactions.

1.      Evidence that Comcast had a long-standing corporate strategy to develop clusters.

The Class cites to internal Comcast documents evincing a twenty-year strategy of acquiring cable properties in contiguous areas, including the Philadelphia DMA.  (See e.g., Pl. Ex. 49, "Comcast History - 1998-1999," p. 3 ("For nearly twenty years, Comcast had pursued a strategy of

acquiring cable properties in contiguous areas, especially in the Atlantic seaboard region. . . ."); Pl. Ex. 51, Special Board Mtg. Minutes of May 24, 1999, p. 1 (concerning the Adelphia swaps, Comcast CEO Brian Roberts "noted that the Company, under the proposed swaps, would acquire cable systems in New Jersey and Eastern Pennsylvania to enhance the Company's clustering strategy in its mid-Atlantic region.").)  In announcing the bid to acquire MediaOne assets, CEO Roberts emphasized that the combination would have a direct clustering effect, giving Comcast clusters in the top 20 markets representing 80% of the cable market and would leave Comcast a "well-clustered company." (Pl. Ex. 54, Tr. of Conf. Call of March 22, 1999, p. 2.)  After the agreement with AT&T supplanted Comcast's initial MediaOne bid, and resulted in Comcast and AT&T allocating Lenfest's cable systems to Comcast, Roberts stated that Comcast's "clustering position becomes even better." (Pl. Ex. 49, Comcast History 1998-1999, p.12.)  Comcast COO Steven Burke testified that Comcast's goal was "to have clusters that were as big as possible in each DMA, our goal was and is." (Pl. Ex. 82, Dep. of Steven Burke on December 5, 2008 ("S. Burke Dep."), 117:10-12.)  Burke wrote to the attendees of a corporate retreat that, "[f]ully 85% of our 8.2 million subscribers will be in clusters over 200,000 subscribers.  These clusters represent a unique opportunity to maximize our business if we learn how to manage them as efficiently as possible."  (Pl. Ex. 63, "Clusters/2000 Management Retreat," p.1 (emphasis in original).)  Robert Pick, Comcast's executive in charge of corporate development wrote that clustering "is the impetus for the next wave of cable acquisitions." (Pl. Ex. 26A, "Trades/Swap Memo.")  In testimony before the FTC in the Adelphia acquisition case, Pick stated that Comcast and Time Warner agreed to divide Adelphia assets between themselves to enable geographic clustering, which "was really most important to Comcast. . . . [T]o the extent we could get an entire market, that was important because we wanted – we wanted clustering." (Pl. Ex.

-10-

26, Dep. of Robert Pick of July 19, 2005, 36:5-21.)

> 2.     Evidence that the purpose behind the swaps and acquisitions strategy was to
> control, dominate and consolidate cable markets.

The Class cites numerous Comcast internal documents as evidencing its strategy to gain control over cable markets.  In announcing Comcast's acquisition of Lenfest, Roberts stated that "Comcast views geographic consolidation of key markets as critically important to the company's future."  (Pl. Ex. 62, Comcast Press Release of January 18, 2000, p.1.)  Joseph Donnelly of Comcast's corporate development unit wrote about the Adelphia acquisition, "step back and say where does it get us – ie – can we dominate mkt, etc."  (Pl. Ex. 29, Handwritten note on Letter of July 22, 1999.)  An analysis of a Toledo, Ohio cable company noted its acquisition "would present Comcast with the opportunity to own approximately 50% of the 66th largest DMA in the nation."  (Pl. Ex. 39, Memo of May 27, 1999.)  An analysis of Cablevision properties stated that the "Cleveland market offers Comcast the opportunity to consolidate the 13th largest DMA in the country, as currently, no MSO dominates this market" and the "Kalamazoo system offers Comcast the opportunity to dominate a top-50 DMA, provided Comcast does a second swap with AT&T to obtain its subscriber base in this market."  (Pl. Ex. 40, Memo of October 13, 1999, p. 4.)  A 2005 memo about New Hampshire stated Comcast had a "real opportunity to consolidate this market along DMA-rational lines and effectively lock up one of the real growth areas in New England."  (Pl. Ex. 41, Email of October 19, 2005.)

> 3.     Evidence that clustering was a common strategy among market participants.

In his book, Leo Hindery declared that shared markets made no sense in the cable industry; that the industry would benefit from clustering with one cable operator per market; and to effectuate

this happening, cable operators would have to voluntarily swap systems across the country.  (Pl. Ex.52, Hindery, <u>The Biggest Game of All</u>, p. 73-74.[5])  In his deposition, Hindery testified that "the whole premise . . . was that some operators would leave an area and others would stay and you would become the significant operator in that DMA."  (Pl. Ex. 89, Dep. of Leo Hindery of November 14, 2008 ("Hindery Dep."), 190:14-16.)  He stated that "all of the cable operators by 1997, 1998, at TCI's urging, adopted [his strategy]. . . .  Every major company participated in the exchange of systems over those 24 months, roughly."  (<u>Id.</u> at 86:14-18.)

When asked about Comcast's desire to control DMAs, Brian Roberts stated in his deposition that, during the time frame of the July 2006 Time Warner/Comcast/Adelphia swap transaction, "there was a lot of swapping going on, as you referred to, that Mr. Hindery facilitated.  Satellite is there, as a real competitor.  There are other competitors in the market, real and future competitors, like phone companies.  I think it's, you know, the notion of aggregating more customers in one cluster.  Once you do so, there's only an incumbent cable company in each of these different 30,000 franchises, and if somebody is able to secure acquiring them, then they have a major presence in the market."  (Pl. Ex. 93, Roberts Dep., 127:22-128:11.)

---

[5]Hindery wrote that cable systems owning spread out franchises,

had always struck me as nonsensical.  It was inefficient for cable operators and confusing for customers.  I strongly believed that the entire industry, including TCI, would benefit enormously by "clustering" cable systems into specific markets, with one cable operator per market.  To make this plan work, however, we'd have to convince other cable operators to voluntarily swap systems across the country.  This was no small challenge.  To pull it off, we'd have to get everybody to agree to basic valuations and stick to them.  But I knew it was quite doable, provided we could get everybody rowing in the same direction.

(Pl. Ex.52 at 73-74.)

    4.     Evidence that the swap agreements were naked restraints of trade as market and customer allocations.

To support its position that Comcast engaged in an illegal market allocation scheme, the Class cites to numerous Comcast internal documents, wherein company executives discussed "rationalizing" the cable industry through possible cable swaps and acquisitions that would consolidate Comcast's position in certain markets in exchange for its giving up positions in other markets.  (See Pl. Ex. 28, Memo of August 15, 1996, p. 2 ("Both Comcast and Adelphia would like to obtain the other's eastern Florida systems."); Pl. Ex. 32, Special Bd. Mtg. Minutes of May 4, 1999, p. 3 (listing systems to be swapped between Comcast and AT&T);  Pl. Ex. 36, Memo of July 11, 1996 (discussing Philadelphia DMA as a "Comcast Sacrosanct System"; and proposing swaps in California); Pl. Ex. 37, Memo of September 29, 1997 (discussing swap of Pittsburgh system for New Jersey and Tennessee systems to "further rationalize the NYC"); Pl. Ex. 38, Memo of May 25, 1999 (discussing clustering opportunity in Southeast Georgia and South Carolina, including swaps of Savannah and Macon, Georgia systems where Comcast "currently dominates each of these markets"); Pl. Ex. 42, Memo of April 6, 2000 (discussing swap of Muncie, Indiana for Kentucy systems to enable Comcast to "get even better clustered" in the Indianapolis DMA in exchange for "get[ting] out of Kentucky"); Pl. Ex. 44 at COM-PA2107968, (attachment to email of April 8, 2003 discussing swaps in Ohio, Kentucky, Indiana, and New Mexico "to rationalize the large Ohio markets"); Pl. Ex. 46, Email of November 13, 2003 (discussing swaps in Tennessee, Colorado and New Mexico that were never consummated)).  The Class also cites Steve Burke's testimony that Comcast and AT&T agreed to swap their respective cable assets in Philadelphia and Chicago because "there was no clear path to [Comcast] having a big cluster in Chicago, it would make more

sense for us to get Philadelphia and to swap Chicago." (Pl. Ex. 82, S. Burke Dep. 109-110.)  Robert

Pick described the swapping of cable assets between Comcast and Time Warner as "horse trading"

among the companies. (Pl. Ex. 26, Pick FTC Testimony, at 23:25-25:6; Pl. Ex. 92, Pick Dep. 228:3-

8.)

       5.      Evidence that Comcast had anticompetitive intent to allocate markets.

The Class asserts that Comcast had an anticompetitive intent to allocate the Philadelphia

DMA in entering into the AT&T transaction, based primarily upon the content of Leo Hindery's

book describing the negotiations between Comcast and AT&T.[6]  The Class describes the deal as an

agreement by Comcast to stand down from competitive bidding with AT&T for MediaOne in return

for receiving Lenfest.  (Class Pl. Mem. at 43.)  Its evidence of anticompetitive intent includes the

Comcast Board minutes describing "discussions with AT&T to reach an amicable and acceptable

alternative to another round of competitive bids," (Pl. Ex. 32, Special Mtg. Of Bd. Minutes of May

4, 1999, p. 2), as well as deposition evidence that the transaction made Comcast the dominant cable

operator in the Philadelphia DMA.  (See Pl. Ex. 31, Donnelly "Lenfest Due Diligence" Memo at 4

---

[6]In his book, Hindery wrote,

Comcast, which is based in Philadelphia, had been trying for years to buy Lenfest
Communications, which owned the cable systems in suburban Philadelphia.  Gerry
Lenfest, the company's founder and namesake, had always refused to sell.  Luckily
for me, AT&T owned 50 percent of Lenfest.  To entice Brian [Roberts] to stand
down on MediaOne, I decided to offer him Lenfest Communications. . . .

      I told Brian flat out that he could have Lenfest, and therefore the Philadelphia
systems he'd wanted for so long, on one condition.  He had to promise right then and
there not to fight me on MediaOne.  He had to agree to take Lenfest as a consolation
prize and walk away. . . .  Brian considered my offer, then extended his had to shake
on the deal.

(Pl. Ex. 52, Hindery, The Biggest Game of All, p. 2.)

("The acquisition of Lenfest will make Comcast the dominant CATV operator in the Philadelphia

DMA (rank – 4th)"); Pl. Ex. 89, Hindery Dep., 53:16-20 ("Q.  When it attained Lenfest, did Comcast

become dominant within the Philadelphia DMA? . . .  A.  It certainly became the largest cable

operator in that market, yes.); Pl. Ex. 102, AT&T Bd. of Directors Mtg. of March 17, 1999

"Executive Summary" (noting Lenfest "is the leading cable television operator in the greater

Philadelphia market.").[7]

> 6.      Evidence of non-compete provisions.

The Class argues that the existence of non-compete clauses further supports application of

the *per se* rule.  Contrary to Comcast's factual assertion, the Class asserts that following the

MediaOne deal, Comcast obtained non-compete agreements with Gerry Lenfest and members of his

family.  (Pl. Ex. 25, Non-Compete Agreement of January 18, 2000.)  The term was 3 years and

covered Pennsylvania, Delaware and New Jersey.  (Id.)  While it does not assert that the non-

compete agreements were themselves a *per se* violation,[8] the Class asserts that the non-compete

---

[7]In response to this evidence, Comcast asserts that the Class's reliance upon the Lenfest
transaction to support a *per se* claim of market allocation is improper because the Lenfest transaction
was an acquisition transaction, not a swap of cable assets.  Comcast argues that the Class seeks to
mischaracterize the Lenfest sale as a swap because we have previously held that the *per se* claim is
limited to the Class's allegations in the Third Amended Complaint that only the swap agreements
constituted *per se* violations, while the Class separately alleged that the acquisition agreements were
subject to rule of reason analysis.  See Glaberson, 2006 WL 2559479, at *9 n.7 (citing Third
Amended Complaint ¶¶ 73-74.)  Based on the Hindery evidence, we find that the Class has met its
summary judgment burden to demonstrate a genuine issue of fact whether AT&T's agreement to sell
the Lenfest assets was an integral part of a broader agreement to swap cable assets between AT&T
and Comcast.

[8]We have previously held that non-compete agreements executed upon the sale of a business
are generally not recognized as antitrust violations, see Class Cert. Mem. at 18-19, and rejected the
Class Expert's market structure analysis to the extent he relied upon the Lenfest non-compete
agreement.  (Id.)

agreements are evidence that Lenfest exited the market, and of Comcast's intention to dominate the Philadelphia market.

> 7.      Evidence of the consequences of the swaps.

Finally, the Class contends that there is ample evidence of anticompetitive consequences arising from Comcast's clustering activity.  It offers Dr. Williams' opinions that Comcast's gain in market share was a consequence of the swap transactions, making the Philadelphia DMA more concentrated, creating entry barriers, removing firms that competed in the geographic market, deterring overbuilding, and increasing prices. (Williams Decl. ¶ 56 ("In sum, economic analysis shows that Comcast's alleged anticompetitive conduct in the Philadelphia DMA reduced the extent of competition provided by overbuilders in the Philadelphia DMA.  Econometric evidence shows that reductions in overbuilding cause cable rates to increase, all else equal.  Thus, Comcast's conduct led to rates being increased or maintained above the level that would prevail in the absence of that conduct throughout the Philadelphia DMA."); ¶ 120 ("the effect of the swaps is to allocate that geographic market between the firms;" "market allocation has diminished competition in the Philadelphia DMA".)

C.      Comcast's Evidence of Pro-Competitive Justifications.

Comcast responds to the Class's evidence by contending that none of the swap transactions were "naked" market allocation agreements with no other purpose or effect; that each involved real, substantial exchanges of plant, infrastructure, employees, contracts and other business resources; and its growth strategy to use clustering did not transform otherwise lawful swap agreements into a horizontal market allocation because cable firms have legitimate business reasons for clustering that have been recognized by regulators and the Class's own experts.  Comcast asserts that the summary

judgment record establishes that clustering the Philadelphia DMA allowed it to introduce new products, such as high-speed internet, telephone, pay per view, video on demand, digital video recorders, digital cable, substantially increased channel choice and high-definition television. (Def. Statement of Undisputed Facts ¶ 48; Def. Ex. 50, Doyle Dep., 91:12-92:3.[9]).  It also asserts that the economies of scale associated with clustering enable cable providers to compete against DBS companies with a national footprint, as well as telephone companies, who by virtue of their existing telephone clusters, and possessing vastly larger resources, were emerging as competitors in multiple product markets – video, data and telephone.  (Def. Statement of Undisputed Facts ¶ 49-51; Def. Ex. 54, Deposition of Robert S. Pick on October 28, 2008 ("Pick Dep."), 56:1-57:23[10]; see also Def. Ex.

---

[9]Michael Doyle, the president of Comcast's Eastern Division, testified that

one additional advantage of the clustering, too, is your ability of getting into the new products.  In a lot of Comcast acquisitions where companies were smaller, they didn't have and didn't spend the capital necessary to offer the new products.  And so certainly the advantage to clustering is you have the resources and you have the personnel who can run the new products.  And in this day and age, as well as it's been over the last years, it's not a video industry anymore.  It's a video, Internet, and telephone industry.  It's a commercial business application.

So, I think the clustering certainly gives you the ability to offer more advanced services to consumers.

(Def. Ex. 50, Doyle Dep., 91:12-92:3.)

[10]Robert Pick, Comcast's senior vice president of corporate development, testified that

the idea of clustering just sort of morphed from the industry.  Part of it was competitively driven when you have – when you had like the direct broadcast satellite providers come into being.  Their footprint by nature is national.  They just put a satellite up in the air and then the signal can reach most of the country.

So when their footprint is national, you know, and we're dealing with small franchises, we obviously cannot compete effectively.  They can tell one story.  They have an upgraded network.  They give one channel lineup.  They can offer more channels.  So for us to compete when we're just a particular franchise in a market makes it more difficult.  It also started to develop as the telephone companies got into

51, Hindery Dep., 132:11-15[11]; Def. Ex. 56, Roberts Dep., 144:23-145:22.[12]).  Finally, it asserts that

the FCC has recognized the efficiencies associated with clustering and expressly considered the

potential effects of clustering when it approved the Time Warner/Comcast/Adelphia transaction in

2006, well after clustering in the Philadelphia DMA had already occurred.  (Def. Statement of

Undisputed Facts ¶ 52-53; Def. Ex. 17, FCC 99-418, Sixth Annual Competition Report, ¶¶

161-162[13]; see also Def. Ex. 18, FCC 01-1, Seventh Annual Competition Report, ¶ 166 (clustering

---

the business and their – their footprint by nature is much larger than ours.  And so –
and then it just sort of happened when you – you know, TCI at one point in time was
the largest cable operator in the U.S. and they were financially and operationally
stressed at one point in time, so they looked to create clusters or they were giving –
they've either sold systems or created joint ventures with – with operators where they
would put the systems, clustered systems, on a local basis and said to an operator,
here, you run it, you're better able to run these things because of the scale economies
within a cluster.

(Def. Ex. 54, Pick Dep., 56:6-57:13.)

[11]Hindery testified that clustering "had nothing to do with controlling the market.  It had
everything to do with putting ourselves in an operating cost structure that mirrored as closely as
possible our nearest and closest competitors."  (Def. Ex. 51, Hindery Dep., 132:11-15.)

[12]Roberts testified that

[t]here was, post-'92, as I have said repeatedly, a desire to take this patchwork of
cable systems, and create more sensible businesses so we can compete more
effectively in the future against the oncoming competitors, who all had complete
DMAs, where in case of satellite, two competitors for every market who had a
hundred percent market share in the United States. So every home in America can get
the product.  They [national footprint DBS providers] can run an ad in the middle of
the Super Bowl, let alone, in local broadcast television.
          So there was, no question, a lot of desire to try to get larger in markets.

(Def. Ex. 56, Roberts Dep., 144:23-145:22.)

[13]The FCC stated that

Clustering of cable systems can create greater economies of scale and size.

"permits cable operators to . . . gain efficiencies related to economies of scale and scope resulting in lower administrative costs, enhanced deployment of new technologies and services, and encouraging the extension into previously unserved areas"); Def. Ex. 19, FCC 01-389, Eighth Annual Competition Report, ¶ 14 ("By clustering their systems, cable operators may be able to achieve efficiencies that facilitate the provision of cable and other services, such as telephony.").).

Based in large part upon these governmental reports, Comcast's expert Dr. David Tecce opined that the entry of the DBS companies, who were capable of offering higher quality digital television in a nationwide footprint, created a competitive crisis for cable firms, who up to that time were providing analog signals to non-contiguous individual franchise areas.

> The need to make significant investments in order to upgrade cable systems to compete with DBS providers led to consolidation among cable operators. DBS had large-scale national operations, which gave them ability to take advantage of scale economies. To compete effectively, most cable firms needed to achieve larger scale.

(April 10, 2009 Expert Report of David J. Teece, Ph.D. ("Teece Report") at ¶ 17.) "As a result, cable firms sought to achieve economies of scale through mergers and acquisitions. Many old-line cable firms decided to sell their systems rather than make the investments in system upgrades necessary to stay competitive with DBS providers in the new competitive environment." (Id. ¶ 18.) Teece recounts the history of the "deployment of digital cable transmission that paved the way for

---

> Accordingly, it can enable cable operators to offer a wider variety of broadband services at lower prices to customers in geographic areas that are larger than single cable franchise areas. Clustering can thus make cable operators more effective competitors to LECs whose local service areas are usually much larger than a single cable franchise area. The General Accounting Office, in its report on the changing status of competition to cable television, also found that ownership ties and clustering strategies may provide cost savings and possible competitive advantages.

(Def. Ex. 17, FCC 99-418, Sixth Annual Competition Report, ¶ 162.)

cable firms to offer other advanced services.  In addition to offering superior video picture quality, digital transmission allows for the provision of several other advanced digital services such as HDTV, Video-on-Demand ("VOD"), Digital Video Recorder ("DVR"), broadband Internet, and cable telephony.  These technological advances have ushered a new paradigm in the telecommunications industry, dubbed 'convergence,' under which multiple forms of telecommunications content (audio, video, and data) are delivered to the consumer by a single firm."

(Id. ¶ 16 (citations omitted).)  He concludes that:

> Regional clustering created significant efficiencies, including achieving economies of scale in upgrading systems to digital and to offer advanced services such as broadband Internet and cable telephony. . . .  Clustering allowed cable operators to achieve regional scale comparable to DBS providers and ILECs.  For instance, a former TCI and AT&T executive testified that clustering "had everything to do with putting ourselves in an operating cost structure that mirrored as closely as possible our nearest and closest competitors."

(Id. ¶ 21.)

Comcast also presents evidence that the entry of incumbent local exchange carriers ("LECs" or "ILECs") such as Verizon's FiOS system, also created new competition for the cable industry. Dr. Teece reports that ILEC competition, which by 2008 had captured 18% market share, is expected to continue to provide significant competition to cable and DBS firms in the next few years.  (Id. ¶ 25-26.)  He states:

> The threat of competition from ILECs has been another factor contributing to cable operators' clustering strategy.  Because the ILECs' phone footprints were much larger than a typical cable franchise area, clustering allowed cable firms to capture economies of scale and compete effectively in offering advanced services and selling advertising.  According to testimony from a former TCI and AT&T executive, clustering was designed to "meet the challenge of these regional phone companies coming and providing video and providing Internet over their existing phone lines.

(Id. ¶ 28 (citations omitted).)  Dr. Teece concludes that Comcast's clustering in response to new

sources of competition has benefitted consumers.  He asserts that consumers benefit from the

programming diversity brought about by increased MVPD channel capacity (id. ¶ 32-33), and from

the ability of a clustered system to provide advanced services such as HDTV, internet and cable

telephony (id. ¶ 34-39).[14]

Another Comcast expert, Dr. Stanley Besen, opines that entry into the MVPD market by

ILECs, who are essentially in the same shoes as wireline overbuilders, has not been impeded by

clustering.  He opines that,

> Verizon is currently an actual competitor, providing service that is comparable to that
> provided by the other operators in large sections of the Philadelphia Cluster.
> Moreover, Verizon is a well-financed, sophisticated company, with access to the
> same programming that is available to Comcast, an established brand-name, and
> long-standing consumer relationships.  In addition, it is able to offer both telephone
> and high-speed internet services along with television programming, in what has
> come to be called "Triple Play" packages.  In short, it poses a formidable competitive
> threat to Comcast and other cable operators not only as a potential but as an actual
> competitor.  Verizon was not eliminated as either an actual or potential competitor
> by the transactions at issue so that, on Plaintiffs' theory, households in the areas that
> they serve, or might serve in the future, have not been harmed by the transactions at

---

[14]Michael Salinger, Director of the Federal Trade Commission's Bureau of Economics,
testified before the Senate Judiciary Committee on the Time Warner/Comcast/Adelphia transaction
that:

> It was also very clear from the outset that the parties' principal objective in making
> the acquisition and asset swap was to increase "clustering" in the TWC and Comcast
> cable assets.  Clustering enables cable firms to realize economies of scale associated
> with providing cable service in contiguous areas.  By acquiring contiguous systems,
> TWC and Comcast could lower several categories of costs, such as management,
> administrative and marketing costs, as well as the expense of providing system
> upgrades.  In addition, TWC and Comcast could use clustering to position themselves
> better to compete with local telephone companies and other providers in the delivery
> of video and telephone service.

(Def. Ex. 22, Michael Salinger, Dir. Bureau of Econ., Prepared Statement of the FTC:
Sports Programming and Cable Distribution: The Comcast/Adelphia/Time Warner Transaction
(Dec. 7, 2006), p. 4.)

issue.

(May 6, 2009 Expert Report of Dr. Stanley Besen ¶ 32 (citations omitted).)

    D.      Analysis

    The United States Supreme Court has held that the *per se* test applies to naked restraints on trade, one where the "purpose of the practice are to threaten the proper operation of our predominantly free-market economy – that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" Broad. Music, Inc v. CBS., 441 U.S. 1, 19-20 (1979) ("BMI") (quoting United States v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16 (1978); see also 2 Areeda and Hovenkamp, Antitrust Law, § 305 (3d ed. 2007) (*per se* rule "rests on various judgments about facts, economics, and social policy: that naked price fixing usually harms the economy if the collaborators have any marked power; that legitimate objectives are so rarely present that they should be disregarded; and that little or nothing worthwhile is lost by a categorical prohibition, which dispenses with unnecessary and costly litigation about power, purpose, effect, or claimed redeeming virtues, and which establishes the 'bright line' permitting those severe punishments that deter and guide private conduct.").  The geographic division of markets among competitors is a *per se* violation of the Sherman Act.  See Palmer, 498 U.S. at 49 (per curiam) ("[A]greements between competitors to allocate territories to minimize competition are illegal"); Topco Assocs., Inc., 405 U.S. at 608 ("This Court has reiterated time and time again that '[h]orizontal territorial limitations . . . are naked restraints of trade with no purpose other than stifling of competition.'  Such limitations are *per se* violations of the Sherman Act." (alteration in original; internal citations omitted)).

However, even when the *per se* label has been applied to a category of anticompetitive conduct, the cases establish that courts may still look to see whether the economic effects of a particular practice in a particular industry justify abandoning a rule of reason analysis.  In BMI, the Court found that, because the blanket license at issue, granting a licensee access to an entire music catalog, created an entirely different product from one that any given composer was able to sell by himself, and did not restrain the right of any individual copyright owner to sell his own compositions separately to any buyer at any price, it could not "be wholly equated with a simple horizontal arrangement among competitors."  441 U.S. at 23-24.  The Court cautioned that when reviewing courts "have some doubt . . . about the extent to which [a] practice threatens the 'central nervous system of the economy,' . . . that is, competitive pricing as the free market's means of allocating resources," application of the *per se* rule should not be used to short circuit a more critical analysis of the practice.  Id. (quoting United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 226 n.59 (1940)).  Similarly, in Eichorn, the United States Court of Appeals for the Third Circuit held that even where the plaintiff alleged a classic variety of *per se* violation, in that case a group boycott, where the facts used to establish the antitrust violation "are substantially different from the classic *per se* horizontal price fixing and group boycott conspiracies the Court has generally found to be *per se* antitrust violations," the rule of reason must be used to determine whether the practice is condemned by section 1.  Eichorn, 248 F.3d at 139 (citing BMI, 441 U.S. at 8 ("Easy labels [like price fixing] do not always supply ready answers.")).

The authorities agree that this "modern approach" to antitrust analysis should apply where the rationale of the *per se* rule does not neatly fit the industry involved.  In BMI, the Supreme Court held that countervailing pro-competitive virtues, like the creation of efficiencies in the operation of

a market or in the provision of goods and services, made application of the *per se* test inappropriate to blanket licenses for copyrighted music.  441 U.S. at 20 ("The blanket license, as we see it, is not a 'naked restrain[t] of trade with no purpose except stifling of competition,' <u>White Motor Co. v. United States</u>, 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963), but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use.")

In light of <u>BMI</u>, the earlier <u>Topco</u> decision, holding that horizontal market allocation agreements were a *per se* section 1 violation,  has been criticized as going too far.  One commentator stated,

> The Court in <u>Topco</u> was a bit like a driver who, because of his "rule" never to pick up hitchhikers, refuses to give a ride to a close friend whose car has broken down. This wooden approach to *per se* rules has been abandoned in subsequent horizontal restraint cases, particularly <u>Broadcast Music</u>, which emphasized the need to characterize restraints before applying a *per se* rule. . . . [U]nder <u>Broadcast Music</u>, a court must determine whether the restraint at issue is one to which the rationale of the rule applies.  The <u>Topco</u> association could not possibly have been a cartel, because no licensee had a significant market share in its designated territory; the market shares were so trivial, that the licensees could have merged – at least under modern standards – without drawing the attention of the enforcement agencies. Moreover, the defendants articulated and proved procompetitive benefits.   The association seems clearly to have been ancillary to a larger productive purpose.

2 Kintner, <u>Federal Antitrust Law</u>, § 11.39 (2002) (citing <u>Eichorn</u>; <u>Polk Bros. v. Forest City Enter.</u>, 776 F.2d 185, 189-90 (7th Cir. 1985) (holding that *per se* rule is designed for "naked" restraints rather than agreements that facilitate productive activity)); <u>see also</u> <u>Augusta News Co. v. Hudson News Co.</u>, 269 F.3d 41, 48 (1st Cir. 2001) ("Despite unguardedly broad language in [<u>Topco</u>], it is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint venture.").  In <u>Polk Bros.</u>, the United States Court of Appeals for the Seventh Circuit noted that courts "must distinguish

between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote." Id. at 188 (citing National Collegiate Athletic Assoc. v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85 (1984)).  Noting the Supreme Court's admonition in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767-68 (1984) that "it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects," Polk Bros. stressed that

> a court must be very sure that a category of acts is anti-competitive before condemning that category *per se*. See [BMI] and NCAA, *supra*, both of which assess under the Rule of Reason horizontal agreements that also involve cooperation among rivals that might produce larger output and more desirable products.  Both BMI and NCAA emphasize that condemnation *per se* is an unusual step, one that depends on confidence that a whole category of restraints is so likely to be anticompetitive that there is no point in searching for a potentially beneficial instance.

776 F.2d at 189; accord Texaco Inc. v. Dagher, 547 U.S. 1, 5 (2006) ("Accordingly, 'we have expressed reluctance to adopt *per se* rules . . . 'where the economic impact of certain practices is not immediately obvious.' " quoting State Oil Co., 522 U.S. at 10); Eichorn, 248 F.3d 131, 144 n.2.

We find that the Class has failed to meet its summary judgment burden with respect to whether the swap transactions were naked market division agreements, rather than merely ancillary restraints on trade.  The Class's evidence, for example, that Comcast executives, as well as Leo Hindery, had a long standing desire to "rationalize" the cable industry by consolidating positions in certain markets in exchange for giving up positions in other markets, does not support the conclusion that the swap agreements were naked restraints of trade that were "'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" Deutscher Tennis Bund, 610 F.3d at 830 (quoting Texaco Inc., 547 U.S. at 5).  Moreover, the ability of cable companies to

provide new and advanced services, achieved through clustering their systems, requires proof of facts that "are substantially different from the classic *per se* horizontal price fixing and group boycott conspiracies the Court has generally found to be *per se* antitrust violations.'" Eichorn, 248 F.3d at 139. The competitive efficiencies achieved by clustering – economies of scale needed to upgrade systems to digital service, and creating the ability to offer advanced services such as broadband Internet and cable telephony in larger geographic footprints to effectively compete with DBS providers and ILECs – are the type of pro-competitive conditions that the Third Circuit held can render an industry practice "substantially different from the classic" horizontal restraints subjected to *per se* treatment. Eichorn 248 F.3d at 139 (citing BMI, 441 U.S. at 8 ("Easy labels [like price fixing] do not always supply ready answers.")). Like the creation of the blanket license in BMI, creation of cable clusters in order to allow MVPD providers to offer new and improved products is not a categorically "naked restrain[t] of trade with no purpose except stifling of competition." BMI, 441 U.S. at 20. Accordingly, we hold that the rule of reason test is the proper method of analyzing the Class's section 1 claim.

## IV. SECTION 1 RULE OF REASON ANALYSIS – ACTUAL AND POTENTIAL COMPETITION

Having addressed the parties' arguments on the issue of *per se* liability, the only section 1 issue remaining to be decided is Comcast's argument that summary judgment must be entered in its favor because the transaction counterparties were never "competitors." In granting class certification, we determined that class treatment of the section 1 liability issue was limited to whether the Class could demonstrate that Comcast conspired **with competitors** to allocate markets. (See Amended Class Certification Order, Doc. No. 432, entered January 13, 2010 ("1/13 Order"),

¶ 11(a) (emphasis added).)  Comcast argues that, even applying a rule of reason analysis to the section 1 claim, the Class has failed to meet its Rule 56 burden to create a genuine issue of fact that Comcast conspired with its competitors to allocate markets because the Transaction Counterparties never directly competed for cable subscribers.  We find that the Class has met its Rule 56 burden to create a jury issue on whether Comcast and the Counterparties were competitors.

A.      Evidence of Actual Competition.

Comcast concedes that, prior to the Transactions, Comcast and the Counterparties each offered cable services to subscribers in the Philadelphia DMA.  However, it asserts that they were never "competitors" because, at all times, they operated cable systems in their own respective, non-overlapping franchise areas and never offered services to the same subscribers, at the same time, anywhere in the Philadelphia region.  (Def. Ex. 59, Williams Dep., at 80:12-25, 104:24-105:3; Def. Ex. 46, Deposition of Steve Burke on December 5, 2008 ("S. Burke Dep."), at 15:23-16:6; 24:23-25:1, 51:17-22, 205:19-21; Def. Ex. 47, Deposition of Scott Burnside on November 11, 2008 ("Burnside Dep."), at 183:16-184:5; Def. Ex. 55, Deposition of Thomas Steel on July 17, 2008 ("RCN 30(b)(6) Dep."), at 192:21-193:17; Def. Ex. 51, Deposition of Leo Hindery, Jr., on November 14, 2008 ("Hindery Dep."), at 94:5-8; 167:9-12; Def. Ex. 52, Deposition of Harold (Gerry) Lenfest on November 18, 2008 ("Lenfest Dep.") at 89:14- 90:5, 95:9-14; Def. Ex. 50, Deposition of Michael Doyle on November 6 and 20, 2008 ("Doyle Dep."), at 155:1-18; Def. Ex. 56, Deposition of Brian Roberts on September 23, 2008 ("Roberts Dep."), at 208:14-17.)

Prior to the Transactions, no class member had the option of simultaneously obtaining video programming from both Comcast and any of the Counterparties at the same household or within the same local franchise area.  (See Def. Ex. 59, Williams Dep., at 104:24-105:3; Def. Ex. 51, Hindery

Dep., at 167:9-12; Def. Ex. 46, S. Burke Dep., at 15:23-16:6; 24:23-25:1, 51:17-22, 205:19-21; Def. Ex. 50, Doyle Dep., at 155:1-18; Def. Ex. 56, Roberts Dep., at 208:14-17.)  Because each cable company offered MVPD service within separate, non-overlapping franchise areas, Comcast asserts that it did not actually and directly compete with any Counterparty for the business of any cable subscriber. (See Def. Ex. 51, Hindery Dep., at 94:5-8, 167:9-12; Def. Ex. 52, Lenfest Dep., at 89:14-90:5, 95:9-15; Def. Ex. 46, S. Burke Dep., at 24:23-25:1; see also Def. Ex. 22, Michael Salinger, Dir., Bureau of Econ., Prepared Statement of the FTC, before the Cmte. on the Judiciary United States Senate: Sports Programming and Cable Distribution: The Comcast/Time Warner/Adelphia Transaction (Dec. 7, 2006), at 4 (testifying that "the FTC staff determined that [Time Warner] and Comcast were not acquiring any cable assets that competed with their existing assets.  In other words, the transaction eliminated no horizontal competition between the parties.")

Comcast supports its assertion by citing the rationale of the Federal Communications Commission in rejecting an objection to the Time Warner/Comcast/Adelphia Transaction that it reduced competition between Comcast and Adelphia or Time Warner.  The FCC determined that, prior to the Transaction, Comcast did not compete directly with Adelphia or Time Warner because each offered cable services in adjacent franchises and, thus, consumers did not have the ability to choose between them.[15]  (See Def. Ex. 16, Time Warner/Comcast/Adelphia Order, ¶ 82.)  Similarly,

---

[15]The FCC's Time Warner/Comcast/Adelphia Order stated, in response to an objection to the proposed merger that:

> In DMAs where both Time Warner and Comcast currently operate, however, they generally do not compete directly for subscribers.  Their systems usually operate in adjacent franchise areas within a DMA, and consumers do not have the ability to choose between them.  Accordingly, the elimination of Time Warner's or Comcast's presence in a particular DMA does not likely indicate the loss of head-to-head competition.

the FCC rejected an objection to the Comcast/AT&T/MediaOne Transaction on the ground that

Comcast and AT&T, or AT&T and MediaOne were competitors, finding that actual competition

exists only among cable firms that overbuild each other's franchise areas and that there was no

evidence that Comcast and AT&T, or AT&T and MediaOne, would have overbuilt one another in

the absence of the transactions.[16]  (See Def. Ex. 15, AT&T/Comcast Order, ¶ 94; Def. Ex. 14,

---

(Def. Ex. 16 ¶ 82.)  The Class concedes that the FCC approved the transaction, but contends that neither the FCC's approval nor its legal conclusion are proper evidence of competition. (Counterstatement of Facts ¶ 33.)

[16]In approving the Comcast/AT&T Transaction, the FCC stated:

> CFA offers no evidence to suggest that AT&T and Comcast would overbuild each other's cable systems such that the proposed merger would diminish competition in these local franchise areas.  Applicants deny having any intentions to overbuild, and confirm that they have not overbuilt in each other's franchise areas, with the exception of the few non-consolidated affiliate systems.  Accordingly, we cannot conclude from the record that AT&T and Comcast had intentions of overbuilding each other's local markets, or that they were likely to do so.

(Def. Ex. 15 ¶ 94.)  In the AT&T/MediaOne order, the FCC found:

> BellSouth argues that the merger will eliminate current and future MVPD competition between AT&T and MediaOne in local areas where the Applicants have overlapping or adjacent cable franchise areas.  BellSouth contends that, in the absence of the proposed merger, AT&T and MediaOne would build over ("overbuild") each other's cable systems, thereby offering consumers in those areas two MVPD cable choices.  However, we find no evidence in the record to suggest that AT&T and MediaOne would overbuild each other's cable systems such that the proposed merger would diminish competition in these local areas.
>
> . . .
>
> Since the initial acquisition of the Fayetteville and Powder Springs overbuilt systems, the system owners have not constructed anymore overbuilds, and there is no evidence to suggest that AT&T and MediaOne would overbuild one another absent the merger. AT&T and MediaOne hold overlapping franchise authority in 13 other areas, but have no overbuilds in these areas.  There is no evidence that they would overbuild each other in these areas absent the merger. We find that the proposed merger is unlikely to diminish MVPD competition between the Applicants to a degree that would warrant the denial of the Application or the imposition of conditions.

MediaOne Group, Inc., 15 FCC Rcd 9816 (2000) ("AT&T/MediaOne Order"), ¶¶ 94-95.)  Finally, Comcast asserts that the swap agreements did not contain non-compete or other enforceable provisions restricting Comcast or the Counterparties from re-entering the area and competing with one another.  However, as noted, the Lenfest acquisition agreement involved a contractual covenant not to compete binding upon Gerry Lenfest, and other family member owners of Lenfest.

The Class responds that each Counterparty offered the same product in the same geographic market; namely, each operated as an MVPD distributor at the same level of the market within the Philadelphia DMA, and therefore were actual competitors prior to the Transactions.  Its economics expert, Dr. Michael A. Williams, opines that Comcast and each of the Counterparties were competitors because they engaged in the same business in the same product market and geographic market.  (Williams Decl. ¶ 164; Expert Reply Decl. Of Michael Williams, Ph.D. ("Williams Reply Decl.") ¶ 15 (stating that at least eight cable companies provided service in the Philadelphia DMA in areas adjacent to Comcast franchises, before being acquired by Comcast)).

Comcast's internal documents show that the company itself viewed other MSOs as its competitors.  (See Pl. Ex. 134 (Comcast internal emails identifying companies that are Comcast's major competitors.))  Comcast required the CEO of Lenfest to sign a non-compete agreement as part of the Lenfest acquisition.  According to Dr. Williams, the non-compete clause "demonstrate[s] that in Comcast's view, the relevant geographic area where these individuals represented a continuing competitive threat to Comcast was not only larger than [a local franchise area], it was larger than the footprints [in which the companies had previously provided service] . . . showing that Comcast

---

(Def. Ex. 14 ¶¶ 94-95.)  The Class concedes that the FCC approved the transactions, but contends that neither the FCC's approval nor its legal conclusion are proper evidence of competition. (Counterstatement of Facts ¶ 34.)

viewed MVPD companies in these neighboring geographic locations as competitors and/or potential competitors, even though Comcast was not an incumbent cable provider in those locations at that time." (Williams Decl. ¶ 79-80.)[17]

Comcast also viewed other MSOs as competitors for the purchase of cable assets and customers. (Pl. Ex. 32, "Minutes of a Special Mtg. of Bd. of Directors of Comcast Corp. of May 4, 1989, at COM PA1151021 (describing the arrangement by which Comcast and AT&T agreed to abandon their competition to purchase MediaOne's cable assets and, instead, "reach[ed] an amicable and acceptable alternative to another round of competitive bids," involving a swap of various AT&T and Comcast cable assets resulting in the addition of 750,000 subscribers for Comcast.) Dr. Williams cites the MediaOne transaction, as well as the competition between Comcast, Lenfest and Mediacom for Marcus Cable's Eastern Shore Systems, and the competition between Comcast and several other MSOs for the assets of Cablevision systems in Ohio, Massachusetts and Michigan, to support his assertion that Comcast competed with the Counterparties to acquire cable assets before they were themselves acquired by Comcast. (Williams Decl. ¶ 122.) Brian Roberts, Comcast's CEO, also acknowledged that Lenfest, prior to its acquisition, was a potential competitor for other cable systems in the Philadelphia DMA. (Pl. Ex. 93, Roberts Dep., 231-32.)

Finally, the Class contends that Comcast's competitors also considered other MSOs to be competitors. For example, AT&T Board of Directors' internal documents list other MSOs, including

---

[17]Dr. Williams also notes that a non-compete agreement was executed between Comcast and executives at Prime Communications, as part of a loan agreement. (Williams Decl. ¶ 23.) There is no evidence that Prime Communication was involved in any of the acquisition or swap transactions.

Comcast, as competitors.  (Pl. Ex. 101, October 1999 AT&T Bd. of Directors Mtg., "Competitive Cable TV Statistics";  Pl. Ex. 102, March 1999 AT&T Bd. of Directors Mtg. "Acquisition of 50% Interest in Lenfest Communications Executive Summary".)  Gerry Lenfest likewise testified that Comcast was a "competitor in acquiring systems," although he stated that Comcast was not a direct competitor for subscribers.  (Pl. Ex. 90, Dep. of Harold Lenfest on November 18, 2008, 89:10-25.)[18]

      B.     Evidence of Potential Competition.

Comcast also argues that the Class cannot create a genuine issue of material fact that the transactions eliminated any potential competition between itself and the Counterparties because there is no evidence that it or any Counterparty ever intended to enter another's market as an overbuilder. Comcast asserts that the Class has produced no evidence that Comcast, Lenfest, or any of the other Counterparties intended to overbuild one another in the Philadelphia DMA at some future time. (See 10/15 Tr. 84:24-85:16; Def. Ex. 59, Williams Dep., 105:9-106:18.[19])  It also asserts that there is no evidence that any Counterparty had any intention of overbuilding Comcast or took affirmative steps toward doing so.  Rule 30(b)(6) representatives of Lenfest and AT&T, the only two Counterparties deposed by Plaintiffs, each testified that the companies had no intention of overbuilding Comcast,

---

[18]The Class makes additional arguments that Comcast also competed with other MSOs for original cable franchises and engaged in "benchmark competition" with other MSOs.  We have already rejected these portions of the Class expert's market structure analysis.  (See Class Cert. Mem. at 18 (rejecting theory of competition for the award of original franchises because all awards occurred before the class period); id. at 51-52 (rejecting theory of benchmark competition as not capable of proof at trial through common evidence).)

[19]Dr. Williams conceded that, in reviewing all of the documents and depositions in the case, he had seen no business plan suggesting that Comcast or another MSO was planning to overbuild another MSO in the Philadelphia DMA.  (Def. Ex. 59, Williams Dep., 105:9-106:18.)

had not taken any affirmative steps toward doing so, and did not consider overbuilding to be economically viable. (See 10/14 Tr., 140:9-14; Def. Ex. 52, Lenfest Dep., 82:25-85:3, 89:23-90:5; Def. Ex. 51, Hindery Dep., 181:7-23.)

Comcast also asserts:

- It had no interest in, or intent to, overbuild any Counterparty nor had it taken any affirmative steps toward doing so, such as seeking to obtain the necessary franchise approvals, building out infrastructure, setting aside capital for that purpose or otherwise performing any planning whatsoever for such a move, because Comcast did not consider overbuilding to be an economically viable business model.  (See Def. Ex. 46, S. Burke Dep., 13:7-14:8, 52:16-57:7; Def. Ex. 56, Roberts Dep., 173:4-174:24.)

- Its pricing decisions were not based on a concern that other MSOs might overbuild Comcast. (See Def. Ex. 46, S. Burke Dep., 207:14-20; Def. Ex. 50, Doyle Dep., 183:14-23; Def. Ex. 57, Deposition of David Scott on December 3, 2008 ("Scott Dep."), 107:19-108:6.)

- There is no evidence that any of the Counterparties based their pricing decisions on Comcast prices. To the contrary, Gerry Lenfest testified that Lenfest did not base its pricing decisions on a concern that Comcast might overbuild Lenfest franchise areas.  (Def. Ex. 52, Lenfest Dep., 70:8-16, 72:6-73:16, 90:21-91:9.)

- The Federal Communications Commission determined in evaluating several of the Transactions that the merging entities had no intention of overbuilding one another's franchise areas, nor were they likely to do so.  (See Def. Ex. 15, AT&T/Comcast Order, ¶ 94; Def. Ex. 14, AT&T/MediaOne Order, ¶¶ 94-95.)

Based upon these averments, Comcast argues that the Class cannot demonstrate a jury issue that any

Counterparty's presence on the fringe of a Comcast franchise prior to the merger, tempered Comcast's competitive behavior.

The Class responds that it has produced evidence that there was a "potential for incumbent MSOs in the Philadelphia DMA to overbuild each other's territories, since they have done so in other markets," and that the FCC recognizes that adjacent cable operators are the most likely entrants. (Counterstatement of Facts ¶ 36). To support its factual assertions of potential overbuilding in the Philadelphia DMA, the Class relies upon specific instances of overbuilding in **other** parts of the country;[20] deposition testimony from Leo Hindery that it is not uncommon for MSOs to overbuild each other's franchise areas (Pl. Ex. 89, Hindery Dep. at 95-96); an assertion by its expert, Dr. Williams, that "there's certainly a potential for the incumbent MSOs in the Philadelphia DMA to overbuild each other's territories because they have done it in other places, (Pl. Ex. 100, Williams Dep. at 46-47); and the FCC's Thirteenth Annual Report, which states that "clustering can present

_____

[20] See Counterstatement of Facts ¶ 8.  The Class cites overbuilding that occurred in **New York City** (Pl. Ex. 89, Hindery Dep., 95-96); **Dover, Delaware** (where Storer Cable, a competitor to a corporate predecessor of Marcus Cable – itself now a Comcast corporate predecessor – overbuilt approximately 500 homes) (Pl. Ex. 27 at COM-PA0776597); **Terre Haute, Indiana** (where 20-25% of Time Warner's territory had been overbuilt by Charter) (Pl. Ex. 23 at COM-PA1130645); **Tampa, Florida** (where an Adelphia franchise was overbuilt by Time Warner) (Pl. Ex. 35); **Kalamazoo, Michigan** (where Cablevision overbuilt approximately 300 homes served by Adelphia) (Pl. Ex. 40 at COM-PA1835049); **Ann Arundel County, Maryland** (where Millenium Cable and AT&T had overbuilt each other's areas representing 50,000 homes passed) (Pl. Ex. 92 at 294-95; Pl. Ex. 103 at COM-DOJ273974-75); **City of Aventura, Florida** (where a Comcast area was overbuilt by Cablevision and Comcast overbuilt AT&T areas) (Pl. Ex. 120 at COM-PA1082923); **Alameda, California** (5,300 homes overbuilt by Comcast) (Pl. Ex. 124 at COM-PA1267909); **Newman County, Georgia** (18,000 subscribers overbuilt by Charter and Comcast) (Id. at COM-PA1267922); **Oshtemo County, Michigan** (Cablevision overbuilt an Adelphia franchise area) (Pl. Ex. 133 at COM-PA1835049); **Orlando, Florida area** (Brighthouse overbuilt an Adelphia franchise area) (Pl. Ex. 106 at COM-PA00011036); **Powhatan, Virginia** (80,000 homes overbuilt by Adelphia) (Pl. Ex. 112 at COM-PA0374859); and **Dolthan, Alabama** (6,500 homes in a Comcast franchise area overbuilt by Time Warner) (Pl. Ex. 125 at COM-PA1382980).

a barrier to entry for the most likely potential overbuilder, (i.e. an adjacent cable operator)" (Pl. Ex. 146, Thirteenth Annual Report ¶ 180 (parenthetical in original)).  It asserts that, to the extent that Comcast and other MSOs avoid overbuilding adjacent franchise areas, record evidence shows that they do so as part of, and in support of, collusive and illegal agreements to allocate cable markets.

C.    Analysis

We find that the Class has produced evidence from which a jury could find in its favor on the section 1 claim's requirement that Comcast conspired with competitors to allocate markets. Comcast's assertions that the Counterparties were not its actual competitors – because each operated cable systems in their own respective, non-overlapping franchise area, and never offered services to the same subscribers, at the same time, anywhere in the Philadelphia region – would have some purchase had we determined that the relevant geographic market was the individual franchise area. However, in the class certification proceedings, we specifically rejected the opinion of Comcast expert Dr. Teece that the relevant geographic market should be pegged at the franchise level or, alternatively at the even smaller household level because the Class showed that it could establish by common evidence that the relevant geographic market should be the DMA.[21]  Importantly, Comcast has not challenged at the summary judgment stage the Class's position that the relevant geographic market is the DMA.

We find that the Class need not show that Comcast competed with the Counterparties in the same franchise areas for those Counterparties to be deemed its actual competitors.  Rather, based

---

[21]We concluded that "[b]ecause the record evidence shows that consumers throughout the DMA can face similar competitive choices and suffer the same alleged antitrust impact resulting from Comcast's clustering conduct in the Philadelphia DMA, we find that it can be the appropriate geographic market definition."  (Class Cert. Mem. at 14-15.)

upon the proposed market definitions, it is sufficient that each provided MVPD services in the Philadelphia DMA.  Were we to agree with Comcast's assertion that parties to an alleged market allocation scheme must have actually competed with one another for the same customers irrespective of market definitions, bizarre results could ensue.  Assume, for example, that two firms at opposite ends of the country – who have never grown so large as to be able to expand to the center of the country – agree they will never cross the Mississippi River to directly compete with one another.  In a suit against both firms asserting a nationwide geographic market definition, their agreement would satisfy all of the elements of an illegal horizontal market allocation.  But each firm could immunize itself from antitrust liability merely by agreeing to the allocation early enough to avoid being deemed direct competitors.  Clearly, the teaching of Palmer and Topco prohibits this result. See Palmer 498 U.S. at 49-50 (noting that "[t]he defendants in Topco had never competed in the same market, but had simply agreed to allocate markets").   Given the relevant product and geographic market definitions presumed by Comcast, it necessarily follows that each Counterparty could be its actual competitor in the market.[22]  Accordingly, we conclude that Comcast's contentions that (1) each company operated within its own respective, non-overlapping franchise area, and (2) never offered services to the same subscribers at the same time anywhere within the Philadelphia DMA, cannot eliminate the Class's market allocation claim as a matter of law where the Class has created a genuine issue of material fact that each company offered MVPD services in the

---

[22]We reject Comcast's reliance upon Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc., 546 U.S. 164, 174-75 (2006) and  Feesers, Inc. v. Michael Foods, Inc., 498 F.3d 206, 214 (3d Cir. 2007).  Volvo Trucks and Feesers were not Sherman Act market allocation cases.  Rather they were decisions construing Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), involving claims of price discrimination by a manufacturer against entities in the market position of a wholesaler.  See Volvo Trucks, 546 U.S. at 171; Feesers, 498 F.3d at 208-11.

Philadelphia DMA prior to the swap transactions.

We find, however, that the Class has failed to meet its summary judgment burden to create a genuine issue of material fact that Comcast or a Counterparty was a potential overbuild competitor. The two variants of potential competition theory apply section 7 of the Clayton Act to prohibit mergers and acquisitions by one company with another if "the effect of such acquisition may be substantially to lessen competition."   United States v. Marine Bancorporation, 418 U.S. 602, 622 (1974).[23]  The Class's assertion that overbuilding has occurred in other markets does not create a genuine factual issue that there was any potential for overbuilding in the Philadelphia DMA among

---

[23]As we stated in the class certification proceedings,

Under the first theory, "perceived potential competition," the Supreme Court held that competition might be diminished if a company that industry participants had thought might actually enter the market on its own, instead simply acquired a company already in that market.  See Marine Bancorporation, 418 U.S. at 625 ("[T]he Court has interpreted § 7 as encompassing what is commonly known as the 'wings effect'– the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter de novo. . . .  The elimination of such present procompetitive effects may render a merger unlawful under § 7.").  Under these cases, "perceived potential competition focuses on the premerger effect on prices of the perception that if profits rise, a new company will enter the market and drive down both prices and profits."  Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours and Co., 826 F.2d 1235 (3d Cir. 1987).

. . .

The actual potential competition doctrine has not received a clear stamp of validity from the Supreme Court, but other courts have applied it where the plaintiff can show:  (1) that the relevant market is oligopolistic; (2) that absent the acquisition [of the incumbent cable operator], the acquiring company [Comcast] would likely have entered the market in the near future either de novo or through a toehold acquisition; and (3) that such entry by the acquiring company [Comcast] would carry a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects.  Tenneco, Inc. v. FTC, 689 F.2d 346, 352 (2d Cir. 1982) (citing Marine Bancorporation, 418 U.S. at 630, 633).

Behrend v. Comcast, 245 F.R.D. 195, 207 (E.D. Pa. 2007).

the transaction Counterparties prior to the mergers.  Evidence that other MSOs in other parts of the country engaged in overbuilding, and evidence that neighboring MSOs are the most likely overbuilder entrants, is insufficient to establish a genuine issue of material fact on whether (1) the transaction Counterparties here would likely have entered a competitor's franchise area in the near future as a potential overbuilder had they not been acquired by Comcast or (2) that they had any intention to potentially overbuild each others' franchise areas, when the record evidence of those parties' intentions is directly to the contrary.  Accordingly, we conclude that the section 1 rule of reason claim may proceed on the Class's theory that Comcast and the Counterparties were "competitors" prior to the Transactions, but not upon its theory that they were potential overbuild competitors.[24]

## V.    SECTION 2 CLAIM – PREDATORY CONDUCT

The Third Amended Complaint contains two claims under section 2 of the Sherman Act,[25] monopolization (Count II) and attempted monopolization (Count III)[26].  The Class identifies two types of allegedly predatory conduct to support its section 2 claims: Comcast's clustering conduct

---

[24]We also find that the Class, to the extent that it raises the issues, cannot rely upon other forms of competition identified by its expert Dr. Williams, namely benchmark competition, competition for original cable franchises, and competition for bargaining power with programming content providers, which we have previously rejected as unsupported by evidence common to the class.

[25] Section 2 of the Sherman Act states:  "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" is guilty of an offense and subject to penalties.  15 U.S.C. § 2.

[26]Comcast argues with respect to both claims that the Class has failed to show predatory conduct.  Accordingly, our analysis of the two section 2 claims is identical for the purposes of the Motion.

and its conduct toward RCN, a cable overbuilder that attempted to overbuild Comcast franchises in Delaware County, Pennsylvania.  (Compl. ¶¶ 83-103.)  Comcast argues it is entitled to summary judgment because its clustering strategy had legitimate business justifications, and, accordingly, cannot be deemed to be predatory anticompetitive conduct.  It asserts that the Class has failed to meet its summary judgment burden to create a genuine issue of material fact that the transactions creating the cluster, either singly or collectively, lacked a legitimate non-pretextual business purpose. Additionally, it argues that its conduct in relation to RCN was not predatory or exclusionary, and that no jury could find that either (1) Comcast's conduct in licensing Comcast SportNet Philadelphia ("CSN Philadelphia") to RCN, (2) RCN's inability to engage contractors, or (3) Comcast's price discounts to potential RCN subscribers, constituted predatory conduct.[27]  Rather, it asserts, the summary judgment record demonstrates that RCN's inability to compete in the Philadelphia DMA resulted from its own financial difficulties in raising capital.  The Class responds that it has presented ample evidence demonstrating the transactions were anticompetitive and lacked valid business justifications.  It also asserts that genuine issues of fact exist regarding Comcast's conduct toward

---

[27]In the class certification proceedings, we rejected two other theories presented by the Class to demonstrate predatory conduct.  We rejected the Class's assertion that Comcast's anti-RCN lobbying activity could be used as proof of predatory conduct, because it was at odds with the Noerr-Pennington doctrine. (Class Cert. Mem. at 46 (citing Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965) (holding that an individual is immune from antitrust liability for exercising First Amendment right to petition the government)).)  We also extensively discussed the issue of Comcast's conduct in denying access to its DBS competitors to CSN Philadelphia in the last class certification opinion, which was based on the same record currently before us on summary judgment.  We rejected Dr. Williams' and Dr. Singer's opinions tying Comcast's clustering activity in the Philadelphia DMA to reduced DBS penetration rates as susceptible to proof at trial through available evidence common to the class.  (Id. at 26-28.)  In its summary judgment brief and in its Counterstatement of Facts, the Class concedes that these issues have been rejected and does not reraise them, other than to preserve an objection to the prior rulings.

RCN.

The elements of a section 2 monopolization claim are (1) the possession of monopoly power and (2) the willful acquisition and maintenance of that power as distinguished from growth or development or consequences of a superior product, business acumen, or historical accident. United States v. Grinnell Corp., 384 U.S. 563, 570-71 (1966); Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc., 159 F.3d 129, 141 (3d Cir. 1998). The elements of section 2 attempted monopolization are (1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power.   West Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 108 (3d Cir. 2010) (citing Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993)).[28] The distinction between the two claims is that "monopolization requires proof of monopoly power, while attempted monopolization requires only proof of a dangerous probability of achieving a monopoly.  Courts interpret the latter requirement to imply  a showing of market share somewhat less than that required for monopoly power."  2 Kintner, Federal Antitrust Law § 14.9.

The possession of monopoly power "will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (emphasis deleted); Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 308 (3d Cir. 2007) ("the acquisition or possession of monopoly power must be accompanied

---

[28]To determine whether there exists a viable claim of monopolization or attempted monopolization, a court must inquire into the relevant product and geographic market.  Spectrum Sports, Inc., 506 U.S. at 459.  We have already held in the class certification proceeding that the Class can establish through common evidence its definitions that the relevant product market is the provision of multichannel video programming service ("MVPS") and the relevant geographic market is the Philadelphia DMA.  For the purposes of its summary judgment motion, Comcast does not challenge these definitions.

by some anticompetitive conduct on the part of the possessor"); Morris Comm'ncs Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1295 (11th Cir. 2004) ("Unlawful monopoly power requires anticompetitive conduct, which is 'conduct without a legitimate business purpose that makes sense only because it eliminates competition.'" (quoting Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 804 (8th Cir. 1987))); LePage's Inc. v. 3M, 324 F.3d 141, 153-54 (3rd Cir. 2003). Antitrust conduct, also called exclusionary conduct or predatory conduct, "is central to the offenses of both monopolization and attempted monopolization." 2 Kintner, Federal Antitrust Law, § 14.9. The analysis of predatory conduct is the same under both sections. Id.

Courts follow a sequential analysis in examining predatory conduct. First, the burden of proof of demonstrating predatory conduct and anticompetitive effect rests on the plaintiff. United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001) (citing Monsanto, 465 U.S. at 763). If a plaintiff successfully demonstrates anticompetitive conduct, the defendant must demonstrate a "procompetitive justification" for its conduct. Id. at 59 (citing Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 483 (1992)). A "procompetitive justification" is a "nonpretextual claim that [the monopolist's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal. . . ." Id., see also LePage's Inc., 324 F.3d at 163 ("'In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons . . . , while the desire to maintain a monopoly market share or thwart the entry of competitors would not.'" (quoting Data Gen. Corp. v. Grumman Sys. Support Corp., 36 F.3d 1147, 1183 (1st Cir. 1994))) (alteration in original); see also 2 Kintner, Federal Antitrust Law § 14.35 ("practices that harm other firms without harming competition, or that harm

rivals because of the defendant's superior efficiency cannot constitute unlawfully exclusionary conduct in the attempt context.")[29].  Once the defendant has met its burden to demonstrate a valid business justification,[30] the burden shifts back to the plaintiff to show that the proffered business justification is pretextual.  See Image Technical Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1212 (9th Cir. 1997).[31]

---

[29]Kintner explains,

In considering exclusionary practices, it is critical to bear in mind that all competition excludes.  Every act of innovation, price cutting, new entry or expanded output harms competitors, excluding them from some part of the market, sometimes to the point of destruction.  But the antitrust laws actively promote this kind of harm to competitors. . . . [I]t is only when firms engage in practices that are *inefficiently* exclusionary – practices that predictably will lead to lower output and higher prices by reducing competition in the market as a whole – that antitrust law may intervene to enjoin or penalize the conduct.

2 Kintner, Federal Antitrust Law, § 14.14.

[30]At least one court has held that the question is **not** whether the business justification is sufficient, but merely whether defendant establishes it had one.  Bell v. Dow Chem. Co., 847 F.2d 1179, 1186 (5th Cir. 1988) (stating that the Supreme Court's decision in Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 597 (1985) "does not hold that a jury can weigh the sufficiency of a legitimate business justification against the anticompetitive effects of a refusal to deal in or order to find intent by a defendant to monopolize. . . .  The fact determination that may be left to a jury is whether the defendant has a legitimate business reason for its refusal, *not* whether that reason is sufficient.  The Aspen jury presumably found all of [defendant's] business justifications to be unpersuasive, *not* persuasive but insufficient.").

[31]We note that in Microsoft the United States Court of Appeals for the District of Columbia Circuit offered an alternative route to demonstrating that the conduct was predatory, holding that "if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Microsoft, 253 F.3d at 59; see also Abbott Labs. v. Teva Pharms. USA, Inc., 432 F. Supp. 2d 408, 422 (D. Del. 2006) (stating that Microsoft's rubric allowed alternate means to plaintiff to rebut defendant's justification: as pretextual or, alternatively, by demonstrating that the anticompetitive harm of the conduct outweighs the procompetitive benefit).  The Third Circuit has never specifically adopted this alternative.  See e.g., United States v. Dentsply Intern., Inc., 399 F.3d 181, 187, 196 (3d Cir. 2005) (acknowledging business justification defense to predatory conduct claim without mentioning

A.       Creation of the Philadelphia cluster.

1.       Has the Class created a genuine issue of material fact that the creation of the

Philadelphia DMA cluster was predatory?

The Class contends that building the Philadelphia cluster was predatory conduct because it

was accomplished through the use of the swap agreements to allocate the market between Comcast,

AT&T and Time Warner.  (Compl. ¶ 83.)  In addition to the evidence already discussed, the Class

_____

balancing) (citing LaPage's Inc. 324 F.3d at 152); Broadcom Corp., 501 F.3d at 318 (same).  Other
post-Microsoft appellate decisions have also been silent on whether this alternative is available.  See
e.g., Morris Commc'ns Corp. v. PGA Tour, Inc., 364 F.3d 1288, 1295 (11th Cir. 2004) (holding that
once the defendant has met its burden to show its valid business justification, the burden shifts to
the plaintiff to show that the proffered business justification is pretextual); ACT, Inc. v. Sylvan
Learning Sys., Inc., 296 F.3d 657, 670 (8th Cir. 2002) (holding that when a valid business reason
exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the
inference of a section 2 violation; plaintiff's evidence did not create a triable jury question on
whether defendant's proffered business reasons were legitimate); see also 3 Areeda and Hovenkamp,
Antitrust Law, § 658 (3d ed. 2007) (noting generally that few decisions have discussed the burden
shifting issue in any detail).
        In their discussion of the section 2 issues, neither party relied upon the alternative balancing
test, made any argument that the test is applicable under Third Circuit case law, or attempted to apply
the test to the summary judgement record.  Moreover, the Class initially advised the Court that it was
not relying upon the alternative balancing test.  (N.T. 4/2/12 at 3:16-5:3.)  However, in a later
correspondence, the Class noted that, as part of its argument that Comcast lacked a valid business
justification, it had argued in a footnote that a reasonable jury could conclude that the harm caused
by Comcast's anticompetitive conduct "far overshadowed" any claimed business justification. (See
Pl. Mem. at 72 n.55.)
        We find that any reliance upon the alternative balancing test was waived.  The Class's
footnote was entirely devoted to the pretext issue, not the balancing test.  Moreover, arguments
"raised in passing (such as, in a footnote), but not squarely argued, are considered waived." John
Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) (finding cursory
arguments contained in footnote in appellate brief were waived).  The Class's correspondence, issued
after it had stated on the record that it was not relying upon the test, is insufficient to raise an
argument that it did not include in its formal brief.  See Acumed LLC v. Advanced Surgical Servs.,
Inc., 561 F.3d 199, 223 (3d Cir. 2009) (holding that a party has sufficient notice before a summary
judgment is entered against it if it had reason to believe that the court might reach the matter at issue
on the pending summary judgment application and the party had an opportunity to support its
position fully); Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 84 (3d Cir. 1999) (holding
that an issue is waived if it is not raised in a party's initial appellate brief).

points to Dr. Williams' opinions that the swaps and acquisitions caused large increases in Comcast market share and market concentration.   Its market share  rose from 23.9% in 1998 to 77.8% in 2Q2002, ending at 69.5% in 4Q2007.  (Williams Decl. ¶ 114.)   Williams opined that Comcast "would be expected to exercise substantial market or monopoly power, unless barriers to entry were low."  (Id. ¶ 117.)  However, he opined, there exist substantial barriers to entry into the MVPD market, both wire-based and satellite, including substantial sunk capital cost, strategic behavior by incumbents designed to raise their rivals' costs, such as limiting programming availability, local and state level regulations, and technological limitations.  (Id. ¶ 118.)  Dr. Williams contends that, among the anticompetitive results from Comcast's acquisition of market power from its clustering the Philadelphia DMA was its ability to deter overbuilding.  (Id. ¶ 131; Williams Supp. Decl., Table 5; see also Singer Reply Decl. ¶¶ 42-59.)  Because, Dr. Williams opines, the presence of an overbuilder restrains cable prices (see Williams Decl. ¶ 133 and App. IV), the Class contends there is ample evidence from which a reasonable jury could conclude that Comcast's clustering of the Philadelphia DMA decreased overbuilding and led to increased prices.   Relying upon the Supreme Court's decision in Grinnell Corp., the Class argues that the swaps transactions are thus sufficient proof of anticompetitive conduct, standing alone, to permit a jury to find for the Class on its section 2 claims.

In Grinnell, the Court held that acquiring competitors in order to perfect a monopoly is predatory conduct.  384 U.S. at 576[32]; see also 2 Kintner, Federal Antitrust Law § 14.13 ("The

---

[32]The Court stated:

We have said enough about the great hold that the defendants have on this market. The percentage is so high as to justify the finding of monopoly.  And, as the facts already related indicate, this monopoly was achieved in large part by unlawful and exclusionary practices.  The restrictive agreements that pre-empted for each company a segment of the market where it was free of competition of the others were one

conduct element of the monopolization offense can be satisfied by a merger (or series of mergers)

to monopoly or by inefficient exclusionary conduct. . . . An acquisition or series of acquisitions that

threaten to achieve monopoly power may establish the requisite conduct and specific intent for an

attempt to monopolize."). Because the Class has presented evidence creating genuine issues of

material fact that (1) the swaps resulted in a dominate market share, (2) the anticompetitive results

from Comcast's acquisition of market power from its clustering the Philadelphia DMA included its

ability to deter overbuilding and (3) the presence of an overbuilder restrains cable prices, the Class

may rely upon the transactions themselves and evidence of Comcast's resultant increase in market

share as proof of predatory conduct.

> 2.     Has Comcast stated a "procompetitive justification" for its conduct?

Comcast argues it is entitled to summary judgment on the section 2 claim because it had

legitimate, procompetitive justifications in creating the Philadelphia cluster, and the Class has failed

to create a triable issue negating this claim. Based on the evidence already discussed in conjunction

with the arguments on the *per se* claim, Comcast argues that each transaction was undertaken for

valid business purposes. It argues that its decision to create a cluster in the Philadelphia DMA was

undertaken to achieve greater efficiency, a prototypically valid business purpose.

---

> device. Pricing practices that contained competitors were another. The acquisitions
> by Grinnell of ADT, AFA, and Holmes were still another. Grinnell long faced a
> problem of competing with ADT. That was one reason it acquired AFA and Holmes.
> Prior to settlement of its dispute and controversy with ADT, Grinnell prepared to go
> into the central station service business. By acquiring ADT in 1953, Grinnell
> eliminated that alternative. Its control of the three other defendants eliminated any
> possibility of an outbreak of competition that might have occurred when the 1907
> agreements terminated. By those acquisitions it perfected the monopoly power to
> exclude competitors and fix prices.

Grinnell, 384 U.S. at 576.

Comcast asserts that contemporaneous Comcast documents identify the efficiencies and advantages associated with clustering, including opportunities in the areas of general management, new product introductions, marketing, brand building, retail presence, ad sales, government and community relations, local programming, call centers, training, and business communications services. (Def. Mem. at 34-35; Def. Ex. 29, "Clusters/2000 Management Retreat Memo.," at COM-PA0214427-28 (outlining management opportunities created by large clusters, including general management, new product introduction, marketing, ad sales, government/community relations, local programming, call centers and training); Def. Ex. 28 (same).)  It adds that testimony confirmed that clustering enabled Comcast to realize marketing efficiencies by increasing its presence across a DMA (thereby enabling its self-advertising to reach a wider audience), and to realize other efficiencies such as consolidating infrastructure, operations, call centers, and management.  (Def. Statement of Undisputed Facts ¶¶ 46-47; Def. Ex. 56, Roberts Dep., 116:2-117:16[33]; Def. Ex. 50,

---

[33]CEO Roberts testified that among the advantages of clustering were

economies of scale and improved consumer benefits.  And I would say that those two categories are what I've been talking about with clustering, that I think in '99 you – depending on the scale, now this total acquisition would have done what I said earlier, make us substantially larger, so we would have qualified for programing discounts.

We would be able to consolidate managers within a market.  We'd be able to open up call centers within those markets, that would be open 24 hours a day, instead of kicking over to an answering service at night.  When most people watch television, historically, that's how cable service was provided.  Now you had a much larger area, and you're able to use new technology, as well as have a bigger scale of operations.

We are able to recruit better executives because it's closer to the caliber of being a TV station general manager.  Often considered the best job in media was to run one of the local markets, because you had the entire market in the broadcast industry or the radio industry, or the newspaper industry, or frankly, the phone industry.  You were in charge of either a state or a city.  So heretofore, we would have, you know, lower paid, smaller area of line of responsibility.  So there's a myriad of benefits that happened in that situation.

Doyle Dep., 90:3-92:3 (stating that a benefit of clustering was the ability to recruit better people and manage business more efficiently); Def. Ex. 53, Marshall Dep., 32:24-33:22 (stating that a benefit of clustering was better ad sales and economies of scale).)  As noted in the discussion of *per se* liability, Comcast asserts that clustering also allowed it to introduce new products such as high-speed internet, telephone, pay per view, video on demand, digital video recorders, digital cable, substantially more channels, and high-definition television.  (Def. Statement of Undisputed Facts ¶ 48.)  The economies of scale associated with clustering enabled cable providers to compete with satellite companies with a national footprint, and telephone companies possessing vastly larger resources and clusters, who were emerging as competitors in multiple product markets – video, data, and telephone.  (Id. ¶ 49; Def. Ex. 54, Pick Dep., 56:1-57:23; Def. Ex. 51, Hindery Dep., 132:11-15; Def. Ex. 56, Roberts Dep., 144:23-146:7.).  We find that Comcast has stated procompetitive justifications for its clustering conduct.

        3.      Has the Class created a genuine issue of material fact that the proffered business justification for clustering is pretextual?

The Class does not dispute that Comcast has identified efficiencies purportedly associated with clustering.  (Counterstatement of Facts ¶ 46.)  Rather, the Class asserts that Comcast did not present evidence that it conducted any post-transaction studies to see whether its assumptions about efficiencies were correct and there is no evidence in the record creating a genuine issue of material fact that the transactions actually resulted in increased efficiency for Comcast.  It argues that a reasonable jury could conclude from Comcast's "lack of interest" in whether its stated justification was true that its claimed efficiency justification was pretextual.  (Class Pl. Mem. at 70.)

---

Def. Ex. 56, Roberts Dep., 116:2-117:16

In contrast to the lack of evidence of actual efficiencies, the Class argues that the evidence creates a genuine issue of material fact that, with each transaction Comcast raised its prices, suggesting that the claim of efficiency is pretextual.  (Class Pl. Mem. at 72-73 (citing Pl. Ex. 6, "Analysis of Adelphia New Jersey Rates," at COM-PA0513589 (stating "it appears that Adelphia's rates could rise about $8.53 to be in line with Comcast's rates."); Pl. Ex. 126, Peyton Email of March 30, 2006 (stating with regard to the Adelphia/Time Warner swap transaction that a "factor[] driving the brand transition timing" was "[a] desire to take as many scheduled rate increases as possible under the existing Adelphia or TW system name."); Pl. Ex. 5, "Rating Agency Presentation January 2002," at COM-PA0206424 (noting that operating cash flow per former subscriber of E. W. Scripps, Jones Intercable and Lenfest increased, on average, 30% within one year of Comcast's acquisition of those systems.); Pl. Ex. 130, "Key Messages," (noting after integration of AT&T systems revenues increased by 9.8%, operating cash flow by 22.9%, margins by 8.2 points, and operating cash flow per subscriber by 23.4%; after integration of Adelphia systems revenues increased by 15.3%, operating cash flow by 28%, margins by 12 points, and operating cash flow per subscriber by 23.4%); Pl. Ex. 113, Presentation of Brian Roberts at Salomon Smith Barney 12th Annual Entertainment, Media & Telecommunications Conference, at COM-PA0470175 (stating that "in every other acquisition we've been able to get the Comcast margin to 42 percent within two years"); Pl. Ex. 123, Announcement of Adelphia and Time Warner Transactions, at COM-PA1137177-178 (showing acquired Adelphia systems' operating cash flow margin increasing from 30% to 39% after acquisition, showing history of increases after AT&T and prior Adelphia acquisitions).)  When asked about projecting revenues models after completing acquisitions, Robert Pick testified that Comcast "generally assume[d] there [would] be rate increases in the – over the modeling period."  (Pl. Ex.

92, Pick Dep., 87:2-4.)   David Scott, Comcast's executive vice-president of finance and administration, testified that Comcast's cable headquarters "directionally" advised how much it expected companywide prices to increase in its budgeting model each year, while allowing individual franchises to vary across the country.  (Pl. Ex. 96, Scott Dep., 26:22-28:14.)

The Class also asserts that Comcast did not need to allocate markets in order to achieve efficiency; that it could have built its cluster by overbuilding its competitors rather than acquiring them or swapping for their assets.  (Pl. Mem. at 75-76.)  It argues that a reasonable jury could find that Comcast's decision to pursue efficiency through swaps and acquisitions, rather than through overbuilding, harmed competition, was unnecessarily restrictive, and was thus anticompetitive, even if Comcast was allegedly engaging in those transactions in pursuit of increased efficiency.

Comcast responds that (1) the Class cites no authority for its assertion that a company claiming efficiency must conduct formal studies to establish that its goal was achieved, (2) the Class itself elicited testimony that Comcast had achieved efficiencies, (3) the Class's experts conceded that clustering can lead to efficiencies, (4) the FCC concluded that clustering increased efficiencies, and (5) the Class itself elicited testimony that obvious efficiencies were observed by Comcast after the transactions.[34]  It points out that it raised cable prices annually both before and after the transactions,

_____

[34]Robert Pick testified in response to a question by Class counsel about whether Comcast studied whether its estimated efficiencies were realized that,

> I'm not aware – I'm not sure or at least I'm not aware of any specific studies that were done to see if they were achieved or not achieved.  Some of them obvious were obvious.  For instance, I think in the operating efficiencies, we assumed that we could bring margins of the AT&T systems to that level close to or similar to the Comcast system.
> And so it's just obvious that you could see during the financial – looking at financial results that if the margins of those things approved – improved at or close to Comcast systems, you would see that we were able to do that.

in both legacy and in newly acquired franchises.  (Def. Sup. Ex. 93, S. Burke Dep., 44:5-20, 45:5-8.[35])   Thus, it argues that its intention to raise prices after acquiring systems does not establish pretext.  It also emphasizes that it is undisputed that it introduced new services into its acquired territories that were not previously available, like digital cable, DVRs, and telephone and internet service.

We find that the Class has not met its summary judgment burden to create a genuine issue of material fact that Comcast's claim of efficiency as a justification for clustering was a pretext.  The Class's evidence that Comcast raised prices does not refute the claim of efficiency.  While the Class did not have to present direct evidence establishing pretext to meet its summary judgment burden, it had to present probative evidence that would demonstrate the existence of a triable issue of fact upon which a reasonable jury could disbelieve what Comcast asserts.  It has tried to do this by arguing that Comcast could have achieved the same efficiency of clustering by overbuilding its competitors, rather than acquiring them or swapping for their assets, and asserting that Comcast never studied whether it was achieving its goals.  We reject these contentions for several reasons.

First, the underlying assumptions – that clustering efficiencies can be similarly created

---

(Pl. Ex. 92, Pick Dep., 305:12-22.)

[35]COO Burke testified that

Basic cable rates in virtually every system in every cable company in every state in the country are raised every year because our programming costs go up every year. And, so, there were basic rate increases I would say in virtually all of the systems in the Philadelphia area every year during the period of time.
                              . . .
We raise prices every year because our programming increases every year.

(Def. Sup. Ex. 93, S. Burke Dep., 44:5-20, 45:5-8.)

through overbuilding, and that creating a cluster through overbuilding is an equally efficient business model – are unsupported by any evidence.  Second, the fact that Comcast could have achieved efficiencies differently is insufficient to show that Comcast's efficiency justifications were a pretext. Third, there is no authority that an antitrust defendant's expectations of efficiency proved accurate. Similarly, the fact that Comcast did not study its efficiencies is also insufficient to show that the efficiency justification was a pretext.  Moreover, the evidence in the record supports the fact that clustering in fact leads to efficiencies of scale.[36]  Finally, the Class does not dispute that Comcast was able to provide significant new services to its customers as a result of clustering.

Accordingly, we grant summary judgment to Comcast on the Class's section 2 claim regarding Comcast's clustering conduct.  The Class has failed to create a genuine issue of material fact that Comcast's proffered business justification was pretextual.

B.      RCN

As noted above, the Class argues that Comcast's conduct toward RCN was predatory in three respects:  (1) its conduct blocking RCN's access to cable infrastructure installation contractors, (2) its conduct in licensing CSN Philadelphia to RCN, and (3) its practice of offering price discounts to potential RCN subscribers.  We shall examine each claim individually.

1.      Access to cable infrastructure installation contractors.

a.      Has the Class created a genuine issue of material fact that Comcast's

---

[36] See Def. Ex. 18, Seventh Annual Competition Report, ¶ 166 (clustering "permits cable operators to . . . gain efficiencies related to economies of scale and scope resulting in lower administrative costs, enhanced deployment of new technologies, and encouraging the extension into previously unserved areas"); Def. Ex. 19, FCC 01-389, Eighth Annual Competition Report, ¶ 14 ("By clustering their systems, cable operators may be able to achieve efficiencies that facilitate the provision of cable and other services, such as telephony.").

actions blocking RCN's access to cable infrastructure installation contractors were predatory?

In June 1998, RCN sought and received certifications to operate Open Video Systems[37] ("OVS") in four counties in the Philadelphia DMA (Delaware, Bucks, Chester, and Montgomery). (Def. Statement of Undisputed Facts ¶ 54.)  Of those four counties, RCN chose to enter Delaware County first, breaking ground on its overbuild cable system in the Borough of Folcroft in late 1999. (Id. ¶ 55.)  From there, RCN continued its overbuilding throughout Delaware County.  In 2000, RCN overbuilt in Folcroft, Ridley Township, Eddystone, Norwood, Sharon Hill, Prospect Park and Collingdale. In 2001 RCN overbuilt in Glenolden, Ridley Park, Upper Darby, Colwyn, Morton, Tinicum Township, Clifton Heights, Darby Township and Darby Borough.  In 2002, RCN overbuilt in Rutledge, Milbourne, East Lansdowne and Lansdowne.  In 2003, RCN overbuilt in Yeadon.  (Id. ¶ 57; Def. Ex. 41, Laura Burke Deposition Exhibit 13.).)

On May 29, 2002, RCN sent a letter to the FCC complaining that "it [was] aware of no less than fifteen (15) contractors in the Philadelphia market – representing virtually all of the viable construction and installation contractors in the area – whom Comcast or, prior to its acquisition by Comcast, Suburban Cable, have prevented or tried to prevent from doing business with RCN."[38] (Def. Ex. 43, RCN 30(b)(6) Dep. Ex. 22 at RCN 0000237.)  After Suburban merged into Comcast, those Suburban personnel responsible for the company's contractor non-compete policy "went to

_____

[37]An OVS is a "facility consisting of a set of transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community. . . ."  47 C.F.R. § 76.1500(a).

[38]Dr. Singer, a class expert, opined that the fifteen area contractors constituted approximately 53% of the available contractors in the Philadelphia area.  (Singer Decl. ¶ 124.)

work for Comcast, where the practice of intimidating contractors continued." (Id. at RCN 0000238.)
Scott Burnside, RCN's Senior Vice President for Regulatory and Governmental Affairs, testified that
RCN suffered "delays and setbacks by not having full cooperation from the outside contractors that
it would normally expect to have."  (Pl. Ex. 83, Burnside Dep., 81:13-16.)

James Cleaver, an installation subcontractor who had worked for Suburban Cable, testified
that several subcontractors who had worked for Comcast were barred from further work when
Comcast became aware that they were working as subcontractors for his company on the RCN build
out.  (Pl. Ex. 84, Cleaver Dep., 61:9-77:22.)  When Cleaver's company began working for RCN as
a subcontractor, he received an email from Chris Patterson of Suburban Cable, which was about to
be acquired by Comcast.  (Def. Ex.43, RCN 30(b)(6) Dep. Ex. 22, at RCN0000241.)  Patterson told
Cleaver:

> You suggest that Suburban did not have a problem with you working for other area
> cable companies and you were right, because they were not in direct competition with
> Suburban Cable as RCN is.  Every mile of rear buss plant that you build gives RCN,
> our competitor the ability to take customers away from Suburban Cable.  Our
> company and the Cable industry does not share the same perspective that you do in
> regards to competition.
>                                    . . .
> You are correct, you are a business man and as we discussed on the phone you need
> to take the proper business decisions for your company.  In my opinion your business
> decision should have been to stay with Suburban and become a part of our major
> project.  You also know that we will become part of a larger cluster under Comcast
> ownership which will span the Tri-state area and south through Baltimore and
> Washington.  You need to know that they have a more intense feeling about
> competing with RCN than Suburban does, and our intensity is pretty strong.  Why
> you choose to work for a smaller company such as RCN in light of things to come
> are more of a short term decision vs looking at the long term in this area with
> Comcast.  Again, you made a business decision for your company any your
> employee's [sic] and that is fine.  Suburban had to act on a legal document that you
> signed for Non-compete.  This is the only reason why Suburban terminated your
> contracts, because it was in breach.

(Id.)  Cleaver testified on cross examination at his deposition that when he worked for Suburban Cable he had access to the company's design plans and used Suburban's equipment. (Def. Ex. 48 Cleaver Dep. 101:14-25.)  He understood that Suburban had concerns because its design plans were confidential and also concerns about equipment being mixed up with the equipment of other companies.  (Id. at 101:14-104:7.)  He also testified that he currently continues to get work from Comcast, even though he also works for RCN and Verizon.  (Id. at 79:13-17.)  Finally, Cleaver testified that RCN paid contractors higher rates "because they wanted to lure whoever [sic] they could, and the only way you are going to get them on is to pay the money."  (Pl. Ex. 84, Cleaver Dep., 118:2-23.)

Notwithstanding the evidence of RCN's complaint to the FCC and the Burnside and Cleaver testimony, Comcast offers evidence that by April 2001, RCN was able to complete its buildout in Delaware County, achieving a penetration rate of 20 – 21%, which was above its 20% minimum target required to keep its operations viable and generate a return.  (Def. Statement of Undisputed Facts ¶ 58; Def. Ex. 55, RCN Rule 30(b)(6) Dep., 62:12-18.)  It adds that, when deposed by the Class, RCN did not identify any barriers to entry created by Comcast in the Philadelphia DMA; instead, RCN's 30(b)(6) designee stated that the only barriers to entry RCN faced in entering the Philadelphia DMA were (i) physical access to the poles that were owned by the utilities to build its system and (ii) obtaining a franchise from each municipality to provide the service.  (Def. Statement of Undisputed Facts ¶ 59; Def. Ex. 55, RCN 30(b)(6) Dep., 47:17-49:4, 55:11-21.)  The Rule 30(b)(6) witness testified that the company had not experienced "any lack of contractors" at the hands of Comcast, and that it was able to retain all the cable construction and installation contractors necessary to build out its cable systems in Delaware County.  (Def. Statement of Undisputed Facts

¶ 67-69; Def. Ex. 55, RCN 30(b)(6) Dep., 152:24-153:1; <u>see also</u> Def. Ex. 47, Burnside Dep., 158:25-159:13.[39])  Comcast has also presented evidence that the pool of cable installers and construction contractors available to build out cable systems in Eastern Pennsylvania numbered in the hundreds, including both locally-based contractors and national companies.  (Def. Statement of Undisputed Facts  ¶ 66; Def. Ex. 48, Deposition of James Cleaver on May 14, 2008 ("Cleaver Dep."), 114:23-117:16; Def. Ex. 40, Cleaver Dep. Ex. 9.)  Comcast notes that RCN stated to the FCC that Comcast had exclusive arrangements with only 15 of these contractors.  (Def. Ex. 43, RCN 30(b)(6) Dep. Ex. 22 at RCN 0000237.)

Although RCN complained to the FCC that Comcast had tied up fifteen installation contractors with non-compete agreements, the record contains evidence of only two signed contractor non-compete agreements – the one discussed in the Cleaver deposition between Suburban Cable TV Co. (which was later acquired by Comcast) and Installation Technologies, Inc. ("ITI"),

---

[39]After offering direct testimony that RCN had suffered set backs and delays due to Comcast's interference with contractors, on cross-examination at his deposition, RCN executive Scott Burnside confirmed the testimony of the Rule 30(b)(6) witness:

> Q.  And you testified about access to contractors.  RCN was able to get contractors to build out in Delaware County, right?
>  . . .
> THE WITNESS: To some degree, yes.
> BY MR. KORPUS:
> Q. To a degree sufficient to build out its system in Delaware County to its specifications, right?
> MR. WOODWARD: Objection. Form.
> THE WITNESS: To do construction in Delaware County, they were able to get construction people willing to do work in Delaware County.

(Def. Ex. 47, Burnside Dep., 158:25-159:13.).  Burnside also testified that some contractors left Comcast to work for RCN because they did not like Comcast's "bullying tactics."  (<u>Id.</u> at 160:25-161:11.)

dated April 22, 1999 and terminated on November 26, 1999, (Def. Ex. 39, Cleaver Deposition

Exhibit 6); and another between Suburban and Lewis Communications dated April 9, 1999.  (Def.

Statement of Undisputed Facts ¶ 71; Def. Ex. 43, RCN 30(b)(6) Dep. Ex. 22 at RCN000242-45.)

Both non-compete agreements were executed before the class period.  Those provisions prohibited

the contractors from working for anyone besides Comcast during the term of the principal contract

in geographic areas where Comcast faced competition.  (Def. Ex. 43; Def. Ex. 39.)   In the

Suburban/ITI contract, the term of the non-compete extended for six months after termination of the

contract, i.e., May 2000.  (Def. Statement of Undisputed Facts ¶ 73; Def. Ex. 39.)  It is undisputed

that Comcast never brought an action to enforce this provision and ITI continued to work for RCN

after Comcast terminated the contract for cause.  (Def. Statement of Undisputed Facts ¶ 74;

Counterstatement of Facts ¶ 74.)  The Suburban/Lewis non-compete only lasted for the duration of

the contract.  Moreover, it is undisputed that, when asked by Comcast to honor the agreement, Lewis

instead chose to work for RCN.  (Def. Statement of Undisputed Facts  ¶ 75; Counterstatement of

Facts ¶ 75.)

     Comcast also presents evidence that RCN's tenuous financial condition, rather than any

problems it experienced with the availability of contractors, caused the company to ultimately

abandon its efforts to overbuild in the Philadelphia DMA.    In December 2000, while its build-out

of Delaware County was underway, RCN announced that, in order to conserve cash, the company

had abandoned its plans to enter any new markets where it did not already provide video service.

This announcement applied nationwide – not just to Philadelphia.  (Def. Statement of Undisputed

Facts ¶ 80; Def. Ex. 45, RCN 30(b)(6) Dep. Ex. 34.)  RCN confirmed in its public filings pursuant

to the federal securities law and in statements to the FCC that it had abandoned plans to engage in

further overbuilding (in Philadelphia or elsewhere) because it lacked the necessary capital.  (Def. Statement of Undisputed Facts ¶ 81-83; Def. Ex. 3, RCN 2001 10-K405, p. 51.; Def. Ex. 42, RCN 30(b)(6) Dep. Ex. 8 (Initial Comments of RCN Corp. in re Annual Assessment of the State of Competition, dated August 3, 2001), p. 7; see also Def. Ex. 47, Burnside Dep.,  170:7-171:22.) Consistent with the announced change in its strategy, RCN did not start any new overbuild construction, and instead actually sought to free itself from its build-out obligations in the Philadelphia DMA and elsewhere.  RCN did not even build out franchise areas where it already had franchise approvals and therefore the legal obligation to build.  (Def. Statement of Undisputed Facts ¶ 84; Def.  Ex. 3, RCN 2001 10-K405, p. 20, 52; Def. Ex. 55, RCN 30(b)(6) Dep., 159:9-160:13; Def. Ex. 3, RCN 2001 10-K405, p. 20, 26; Def. Ex. 4, RCN 2002 10-KA, p. 22, 28; Def. Ex. 5 RCN 2003 10-K, p. 32; Def. Ex. 6, RCN 2004 10-K, p. 16; Def. Ex. 7, RCN 2005 10-K, p. 19.)  Among the areas affected by RCN's strategic retrenchment were communities in Bucks County where RCN had franchise approvals and build out obligations.  In 2002 and 2003, due to its continuing net losses and ongoing inability to raise capital, RCN reiterated in its public disclosures that it would not be able to honor its build-out requirements in certain communities across the country, including in Eastern Pennsylvania.  (Def. Statement of Undisputed Facts ¶ 88; Def. Ex. 3, RCN 2001 10-K405, p 20, 24, 51-52; Def. Ex. 4, RCN 2002 10-KA, p. 22, 26-27; Def. Ex. 5, RCN 2003 10-K, p. F-1, F-26, F-29, F-39; Def. Ex. 55, RCN 30(b)(6) Dep., 164:20-165:6, 167:20-168:24.)  In May 2004, RCN filed for bankruptcy.  (Def. Statement of Undisputed Facts ¶ 89; Counterstatement of Facts ¶ 89.)  Even after emerging from bankruptcy, RCN's financial problems persisted, and its losses continued to mount.  It is undisputed that, in May 2005, RCN disclosed that it was continuing its efforts to terminate or renegotiate franchise agreements in communities across the country, including

Eastern Pennsylvania, to avoid breaches and related penalties, and announced that it expected to continue to experience net losses "for the foreseeable future." (Def. Statement of Undisputed Facts ¶ 93; Counterstatement of Facts ¶ 93.)

The Class does not dispute that RCN was suffering from financial problems. It contends that RCN, in part, blamed its problems on "the inability to secure, or the uncertainty about whether it will be able to secure, essential programming," (Def. Ex. 42, Initial Comments of RCN Corp to FCC, p. i-ii) and that RCN repeatedly complained to the FCC about Comcast. It contends that RCN's financial problems are evidence of the toll Comcast exacted on its competitor through its anticompetitive conduct in the Philadelphia DMA, i.e, by limiting RCN's access to contractors, as well as its conduct in targeting price discounts to prospective RCN subscribers – which we discuss below – Comcast raised RCN's costs. (See Singer Merits Reply Decl. ¶ 34 ("Comcast's contractor-foreclosure strategy directly raised RCN's costs of supplying MVPD service in the Philadelphia DMA and thereby provided Comcast with an artificial cost advantage vis-a-vis RCN. Dr. Teece's proposed remedy – importing contractors from distant areas – is also an example of raising rivals' costs."); see also Teece Decl. ¶ 176 (finding that "a number of Philadelphia area contractors chose to work solely (or mostly) with RCN," but noting also that "RCN apparently paid contractors more than Comcast in order to incentivize them to work with RCN.").)

Drawing all inferences in favor of the Class as the non-moving party, we find that the Class has succeeded in creating a genuine issue of material fact that Comcast acted with predatory intent regarding RCN's access to cable infrastructure installation contractors. There is a genuine issue of fact with regard to the reasons why RCN encountered problems in its build out in Delaware County. Comcast's evidence showing a larger pool of contractors, that RCN was able to complete its build

out in Delaware County with available contractors, that Comcast never enforced non-compete agreements with contractors, and that RCN's problems arose from its lack of capital, does not establish that it is entitled to judgment as a matter of law on the issue. The contrary evidence Comcast presents merely counters the Class's evidence; it does not establish that no jury could find predatory conduct on the part of Comcast if it chose to believe the Class's evidence.

    b.  Has Comcast stated a "procompetitive justification" for its conduct?

  Comcast's stated justification for "tying up" contractors with non-compete clauses is that it utilized non-compete clauses with contractors to protect its proprietary customer information, confidential design plans, and equipment. (Def. Statement of Undisputed Facts ¶ 76; Def. Ex. 46, S. Burke Dep., 167:15-168:21; Def. Ex. 48, Cleaver Dep., 103:18-104:4 (acknowledging that Comcast personnel expressed concerns about confidential design plans and mixing up equipment on the same truck)). Comcast's Steve Burke testified generally that the company was concerned that an installation contractor, who had access to Comcast's customer lists, might also work for DirecTV or RCN:

> we don't like the fact that you have names of our customers and now you are doing business with DirecTV, and the potential for somebody to make a bigger commission by doing business with DirecTV than Comcast, all of a sudden we lose a customer. So I think it's totally appropriate to tell a contractor, you know, we have enough work for 50 people, you work for us, we don't want you working for our competitor. But I don't know in the specific case of RCN whether that was done in Philadelphia.

(Def. Ex. 46, S. Burke Dep. 167:16-168:1.) He added,

> It's not a matter of company policy that if a company does work for anyone else they can't do work for us, but just as a matter of common business sense, if someone – if you have someone who is doing a lot of business with you and a lot of business with one of your competitors and you suspect that that is damaging you because they are taking your names and customers to someone else, boy, if I was running a system in Sarasota, Florida, I would stop it.

(Id. 168:13-22.)  We find that Comcast has stated a legitimate procompetitive justification for its conduct with regard to cable infrastructure installation contractors.

        c.     Has the Class created a genuine issue of material fact that the proffered business justification is pretextual?

We find that the Class has failed to create a genuine issue of material fact that Comcast's stated justification was a pretext for predatory conduct.  Indeed, in its summary judgment brief, the Class does not address Comcast's justifications for imposing no-compete terms on cable installers, i.e., the need for cable companies to protect their customer lists, design plans, and equipment.[40] Accordingly, we conclude that the Class has failed to meet its summary judgment burden on the issue of whether Comcast's justifications for requiring no-compete clauses by cable infrastructure installation contractors were pretextual.

        2.     RCN's access to CSN Philadelphia.

The Class contends that CSN Philadelphia, Comcast's regional sports network, is "must have" programming needed by MVPDs, including RCN, to compete in the Philadelphia DMA.  (Pl. Ex. 83, Burnside Dep., 83:14-85:12.)  The Third Amended Complaint alleges that Comcast initially refused to provide RCN, and then provided only on a short-term basis, access to Comcast SportsNet Philadelphia, refusing to enter into a stable, multi-year license for the content until only shortly

---

[40]We note that Dr. Singer addresses the issue in his declaration, opining that "[t]here does not appear to be a compelling justification for [the contractor no-compete] conduct, as one Comcast official noted to another that 'I am not entirely sure what problem a[n] [exclusivity] program would be designed to solve' and that exclusive contracting 'has not bubbled up from the field as an urgent need and so I am not sure what we are trying to fix.'" (Singer Decl. ¶ 112 (quoting COM-PA1456482).)  While it is unclear whether Dr. Singer was aware of Comcast's stated justifications when he stated there did not appear to be one, his opinion denying that Comcast had stated any justifications is not supported by the record.

before the Third Amended Complaint was filed.  (Compl. ¶¶ 86-90.)  The Class asserts that RCN's

initial attempt to license CSN Philadelphia was "initially rebuffed," and that Comcast later indicated

it would terminate RCN's access to CSN Philadelphia during the time period that it was building out

its Delaware County communities.  (Counterstatement of Facts ¶ 61; Pl. Ex. 97, RCN 30(b)(6) Dep.,

69:16-20; Pl. Ex. 118.)  It presents evidence that, during this time frame when RCN was attempting

to sign up customers in its new operating areas, Comcast call center workers were directed to tell

subscribers cancelling in favor of RCN that RCN will no longer have the right to carry Comcast

SportsNet after October 1, 2000.  (Pl. Ex. 81, S. Burke Dep., 123:6-19; Pl. Ex. 83, Burnside Dep.,

116:22-118:8).  While conceding that "Comcast eventually allowed RCN access to the 'must-have'

programming on a series of short term, month-to-month contracts," it characterizes this arrangement

as "outside the industry norm."  (Counterstatement of Facts ¶ 61 (citing Pl. Ex. 135, Letter of April

16, 2001, p. 6.).)[41]

---

[41]We note that the summary judgment record includes testimony from Scott Burnside that
Comcast used CSN Philadelphia to create an entry barrier.  Burnside, referring to the month-to-
month contract period, testified "it gave Comcast some leverage . . . over RCN and where RCN
might go into other competitive – other communities in that greater Philadelphia market.  (Pl. Ex.
83, Burnside Dep., 104:23-105:2.; but see Def. Ex. 47, Burnside Dep., 114:18-21 (stating "RCN still
does have the programming required to be competitive because they are there and competing on a
daily basis."); see also Def. Ex. 55, RCN 30(b)(6) Dep., 49:5-15 (stating that obtaining programming
is not an entry barrier)).

    However, we find that the evidence cited for the "outside the industry norm" proposition, as
well as the claim that Comcast told RCN it would terminate its access to CSN Philadelphia, is taken
out of context.  CSN Philadelphia's CEO Jack Williams informed RCN on May 25, 2000 that, due
to changes in the cost of programming, the market, and the needs of Comcast's affiliates, Comcast
would not be able "to extend its arrangement with your system **at the price and on the other terms
and conditions currently in effect** when your agreement expires this coming October."  (Pl. Ex.
118, Letter of May 25, 2000 (emphasis added).)  The letter states that this same notice was being
given to all CSN Philadelphia affiliates.  The Class concedes that RCN received a long-term contract
executed in December 2003, and made effective as of October 1, 2001, the termination date of its
prior long-term contract.  (Pl. Ex. 79.)

    The contention that the intervening short-term contracts were "outside the industry norm"

In his report, Dr. Singer opined that Comcast sought to deny RCN access to CSN Philadelphia, and then sought to raise its rival's costs by artificially inflating the price, once the FCC determined that Comcast was required to provide access to its wireline competitors. (Singer Decl. ¶ 97.) Dr. Singer opines that, "[e]ven though Comcast ultimately was compelled to supply RCN with [CSN Philadelphia], the episode reveals Comcast's anticompetitive intent and highlights the competitive implications of such exclusionary conduct in the downstream market." (Singer Decl. ¶ 100.)

Comcast responds that RCN has had access to CSN Philadelphia continuously from before the class period to the present day and that RCN's own corporate designee testified that lack of access to CSN Philadelphia programming did not constitute a barrier to entry for RCN into the Philadelphia DMA. (Def. Statement of Undisputed Facts ¶ 61; Def. Ex. 55, RCN 30(b)(6) Dep., p. 127:17-22; Def. Ex. 47, Burnside Dep., 143:16-144:12.) It adds that RCN had a "most-favored-nation" clause guaranteeing that it would receive CSN Philadelphia on terms no less

is based upon a letter Comcast CEO Brian Roberts sent to Senator Arlen Specter. In describing Comcast's relations with RCN, he stated that RCN "has had, and continues to have, a contractual agreement to carry Comcast SportsNet on its systems in the network's greater Philadelphia service area;" that in "October 2000, *every* Comcast SportsNet affiliate was offered a six-month carriage renewal (through March 2001), after which the carriage agreement would remain in place on a continuous, month-to-month basis; while this month-to-month agreement is in place, either Comcast SportsNet or the affiliate has the right to terminate the agreement on 90 days' notice." (Pl. Ex. 135, Letter of April 16, 2001, p. 6 (emphasis in original).) Roberts told Specter that Comcast did this "to assure affiliates of continuous service while the company reviewed its business plan and structure" and Roberts stated that Comcast advised RCN that, on completion of that review, it would offer "*all* affiliates a standard new contract whose terms and length will be consistent with established industry practices." (Id. (emphasis in original).) The Class reads the statement that the new contract would "be consistent with industry standards" as evidence that the interceding month-to-month arrangement was outside the norm. This characterization ignores the evidence, undisputed by the Class, that the interceding arrangement was imposed on all affiliates and was instituted by Comcast "to assure affiliates of continuous service while the company reviewed its business plan and structure." (Id.)

favorable than those provided to other licensees.  (Def. Statement of Undisputed Facts ¶ 63; Def. Ex. 31, 32.)  Comcast asserts that it licensed the programming to RCN, its competitor, on exactly the same terms offered to all CSN Philadelphia licensees (including Comcast Cable itself).  (Def. Statement of Undisputed Facts ¶ 64; Def. Ex. 49, Deposition of Joseph Donnelly on November 19, 2008 ("Donnelly Dep."), 162:15-19 (stating "I can tell you that the Comcast SportsNet rates in Philadelphia are the same for everybody.  And there are competitors, people who are, like Verizon who get it and pay the same rate as we do, RCN who pays the same rate as we do."); Def. Ex. 60, Deposition of Jack Williams on December 16, 2008 ("Jack Williams Dep."), 45:20-46:2; 69:12-18; Def. Ex. 55, RCN 30(b)(6) Dep. 139:6-12, 141:16-143:20.)  The "short-term" agreements, which were the same for all licensees, occurred only during a one-year period when Comcast was conducting an internal review of pricing strategy.  (Def. Statement of Undisputed Facts  ¶ 65; Def. Ex. 60, Jack Williams Dep., p. 45:8-46:23 (stating "When RCN came on in Philadelphia, we offered a contract that would expire at the same time of all the other contracts. That contract was then extended for a year, as were all of the others.").)

Construing the evidence in the light most favorable to the Class, we find that the Class has failed to create a genuine issue of material fact that Comcast acted with predation toward RCN with regard to its carriage of CSN Philadelphia.  While the Class contends that Comcast acted with predation toward RCN because it was overbuilding Comcast's Delaware County franchises, the Class failed to create a genuine issue of material fact that Comcast treated RCN differently from all of its other CSN Philadelphia affiliates during the relevant time frame.  Comcast advised each affiliate that its contract would not be renewed on the existing terms; it offered each affiliate short term contracts extending their carriage during the period in which Comcast was reassessing its terms

of carriage; and it eventually offered RCN – like every other affiliate – a long term carriage contract

back dated to the end of the prior long term contract, with no interruption in service.  Information

provided by Comcast call center workers to prospective RCN subscribers, that RCN had access to

CSN Philadelphia on a short term basis, was truthful and there is no evidence that Comcast offered

dissimilar information to inquiries from non-RCN prospective subscribers.  The Class offered no

evidence to create a genuine issue that Comcast threatened to cancel RCN's carriage or that Comcast

acted "outside the industry norm" in placing all of its affiliates on short term carriage contracts while

it reassessed its terms of carriage.  Accordingly, we find that the Class has failed to create a genuine

issue of material fact that Comcast acted with predatory intent in dealing with RCN's carriage of

CSN Philadelphia.

> 3.    Targeted price discounts.

Finally, the Class asserted in the Third Amended Complaint that Comcast's policy of offering

targeted price discounts to prospective RCN customers to convince them not to switch service was

predatory conduct.  (Compl. ¶¶ 93-94.)  The summary judgment record shows that, beginning in the

winter of 2000 when RCN was about to offer service in Folcroft, Delaware County, Comcast offered

discounts in the form of the "Comcast Advantage Plan" or "CAP" to customers in Folcroft.  CAP

offered a price freeze and free premium channels for eighteen months to customers who signed a

written agreement not to cancel service during that period.  (Def. Statement of Undisputed Facts ¶

77-78; Counterstatement of Facts ¶ 77.)  Customers who switched to another provider or otherwise

terminated the contract incurred a termination penalty ranging from $30 to $75 dollars.  (Pl. Ex. 2

at COM-PA0982337; Pl. Ex. 81, Dep. of Laura Burke of April 25, 2008 ("L. Burke Dep.") 37:13-

38:4.)  Comcast did not use written contracts for customers in any other franchise area in the

Philadelphia DMA at the time it offered CAP to customers in Folcroft.  (Pl. Ex. 81, L. Burke Dep.,

42:4-17.)  The early termination penalty was also unique to CAP.  (Id. at 44:13-17.)  Comcast

enforced the penalty, collecting the termination fee by including it as a separately itemized line on

the customer's monthly cable bill.  (Pl. Ex. 81, L. Burke Dep., 92:3-93:11.)  Although it began

offering CAP in Folcroft, Comcast adjusted and changed the program over time, extending the offer

to other areas that RCN entered as an overbuilder.  (Id. at 97:4-99:3.)

The purpose of CAP was to keep customers from switching cable providers.  (Pl. Ex. 85,

Dep. of Frank Dingianni of June 25, 2008 ("Dingianni Dep."), 19:22-24.)  Specifically, Comcast

> wanted to hold RCN at bay. . . .   There was a certain percentage number that they
> were trying to hit, that they thought that RCN wouldn't be able to survive. . . .  If they
> held them under 30 percent . . . .  The amount of subscribers that RCN could get out
> of the areas and then maintain profitability. . . . [T]here was a break point where they
> wouldn't be viable, RCN.

(Id. at 40:8-19, 42:22-24.)  In Folcroft, an area "[s]wept by CAP reps in March/April," as of June

2000, Comcast was able to sign up 70% of its subscribers to CAP contracts; for Ridley Township,

which was "[s]wept by CAP reps in May/June," Comcast was able to sign up 77% of its subscribers

to CAP contracts.  (Pl. Ex. 1, "Marketing Overview".)  Dr. Singer opined for the Class that

> Comcast believed that RCN's minimum viable scale was a 50 percent penetration
> rate. . . .  Comcast documents demonstrate that  Comcast's CAP program held RCN
> to 10 percent penetration, and that the CAP program ensured that RCN could not
> under any circumstances achieve a penetration rate of more than 16 percent.  By
> holding RCN to a penetration rate below this minimum viable scale, Comcast
> ensured that RCN's business model was doomed to fail.  Facing these "unfavorable
> economics," RCN would incur a loss on every subscriber it successfully wrested
> from Comcast.  Accordingly, Comcast's exclusionary conduct significantly impaired
> competition from RCN.

(Singer Merits Reply Decl. ¶ 41.)  According to Dr. Singer, because of the price freeze in RCN areas

and increased prices in non-RCN areas, "Comcast customers in RCN areas received rates that were

18 to 38 percent below the rate paid by Comcast customers in non-RCN areas.  The implications of this disparate pricing policy are clear – but for RCN's failure to enter the City of Philadelphia, Comcast's customers in those areas would have enjoyed significantly lower prices."  (Singer Decl. ¶ 115.)

Comcast responds that CAP was a purely voluntary program, which subscribers were free to accept or reject.  It notes too that the Class's own expert opined that price discounts in response to entry by a new competitor are a consumer benefit of competition.  (See Williams Decl., ¶¶ 142-43, Table 6.[42])  Finally, it asserts, and the Class does not dispute, that there is no evidence that the prices charged under CAP were lower than any relevant measure of Comcast's costs.  (Def. Statement of Undisputed Facts ¶ 78; Counterstatement of Facts ¶ 78.)  It argues that, irrespective of the evidence marshaled by the Class that Comcast specifically targeted CAP to maintain its subscriber base against incursion by RCN, its CAP pricing cannot be deemed predatory absent evidence that Comcast offered cable services below cost to drive RCN out of the market.

We find that the fact that Comcast never charged below cost prices to potential RCN customers does not mandate a summary judgment finding that CAP was not exclusionary conduct.

---

[42]In the section of his report entitled "Incumbent Cable Operators Reduce Rates when Competitors Enter," Dr. Williams opines

> The evidence illustrates, through individual pricing decisions, how incumbent cable operators responded to new entrants.  The econometric analyses reviewed above establish that competition lowers rates, while the evidence shown in the table illustrates how incumbent cable operators compete for subscribers using lower rates and other promotional incentives.  Comcast's anticompetitive conduct, which created and increased barriers to entry, reduced the extent of that entry, which would have required Comcast to offer such lower rates and promotions.

(Williams Decl., ¶ 143.)  As evidence supporting his opinion, Dr. Williams specifically cites the CAP program in Folcroft.  (Id., Table 6.)

While Comcast is correct that section 2 claims based upon predatory pricing require evidence that the defendant has cut prices below some measure of its costs in providing the product, see Brook Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222-23 (1993) ("a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs"), the theory upon which the Class proceeds is not that Comcast's pricing policy was predatory.  The Class asserts that CAP constituted predatory conduct because it was an exclusionary practice, entered into by a monopolist, to block the entry of a new competitor.

The Class has presented evidence that CAP was an exclusivity arrangement, that its purpose was to prevent RCN from attaining market penetration by locking up customers to an incentivized long term commitment to receiving their MVPD services from Comcast, and included penalty provisions if a customer chose to switch providers.  An exclusivity arrangement by monopolists can constitute an exclusionary practice.  LePage's Inc., 324 F.3d at 157 (citing U.S. Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 593 (1st Cir. 1993).[43]  An exclusionary practice is "'a method by which a firm . . . trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it.'"  Id. at 164 (alteration in original) (quoting Richard A. Posner, Antitrust Law: An Economic Perspective 28 (1976)).  In discussing the

---

[43]In addition to relying upon the decision in LePage's, Inc., the Class cites to Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co., 305 F.3d 1124, 1139-40 (10th Cir. 2002) to also support the proposition that conduct by a monopolist to lock up customers with long term contracts in anticipation of competition is exclusionary.  The case is inapposite.  At the referenced pin cite, the United States Court of Appeals for the Tenth Circuit, discusses whether the "state action doctrine" immunized conduct under state antitrust law, declining to reach the question because "it is clear that no state policy expressly permitted Southwestern Bell to attempt to lock up customers contractually long beyond the November 1996 introduction of competition in an effort to stymie that competition." Id.  The Court was clearly discussing an inapposite doctrine concerning an inapposite state law issue.

antitrust impact of an exclusivity arrangement in the form of bundled rebates, the *en banc* court in LePage's, Inc. held that "[w]hen a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general." Id. at 159.  Most importantly, LePages's, Inc. rejected the proposition advanced by 3M and repeated here by Comcast that "after Brooke Group, no conduct by a monopolist who sells its product above cost — no matter how exclusionary the conduct — can constitute monopolization in violation of § 2 of the Sherman Act." Id. at 147.  LePage's, Inc. unequivocally closes the door in this Circuit on an assertion that above cost pricing safe-harbors otherwise exclusionary conduct.

While  a new entrant may engage in "promotional" activity, such as offering a discount in exchange for a period of exclusivity, or offering below cost pricing in the short term in order to introduce itself or a new product to the market, "[w]hen a firm has considerable market power in the very product or service being promoted, the promotional pricing defense disappears."  3A Areeda and Hovenkamp, Antitrust Law, § 746 (3d Ed. 2008); see also id. at § 1807 (discount contracts are "problematic" when the defendant is a dominant firm in a position to force "an all-or-nothing choice").  The Class has created a genuine issue of material fact that Comcast, a firm possessing market power, was able  to lock up 70% to 77% of the potential customer base available to the new entrant.  Because it possessed market power, its decision to target promotional discounts to deter a new entrant may be deemed predatory and an exercise of market power to maintain its monopoly. As Comcast makes no arguments that CAP had otherwise legitimate business justifications, we

conclude that the claim must be submitted to a jury.[44]

## VI.   ANTITRUST INJURY

We have previously determined that proof of antitrust impact of the section 1 and section 2

claims must be limited to the one theory the Class successfully demonstrated could be proved by

evidence common to the Class, namely, that Comcast's clustering conduct deterred the entry of

overbuilders in the Philadelphia DMA.  (Class Cert. Mem. at 45-47; Order of January 13, 2010 at

¶ 11.)  Comcast argues that summary judgment should be entered on all claims because the Class

has failed to create a trial issue on this sole remaining theory of antitrust injury.[45]  Comcast argues

that (1) the Class has failed to prove the antitrust impact of clustering on RCN, and (2) Dr. Williams'

--------

[44]We note that Comcast asks that, in the event we should only find that there is a genuine issue of fact as to whether its conduct toward RCN was predatory, we amend our class certification order to limit the Class to subscribers residing in Delaware County.  (See Def. Mem. at 50-51.) Because we conclude that the Class may present to a jury its section 1 rule of reason claim that Comcast's clustering conduct unreasonably restrained trade, as well as its section 2 monopolization claim based upon the targeted discounts in Delaware County, we find no cause to amend our order.

[45]Individual antitrust injury or antitrust impact, must be established for a plaintiff to have standing under section 1 or section 2 of the Sherman Act.  Bell v. Dow Chem. Co., 847 F.2d 1179, 1182 (5th Cir. 1988) (holding that "Antitrust injury is a component of the standing inquiry, not a separate qualification.").  This requirement is inferred from section 4 of the Clayton Act, 15 U.S.C. § 15, which affords a remedy to any person injured in his business or property "by reason of" an antitrust violation.  In Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977), the Supreme Court described antitrust injury as

. . . injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.  The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.  It should, in short, be "the type of loss that the claimed violations . . . would be likely to cause."

Id. (citing Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125 (1969)); see also Atl. Richfield, 495 U.S. at 342-44.

theories of the general antitrust impact of clustering are purely theoretical and divorced from the factual record.   It argues that some amount of empirical evidence is required to show antitrust impact; because the Class cannot present empirical evidence to support Dr. Williams' theory, the fact that the Class has successfully stated a theory should not prevent the grant of summary judgment.

Because we have found the Class has presented evidence from which a jury could find that Comcast had monopoly power derived from its creation of its cluster in the Philadelphia DMA, and acted with predation toward RCN in its targeted discounts to prospective RCN subscribers, it follows that the Class has met its summary judgment burden on the causation issue of antitrust impact.   The Class has presented evidence from which a jury could find that Comcast's conduct did deter overbuilding, as well as evidence that RCN stopped overbuilding because of Comcast's conduct. Genuine issues of fact exist on both these issues rendering summary judgment inappropriate.

We also reject Comcast's arguments  that the Class cannot show antitrust impact on a theory that clustering deters overbuilding in general.   Comcast argues that the Class has failed to meet its summary judgment burden because it has not presented empirical evidence to support Dr. Williams' theory that clustering deterred overbuilding.   (Def. Mem. at 57 (citing, among others, In re Baby Food Antitrust Litig., 166 F.3d 112, 135 (3d Cir. 1999) (holding that expert's unsupported economic theory and assumptions must be rejected where the opinion was not supported by actual record evidence); Mass. School of Law v. Am. Bar Ass'n, 107 F.3d 1026, 1040 (3d Cir. 1997) (holding that economic expert's report was properly disregarded where it was based on general and theoretical observations and was not tied to evidence in the record)).   In granting class certification, we found that, although Dr. Williams' other theories of antitrust impact were not capable of proof common to the class, his clustering theory was supported by empirical evidence and was based upon the

factual record.  (Class Cert. Mem. 29-47.)  Dr. Williams had theorized that econometric studies showed that, "all else equal, ownership of a cable system by a large MSO (typically defined as one of the ten largest MSOs) generally results in higher [cable] rates of approximately 5% to 10%." (Williams Decl. ¶ 52.)  He concluded that studies showed that an MSO "can increase its profits by clustering its cable systems so that they share their boundaries with one another and share as little total boundary as possible with other cable providers serving adjacent franchise areas.  Such contiguous clustering is profit-enhancing for an MSO because it reduces the likelihood or amount of overbuilding into its franchise areas."  (Id. ¶ 88.)  He identified  several anticompetitive consequences arising from the resulting reduction in overbuilding within the MSO's franchise areas, and supported his theories by presenting (1) two economic models of overbuilding (Williams Decl. App'x II at 107-26; Williams Cl. Reply Decl. App'x I at 13-18.), (2) citations to reports issued by the FCC and the General Accounting Office, and (3) at least six scholarly articles.  (Class Cert. Mem. 34-38.)

     In accepting Dr. Williams' general theory on the anticompetitive impact of clustering, we rejected competing opinions offered by Comcast's experts and concluded that the Class "has successfully shown, through Dr. Williams' model, as well as his citations to empirical studies conducted by governmental agencies and private researchers, that the presence of an overbuilder constrains cable prices." (Class Cert. Mem. at 45-46.)  We found that the Class "has also shown that Comcast engaged in conduct designed to deter the entry of overbuilders in the Philadelphia DMA, including denying RCN access to the services of cable installation contractors." (Id. at 46.)  While that last portion of our decision has now been shown to be unsupported by the summary judgment record, the Class has presented the governmental and scholarly research supporting the general

-71-

antitrust impact theory that clustering deters overbuilding, as well as evidence that the CAP discounts were predatory. Accordingly, we find that the Class has met its summary judgment burden of presenting evidence sufficient to create a genuine fact issue on the antitrust impact theory that clustering deters overbuilding.

## VII.   CONCLUSION

We find that the Class can proceed to trial on Count I of the Third Amended Complaint, the Sherman Act section 1 rule of reason claim, based upon the theory that Comcast's creation of the Philadelphia cluster through its acquisition of competing cable companies and its swapping of cable assets constituted a horizontal allocation of markets. However, *per se* treatment of the section 1 claim is rejected because Comcast has succeeded in showing that the clustering of its cable assets created pro-competitive economic efficiencies and allowed it to offer new products and services to consumers. The portions of Count II, asserting a section 2 monopolization claim, and Count III, asserting an attempted monopolization claim, which contend that Comcast acted with predation in creating its anti-RCN targeted discounts, may also proceed to trial. We grant summary judgment to Comcast on those portions of Counts II and III contending that (1) Comcast's clustering conduct, (2) its conduct blocking RCN's access to cable infrastructure installation contractors, and (3) its conduct in licensing CSN Philadelphia to RCN, constituted acts of monopolization or attempted monopolization.

An appropriate order will be entered.

BY THE COURT:

/s/ John R. Padova
John R. Padova, J.