IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CAROLINE BEHREND, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION, et al. | : | NO. 03-6604 |

**MEMORANDUM**

Padova, J.                                                        September 25, 2012

Presently before the Court is Class Plaintiffs' Motion to Enforce Settlement. We heard

argument on the Motion on August 21, 2012. For the following reasons, we deny the Motion.

**I.       FACTS**

On June 11, 2012, the parties to this antitrust class action signed an "Outline Sheet of

Proposed Settlement Key Terms." (Barnett Decl. Ex. E. ("Term Sheet"); Stipulation of Undisputed

Facts and Documents ("Stip.") at ¶ 7.[1])  The document's preamble states that "Subject to

confirmation by the Parties to the Mediator (with copies to the other side) on June 12, 2012,

agreement in principle on the following terms, which all participants in the mediation have

committed to recommend." (Id. (parenthetical in original).)  The Term Sheet lists nine terms:  (1)

a total price term, one-third of which is to be paid in cash, and two-thirds of which is to be paid in

services; (2) a release term calling for "All-in for releases in a form satisfactory to counsel from

Chicago, Boston, and Philadelphia classes"; (3) a proviso that the price term "[i]ncludes all amounts

---

[1] The parties have submitted the issues raised in Plaintiffs' Motion on a stipulated record. They have also filed proposed findings of fact and conclusions of law.  In a telephone conference convened with the Court on August 8, 2012, the parties agreed that the Court could rule on the enforceability of the Term Sheet as a matter of law on the record submitted.  (See Cl. Pls. Proposed Findings of Fact and Conclusions of Law for Mot. To Enforce Settlement Agreement at ¶ 21.)

– including but not limited to attorneys fees, costs and expenses, costs of notice and administration, service fees, if any"; (4) a term providing for allocation of the total settlement fund among all subscribers in the three classes "per a plan of allocation to be submitted to court by class counsel"; (5) a statement that the "specifics of [the] services portion [were] to be negotiated," with the parties designating a non-exclusive list of services that might be offered to class members, and a proviso that "Default services to be discounts for add-ons, specifics to be negotiated"; (6) "No reverter" of settlement funds to Comcast; (7) a provision that the value of the "services" portion of the settlement is "to be monetized for attorneys fee award on a 'dollar for dollar' basis" and "[i]f counsel are unable to negotiate attorneys fees in 14 day [sic], it will be submitted to Judge Padova;" (8) a completion date for drafting settlement papers; and (9) a provision for "Counsel to jointly request the trial date in Philadelphia to be vacated upon immediate notification to the court of pending settlement." (Id.)

The Term Sheet resulted from settlement negotiations with a private mediator, Professor Eric D. Green of Resolutions, LLC. (Barnett Decl. ¶ 5; Seshens Decl. ¶ 3.) The mediation took place in Green's office in Boston on June 11, 2012, and lasted from 9:00 a.m. to 10:00 p.m.[2] (Barnett Decl. ¶ 5.) Green drafted the Term Sheet. (Id.) The Term Sheet was signed by Thomas R. Nathan, Comcast's Senior Vice President and General Counsel, as well as by its trial counsel Michael Carroll and Sheron Korpus; Barry Barnett, David Woodward and Joseph Goldberg signed for the Class. (Stip. ¶ 7; Barnett Decl. at ¶ 6.)

---

[2] Although the negotiations took place in Massachusetts and the Term Sheet was signed there, no party has suggested that anything other than Pennsylvania law governs the resolution of this motion. See Pl. Mem. at 8 (citing Pennsylvania law); Def. Mem. at 7 (same); see also Wilcher v. City of Wilmington, 139 F.3d 366, 372 (3d Cir. 1998) (holding that settlement agreement is a contract and that contracts must be interpreted according to local law).

-2-

At the time that the parties negotiated the Term Sheet, Comcast had a pending petition for writ of certiorari in the United States Supreme Court concerning this Court's order granting certification of the Philadelphia class.  (Stip. ¶¶ 2-3; see Comcast Corp. v. Behrend, No. 11-864, 2012 WL 105558 (U.S. Jan. 11, 2012).)  The petition was first listed for conference on March 16, 2012.  On April 14, 2012, the Supreme Court reported that the petition was still under consideration and relisted it for conference on May 10, 2012.  By June 11, 2012, the petition had been relisted five times and remained open.  (Stip. ¶ 3.)  At approximately 10:00 a.m. on June 11 – the day the parties engaged in the mediation – the Supreme Court again relisted the petition for conference on June 14, 2012.  (Id. ¶ 4.)  Both parties were aware on the morning of June 11 that the Supreme Court had relisted Comcast's petition.  (Id. ¶ 5.)  Also, at approximately 10:00 a.m. on June 11, 2012, the Supreme Court granted certiorari in another pending case, Amgen Inc. v. Conn. Ret. Plans & Trust Funds, ___ U.S. ___, 132 S. Ct. 2742 (June 11, 2012), which also involved class certification issues and in which the certiorari petition briefing included a cross-reference to Comcast's then pending Petition.  (Stip. ¶ 6; see Amgen Inc. v. Conn. Ret. Plans & Trust Funds, No. 11-1085, 2012 WL 707042, at *26 n.11 (U.S. Mar. 1, 2012)).

On June 12, 2012, counsel for each of the parties confirmed to the other party and to the mediator that they had authority from their respective clients to agree to the Term Sheet.  (Stip. ¶ 8.) At 5:22 p.m., Barry Barnett emailed Professor Green that,

> At the end of the mediation last night, the parties signed an outline of a tentative agreement in principle, subject to confirmation today of the negotiators' authority to commit preliminarily to the outline of terms.
> I spoke by telephone a little while ago with Mike Carroll, who said he expects to receive confirmation from Comcast shortly and will forward it when he does.
> With this understanding that Comcast will also provide its confirmation

-3-

today, this confirms that the negotiators for class plaintiffs have authority to and do commit on behalf of class plaintiffs to the tentative agreement in the outline.

(Barnett Decl. Ex. F.)  At 5:25 p.m., Michael Carroll emailed: "I have now received the required authorization from Comcast."  (Id.)  Professor Green then emailed: "Confirmed on both sides.  We have a settlement.  Congratulations.  Thanks to all for their fine work."[3]  (Id.)

On June 13, 2012, at 12:23 a.m., Barnett emailed Carroll saying,

> Our next task I think involves getting a first-blush reaction from Judge Padova to the agreement in principle and pivoting from there (assuming favorable feedback from the court) to taking the case off the trial calendar and the cert. calendar.
> I think we both believe we should advise Judge Padova of the terms we propose in person.  I could do that, and would prefer to do it, tomorrow (actually today now).  Please let me know your thoughts on timing.

(Barnett Decl. Ex. G.)  Carroll emailed back at 10:24 a.m.,

> Let's discuss this later this am.  Today doesn't work for me.  Cld do tmrrw but don't agree w idea that we are going to solicit padova's views/reaction.  Think we are telling him we have a deal and asking for stay of litigation pending final approval.  Think phone call/letter notice would be normal process.  1130 work for you?

(Id.)  Later that morning, counsel had a telephone call in which they both discussed how to proceed following the mediation and Comcast's then pending certiorari petition.  (Stip. ¶ 9.)  According to Michael Carroll, Barry Barnett observed during the call that the Term Sheet did not provide for notifying the Supreme Court of the tentative settlement and asked how Comcast wanted to proceed.  Carroll asserts he told Barnett that he had conferred with Comcast's Supreme Court counsel, Miguel Estrada, who advised him that "the general practice was not to notify the Supreme Court until after

---

[3] Professor Green's email recites that it was sent at 4:32 p.m.  There is no explanation for why Professor Green's email seems to be sent one hour before the two other emails; however, no party disputes the sequence of the emails.

preliminary approval by the District Court and that the cert petition would not become moot until final approval by the District Court.  Mr. Barnett responded that he did not disagree with that approach."  (Carroll Decl. ¶ 3.)  According to Carroll, Barnett then asked what would happen if the certiorari petition were granted, to which Carroll replied "that we would still go forward, but that I could not respond for my client."  (Id. at ¶ 4.)

Also on June 13, Carroll emailed to Barnett a draft of a letter to the Court to announce the settlement.  Barnett emailed back:

> Mike, this generally looks fine, but it's important that we ask the court to have a brief call with us so we can outline the terms instead of offering to make ourselves available if he wants to talk with us.  If he has a problem, which I highly doubt, I don't want to find out about it after we have lost the trial setting in early July [sic].[4] He can always tell us he is happy to wait until June 30.  Can you please edit the last sentence so that it asks for a quick conference solely to answer any questions he may have.  Thank you.

(Barnett Decl. Ex. H.)  The parties exchanged additional emails finalizing the draft letter to the Court (Barnett Decl. Ex. I), and the completed letter was signed and faxed to the Court by Carroll's office at 3:46 pm on June 13.  (Stip. ¶¶ 1c, 10; Barnett Decl. Ex. J.)  The letter recited that "The parties are pleased to inform the Court that they have reached a tentative agreement to resolve the above-referenced actions.  The parties expect to have the legal documentation necessary to finalize the settlement prepared by June 30, after which the settlement will be presented to Your Honor for preliminary approval, to be followed by notice to the three classes and a settlement hearing."  (Barnett Decl. Ex. J.)  We entered an Order on June 18 staying all scheduling order deadlines through June 30, 2012, and stating that we would revisit the stay thereafter.  (Stip. ¶ 11; Barnett

---

[4]Trial of this matter was to be begin in early September 2012.

Decl. Ex. K.)

At 9:56 a.m. on Friday, June 22, Barry Barnett emailed Carroll a draft of a settlement agreement.  (Stip. ¶¶ 1j, 12; Barnett Decl. Ex. L ("First Draft Agreement").)  He stated, "It's still preliminary as not everyone on the team has had a chance to weigh in.  But it should give us a basis for coming up with a final document."  (Barnett Decl. Ex. L (cover sheet email).)  At 5:39 p.m. that same day, David Woodward emailed Carroll "a revised confidential draft settlement agreement, clarifying the language and provisions of the initial draft Barry sent you earlier today."  (Stip. ¶¶ 1k, 12; Seshens Decl. Ex. B. ("Second Draft Agreement").)  Woodward stated that "While Barry is travelling [sic] and therefore he and others on our team haven't had an opportunity to review this draft, it remains subject to further review and additional modifications by class plaintiffs' team. Nevertheless, the attached should keep us moving forward as expeditiously as possible in reaching mutually acceptable settlement papers."  (Seshens Decl. Ex. B (cover sheet email).)

On Monday, June 25, the Supreme Court granted Comcast's pending petition for writ of certiorari.  (Stip. ¶ 13; Barnett Decl. Ex. M; see Comcast Corp. v. Behrend, No. 11-864, 2012 WL 113090, at *1 (U.S. 2012).[5])  That afternoon, counsel for the Class and Comcast spoke by telephone, and Michael Carroll advised that Comcast was considering its options following the grant of its certiorari petition.  (Stip. ¶ 14.)  Carroll also advised that the Second Draft Agreement contained

---

[5]The order provides in relevant part:

The petition for a writ of certiorari is granted limited to the following question: "Whether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis."

Comcast Corp., 2012 WL 113090, at *1.

numerous additions to and changes from the Term Sheet with which Comcast did not agree.  (Id.; Carroll Decl. ¶ 5.)  Barry Barnett stated that the drafting had not gone as he would have liked and that he would be willing to send Comcast a new draft.  (Stip. ¶ 14.)  Carroll responded that he would let Class counsel know the following day if it was too late for that.  (Id.)

Carroll informed Barnett the next day, June 26, that Comcast did not view the Term Sheet as binding and that it no longer wished to pursue the proposed settlement.  (Stip. ¶ 15; Carroll Decl. ¶ 6.)  Carroll "explained that the term sheet was non-binding and that Plaintiffs' addition of new and modified terms demonstrated no meeting of the minds.  Mr. Barnett insisted that the term sheet was binding and stated his intention to bring a motion to enforce.  He nevertheless offered to provide Comcast with a new revised draft settlement agreement."  (Carroll Decl. ¶ 6; Stip. ¶ 15.)

## II.    DISCUSSION

As a general rule, courts "encourage attempts to settle disagreements outside the litigative context," and a district court may accordingly enforce a settlement agreement.  Wilcher, 139 F.3d at 372.  When parties agree to resolve pending litigation through a settlement agreement and a dispute arises regarding the enforcement of that agreement, a district court may "'enter injunctive relief on a party's behalf to enforce a settlement agreement when it determines that one of the parties has failed to perform its obligations."  Saudi Basic Indus. Corp. v. Exxon Corp., 364 F.3d 106, 112 (3d. Cir. 2004) (quoting Wilcher, 139 F.3d at 372).

A settlement agreement is a contract.  Wilcher, 139 F.3d at 372; Mazzella v. Koken, 739 A.2d 531, 536 (Pa. 1999) ("The enforceability of settlement agreements is governed by principles of contract law." ).  Under Pennsylvania law, "where the facts are in dispute, the question of whether

a contract was formed is for the jury to decide. . . .  However, the question of whether an undisputed set of facts establishes a contract is a matter of law."  Quandry Solutions Inc. v. Verifone Inc., No. 07-097, 2009 WL 997041, at *5 (E.D. Pa. April 13, 2009) (internal quotation marks and citation omitted).  Thus, in order to prevail on a motion to enforce a settlement, the movant must essentially meet a summary judgment standard, i.e., it must show that there are no disputed material facts regarding whether a contract was formed, and that there are no disputed material facts regarding the terms of the contract.  See Tiernan v. Devoe, 923 F.2d 1024, 1031-32 (3d Cir. 1991) ("The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same – both deprive a party of his right to be heard in litigation."); LG Elecs. Inc. v. ASKO Appliances, Inc., No. 08-828, 2012 WL 2365901, at *1 (D. Del. June 21, 2012) ("A motion to enforce a settlement agreement closely resembles a motion for summary judgment and employs a similar standard of review." (citing Parker–Hannifin Corp. v. Schlegel Elec. Materials, Inc., 589 F. Supp. 2d 457, 461 (D. Del. 2008)); Bamgbose v. Delta-T Grp., Inc., No. 09-667, 2011 WL 6150599, at*3-4  (E.D. Pa. Dec. 12, 2011) (holding that if "material facts are in dispute as to the existence or terms of an agreement to settle, a district court should not grant a motion to enforce a settlement agreement without holding an evidentiary hearing.  By contrast, 'no hearing is necessary where there is no dispute as to the existence of a settlement.'" (quoting Tiernan, 923 F.2d at 1003)).

Courts will enforce a settlement agreement if all its material terms have been agreed upon by the parties.  Century Inn, Inc. v. Century Inn Realty, Inc., 516 A.2d 765, 767 (Pa. Super. Ct. 1986).  "The first element of the test for enforceability of a contract is whether both parties manifested an intention to be bound."  Am. Eagle Outfitters v. Lyle & Scott, Ltd., 584 F.3d 575, 582

(3d Cir. 2009) (citing <u>ATACS Corp. v. Trans World Commc'ns, Inc.</u>, 155 F.3d 659, 666 (3d Cir.

1998)).  In assessing whether "both parties manifested an intention to be bound" by a contract, "the

object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable

person would apprehend in considering the parties' behavior." <u>Am. Eagle Outfitters</u>, 584 F.3d at 582

(citing <u>Ingrassia Constr. Co., Inc. v. Walsh</u>, 486 A.2d 478, 483 (Pa. Super. Ct. 1984)).  Furthermore,

"parties may bind themselves contractually although they intend, at some later date, to draft a more

formal document." <u>Id.</u> (internal citations and quotation marks omitted); <u>see also</u> <u>Bamgbose</u>, 2011

WL 6150599 at *4 (citing <u>McDonnell v. Ford Motor Co.</u>, 643 A.2d 1102, 1105 (Pa. Super. Ct.

1994)).  As the Pennsylvania Supreme Court explained:

> Where the parties have agreed on the essential terms of a contract, the fact that they
> intend to formalize their agreement in writing but have not yet done so does not
> prevent enforcement of such agreement . . . .  Given the inability of the parties to an
> oral agreement to reduce such agreement to writing after several attempts does not
> necessarily preclude a finding that the oral agreement was enforceable.

<u>Mazzella</u>, 739 A.2d at 536 (citations omitted).  However,

> where it is in contemplation of the parties that a more formal contract shall be
> executed, . . . it is an essential to the enforcement of [the] informal contract that the
> minds of the parties should meet upon all the terms, as well as the subject-matter, of
> the contract; and, *if anything is left open for future consideration, the informal
> [agreement] cannot form the basis of a binding contract*.

<u>Quandry Solutions</u>, 2009 WL 997041, at *12 (internal quotation marks omitted; alterations and

emphasis in original).  Pennsylvania law has long recognized that "'documents, having the surface

appearance of contracts may be in fact evidence of mere negotiating by parties with a view toward

executing a binding contract in the future.'"   <u>Am. Eagle Outfitters</u>, 584 F.3d at 582 (quoting

<u>Goldman v. McShain</u>, 247 A.2d 455, 458 (Pa. 1968)).   Indeed, it is "'hornbook law that evidence

of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract.'" Id. (quoting Channel Home Ctrs. v. Grossman, 795 F.2d 291, 298 (3d Cir. 1986)).  If there is conflicting evidence regarding whether the parties intended a particular writing to constitute a complete expression of their agreement, the intent of the parties is a question to be resolved by a fact finder.  Mazzella, 739 A.2d at 536.  In sum, we must determine as a matter of law whether "'the nature and extent of its obligation [is] certain; [and whether] the parties themselves [] agree[d] upon the material and necessary details of the bargain.'"  Am. Eagle Outfitters, 584 F.3d at 585 (quoting Lombardo v. Gasparini Excavating Co., 123 A.2d 663, 666 (Pa. 1956)).

Once an enforceable contract is found to have been formed, the next question is whether the terms agreed to by the parties are sufficiently unambiguous to permit judicial interpretation of the contract.  Id. at 586.  The ambiguity inquiry focuses on whether the terms of a contract are sufficiently clear and unambiguous to permit judicial interpretation of the contract as a matter of law. Id. at 587.  Thus, a court may find that the parties intended to be bound and that the terms of the agreement are sufficiently definite so that an enforceable contract was formed as a matter of law, but that "the language chosen by the parties is ambiguous," necessitating interpretation of the contract terms by a fact finder.  Id.; see also Miller v. Clay Twp., 555 A.2d 972 (Pa. Cmmw. Ct. 1989) (holding that where ambiguities and undetermined matters render the agreement impossible to understand and enforce, the agreement must be set aside and the matter remanded for a trial on the merits); Mazzella, 739 A.2d at 536-37 ("If, however, there exist 'ambiguities and undetermined matters which render a settlement impossible to understand and enforce,' such an agreement must

-10-

be set aside.").  Thus, to determine whether the parties have formed an enforceable contract, we consider "'whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'"  <u>Am. Eagle Outfitters</u> at 585 (quoting <u>Channel Home Ctrs.</u>, 795 F.2d at 298-99).  Whether the terms are sufficiently definite is a question of law.  <u>Id.</u>

We find that the Term Sheet is incomplete in significant respects and cannot be summarily enforced.  Terms that are deemed material to a class action settlement agreement generally include the monetary terms, the allocation of settlement proceeds, and a description of the claims to be released.[6]  <u>See, e.g.</u>, <u>Bamgbose</u>, 2011 WL 6150599, at *4 (finding enforceable a term sheet listing monetary terms, the allocation of settlement proceeds, a definition of the settlement class, and the claims to be released, among other terms); <u>Curiale v. Lenox Grp., Inc.</u>, No. 07-1432, 2008 WL 4899474, at *5 (E.D. Pa. Nov. 14, 2008) (finding that settlement agreement providing that defendant would comply with regulatory requirements, a monetary term, and a release term was enforceable); <u>Hughes v. InMotion Entm't</u>, No. 07-1299, 2008 WL 3889725, at *6 (W.D. Pa. Aug. 18, 2008) (finding that settlement agreement containing monetary term that class members would receive free rental of one DVD in addition to defendant making charitable donation, in exchange for release of any and all known and unknown claims was enforceable);  <u>Colella v. Univ. of Pittsburgh</u>, 569 F. Supp. 2d 525, 531 (W.D. Pa. 2008) (finding that monetary term calling for each class member to

---

[6]Although Comcast argued in its brief that provisions relating to class notice and opt-out rights were material terms omitted from the Term Sheet (<u>see</u> Def. Mem. In Opp. To Cl. Pls.' Mot. To Enforce Settlement at 14-15), counsel agreed at oral argument that matters that involve the process and procedure for preliminary and final approval of a class action, other than who would bear the costs thereof, were not material terms for the purposes of determining whether the Term Sheet was a binding agreement.  (N.T. 8/21/12 at 13-15.)

receive one football game ticket having specific face value to one of two football games in the 2008 football season, in exchange for release of any and all known and unknown claims was enforceable); see also Cooper v. Se. Pa. Transp. Auth., No. 06-888, 2011 WL 3919743, at *5 (E.D. Pa. Sept. 6, 2011) (refusing to enforce settlement agreement where description of release term was too ambiguous to be useful).

In the Term Sheet, which the Class itself referred to as an "outline of a tentative agreement," see Barnett Decl. Ex. F., at least four of the nine terms listed by the parties were expressly subject to further discussion and negotiation: the release term ("in a form satisfactory to counsel"); the allocation of settlement funds among the class members ("per plan . . . to be submitted to court"); the specifics of the services component of the settlement fund ("to be negotiated"); and the attorneys fees ("[i]f counsel are unable to negotiate . . ., it will be submitted to Judge Padova"). (Term Sheet.) Of these terms, the most important to our analysis is the services portion of the monetary term, constituting two-thirds of the total value of the Settlement Fund, which was never finalized. While the parties agreed upon a total value for that portion of the Settlement Fund, they did not agree on what services would be available to Class members and how those services would be valued. They agreed only that the services portion was "to be negotiated," and provided a non-exclusive list of what those services might include. While they also provided a suggestion for a "default" option – namely, "discounts for add-ons" – this too was specifically made subject to further negotiation.[7] The Term Sheet is not a completed, binding contract; it is merely an "agreement to agree" that is not

---

[7]Based on the scant words used by the parties to describe it, it is also ambiguous how the default option could arise. Presumably it could come into effect under either two very different circumstances: (1) if the parties failed to reach an agreement on the menu of services to be offered, or (2) if a class member failed to choose a service.

capable of being enforced.  See Trowbridge v. McCaigue, 992 A.2d 199, 202 (Pa. Super. Ct. 2010)

("'An agreement to agree is incapable of enforcement, especially when it is stipulated that the

proposed compact shall be mutually agreeable.'") (quoting Highland Sewer & Water Auth. v. Forest

Hills Mun. Auth., 797 A.2d 385, 390 (Pa. Commw. Ct. 2002)); Mongeluzzi v. Pansini & Lessin, 61

Pa. D. & C.4th 52, 70 (Ct. Com. Pl. 2001) ("Under Pennsylvania law, an agreement to agree is not

an enforceable contract.").

It is also objectively clear from the words of the Term Sheet, the manner in which even Class

Counsel referred to it, and from the many non-finalized terms included therein, that the parties

intended to execute a more formal contract in the future.  In such circumstances, the law requires

that, to be enforceable on its own, the informal contract must demonstrate that there was a meeting

of the minds on **all** of the terms of the parties' agreement.  Quandry Solutions, 2009 WL 997041,

at *12 (stating "*If anything is left open for future consideration, the informal [agreement] cannot

form the basis of a binding contract.*") (alteration and emphasis in original).  Given the material

terms left unresolved in the Term Sheet and the content of the draft agreements that the Class

subsequently forwarded to Comcast, we cannot conclude as a matter of law that the undisputed facts

objectively establish a meeting of the minds.  For example, the drafts (1) provide a definition for the

"services" component of the Settlement Fund  – "any telecommunications services currently or

subsequently offered by Comcast" – that is materially different from the exemplars listed in the Term

Sheet,[8] and (2) set a way to value  those services – the "then current lowest prices charged by

Comcast to customers in the relevant cluster for those services, net of any amounts reflecting the

---

[8]Compare Term Sheet ¶ 5 with First Draft Agreement ¶ 1.14 and Second Draft Agreement
¶ 1.14.

monetization by Comcast of such services to pay for attorneys' fees plus reimbursement of costs and expenses to Class Counsel" – that was never mentioned, let alone agreed to, in the Term Sheet.[9] Thus, the value at which each provided service is to be booked against the total value of the services portion of the Settlement Fund is a material term the parties never agreed upon.

Additional examples include the following: (1) while the Term Sheet provided that the proposed settlement "[i]ncludes all amounts – including . . . costs of notice and administration," the draft agreements included a provision making Comcast responsible for including a class notice in its billings to its current subscribers "at no cost to Class Plaintiffs";[10] (2) while the Term Sheet is silent on how services are to be administered, the draft agreements make Comcast responsible to administer the service discounts portion of the Settlement Fund;[11] (3) while the Term Sheet states that if the parties are "unable to negotiate attorneys fees in 14 day [sic], it will be submitted to Judge Padova," the draft agreements impose an additional term, never agreed to by Comcast, barring Comcast from raising any objection to Class counsel's fee application;[12] and (4) while the Term Sheet is silent on the use of escrow accounts and the timing of Comcast's obligation to deposit money into the Settlement Fund, the draft agreements require Comcast to deposit the cash portion of the Settlement Fund, as well as a monetized portion of the services component representing

---

[9] See First Draft Agreement ¶ 4.2; Second Draft Agreement ¶ 4.2.

[10] Compare Term Sheet ¶ 3 with First Draft Agreement ¶ 2.3, and Second Draft Agreement ¶ 2.3.

[11] See First Draft Agreement ¶ 5.8; Second Draft Agreement ¶¶ 5.4, 5.8.

[12] Compare Term Sheet ¶ 7 with First Draft Agreement ¶ 5.7, and Second Draft Agreement ¶ 5.7.

-14-

attorneys fees, into an escrow account within five days of preliminary approval by the Court.[13]

Finally, while the Term Sheet was silent regarding whether and when Comcast would withdraw its

then pending certiorari petition, the draft agreements impose an additional term never agreed to by

Comcast requiring it to withdraw its petition no later than the date of execution of the completed

Settlement Agreement, and to abide by the Agreement regardless of any disposition by the Supreme

Court.[14]

        Accordingly, we deny the Class's Motion to Enforce the Settlement Agreement finding that

the Term Sheet is not capable of being summarily enforced as a binding agreement to settle this

dispute.  An appropriate order follows.[15]

                                        BY THE COURT:

                                        /s/John R. Padova

                                        _____

                                        John R. Padova, J.

---

[13]See First Draft Agreement ¶¶ 1.12, 1.13, 4.1, 5.7; Second Draft Agreement ¶¶ 1.12, 1.13, 4.1, 5.7.

[14]See First Draft Agreement ¶¶ 6.1, 6.2; Second Draft Agreement ¶¶ 6.1, 6.2.

[15]In the Order, we also grant Comcast's pending motion to stay trial and pretrial proceedings pending resolution of the certification issues before the Supreme Court.