IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STANFORD GLABERSON, et al.,<br><br>                   Plaintiffs,<br>v.<br><br>COMCAST CORPORATION, et al.,<br><br>                   Defendants. | Case No. 03-cv-06604 (JP)<br><br>**Expert Report of<br>Stanley M. Besen, Ph.D.**<br><br>January 15, 2014 |

## I.    INTRODUCTION

1)    My name is Stanley M. Besen and I am currently a Senior Consultant to Charles River
      Associates ("CRA") where I previously served as a Vice President.  I have published
      widely on telecommunications economics and policy, intellectual property, and the
      economics of standards, and have consulted to many companies in the telecommunications
      and information industries.  I have served as a Brookings Economic Policy Fellow, Office
      of Telecommunications Policy, Executive Office of the President (1971-1972); Co-
      Director, Network Inquiry Special Staff, Federal Communications Commission (1978-
      1980); Coeditor, RAND Journal of Economics (1985-1988); Senior Economist, RAND
      Corporation (1980-1992); a member of the Editorial Board of Information Economics and
      Policy (1992-2004); and Vice President, Charles River Associates (1992-2008).  I am
      currently a member of the Editorial Board of Economics of Innovation and New
      Technology.

2)    I have an extensive academic background.  I have taught at Rice University (1965-1980),
      where I was the Allyn R. and Gladys M. Cline Professor of Economics and Finance (1979-
      1980); Columbia University (1988-1989), where I was the Visiting Henley Professor of
      Law and Business; and the Georgetown University Law Center (1990-1991), where I was
      Visiting Professor of Law and Economics.  I hold a Ph.D. in Economics from Yale
      University.

3)    I have analyzed the telecommunications industry, including the cable television industry,
      for more than 40 years.  My published articles on the cable television industry include
      analyses of Federal Communications Commission ("FCC") policies that restricted entry,

regulated rates, and limited vertical integration.  I have also testified as a witness before committees of the U.S. Congress on cable television matters including, among others, entry policy, the effects of vertical integration, and leased access.  In addition, I have consulted to both cable operators and cable programmers on, among others, issues of rate regulation, national ownership caps, and vertical integration, and have provided expert testimony and filed reports to the FCC and other government agencies on behalf of these clients.  My curriculum vitae is attached as Appendix A to this report.  CRA receives a standard hourly rate of $950 for my services in this matter.

4)   I have been asked by attorneys for Comcast to review the analysis in Second Supplemental Expert Report of Michael A. Williams, Ph.D., dated August 19, 2013 (the "Williams Report"), submitted in support of plaintiffs' motion to certify a revised class in *Stanford Glaberson, et al., v. Comcast Corporation, et al.,* No. 03-6604, in the United States District Court for the Eastern District of Pennsylvania.  A list of the materials I relied on in forming my opinions is attached as Appendix B to this report.  My research in this matter is ongoing and I reserve the right to modify or supplement my opinions as additional information becomes available.

## II.   SUMMARY OF OPINIONS

5)   The Williams Report contains two primary conclusions.  First, Dr. Williams concludes that, but for Comcast's allegedly anticompetitive conduct, RCN would have overbuilt[1] the areas

---

[1] As explained by the FCC: "The term 'overbuild' describes the situation in which a second cable operator enters a local market in direct competition with an incumbent cable operator. In these markets, the second operator, or 'overbuilder,' lays wires in the same area as the incumbent, 'overbuilding' the incumbent's plant, thereby giving consumers a choice between cable service

of Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties in Pennsylvania for

which it had received an Open Video System ("OVS") authorization from the FCC and

would have offered programming comparable to that of Comcast in those areas.  More

specifically, Dr. Williams concludes that, by January 1, 2003, RCN would have offered this

programming to at least 50 percent of the households (the "homes passed standard") and

would have provided service to at least 15 percent of the households in those areas, (the

"subscribership standard"), thereby satisfying the FCC's "50/15 Standard" for effective

competition.[2,3]  Second, Dr. Williams concludes that Comcast's market power in Bucks,

Chester, Delaware, Montgomery, and Philadelphia Counties allowed it to charge

supracompetitive prices to all members of the putative class in those five counties,

including Comcast subscribers located in areas in which RCN had not received an OVS

authorization from the FCC.

6)      To support his first conclusion, Dr. Williams describes a sequence of steps by which, he

claims, RCN would have overbuilt portions of Bucks, Chester, Delaware, Montgomery,

and Philadelphia Counties but for Comcast's allegedly anticompetitive conduct: (1) RCN

---

providers."  (Federal Communications Commission. (Adopted: 2006, December 20, Released:
2007, March 5).  "Report and Order and Further Notice of Proposed Rulemaking, In the Matter
of Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as
amended by the Cable Television Consumer Protection and Competition Act of 1992" (MB
Docket No. 05-311), p. 15, footnote 97.  *Available at* www.mhcrc.org/docs/ops_FCCCFAR.pdf,
viewed on January 10, 2014.)

[2] Dr. Williams writes: "But for Comcast's anticompetitive conduct, RCN would have offered
video services comparable to those offered by Comcast to at least 50 percent of the households in
the area in the five counties in which it was authorized to serve and would have served at least 15
percent of the households in that area that subscribe to multichannel video programming
distributor ('MVPD') services by January 1, 2003."  (Williams Report, ¶ 9.)

[3] The "50/15" criteria are among the criteria used by the FCC to identify whether an incumbent
cable operator is subject to "effective competition."  (47 C.F.R. § 76.905.)

obtained an OVS authorization from the FCC in June 1998 for parts of the five counties;
(2) RCN would have reached agreements with the local franchising authorities ("LFAs") in
all areas for which it had obtained OVS authorization within one year after it had obtained
that authorization (*i.e.*, by July 1999); and (3) RCN would have built out these franchises to
the FCC's 50/15 Standard within three and one half years after reaching those local
franchise agreements.[4]  In sum, Dr. Williams describes a sequence of steps whereby he
concludes that RCN would have built out franchises in parts of the five counties to the
FCC's 50/15 Standard by January 2003.

7)  For the reasons summarized here, it is my opinion that Dr. Williams' characterization of
RCN's build out in the five counties in the absence of Comcast's allegedly anticompetitive
conduct is not supported by (and in many cases is contradicted by) the examples on which
he relies and by the historical performance of RCN and other overbuilders.  Among other
flaws, Dr. Williams relies on an extremely small sample from the available wireline
overbuilder data, uses information on projected rather than actual construction times, and
conflates the experience of new entrant overbuilders with that of incumbent telephone
operators.  Furthermore, Dr. Williams provides no evidence that any of the communities
that he refers to in his report have ever received an effectively competitive designation
because a wireline overbuilder other than a local telephone company had met the FCC's
50/15 Standard in the community.  I briefly summarize my opinions regarding each of Dr.
Williams's posited steps below.

---

[4] The sequence that Dr. Williams describes includes a fourth step, which corresponds to the point
at which RCN would have overbuilt in their entirety the areas in which it had obtained OVS
authorization, a step that Dr. Williams opines would have occurred within seven years after RCN
reached local franchise agreements.  (Williams Report, ¶ 14.)

8)   I note at the outset that the overbuilding sequence that Dr. Williams describes—and the conclusions that he draws from it—applies at most to the 106 communities in the five counties for which RCN received an OVS authorization.  It does not apply to the other 110 communities in the five counties in which Comcast provides television service.  Because RCN neither sought nor obtained an OVS authorization for these 110 communities—step (1) of Dr. Williams's overbuilding sequence—the conclusion from Dr. Williams's analysis must be that they would *not* have been overbuilt by RCN.

9)   Regarding Dr. Williams' step (2), his conclusion that RCN would have reached agreements with the LFAs within one year after it obtained an OVS authorization in the 106 communities covered by that authorization, ignores the fact that, by July 15, 1999, more than a year after receiving the OVS authorization, RCN had actually only signed *nine* such agreements.  Significantly, this date was *before* Comcast had acquired or swapped any cable franchise in the five counties or had commenced the targeted discounts of the Comcast Advantage Plan.

10)  Moreover, Dr. Williams' conclusion in this regard is based on a review of only nine franchise agreements signed by overbuilders, including RCN, that had received OVS authorizations.  Of these nine agreements, five are for franchises that *never became operational*, so they cannot be viewed as examples of successful build outs; two are for OVS franchises with no build-out requirements; and one is for a franchise where the overbuilder, RCN, initially *failed* to meet its build-out requirement.

11)  Dr. Williams's assertion that the OVS authorization obtained by RCN for communities in the five counties would have resulted in operational franchises but for Comcast's alleged anticompetitive conduct is also belied by the experience of RCN in other areas of the

United States and by the experiences of other overbuilders. In fact, of all the communities outside of Philadelphia, Boston, and Chicago in which RCN has obtained OVS approval, fewer than three percent currently have an operational RCN system. Moreover, this is consistent with the failure of other overbuilders to develop operational systems in the areas in which they had obtained OVS authorizations or even to develop operational systems in areas in which they had signed franchise agreements.

12) Regarding Dr. Williams' step (3), his analyses support neither the subscribership nor homes passed standard of the 50/15 Standard. With respect to the subscribership standard, Dr. Williams cites *absolutely no evidence* on the fraction of households that would have subscribed to RCN's service but for Comcast's allegedly anticompetitive conduct. As a result of this omission alone, Dr. Williams has provided no basis upon which to conclude that RCN would have *ever* satisfied the 50/15 Standard in any community in the five counties, let alone satisfied the 50/15 Standard by January 1, 2003.

13) As to the homes passed standard, Dr. Williams's first category of "evidence" that RCN would have met this standard in the communities for which it had received an OVS authorization by January 2003 is various overbuilders' *projected or anticipated* time to complete construction rather than on the *actual* time it took those overbuilders to complete construction. Dr. Williams takes no account of the fact that several of the overbuilders on whose behavior his conclusion is based were not successful in meeting the build-out requirements in their franchise agreements years after their projected completion dates.

14) The second category of evidence offered by Dr. Williams regarding the amount of time that RCN would have taken to meet the homes passed standard comprises eight examples of the actual time taken by overbuilders to build out portions of their systems. However, all but

one of these examples involve Incumbent Local Exchange Carriers ("ILECs")—local telephone companies—which Dr. Williams has previously acknowledged are inappropriate "comparables" for overbuilders like RCN because ILECs, unlike RCN, have existing infrastructure that can be upgraded to offer television service.

15) The remaining example referenced by Dr. Williams is RCN's build out of its system in Boston, but this example also offers no support for Dr. Williams's opinion that RCN would have met the homes passed standard anywhere in the five counties.  Indeed, in 2012, more than twelve years after receiving its franchise, the FCC found that RCN had passed *less than one third* of all Boston households, well short of the 50 percent homes passed standard of the FCC's 50/15 Standard.

16) The final piece of evidence offered by Dr. Williams regarding the homes passed standard is based on a misreading of a single Comcast document, which Dr. Williams states reflects "Comcast's assessment of when nine franchises in Delaware County were overbuilt by RCN."[5]  The document, which refers to a very small number of franchises in a single county, says nothing about RCN reaching the 50/15 Standard (or any other overbuilding milestone) in any franchise area.  Moreover, another Comcast document (to which Dr. Williams does not refer) demonstrates that the document cited by Dr. Williams refers to the dates at which RCN first *started* to serve customers in each franchise area.  As a result, the document cited by Dr. Williams provides *no information* about the amount of time it would take RCN to meet the homes passed standard or the subscribership standard in any franchise area.

---

[5] Williams Report, ¶ 21.

17) Dr. Williams attempts to bolster his opinion that RCN could have completed step (3) of his framework by arguing that "RCN had substantial funds available to invest in its network development plan, a plan that likely would have succeeded within the time periods I have estimated but for Comcast's conduct complained of in this case."[6]  However, the experience of overbuilders—by no means limited to RCN—during the period that he analyzes shows that the industry faced serious financial difficulties as it became apparent that the economics of overbuilding were not favorable.  These industry-wide financial difficulties substantially decrease the likelihood that RCN would have met the homes passed standard in the communities for which it had received an OVS authorization by January 1, 2003, which is consistent with RCN's own contemporaneous statements.

18) Dr. Williams's second primary conclusion is that Comcast's behavior allowed it to charge supracompetitive prices to all members of the putative class in the five counties, including Comcast subscribers *not* located in areas for which RCN had received an OVS authorization from the FCC.  However, RCN specifically noted in filings with the FCC that the effect of its entry on the prices charged by cable operators was limited to the areas in which it had actually entered, which is also consistent with plaintiffs' contention in this litigation that Comcast "targeted" its discounts to the areas in Delaware County in which RCN had actually entered.

19) I discuss each of these opinions in greater detail in the remainder of this report.

---

[6] Williams Report, ¶ 17.

### III. DR. WILLIAMS PRESENTS NO EVIDENCE THAT RCN WOULD HAVE OVERBUILT MANY OF THE COMMUNITIES IN THE FIVE COUNTIES

20) In his Report, Dr. Williams describes a sequence of steps by which, he claims, RCN would have overbuilt parts of Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties but for Comcast's allegedly anticompetitive conduct. The first step in Dr. Williams' posited sequence is that RCN obtained an OVS authorization from the FCC in June 1998 for *parts* of the five counties.

21) However, it is important to observe at the outset that RCN had obtained an OVS authorization by June 1998, Dr. Williams's chronological starting point, for only 106[7] of the 216 communities in which Comcast has active cable franchises in the five counties.[8,9] (There are a total of 246 communities in the five counties with active cable franchises, but Comcast is not the incumbent cable operator in all of them.) For the remaining 110 communities in the five counties in which Comcast provides cable television service, RCN never even reached that "starting point" of the sequence of events that Dr. Williams posits.

---

[7] Federal Communications Commission. "Archived Filings for Certification of Open Video Systems." *Available at* www.fcc.gov/encyclopedia/archived-filings-certification-open-video-systems, viewed on November 26, 2013.

[8] Federal Communications Commission. "FCC Cable Communities Registered." *Available at* www.fcc.gov/encyclopedia/cable-communities-registered-fcc, viewed on November 26, 2013.

[9] I understand that these 216 communities correspond to 235 Comcast billing areas, and that plaintiffs' expert Dr. James T. McClave assumes that 117 of these Comcast billing areas, corresponding to the 106 communities for which RCN had received an OVS authorization, would have been overbuilt by RCN but for Comcast's allegedly anticompetitive conduct.

Indeed, Dr. McClave expressly assumes that those communities would not have been overbuilt absent Comcast's allegedly anticompetitive conduct.[10]

## IV. DR. WILLIAMS'S EVIDENCE REGARDING THE TIMING AND LIKELIHOOD OF RCN OBTAING FRANCHISE AGREEMENTS IS FLAWED

22) The second step in Dr. Williams's posited sequence is that RCN would have reached agreements with the LFAs in all of the 106 communities in the five counties for which it had received an OVS authorization.  To support his conclusion that RCN would have reached agreements with the LFAs in all of these communities within twelve months of receiving the OVS authorization from the FCC, Table 1 of the Williams Report, Time Elapsed Between FCC Approval Dates and Franchise Agreement Dates by Cable Overbuilders, presents nine examples of the number of months between (i) the date on which an overbuilder received an OVS authorization from the FCC and (ii) the date on which the overbuilder signed a franchise agreement.  Based on these nine examples, Dr. Williams concludes that RCN would have negotiated franchise agreements in all 106 communities for which it had received an OVS authorization within twelve months of receiving that authorization (*i.e.*, no later than July 1999).[11]

23) In reaching this conclusion, however, Dr. Williams ignores the fact that by July 15, 1999, slightly more than twelve months after receiving the OVS authorization for the 106 communities, RCN had signed franchise agreements with only *nine* communities in the

---

[10] McClave, James T.  (2013, August 19).  "Class Re-Certification Report of Dr. James T. McClave, in *Caroline Behrend et al., v. Comcast Corporation, et al.*, In the United States District Court for the Eastern District of Pennsylvania," p. 8.

[11] Williams Report, ¶ 12.

Philadelphia area.[12]  Indeed, RCN itself explained in a letter to Comcast that "*[i]t is likely we will not ultimately serve each of the communities* [in the Philadelphia area within RCN's OVS certification] but no final decisions have been taken in that respect."[13]  In this regard, it is important to observe that Comcast had yet to acquire or swap any cable franchises in the five counties[14] or to commence the targeted discounts of the Comcast Advantage Plan by this time.[15]  Thus, any failure by RCN to reach agreements with local franchising authorities at that time cannot be ascribed to Comcast's allegedly anticompetitive conduct.

24) As I explain in more detail below, even the nine examples selected by Dr. Williams do not support his conclusions.  Five of the franchise agreements cited by Dr. Williams in his Table 1 are for systems that were never operational, two are RCN OVS franchise agreements that did not have build-out requirements, and one is for a franchise where the overbuilder, RCN, initially failed to meet its build-out requirements.

25) The experience of RCN in other parts of the country also does not support Dr. Williams' conclusion.  Indeed, of all the communities outside of Philadelphia, Boston, and Chicago in

---

[12] Letter from John J. Gdovin to Geoffrey Sellers.  (1999, July 15).  (RCN0001007.)

[13] *Ibid*., emphasis added.

[14] Comcast's acquisition of Marcus Cable closed in April 1998 but these franchises were located in Kent County, Delaware, not in the five counties at issue.  Comcast's acquisition of Greater Media closed in June 1999, which is at the end of Dr. Williams's posited 12-month period. (Third Amended Class Action Complaint for Violations of the Sherman Antitrust Act, *Caroline Behrend et al., v. Comcast Corporation, et al.*, In the United States District Court for the Eastern District of Pennsylvania, ¶ 52.)

[15] Comcast used seven versions of the Comcast Advantage Plan in Delaware County, the first of which began in March 2000.  ("Competitive Overview – Delaware County."  (COM-PA0982329-37.))

which RCN obtained an OVS authorization (covering territories not served by Comcast as well as those served by Comcast), *fewer than three percent* currently contain an operational RCN system, either OVS or cable.  Nonetheless, Dr. Williams concludes that, but for Comcast's conduct, *all* of RCN's OVS applications in the five counties would have resulted in operational RCN systems.  I discuss these flaws in Dr. Williams' analysis in more detail below.

**A.    Dr. Williams's Nine Examples of Franchise Agreement Dates Do Not Support His Ultimate Conclusion that RCN Would Have Satisfied the FCC's 50/15 Standard in All Communities, Much Less Within the Time Period that He Asserts**

26)    Although the information presented in Table 1 of the Williams Report pertains to communities that reached the "starting point" of the sequence of steps posited by Dr. Williams, an OVS authorization, that information does not support his conclusion that RCN would have satisfied the FCC's 50/15 Standard in the 106 communities in Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties that were covered by that authorization.

27)    The table below provides more information about the nine franchise agreements cited in Table 1 of the Williams Report.  Digital Access, which accounts for four of the nine entries, went out of business shortly after signing the franchise agreements cited by Dr. Williams and thus never completed their respective build outs.[16]  Similarly, although Knology obtained a cable franchise in Louisville, Kentucky in 2000, that franchise never

---

[16] Estrella, J.  (2001, March 4).  "Digital Access Pulls the Plug."  *Multichannel News*.  *Available at* www.multichannel.com/news-article/digital-access-pulls-plug/98802, viewed on November 19, 2013.

became operational.[17]  Thus, five of the nine entries in Table 1 of the Williams Report

pertain to franchises that never became operational.

**Table 1: Franchise Agreements Cited in Table 1 of the Williams Report**

| Overbuilder | Location | Date of OVS Approval[18] | Ever Operational?[19] | Current Franchise Type |
|---|---|---|---|---|
| Digital Access | Indianapolis, IN | December 1999 | No | N/A |
| Digital Access | Lenexa, KS | December 1999 | No | N/A |
| Digital Access | Milwaukee, WI | December 1999 | No | N/A |
| Digital Access | Nashville, TN | December 1999 | No | N/A |
| Knology | Louisville, KY | June 2000 | No | N/A |
| RCN | Boston, MA | February 1997 | Yes | OVS |
| RCN | New York City, NY | February 1997 | Yes | OVS |
| RCN | Redwood City, CA | June 1998 | Yes | Cable |
| RCN/Starpower | Washington D.C. | January 1998 | Yes | OVS |

28)   Three of the examples in Dr. Williams's Table 1 concern franchise agreements signed by

RCN in Boston, New York City, and Redwood City, California.  RCN initially obtained an

OVS franchise in Boston in 1997, then converted it to a cable franchise in 1999, and, after

failing to meet the build-out requirement in the cable franchise agreement, reverted to an

---

[17] Knology's Form 10-K Filing for 2004 indicates that: "In connection with the restructuring of capitalization pursuant to the prepackaged plan of reorganization, the Company issued new 12% senior notes due 2009, which include covenants limiting the ability to fund expansion into new markets, including Nashville and Louisville."  (Knology, Inc., Form 10-K Filing for the fiscal year ended December 31, 2004, p. F-10.)  A map on WOW's current website does not indicate that it serves Louisville.  ("WOW! Locations." *Available at* www.wowway.com/home-map, viewed on January 10, 2014.)  Thus, it appears that neither Knology nor its successor, WOW, ever provided service in Louisville.

[18] Williams Report, Table 1.

[19] A location is conservatively considered "ever operational" if the provider or its acquirer ever offered service there, regardless of whether the provider achieved the franchise build-out requirements or even satisfied the 50/15 Standard.

13

OVS franchise without a build-out requirement in 2002.[20,21]   Similarly, RCN currently

operates with an OVS franchise in New York City[22] that does not contain a built-out

requirement.[23]   Although the initial franchise agreement for RCN's operation in Redwood

City, California, did contain a build-out requirement,[24] RCN later received an extension of

its build-out deadline.[25]   The lack of build-out requirements in these franchise agreements

or the franchisee's failure to meet these requirements is important because Dr. Williams

later relies on build-out *requirements* in franchise agreements to support his conclusion that

[20]   City of Boston Department of Innovation & Technology.  (2010, July 15).  "Report on the Renewal and Transfer of the RCN-BecoCom Inc. Open Video System (OVS) Operating Agreement Between the City of Boston and ABRY Partners VI, L.P., Yankee Cable Acquisition, LLC," p. 3.  *Available at* www.cityofboston.gov/Images_Documents/Boston%20Report%20on%20RCN%20OVS%20Renewal%20and%20Transfer%20to%20Yankee%20Cable%20ABRY%20Partners%20July%202010_tcm3-18924.pdf, viewed on January 10, 2014.

[21] The FCC reports that some overbuilders "have converted cable franchises into OVS franchises, which has enabled some [Broadband Service Providers or 'BSPs'] *to eliminate buildout requirements.*"  (Federal Communications Commission.  (Adopted: 2007, November 27, Released: 2009, January 16).  "Thirteenth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming" (MB-Docket No. 06-189), ¶ 135, emphasis added.  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-07-206A1.pdf, viewed on January 10, 2014.) BSPs are firms that provide video, voice, and data services over a single network; RCN is a BSP.

[22] "Open Video System Agreement between The City of New York and RCN Telecom Services of New York, Inc."  (1997, December 23).  *Available at*: www.nyc.gov/html/doitt/downloads/pdf/rcn_franchise_agreement.pdf, viewed on January 10, 2014.

[23] New York City Information Technology & Telecommunications.  "Frequently Asked Questions: Open Video System."  *Available at* www.nyc.gov/html/doitt/html/faq/video.shtml, viewed on January 8, 2014.

[24] "Report To the Honorable Mayor and City Council From the City Manager of the City of Redwood City, *Amend RCN Franchise Agreement*."  (2004, September 13), p. 1.  *Available at* rwcteens.org/government/council/packets/2004/0913/Reg_040913-6-4C.pdf, viewed on January 10, 2014.

[25] "Amendment No. 1 to Cable System Franchise Agreement between the City of Redwood City and RCN Telecom Services, Inc." (2004, September 21), pp. 3-4.

RCN would have met the homes passed standard of the 50/15 Standard by January 2003 in the 106 communities in the five counties for which it had received an OVS authorization.

29)   Despite these facts, Dr. Williams uses the average time between the FCC OVS approval dates and the franchise agreement dates for these nine OVS observations to support his conclusion that all 106 communities in the five counties for which RCN had received an OVS authorization would have been substantially built out by RCN only a few years after the date of the authorization.

**B.    The Vast Majority of RCN's OVS Applications Never Resulted in Operational Systems**

30)   Whereas the Williams Report presents data for only nine OVS applications, a systematic analysis of RCN's OVS applications nationwide demonstrates that *almost none* of the OVS authorizations that were received by RCN have resulted in systems that are currently operational.[26]

31)   When I exclude communities in Philadelphia, Boston, and Chicago (that is, the communities in which I understand counsel for plaintiffs allege consumers were harmed by Comcast's so-called clustering of cable franchises), I find that RCN obtained OVS authorizations from the FCC for 375 communities.[27]   Of these, only eleven currently

---

[26] One observer has attributed the lack of success of OVS systems to: (1) the availability of direct broadcast satellite service in much of the United, which made OVS a "second entrant" and the (2) the requirement that OVS operators lease a very large proportion of their channel capacity to programmers at "just and reasonable rates," which severely limited the profitability of OVS providers.  (Botein, M. (2006).  "Open Video Systems: Too Much Regulation Too Late?" *Federal Communications Law Journal,* Vol.58, pp. 442-443.)

[27] *Supra* footnote 7.

contain an operational RCN system.[28],[29]  That is, of all the communities outside of

Philadelphia, Boston, and Chicago in which RCN obtained OVS authorizations from the

FCC, there are operational RCN systems in fewer than three percent.[30],[31]

---

[28] I consider a community in which RCN received an OVS authorization to have an operational OVS system or cable franchise if either (i) the Warren Communications *TV Factbook* lists an operating RCN (or, in California, Astound Broadband) system that includes the community, or (ii) the FCC lists RCN (or, in California, Astound Broadband) as having an active OVS system or cable franchise in the community.

[29] Because of the difficulty in matching community names in the FCC OVS authorizations with the list of currently active cable franchises and OVS systems, I also performed this analysis at the county level. Excluding counties in Philadelphia, Boston, and Chicago, RCN received OVS authorizations from the FCC in 25 counties.  In only six (24 percent) of these counties is there currently an active RCN OVS system or cable franchise.  Although this calculation is extremely conservative because it counts an RCN OVS authorization as successful if RCN has an active system *anywhere in the same county*, it still demonstrates that the vast majority of RCN OVS authorizations did not lead to operational systems.

[30] I note that, although counsel for plaintiffs alleges that Comcast's clustering in Philadelphia, Boston, and Chicago harmed consumers in those areas, RCN was actually *more* successful in developing operational OVS systems or cable franchises than it was elsewhere in the country.  In Philadelphia, of the 106 OVS authorizations received by RCN, 23 (22 percent) are currently operational.  In Boston, of the 49 OVS authorizations received by RCN, 19 (39 percent) are currently operational.  In Chicago, of the 21 authorizations received by RCN, two (ten percent) are currently operational.

[31] RCN's failure to develop operational systems in many communities is well documented.  For example, RCN obtained OVS authorizations in the Portland, OR and Seattle, WA areas, and in parts of New Jersey but never offered service in those areas.  (Federal Communications Commission.  (Adopted: 1998, July 31, Released: 1998, July 31).  "Memorandum Opinion and Order In the Matter of RCN Telecom Services of New Jersey, Inc., Certification to Operate an Open Video System." *Available at* transition.fcc.gov/Bureaus/Cable/Orders/1998/da981530.txt, viewed on January 10, 2014;  Federal Communications Commission.  (Adopted: 1999, September 1, Released: 1999, September 1).  "Memorandum Opinion and Order In the Matter of RCN Telecom Services of Washington, Inc., Certification to Operate an Open Video System." *Available at* transition.fcc.gov/Bureaus/Cable/Orders/1999/da991772.txt, viewed on January 10, 2014; and Federal Communications Commission.  (Adopted: 2000, February 4, Released: 2000, February 7).  "Memorandum Opinion and Order In the Matter of RCN Telecom Services of Oregon, Inc., Certification to Operate an Open Video System.")  Moreover, in its Form 10-K Filing for the fiscal year ended December 31, 2001, RCN noted that it had written off the value of property and equipment "located in *abandoned markets* primarily located in Portland, Seattle

32)    RCN's experience is consistent with that of other overbuilders.  Knology, one of the more

successful overbuilders, obtained OVS authorizations from the FCC in 2000 for both

Lexington and Louisville, Kentucky,[32] but WideOpenWest ("WOW"), which acquired

Knology in 2012, does not report currently providing service in either of these areas.[33]

Moreover, Knology reported in 2002 that it had a franchise in Nashville, Tennessee,[34] but

WOW does not currently provide service in that area.[35]  Similarly, WOW obtained

franchises in Tucson, Arizona;[36] Colorado Springs,[37] Denver, and Boulder, Colorado;[38] and

Irving, Texas,[39] but does not currently provide service in any of those areas.[40]  Another

---

and Northern New Jersey."  (RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2001, p. 79, emphasis added.)

[32] *Supra* footnote 7.

[33] A map on WOW's current website does not indicate that it serves these locations.  ("WOW! Locations." *Available at* www.wowway.com/home-map, viewed on November 24, 2013.)  Furthermore, the Warren Communications *TV Factbook* does not list an operating WOW system in these locations.  (*Advanced TV Factbook*.  Warren Communications News.  *Available at* www.advancedtvfactbook.com, viewed on December 11, 2013.)

[34] Knology, Inc., Form 10-K Filing for the fiscal year ended December 31, 2002, p. 2.

[35] *Supra* footnote 33.

[36] "WideOpenWest to Provide Tucson Service."  (2000, August 8).  *Denver Business Journal*. *Available at* www.bizjournals.com/denver/stories/2000/08/07/daily11.html, viewed on January 9, 2014.

[37] "Cable Television Franchise Agreement Between The City of Colorado Springs and WideOpenWest Colorado, LLC."  (2001, June 22).  *Available at* www.springsgov.com/doccenter/internalservices/wideopenwestcablefranchiseagreement.pdf, viewed on January 9, 2014.

[38] "Voters Approve WideOpenWest Franchises in Denver and Boulder."  (2000, August 9). *PRNewswire*.  *Available at* www.thefreelibrary.com/Voters+Approve+WideOpenWest+Franchises+in+Denver+and+Boulder.-a063969639, viewed on January 9, 2014.

[39] "WOW Gets 2nd Texas Franchise."  (2000, May 28).  *Multichannel News*.  *Available at* www.multichannel.com/news-article/wow-gets-2nd-texas-franchise/69229, viewed on January 9, 2014.

overbuilder, WINfirst, signed franchise agreements in Austin, Dallas, Houston, and San

Antonio, Texas; Los Angeles, Sacramento, and San Diego, California; and Seattle,

Washington.[41]  However, WINfirst suspended its sole build out (in Sacramento) and later

declared bankruptcy.[42]  Thus, not only is an OVS authorization from the FCC not a

guarantee that construction will occur and a system will become operational, evidence from

a wider sample of communities nationwide demonstrates that overbuilding is highly

unlikely even where an overbuilder has obtained a franchise.

33)  In summary, RCN's experience outside of Philadelphia (and Boston and Chicago) belies

Dr. Williams's assertion that RCN would have overbuilt all 106 Comcast communities in

---

[40] *Supra* footnote 33.  WOW's Colorado assets were sold in 2003 to Champion Broadband. (City and County of Denver, Office of the Auditor.  (2006, January).  "Champion Broadband, LLC Cable Franchise Agreement Compliance Audit."  *Available at* www.denvergov.org/Portals/741/documents/Audits2006/Champion%20Broadband,%20LLC.pdf , viewed on January 13, 2014.)  However, Champion Broadband is not listed as currently providing service in Colorado Springs, Denver, or Boulder, Colorado in the *Advanced TV Factbook*.

[41] Haugsted, L.  (2002, March 10).  "Capital Constraints Cripple WINfirst, Too."  *Multichannel News*.  *Available at* www.multichannel.com/news-article/capital-constraints-cripple-winfirst-too/93393, viewed on January 10, 2014.

[42] Hofmeister, S.  (2002, March 14).  "Council's Plan for Cable Competition Goes Bust."  *Los Angeles Times*.  *Available at* articles.latimes.com/2002/mar/14/local/me-cable14, viewed on January 10, 2014.  The assets of WINfirst were later purchased by SureWest ("SureWest acquires Winfirst assets."  (2002, July 15).  *Sacramento Business Journal.  Available at* www.bizjournals.com/sacramento/stories/2002/07/15/daily5.html?page=all, viewed on January 13, 2014.); SureWest was subsequently acquired by Consolidated Communications in 2012 (Consolidated Communications.  (2012, July 2).  "Consolidated Communicates completes purchase of SureWest Communications."  *Available at* www.consolidated.com/news/archive/2012/consolidated-communications-completes-purchase-of-surewest-communications, viewed on January 13, 2014.).  According to the Warren Communications *TV Factbook*, Consolidated Communications currently has an operating system in Sacramento but not the other cities in which WINfirst signed franchise agreements. (*Advanced TV Factbook*.  Warren Communications News.  *Available at* www.advancedtvfactbook.com, viewed on December 11, 2013.)

the five counties for which it had received an OVS authorization from the FCC. The experience of RCN in those areas shows that an exceedingly small fraction of OVS authorizations ever resulted in an operational OVS system or cable franchise. This is also consistent with the failure of other overbuilders to develop operational systems in the areas in which they had obtained OVS authorizations for reasons that have nothing to do with Comcast's conduct. Nonetheless, Dr. Williams asserts that, but for Comcast's conduct, *all* of the communities for which RCN had received an OVS authorization in the five counties would have resulted in operational OVS or cable systems. I find that Dr. Williams's conclusion is not supported by—and is in fact contradicted by—the empirical evidence.

## V.   DR. WILLIAMS'S EVIDENCE REGARDING BUILD-OUT TIMES FOR OVERBUILDERS IS FLAWED

34)   The third step in Dr. Williams's posited sequence is that after signing, by July 1999, franchise agreements in the communities in which it had received an OVS authorization, RCN would have built out these franchises to the FCC's 50/15 Standard three and one half years later. As I noted earlier, Dr. Williams provides absolutely no evidence on the fraction of households to which RCN would have provided service (*i.e.*, the subscribership standard) but for Comcast's allegedly anticompetitive conduct. As a result of this omission alone, he has no basis upon which to conclude that RCN would have overbuilt any community in the five counties to the 50/15 Standard by January 1, 2003.

35)   Dr. Williams's evidence on the fraction of households to which RCN service would have been available (*i.e.*, the homes passed standard) but for Comcast's allegedly anticompetitive conduct is also flawed. The first piece of evidence offered by Dr. Williams regarding the time that RCN would have required to meet that standard are a set of 22

projected or anticipated times for overbuilders to build out a cable system. However, these

do not reflect the *actual* amount of time taken by an overbuilder to build out a cable

system. This is an important distinction because, as shown below, several of the

overbuilders referenced by Dr. Williams were not successful in meeting these projected or

anticipated build-out times, including the build-out requirements in their franchise

agreements.

36) The second piece of evidence offered by Dr. Williams regarding the time that RCN would

have required to meet the homes passed standard are eight examples of the actual time

taken by overbuilders to build out portions of their systems. However, all but one of these

examples involve ILECs, local telephone companies, which can be expected to be (and

have been) more successful overbuilders than RCN because they had an existing

infrastructure and relationships with consumers in the areas in which they entered as

providers of television service. The remaining example referenced by Dr. Williams is

RCN's build out of its system in Boston where the FCC found in 2012, more than twelve

years after receiving its franchise, that RCN had passed fewer than one third (*i.e.*, well

under 50 percent) of all households.

37) The final piece of evidence offered by Dr. Williams is based on a misinterpretation of a

single Comcast document. Dr. Williams contends that the document refers to the

*completion* of overbuilding in a community. However, another Comcast document, to

which Dr. Williams does not refer, demonstrates that the document Dr. Williams cites

refers instead to the *commencement* of RCN's service in that community. That is, the

document, which refers to a very small number of franchise areas in one county, says

nothing about RCN reaching the 50/15 Standard (or any other overbuilding milestone) in

any franchise area.  Consequently, this document does not support the conclusion that Dr. Williams attempts to draw from it.

38)   Dr. Williams attempts to bolster his opinion that RCN would have completed the third step of the sequence that he describes by arguing that RCN had sufficient capital to invest in developing its network in Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.  However, that claim is inconsistent with the statements of RCN itself, even before Comcast entered into any of the acquisitions or swaps that are at issue in this litigation.  It is also inconsistent with the experience of overbuilders, including but not limited to RCN, in markets other than Philadelphia (and Chicago and Boston) during the same time period.  I discuss each of these flaws in Dr. Williams's analyses in more detail in the remainder of this section.

A.   **Dr. Williams Lacks Support for His Conclusion Regarding the Timing of Meeting the Homes Passed Standard**

39)   To support his opinion that RCN would have met the homes passed standard in the communities where it had received an OVS authorization three and one half years after signing agreements with the franchising authorities in those communities, Table 2 of the Williams Report, <u>Build-Out Times for Overbuilders</u>, purports to provide evidence on the amount of time overbuilders actually took to construct their systems.  However, the Williams Report does not provide a consistent definition (or, indeed, in many cases, *any* definition at all) of "build out" and, at least as important, the time periods reported in the table are merely *planned* build-out time periods and do not reflect the *actual* amount of time taken by an overbuilder to build out a cable system.  That is, the table reports only the time in a franchise agreement within which the overbuilder "shall" complete a build out, or

"must" make its service available, or is "required" to begin to provide service.  The table provides not a single measure of how long a build out *actually* took in any of the cases reported or the *actual* extent of the build out.  It is clearly inappropriate to rely on planned or promised construction timetables when the timing of actual construction can be observed.

40)  This is important because, contrary to Dr. Williams's suggestion that the build-out time requirements specified in franchise agreements correspond to actual build-out times, it is apparent that several of the overbuilders listed in Table 2 of the Williams Report were not successful in meeting the build-out requirements in their franchise agreements:

- Knology, which had been granted a franchise in Knoxville, Tennessee that contained a four year build-out requirement in 2000, and which had been granted a five year extension in 2004,[43] had apparently still failed to meet that requirement in 2009.[44]

- WOW, which acquired Knology in 2011, does not currently provide *any* service in Louisville, Kentucky,[45] despite the fact that Knology had acquired a cable franchise in 2000[46] and had, according to Table 2 of the Williams Report, committed to a 4.5 year build out.

---

[43] Hickman, H.  (2008, February 20).  "Knology to finish work."  *Knoxville News Sentinel*. *Available at* www.knoxnews.com/news/2008/feb/20/knology-finish-work, viewed on January 14, 2014.

[44] Ferrar, R.  (2009, November 30).  "Knoxville City Council wants report from Knology." *Knoxville News Sentinel*.  *Available at* www.knoxnews.com/news/2009/nov/30/councilmen-want-report-from-knology, viewed on November 18, 2013.

[45] *Supra* footnote 33.

[46] "Knology seeks Jefferson County franchise."  (2000, November 29).  *Business First*. *Available at* www.bizjournals.com/louisville/stories/2000/11/27/daily23.html, viewed on November 20, 2013.

- Knology, which was granted a cable franchise in Mount Pleasant, South Carolina in March 1999 with a requirement that the system be completely built out by July 2005,[47] was reported as first starting construction of its system in *2011*.[48]

- RCN, which applied for a cable franchise with a five year build-out requirement in San Diego, California in 2000,[49] does not currently provide service in that area.[50]

41) It is also important to note that eight of the 22 examples in Table 2 of the Williams Report relate to commitments made by Verizon, an ILEC.  Because ILECs already provided telephone service throughout an area, it was far simpler and less costly for them to *add* television service to their offerings than it is for new entrants to construct facilities *de novo* in order to provide television service to the same households.  In addition to existing distribution plants, ILECs already have access to rights-of-way and typically own the poles and conduits through which their video plant would be extended.  They also have existing relationships with households to which they have provided telephone service.  New entrants have none of these advantages.  For both reasons, ILECs, particularly AT&T and

---

[47] Town of Mount Pleasant.  (1999, March 9).  "Knology Cable Franchise Ordinance and Knology Telecommunications Franchise Ordinance," Exhibit "A," Construction Schedule. *Available at* www.secinfo.com/dsVsf.63K9.b.htm#16thPage, viewed on January 13, 2014.

[48] Bird, A.  (Posted: 2011, January 7, Updated: 2012, March 23).  "Knology expands service to Mount Pleasant."  *The Post and Courier.  Available at* www.postandcourier.com/article/20110107/PC05/301079901, viewed on November 18, 2013.

[49] The City of San Diego, Manager's Report.  (2000, October 18).  "Grant of Competitive Cable Television Franchise Agreement with RCN Telecom Services."  *Available at* docs.sandiego.gov/reportstocouncil/2000/00-214.wpd.pdf, viewed on January 10, 2014.  Dr. Williams includes this example in his Table 2, which presents "the time period between the date overbuilders enter into franchise agreements and the 50/15 and 100 percent build-out dates," (Williams Report, ¶13) although it is unclear that RCN ever obtained a franchise agreement with the City of San Diego.

[50] RCN's website does not currently indicate that it provides service in San Diego.  (RCN. "Where We Service."  *Available at* www.rcn.com/about-rcn/where-we-service, viewed on January 10, 2014.)  Furthermore, the Warren Communications *TV Factbook* does not list an operating RCN or Astound, which acquired RCN's San Francisco assets in 2007, system in San Diego.  (*Advanced TV Factbook*.  Warren Communications News. *Available at* www.advancedtvfactbook.com, viewed on December 11, 2013.)

23

Verizon, have been far more successful as overbuilders than have new entrants such as

RCN and WOW.[51]   Indeed, Dr. Williams made exactly this point in an earlier declaration:

> ILECs already have made large investments [in] infrastructure….
> [I]nstead of building an entirely new network from scratch, ILECs
> only need to upgrade their existing telephone access lines to provide
> the additional video and data services.[52]

Despite having earlier acknowledged these marked differences between the economics of

ILECs and overbuilders like RCN, Dr. Williams nonetheless attempts to infer the likely

behavior of RCN from the behavior of ILECs.

42)   Moving beyond the examples in Dr. Williams's Table 2, it is not difficult to find examples

of overbuilders that failed to meet the build-out requirements in their franchise agreements.

For example, the Greater Metro Telecommunications Consortium ("GMTC") is an agency

comprising 32 cities, counties, and towns in Colorado.[53]   Combined, the GMTC

---

[51] According to the National Cable and Telecommunications Association, in 2012 Verizon was
the fifth largest multiple-system operator ("MSO") in the U.S. with 4.7 million subscribers and
AT&T was the seventh largest MSO in the U.S. with 4.5 million subscribers.  In contrast, new-
entrant overbuilders like WOW and RCN were the thirteenth and fifteenth largest MSOs in the
U.S., respectively, with 702 thousand and 328 thousand subscribers, respectively.  (National
Cable and Telecommunications Association.  "Industry Data: Top 25 Multichannel Video
Service Customers (2012)."  *Available at* www.ncta.com/industry-data, viewed on January 9,
2014.)

[52] Williams, Michael A.  (2009, May 11).  "Expert Reply Declaration of Michael A. Williams,
Ph.D., in *Caroline Behrend, et al. v. Comcast Corporation, et al.*, in the United States District
Court for the Eastern District of Pennsylvania," ¶ 67, internal quotation marks and footnote
omitted.  See also, Williams, Michael A.  (2009, September 11).  "Supplemental Expert
Declaration of Michael A. Williams, Ph.D., in *Caroline Behrend, et al. v. Comcast Corporation,
et al.*, in the United States District Court for the Eastern District of Pennsylvania," ¶ 26.

[53] "Comments of the Greater Metro Telecommunications Consortium, the Rainier
Communications Commission, Howard County, Maryland, the Cities of Bellevue and Olympia,
Washington, and the Washington Association of Telecommunications Officers and Advisors
Before the Federal Communications Commission In the Matter of Implementation of Section
621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television

represented a population of 459,000 cable subscribers and 925,000 households.[54] According to a 2006 filing to the FCC: "The GMTC communities entered in competitive franchise agreements with WideOpenWest (now Champion Broadband) in 2000.  While the franchise area requires construction of the cable system and offering of cable service to all households within the boundaries of each GMTC jurisdiction, Champion Broadband is only providing services to approximately 2,000 subscribers [*i.e.*, fewer than one percent of cable subscribers in the GMTC] in very small sections of the Cities of Denver and Lakewood."[55]  Similarly, as discussed previously, the overbuilder WINfirst signed franchise agreements in eight large cities but announced in 2002 that it had stopped construction of its only system, which was located in Sacramento, and was quoted as being in "capital preservation mode." [56]  A few days later, the company filed for bankruptcy protection. [57]

43) Similarly, RCN has requested significant relief from the build-out requirements in many of its cable franchises (including the requirements in its Redwood City, California franchise agreement cited by Dr. Williams).  For example, in its 2001 Form 10-K Filing, RCN stated that:

---

Consumer Protection and Competition Act of 1992."  (2006, February 13).  (MB Docket No. 05-311), p. 2.  *Available at* www.watoa.org/FCC_Franchise_Comments.pdf, viewed on January 10, 2014.

[54] *Ibid.*

[55] *Ibid.,* p. 4.

[56] *Supra* footnote 41.

[57] *Supra* footnote 42.

> *[I]t is probable that the Company will not be able to meet all of the
> construction and system build-out requirements contained in some
> of the cable franchises arrangements it has entered into with
> certain local governments.*  In certain communities…the Company
> has agreed with the franchising authorities either to terminate the
> franchise without penalty or prejudice to enter into a new franchise
> in the future *or to postpone indefinitely any build-out obligations.*
> In other cases, the Company is attempting to negotiate with
> franchising authorities to extend or modify the terms of the
> applicable franchise to avoid any breaches and related penalties,
> terminate the applicable franchise without penalty or prejudice to
> entering a new franchise in the future or to postpone indefinitely
> any build-out obligations under the franchise.[58]

44)   Table 3 of the Williams Report, <u>Comparison of "Built Out Percentage" to "Percentage of
Required Build Out Time"</u>, is presumably intended to provide evidence of actual, as
opposed to "required," build outs.  However, all but one of the cases in Table 3 rely on the
performances of incumbent phone companies, which, for the reasons that I described above
(and that Dr. Williams has recognized in the past), can be expected to be more successful
overbuilders than new entrants such as RCN.

45)   The one example cited by Dr. Williams in Table 3 that does not pertain to overbuilding by
an ILEC relates to RCN's operation in Boston.  Dr. Williams apparently considers RCN's
operation in Boston a success.  Based on press accounts he claims that RCN had built out a
system that covered 81 percent of Boston's households.[59]  However, in 2012, the FCC

---

[58] RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2001, p. 20, emphasis
added.

[59] Williams Report, Table 3, citing Horn, P.  (2000, December 12).  "RCN Has Long-term
Promise, Immediate Costs with Network the Telecom Firm Bundles Services for Residential
Users. But Its Funds are Limited, and It May Scale Back its Goals."  *The Philadelphia Inquirer*
and "RCN to build broadband network in Boston."  (1999, July 27).  *The Associated Press State
& Local Wire*.

found that the RCN system passed only 32 percent of all households in Boston.[60]  The

Commission also concluded that "[a]t present, RCN has neither an obligation to expand the

geographic scope of its system *nor any prospect of doing so*."[61]  In fact, RCN reported in

2004 that it had "terminated" its Boston cable franchise and reverted to OVS status.[62]

RCN's system in Boston, therefore, cannot serve as an example of RCN's ability to

successfully meet the build-out requirements set forth in its franchise agreements, let alone

as an example of its success in meeting the 50/15 Standard.

46)  Dr. Williams's final analysis of the time that it supposedly would have taken RCN to

overbuild communities where it had received an OVS authorization from the FCC absent

the allegedly anticompetitive conduct is based on a single Comcast document.  He states

that:

> According to Comcast, on average, a franchise was overbuilt by
> RCN approximately one year and five months after the franchise
> agreement date.  Out of the nine franchises, the longest period from
> the date of RCN's franchise agreement to the date Comcast
> concluded the franchise was overbuilt was three years.  Therefore,
> my conclusion [is] that RCN's 50/15 build-out date would be no

---

[60] Federal Communications Commission.  (Adopted: 2012, April 6, Released: 2012, April 9).
"Memorandum Opinion and Order, In the Matter of Petition of the City of Boston,
Massachusetts, For Recertification to Regulate the Basic Cable Service Rates of Comcast Cable
Communications, LLC (CUID MA0182)," (CSR 8488-R), ¶ 7.  *Available at*
hraunfoss.fcc.gov/edocs_public/attachmatch/DA-12-553A1.pdf, viewed on January 10, 2014.

[61] *Ibid*., footnote omitted, emphasis added.

[62] RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2004, p. 16.  RCN also
reported that it had entered into an OVS agreement and terminated its cable franchise in San
Francisco.  It later sold those operations. ("RCN Corporation and Astound Broadband Close Sale
of RCN's San Francisco Assets."  (2007, March 14).  *Business Wire*.  *Available at*
www.businesswire.com/news/home/20070314005987/en/RCN-Corporation-Astound-
Broadband-Close-Sale-RCNs#.UtA4MJ5dUk0, viewed on November 17, 2013.)

later than three and one half years after the franchise agreement date,
but for Comcast's anticompetitive conduct.[63]

The Comcast document on which Dr. Williams relies does not support this conclusion.

47) The document, which refers to a very small number of franchises in a single county, says

nothing about RCN reaching the 50/15 Standard (or any other overbuilding milestone) in

any franchise area.[64]  Moreover, another Comcast document (to which Dr. Williams does

not refer) demonstrates that the document cited by Dr. Williams refers to the dates at which

RCN first *started* to serve customers in each franchise area.[65]  As a result, the document

cited by Dr. Williams provides *no information* about the amount of time it would take RCN

to meet the homes passed standard or the subscribership standard in any franchise area.

**B.   Dr. Williams's Conclusions Regarding RCN's Financial Strength Are Incorrect**

48) To support his opinion that RCN would have met the homes passed standard by January 1,

2003 in the 106 communities in the five counties for which it had received an OVS

authorization, Dr. Williams interprets "RCN's contemporaneous filings with the U.S.

Securities and Exchange Commission ('SEC')" as "indicat[ing] that the firm had the ability

to complete the build out of the franchises in the five counties for which it had FCC

---

[63] Williams Report, ¶ 21.

[64] "Competitive Overview – Delaware County."  (COM-PA0982329-37.)

[65] "Competitive Subscriber Number Analysis."  (COM-PA2002234-335 at 255-334.)  The dates
listed in Table 4 of the Williams Report correspond to the dates listed in this document as the
"date competition started."  For example, the document shows that Comcast estimated that RCN
had 21 (a one percent penetration rate) customers in Tinicum Township as of October 2001, a
month after Dr. Williams asserts that Comcast determined the franchise to be "overbuilt."  (*Ibid.*
at 255.)  As another example, the document shows that Comcast estimated that RCN had 209
customers (a four percent penetration rate) in Yeadon as of November 2003, the date on which
Dr. Williams asserts that Comcast had determined the franchise to be "overbuilt."  (*Ibid.* at 312.)

approval."[66]  He concludes that "RCN had substantial funds available to invest in its

network development plan, a plan that likely would have succeeded within the time periods

I have estimated but for Comcast's conduct complained of in this case."[67]  However, the

evidence shows that RCN, like other overbuilders at the time, faced serious financial

difficulties as it became apparent that the economics of overbuilding were not favorable.

These industry-wide financial difficulties substantially decreased the likelihood that RCN

would have been able to successfully build out its franchises in the five counties but for the

alleged anticompetitive conduct of Comcast.

49)  Overbuilders' lack of access to capital and the corresponding effect on their ability to

complete build outs were described contemporaneously by industry analysts.  For example,

Bank of America wrote in the first quarter of 2001:

> Regarding overbuilding, there has been continuing evidence of the
> difficulty of the overbuild business model and the trepidation of the
> private capital markets to fund these types of businesses.  In the past
> month RCN ended its efforts to obtain a franchise in Philadelphia,
> American Broadband cancelled plans to enter Buffalo and Digital
> Access shuttered the company altogether.[68]

Similarly, an article in *Multichannel News* in the first quarter of 2002 noted that:

> Another overbuilder has found the capital markets to be a bigger
> threat to long-term viability than incumbent cable companies.  The
> president of Western Integrated Networks, which does business as
> WINfirst, has confirmed that the company has stopped construction
> in its sole build in Sacramento, Calif., and is in 'capital preservation
> mode'….  The inability to continue raising large sums for telecom-

---

[66] Williams Report, ¶ 16.  The reference is to RCN's SEC Form 10-K Filing for the fiscal year
ending December 31, 2000.

[67] Williams Report, ¶ 17.

[68] Banc of America Securities, Equity Research, Montgomery Division. "Cable Industry
Comment."  (2001, March 26).  (COM-PA1059444-51 at 47.)

> network buildouts has killed or crippled many once-hot start-up
> 'broadband service providers' over the last couple of years.
> American Broadband Inc. of Rhode Island and Digital Access Inc.,
> which had plans to build in five states, scrapped their overbuilds
> entirely. And the likes of Carolina Broadband Inc., TotaLINK LLC
> and even the well-established RCN Corp. have scaled back their
> construction plans.[69]

50) The FCC described the financial difficulties faced by overbuilders in its Ninth Annual

   Report on competition in the market for video services, which was issued at the end of

   2002.  For example, the FCC noted that WOW, the second largest BSP, had "suspended

   build-out commitments due to financial difficulties"[70] and Knology, the third largest BSP,

   "experienced financial troubles in the last year, and filed a pre-packaged Chapter 11

   bankruptcy that allows it to continue service uninterrupted."[71]  In the same report, the FCC

   noted that these financial difficulties extended to RCN and, as a result, RCN had reduced

   the number of markets it planned to enter:  "Like all BSPs…RCN has experienced trouble

   acquiring financing and, as a result, has scaled back expansion plans and focused on

   marketing to existing passed homes."[72]  Thus, Dr. Williams's opinion that RCN had

   sufficient capital to build out its OVS communities by 2003 is completely at odds with the

   FCC's contemporaneous finding that RCN was scaling back its building commitments

   because of inadequate capitalization.

---

[69] *Supra* footnote 41.

[70] Federal Communications Commission.  (Adopted: 2002, December 23, Released: 2002, December 31).  "Ninth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming" (MB Docket No. 02-145), ¶ 104, footnote omitted.  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-02-338A1.pdf, viewed on January 10, 2014.

[71] *Ibid*.

[72] *Ibid*., ¶ 103, footnote omitted.

51)   To support his contention that RCN had the financial ability to complete the build out of
franchises in the five counties in which it had OVS approvals, Dr. Williams relies on the
following language from RCN's 2000 SEC Form 10-K Filing: "The Company believes its
currently available funds are sufficient to fund development of *the markets the company
has committed to entering*."[73]   However, he ignores other statements made by RCN
concerning its operations either before or shortly after issuing its 2000 Form 10-K Filing
that make clear that RCN had already reduced the number of areas that it planned to enter.
For example, an article released on December 16, 2000 (*i.e.*, months before RCN filed its
2000 Form 10-K Filing and weeks before December 31, 2000, a date on which Dr.
Williams concluded "that RCN had substantial funds available to invest in its network
development plan"[74]) states:

> RCN Corp., a telecommunications company that serves more than
> 130,000 Lehigh Valley customers, *announced this week that it has
> abandoned an aggressive plan to enter new markets in order to
> conserve cash.*[75]

52)   As another example, in RCN's 2001 Form 10-K Filing, it noted that it had curtailed the
number of markets that it planned to enter in the second quarter of 2001, the same quarter
in which it released the 2000 Form 10-K Filing cited by Dr. Williams:

> As the economy changed and the capital available to our industry
> became limited, the Company revised its strategic and fundamental
> plans accordingly.  *During the second quarter of 2001, the Company*

---

[73] Williams Report, ¶17, quoting RCN Form 10-K Filing for the fiscal year ended December 31,
2000, p. 47, emphasis added.

[74] *Ibid.*

[75] Berg, C.  (2000, December 16).  "RCN pulls back on plans for growth."  *The Morning Call*.
*Available at* articles.mcall.com/2000-12-16/business/3328168_1_rcn-mccourt-telephone-and-
internet-services, viewed on January 10, 2014, emphasis added.

> *shifted focus from beginning construction in new markets to*
> *additional construction activities in its existing markets to achieve*
> *higher growth with lower incremental capital spending.*  The
> expansion plans in certain existing markets over the next 18 to 24
> months were also curtailed and delayed in some markets…. As a
> result of the change in expansion plans, we initiated discussions with
> the respective franchising authorities to inform them of the
> Company's decision to stop or delay construction.[76]

Indeed, a November 1, 2001 *Philadelphia Inquirer* article quoted RCN as stating that "it would be too expensive and too difficult to build a network in the entire [City of Philadelphia] at once, and that it prefers to commit to only two of the four franchise areas" in Philadelphia.[77]  Despite this, Dr. Williams asserts that RCN would have had the financial capacity to build out its systems to the 50/15 Standard in *all* of the 106 communities (including all of the City of Philadelphia) for which it had received an OVS authorization within only three and one half years of signing franchise agreements.

53)  In summary, contemporaneous business documents and statements by RCN itself demonstrate that RCN was cutting back its building plans at exactly the time that Dr. Williams contends the company had sufficient capital to complete the build out of all the communities in the five counties for which it had received an OVS authorization from the FCC.  The financial difficulties that led RCN to reduce the number of markets that it planned to enter were related to its access to capital, difficulties that confronted many other overbuilders, including WOW, Knology, American Broadband, and Digital Access.

---

[76] RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2001, pp. 51-52, emphasis added.

[77] Horn, P.  (2000, November 1).  "Phila. Council Panel Questions RCN on Cable Plan." *Philadelphia Inquirer.  Available at* articles.philly.com/2000-11-01/business/25613267_1_rcn-franchise-areas-cable-franchise-contracts, viewed on January 10, 2014.

## VI. DR. WILLIAMS LACKS SUPPORT FOR HIS CONCLUSIONS REGARDING THE EFFECT OF OVERBUILDING ON NEIGHBORING FRANCHISES

54)   The second primary conclusion contained in the Williams Report is that Comcast's

acquisition of market power allowed it to charge supracompetitive prices to all members of

the putative class in Bucks, Chester, Delaware, Montgomery, and Philadelphia Counties.

That is, Dr. Williams contends that consumers in the communities in which RCN had *not*

applied for OVS authorization (and so for which he provides no evidence that RCN had

any prospect of overbuilding) would have nonetheless benefited from overbuilding in

neighboring franchises.[78]

55)   The sole authority cited by Dr. Williams to support this conclusion[79] is the following

passage from the FCC's Eighth Annual Report, In the Matter of Annual Assessment of the

Status of Competition in the Market for the Delivery of Video Programming:

> Similarly, RCN contends that in Somerville, Massachusetts, upon its
> entry, Time Warner, the incumbent, announced *a rate freeze for only
> that area where it faced competition*.  In suburban Philadelphia, as a
> result of RCN's entry, Comcast, the incumbent, began to offer "rate
> locks" and service improvements *in the towns where it faced
> competition*.  In the Washington, D.C., area, as a result of entry by
> Starpower, an RCN affiliate, Comcast, the incumbent cable operator,
> reduced a previously proposed rate increase. RCN also contends that
> in anticipation of its entry in Fairfax County, a suburb of

---

[78] Williams Report, ¶ 29.  Dr. Williams writes: "the competitive effect of overbuilder entry may extend to geographic areas not served by the [overbuilder]."

[79] Williams Report, ¶ 29.  Dr. Williams cites the Declaration of Dr. Robert D. Willig on Behalf of EchoStar Communications Corporation, General Motors Corporation, and Hughes Electronics Corporation, CS Docket No. 01-348 (2002), ¶ 45, which in turn cites Federal Communications Commission.  (Adopted: 2001, December 27, Released: 2002, January 14).  "Eighth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming." (CS Docket No. 01-129), ¶ 201.  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-01-389A1.pdf, viewed on January 10, 2014.

Washington, D.C., the incumbent Cox announced an upgrade of its plant.[80]

56) It is clear, however, that this passage is consistent with the view that the effect of RCN's entry on cable prices is limited to the areas in which entry had actually occurred. Even the reference to RCN's entry in Fairfax County, Virginia, is consistent with this view since RCN currently provides service in Fairfax County, so that Cox's upgrade of its physical plant was being made in response to future entry by an *actual competitor*.

57) Moreover, in its own filings with the FCC in connection with the Eighth Annual Report, RCN repeatedly emphasized that the effect of its entry on cable rates was limited to the areas in which it had actually entered:

> Incumbent Time Warner announced rate freezes in Somerville, a Boston suburb, upon RCN's entry, *even though it was raising rates in most of the eastern Massachusetts communities in which it was the franchisee* by 10% to 15%....
>
> In Manhattan the incumbent, Time Warner, adopted an aggressive bulk discount plan *for apartment buildings targeted for service by RCN*....
>
> As RCN has rolled-out its competitive cable and local telephone services in suburban Philadelphia communities such as Folcroft, the incumbent, Comcast, began offering rate locks and service improvements *in towns to which RCN was offering or about to begin offering service. These special offers were highly selective, and focused specifically on the imminent arrival of RCN's competitive service.*[81]

---

[80] Federal Communications Commission. (Adopted: 2001, December 27, Released: 2002, January 14). "Eighth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming." (CS Docket No. 01-129), ¶ 201, emphasis added, footnotes omitted. *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-01-389A1.pdf, viewed on January 10, 2014.

[81] "Initial Comments of RCN Corporation In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming." (2001, August 3). (CS Docket No. 01-129). Appendix A, pp. 1-2, emphasis added.

58)   Indeed, plaintiffs' expert in this case has emphasized that Comcast's response to RCN's

entry in Delaware County was limited to areas in which RCN and Comcast competed:

> As part of the Comcast Advantage Plan ("CAP"), Comcast offered
> discounts or rate freezes to consumers who agreed not to switch to
> RCN. *These benefits were only available to consumers who also
> had the option of subscribing to RCN…* Comcast's offer was
> highly unusual and was not provided previously to customers in
> that area or other areas of Philadelphia prior to RCN's entry….
> [Comcast] also targeted potential RCN customers within franchises
> by offering its CAP plans only on streets with "competitive
> activity."[82]

59)   I therefore conclude that Dr. Williams has no basis on which to support his opinion that the

competitive effect of RCN's entry in Bucks, Chester, Delaware, Montgomery, and

Philadelphia Counties would have extended to areas that RCN would not have overbuilt.

## VII. CONCLUSION

60)   This report contains a statement of my opinions regarding the Williams Report. It also

describes the bases and reasons for my opinions and the data and information that I

considered in forming these opinions.

I declare under penalty of perjury that the foregoing is true and correct.

Stanley M. Besen, Ph.D.
January 15, 2014

---

[82] Singer, Hal. "Expert Declaration of Dr. Hal Singer, *Caroline Behrend, et al., vs. Comcast
Corporation, et al.*, Civil Action No. 03-6604, United States District Court for the Eastern
District of Pennsylvania." ¶ 113, emphasis added, footnote omitted.

**Appendix A: Curriculum Vitae**



## Stanley M. Besen
Senior Consultant

PhD, Economics
Yale University

MA, Economics
Yale University

BBA, Economics
City College of New York

## Professional experience

| | |
|---|---|
| 2008–Present | *Senior Consultant*, Charles River Associates, Washington, DC |
| 1992–2008 | *Vice President*, Charles River Associates, Washington, DC |
| 1980–1992 | *Senior Economist*, The RAND Corporation, Washington, DC |
| 1990–1991 | *Visiting Professor of Law and Economics*, Georgetown University Law Center |
| 1988–1989 | *Visiting Henley Professor of Law and Business*, Columbia University |
| 1985–1988 | *Co-editor*, RAND Journal of Economics |
| 1978–1980 | *Co-director*, Network Inquiry Special Staff, Federal Communications Commission |
| 1971–1972 | *Brookings Economic Policy Fellow*, Office of Telecommunications Policy, Executive Office of the President |
| 1965–1980 | *Assistant Professor, Associate Professor, Professor of Economics, Allyn R. and Gladys M. Cline Professor of Economics and Finance*, Rice University |
| 1963–1965 | *Economist*, Institute for Defense Analyses |
| 1962–1963 | *Acting Assistant Professor of Economics*, University of California, Santa Barbara |

## Consultancies

| | |
|---|---|
| 1972–1978 | The RAND Corporation |
| 1972–1977 | Office of Telecommunications Policy, Executive Office of the President |
| 1975 | Texoma Regional Planning Commission |
| 1967 | Department of Defense |

## Professional activities/honors

- *Member*, National Research Council Board on Earth Sciences and Resources, Division on Earth and Life Studies, Committee on Licensing Geographic Data and Services, 2002–2004

- *Member*, The National Academies Computer Science and Telecommunications Board Committee on Internet Searching and the Domain Name System, 2001–2004

- *Member*, Editorial Board, *Information Economics and Policy*, 1992–2004

- *Member*, Editorial Board, *Economics of Innovation and New Technology*, 1989–Present

- *Member*, US National Committee on Data for Science and Technology (CODATA), National Academy of Sciences/National Research Council, 1993–1996

- *Member*, Office of Technology Assessment Advisory Panel on Communications Systems for an Information Age, 1986–1988

- *Member*, Regional Telecommunications Planning Advisory Committee, City of Cincinnati, 1985

- *Member*, Office of Technology Assessment Advisory Panel on Intellectual Property Rights in an Age of Electronics and Information, 1984–1985

- *Expert*, World Intellectual Property Organization/UNESCO Meeting on Unauthorized Private Copying of Recordings, Broadcasts and Printed Matter, 1984

- *Member*, Editorial Board, *Southern Economic Journal*, 1979–1981

- *Member*, Task Force on National Telecommunications Policy Making, Aspen Institute Program on Communications and Society, 1977

- *Member*, Technical Advisory Committee on Business Development, Model City Program, City of Houston, 1969–1971

- Listed in *Who's Who in America*, 1982–1983, 1984–1985, 1986–1987, 1988–1989, 1990–1991, 1992–1993, 1994, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008, 2009, 2010, 2011, 2012, 2013, 2014

- Brookings Economic Policy Fellow, 1971–1972

- Wilson University Fellow, 1959–1961

- Overbrook Fellow, 1958–1959

- Beta Gamma Sigma, 1958

## Publications

### Books and reports

*Survey in the Area of the Economic Assessment of Media Markets: Royalties and Cost Structures of Collecting Societies for Music Rights in Cable Retransmission.* With E.J. Murdoch, R. Nitsche, and A. Kleymenova. Final Report, October 31, 2003.

*Telecommunications and Information Technology Standardization in Japan: A Preliminary Survey.* The RAND Corporation, N-3204-CUSJR, 1991.

*Compensating Creators of Intellectual Property: Collectives that Collect.* With S. Kirby. The RAND Corporation, R-3751-MF, 1989.

*New Technologies and Intellectual Property: An Economic Analysis.* The RAND Corporation, N-2601-NSF, 1987.

*Compatibility Standards, Competition, and Innovation in the Broadcasting Industry.* With L. Johnson. The RAND Corporation, R-3453-NSF, 1986.

*The Economics of Bulk Power Exchanges.* With J. Acton. The RAND Corporation, N-2277-DOE, 1985.

*Misregulating Television: Network Dominance and the FCC.* With T. Krattenmaker, A. Metzger, and J. Woodbury. Chicago: University of Chicago Press, 1984.

*An Analysis of the Federal Communication Commission's Group Ownership Rules.* With L. Johnson. The RAND Corporation, N-2097-MF, 1984.

*Regulation of Media Ownership by the Federal Communications Commission: An Assessment.* With L. Johnson. The RAND Corporation, R-3206-MF, 1984.

*Issues in the Design of a Market Experiment for Bulk Electrical Power.* With J. Acton. The RAND Corporation, N-2029-DOE, 1983.

*An Economic Analysis of Mandatory Leased Channel Access for Cable Television.* With L. Johnson. The RAND Corporation, R-2989-MF, 1982.

*After Energy Price Decontrol: The Role of Government Conservation Programs.* With L. Johnson. The RAND Corporation, N-1903-DOE, 1982.

*Cable Copyright and Consumer Welfare: The Hidden Cost of the Compulsory License.* With H. Shooshan, C. Jackson, and J. Wilson. Shooshan and Jackson, 1981.

*New Television Networks: Entry, Jurisdiction, Ownership, and Regulation*" With T. Krattenmaker et al. Final Report, Network Inquiry Special Staff, Federal Communications Commission, 1980.

*Economic Policy Research on Cable Television: Assessing the Costs and Benefits of Cable Deregulation.* With B.M. Mitchell, R.G. Noll, B.M. Owen, R.E. Park, and J.N. Rosse. Prepared for the Office of Telecommunications Policy, Executive Office of the President, December 1976. Reprinted in P. MacAvoy (ed.), *Deregulation of Cable Television.* American Enterprise Institute, 1977.

*On Measuring the Gain in Economic Welfare from Marginal Cost Pricing when a Related Market Is of Importance: The Case of Electricity and Natural Gas.* With B. Mitchell. The RAND Corporation, P-5755, 1977.

*A Simultaneous Equations Model of Television Station Revenue and Expenditure.* Appendix F to R. Park, L. Johnson, and B. Fishman, *Projecting the Growth of Television Broadcasting: Implications for Spectrum Use.* The RAND Corporation, R-1841-FCC, 1976.

*Introduction to Monetary Economics.* Harper and Row, 1975.

*An Economic Evaluation of an Alternative Method of Funding Public Broadcasting.* Broadcasting Institute of North America, 1973.

*Evaluating the Returns to Regional Economic Development Programs.* Institute for Defense Analyses, B-272, 1966.

*Internal Prices as an Administrative Tool: An Application to the Military Air Transport Service.* With M. Bailey, J. Cross, and W. Sewell. Institute for Defense Analyses, S-200, 1965.

## Articles and book chapters

"The Economics of Internet Standards." With G. Sadowsky. *Handbook on the Economics of the Internet*, Johannes M. Bauer and Michael Latzer (editors), forthcoming.

"Trying to Promote Network Entry:  From the Chain Broadcasting Rules to the Channel Occupancy Limits." *Review of Industrial Organization*, forthcoming.

"Library Demand for E-Books and E-Book Pricing: An Economic Analysis." With S.N. Kirby, *Journal of Scholarly Publishing*, 2014.

"The Evolution of Internet Interconnection from Hierarchy to 'Mesh': Implications for Government Regulation." With M.A. Israel. *Information Economics and Policy*, 2013.

 "An Economic Analysis of the AT&T-T-Mobile USA Wireless Merger." With S.D. Kletter, S.X. Moresi, S.C. Salop, and J.R. Woodbury. *Journal of Competition Law and Economics*, 2013.

Introduction to Symposium, "The Use and Abuse of Voluntary Standard-Setting Processes in a Post-Rambus World: Law, Economics, and Competition Policy." Co-editor with R.J. Levinson. *The Antitrust Bulletin*, Spring 2012.

"Economic Remedies for Anticompetitive Hold-up: The Rambus Cases." With R.J. Levinson. *The Antitrust Bulletin*, 2011.

"The FCC's Network Inquiry: A Thirty Year Retrospective." With T.J. Krattenmaker. *Virginia Journal of Sports and Entertainment Law*, 2011.

"Lessons from *FTC v. Rambus*." With R.J. Levinson. *Icarus*, Communications & Digital Technology Industries Committee, American Bar Association Section of Antitrust Law, Summer 2010.

"Standards, Intellectual Property Disclosure, and Patent Royalties after *Rambus.*" With R.J. Levinson. *North Carolina Journal of Law & Technology*, 2009.

"Regulating Intellectual (Property) Monopolies." *Competition & Consumer Law Journal*, December 2008.

"Evaluating the Competitive Effects of Mergers of Internet Backbone Providers." With J.S. Spigel and P. Srinagesh. *ACM Transactions on Internet Technology.* 2002.

"Advances in Routing Technologies and Internet Peering Agreements." With P. Milgrom, B.M. Mitchell, and P. Srinagesh. *American Economic Association Papers and Proceedings.* 2001.

"Intellectual Property." In *The New Palgrave Dictionary of Economics and the Law*. The Macmillan Press, 1998. Reprinted in R. Towse and R.W. Holzhauer (eds.), *The Economics of Intellectual Property*, Edward Elgar, 2001.

"Analyzing Vertical and Horizontal Cross Ownership in Cable Television: the Time Warner-Turner Merger (1996)." With E. Murdoch, D. O'Brien, S. Salop and J. Woodbury. In J.E. Kwoka and L.J. White, *The Antitrust Revolution: Economics, Competition, and Policy*. Third Edition, Scott, Foresman, 1998.

"Telecommunications in the USA: Evolution to Pluralism." With S.R. Brenner and J.R. Woodbury, in B. Lange (ed.), ISDN: *An International Comparison of Trends in the USA, Japan, Singapore and Europe*. Final Report to the ISDN Commission of North Rhine-Westphalia, 1996.

"The Standards Processes in Telecommunications and Information Technology." In R. Hawkins, R. Mansell and J. Skea (eds.), *Standards, Innovation, and Competitiveness: The Politics and Economics of Standards in Natural and Technical Environments*. Edward Elgar, 1995.

"Rate Regulation, Effective Competition, and the Cable Act of 1992." With J.R. Woodbury. *Hastings Communications and Entertainment* Law *Journal*. 1994.

"Choosing How to Compete: Strategies and Tactics in Standardization." With J. Farrell. *Journal of Economic Perspectives,* 1994.

"AM v. FM: The Battle of the Bands." *Industrial and Corporate Change*, 1992.

"An Economic Analysis of Copyright Collectives." With S. Kirby and S. Salop. *Virginia Law Review*, 1992. Reprinted in R.P. Merges (ed.), *Economics of Intellectual Property Law*, Cheltenham, UK and Northampton, MA, USA: Edward Elgar Publishing, 2007; reprinted in Stephen E. Margolis and Craig M. Newmark (editors), *Intellectual Property and Business*, Edgar Elgar Publishing, 2010.

"The Role of the ITU in Telecommunications Standardization: Pre-Eminence, Impotence, or Rubber Stamp?" With J. Farrell. *Telecommunications Policy*, 1991. Reprinted as The RAND Corporation, RP-100, 1992.

"An Introduction to the Law and Economics of Intellectual Property." *Journal of Economic Perspectives,* (with L. Raskind), 1991. Translated and reprinted as "Introduzione agli Aspetti Legislativi ed Economici della Proprieta Intellettuale." in G. Goisis (ed.), *Efficienza Produttiva: Alcuni Contributi Su Noti (E Meno Noti) Argomenti*. CEDAM, 1994; reprinted in K.E. Maskus (ed.), *The WTO, Intellectual Property Rights and the Knowledge Economy*. Cheltenham, UK and Northampton, MA, USA: Edward Elgar Publishing, 2004.

"The European Telecommunications Standards Institute: A Preliminary Analysis." *Telecommunications Policy*, 1990. Reprinted as The RAND Corporation, N-3320-NSF, 1991.

"Separate Satellite Systems and INTELSAT: An American View." *Revue de Droit de l'Informatique et des Telecoms,* 1989.

"The Economics of Telecommunications Standards." With G. Saloner, in R. Crandall and K. Flamm (eds.), *Changing the Rules: Technological Change, International Competition, and Regulation in Communications, Brookings Institution.* 1989. Reprinted as "Compatibility Standards and the Market for Telecommunications Services." in T.J. Allen and M.S. Scott Morton (eds.), *Information Technology and the Corporation of the 1990s*. Oxford University Press, 1994.

"Private Copying, Appropriability, and Optimal Copying Royalties." With S. Kirby. *Journal of Law and Economics,* October 1989. Reprinted in R.P. Merges (ed.), *Economics of Intellectual Property Law*, Cheltenham, UK and Northampton, MA, USA: Edward Elgar Publishing, 2007. An earlier version appeared as The RAND Corporation, R-3546-NSF, 1987.

"Assessing the Effects of Bulk Power Rate Regulation: Results from a Market Experiment." *Applied Economics* (with J. Acton), May 1987. Reprinted in J. Plummer and S. Troopman (eds.), *Competition in Electricity: New Markets and New Structures* (Public Utilities Reports and QED Research, 1990). An earlier and more extended version appeared as "Regulation, Efficiency, and Competition in the Exchange of Electricity: First-Year Results from the FERC Bulk Power Market Experiment." The RAND Corporation, R-3301-DOE, 1985.

"Discussion of Michael A. Tyler, 'The Extent of Software Piracy.' " In F. Huband and R. Shelton (eds.), *Protection of Computer Systems and Software.* Clifton, NJ: Law & Business, Inc., 1986.

"Private Copying, Reproduction Costs, and the Supply of Intellectual Property." Information Economics and Policy, 1986. Reprinted in D. Lamberton (ed.), *The Economics of Communication and Information.* Edward Elgar, 1996. An earlier version appeared as The RAND Corporation, N-2207-NSF, 1984.

"Copying Costs and the Costs of Copying." In M. Greenberger (ed.), Electronic Publishing Plus: *Media for a Technological Future.* Knowledge Industries, 1985.

"Regulation of Broadcast Station Ownership: Evidence and Theory." With L. Johnson in E. Noam (ed.), *Video Media Competition: Regulation, Economics, and Technology.* Columbia University Press, 1985.

"The Regulation of Telecommunications Networks." *Information Society*, 1984.

"The Determinants of Network Television Program Prices: Implicit Contracts, Regulation, and Bargaining Power." With J. Woodbury and G. Fournier. *The Bell Journal of Economics,* 1983.

"Regulation, Deregulation, and Antitrust in the Telecommunications Industry." With J. Woodbury. *The Antitrust Bulletin*, 1983.

Summary Comments in E. Noam (ed.), *Telecommunications Regulation Today and Tomorrow*. Law & Business, Inc./Harcourt Brace Jovanovich, 1983.

"Economic Implications of Mandated Efficiency Standards for Household Appliances: Comment." With L. Johnson. *The Energy Journal*, 1982.

"Regulating Network Television: Dubious Premises and Doubtful Solutions." With T. Krattenmaker. *Regulation,* 1981.

"The Deregulation of Cable Television," Law and Contemporary Problems, Winter 1981 (with R.W. Crandall). Reprinted in T. G. Krattenmaker, *Telecommunications Law and Policy*, Carolina Academic Press, 1995 and 1998 (Second Edition); S. M. Benjamin, D. Lichtman, and H.A. Shelanski, *Telecommunications Law and Policy*, Carolina Academic Press, 2001; and S.M. Benjamin, D.G. Lichtman, H.A. Shelanski, and P. J. Weiser, *Telecommunications Law and Policy*, Carolina Academic Press, 2006 (Second Edition).

"An Analysis of the Network-Affiliate Relationship in Television." With S. Preskill. Network Inquiry Special Staff, Federal Communications Commission, 1980.

"The Value of Television Time: Some Problems and Attempted Solutions: Reply." *Southern Economic Journal,* 1978.

"Copyright Liability for Cable Television: Compulsory Licensing and the Coase Theorem." With W. Manning and B. Mitchell. *Journal of Law and Economics*, April 1978. Reprinted in R. Towse and R.W. Holzhauer (eds.), *The Economics of Intellectual Property*, Edward Elgar, 2001. An earlier version appeared as "Copyright Liability for Cable Television: Is Compulsory Licensing the Solution?" The RAND Corporation, R-2023-MF, 1977.

"Deregulating Telecommunications—Sorting Out Mixed Signals." *Regulation*, 1978.

"The Value of Television Time." *Southern Economic Journal*, January 1976. An earlier version appeared as "The Value of Television Time and the Prospects for New Stations," The RAND Corporation, R-1328-MF, 1973.

"Watergate and Television: An Economic Analysis." With B. Mitchell. *Communications Research*, July 1976. An earlier version appeared as The RAND Corporation, R-1712-MF, 1975.

"Market Size, VHF Allocations, and the Viability of Television Stations." With P. Hanley. *Journal of Industrial Economics,* 1975.

"The Economics of the Network-Affiliate Relationship: Reply." With R. Soligo. *American Economic Review,* 1975.

"The Economics of the Cable Television 'Consensus.'" *Journal of Law and Economics*, 1974.

"Education and Productivity in United States Manufacturing: Some Cross-Section Evidence." *Journal of Political Economy*, 1973.

"The Economics of the Network-Affiliate Relationship in the Television Broadcasting Industry." With R. Soligo. *American Economic Review*, 1973.

"Elasticities of Substitution and Returns to Scale in United States Manufacturing: Some Additional Evidence." *Southern Economic Journal,* 1967.

"Cost Effectiveness Analysis for the 'War on Poverty.'" With A. Fechter and A. Fisher, in T. Goldman (ed.). *Cost-Effectiveness Analysis: New Approaches in Decision-Making.* New York: Praeger, 1967.

"An Empirical Analysis of Commercial Bank Lending Behavior." *Yale Economic Essays*, 1965.

## Congressional testimony

Witness, Subcommittee on Intellectual Property and Judicial Administration, Committee on the Judiciary, US House of Representatives, 1991. Prepared statement and testimony appear in *Intellectual Property and International Issues*, 102nd Congress, 1st Session.

Witness, Subcommittee on Telecommunications and Finance, Committee on Energy and Commerce, US House of Representatives, 1990. Prepared statement and testimony appear in *Cable Television Regulation (Part 2)*, 101st Congress, 2nd Session.

Witness, Subcommittee on Telecommunications, Consumer Protection, and Finance, Committee on Energy and Commerce, US House of Representatives, 1983. Prepared statement and testimony appear in *Options for Cable Legislation*, 98th Congress, 1st Session.

Witness, Subcommittee on Communications, Committee on Commerce, Science, and Transportation, US Senate, 1982. Prepared statement and testimony appear in *Cable Television Regulation*, 97th Congress, 2nd Session.

Witness, Subcommittee on Telecommunications, Consumer Protection, and Finance, Committee on Energy and Commerce, US House of Representatives, 1981. Prepared statement and testimony appear in *Status of Competition and Deregulation in the Telecommunications Industry*, 97th Congress, 1st Session.

Witness, Subcommittee on General Oversight and Minority Enterprise, Committee on Small Business, US House of Representatives, 1980. Prepared statement and testimony appear in *Media Concentration (Part 1)*, 96th Congress, 2nd Session.

Witness, Subcommittee on Communications, Committee on Commerce, Science, and Transportation, US Senate, 1977. Prepared statement and testimony appear in *Cable Television*, 95th Congress, 1st Session.

Witness, Subcommittee on Communications, Committee on Interstate and Foreign Commerce, US House of Representatives, 1976. Prepared statement and testimony appear in *Cable Television Regulation Oversight (Part 1)*, 94th Congress, 2nd Session.

## Other presentations

"Regulating Intellectual (Property) Monopolies," Australian Competition and Consumer Commission Conference on Revisiting the Rationale for Regulation, 2008.

Panelist, P2P File-Sharing and Its Impact on Copyright Holders, Federal Trade Commission Public Workshop on Peer-to-Peer File-Sharing Technology: Consumer Protection and Competition Issues, December 16, 2004.

Panelist, DOJ/FTC Hearings on Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy, Session on Licensing Terms in Standards Activities, April 18, 2002.

Panelist, Federal Communications Commission Roundtable on Media Ownership Policies, Session on Ownership Policies and Competition, October 29, 2001.

Panelist, Federal Trade Commission Hearings on Global and Innovation-Based Competition, November 30, 1995.

"The Economics of Performance Rights in Sound Recordings", (with S.C. Salop), International Center for Art Economics (ICARE), International Conference on the Economics of Intellectual Property Rights, University of Venice, Ca' Dolfin, Venice, October 6–8, 1994.

Panelist, Session on "The Role of Competition in the Electronic Media," Federal Trade Commission Symposium on Media Concentration, 1978. Comments reprinted in Federal Trade Commission, Bureau of Competition, Proceedings of the Symposium on Media Concentration, Volume I.

## Expert witness activities

Expert Rebuttal Report of Stanley M. Besen, Ph.D., in *TriStar Investors, Inc. v. American Tower Company et al, In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No: 3:12-CV-499*, September 18, 2013.

Expert Report of Stanley M. Besen, Ph.D., in *TriStar Investors, Inc. v. American Tower Company et al, In the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No: 3:12-CV-499*, August 20, 2013.

Expert Report of Stanley M. Besen, PhD, in *Deseret Management Corporation v. United States of America, Case No. 09-273T in the United States Court of Federal Claims*, December 28, 2010.

Expert Report of Stanley M. Besen, PhD, in *Deseret Management Corporation v. United States of America, Case No. 09-273T in the United States Court of Federal Claims*, August 27, 2010.

Declaration of Dr. Stanley M. Besen In Reply to Plaintiffs' Amended Motion to Certify the Philadelphia Cluster Class, in *Caroline Behrend et al. v. Comcast Corporation et al., Civil Action No. 03-6604*, May 6, 2009.

Expert Report of Dr. Stanley M. Besen In Opposition to Plaintiffs' Motion for Class Certification of the "Chicago Cluster," in *Caroline Behrend et al. v. Comcast Corporation et al., Civil Action No. 03-6604*, July 18, 2007.

Expert Report of Dr. Stanley M. Besen In Opposition to Plaintiffs' Motion for Class Certification of the "Philadelphia Cluster," in *Caroline Behrend et al. v. Comcast Corporation et al., Civil Action No. 03-6604*, November 9, 2006.

Expert Report of Stanley M. Besen, filed before Minnesota Arbitration Panel in the Arbitration Proceeding, and testimony, April 18, 2001. *In the Matter of Hubbard Broadcasting, Inc. v. CBS Broadcasting Inc. and Multimedia Holdings Corporation.*

Supplemental Expert Report of Stanley M. Besen filed before the United States District Court Southern District of New York on behalf of Turner Broadcasting et al., December 16, 1999. *United States v. ASCAP: In the Matter of the Application of Turner Broadcasting System, Inc., et al., Civ. No. 13-95 (WCC).*

Expert Report of Stanley M. Besen filed before the United States District Court Southern District of New York on behalf of Turner Broadcasting et al., April 16, 1999. *United States v. ASCAP: In the Matter of the Application of Turner Broadcasting System, Inc., et al., Civ. No. 13-95 (WCC).*

Affidavit of Stanley M. Besen filed before the US District Court, Middle District of Florida, Tampa Division on behalf of Comcast Cablevision of West Florida, Inc., February 14, 1998. *DeSoto Broadcasting, Inc. as the General Partner of and on behalf of DeSoto-Channel 62 Associates, Ltd. v. Comcast Cablevision of West Florida, Inc., Case No. 96-1581-CIV-T-24A.*

Preliminary Expert Report of Stanley M. Besen filed before the US District Court, Middle District of Florida, Tampa Division on behalf of Comcast Cablevision of West Florida, Inc., February 5, 1998. *DeSoto Broadcasting, Inc. as the General Partner of and on behalf of DeSoto-Channel 62 Associates, Ltd. v. Comcast Cablevision of West Florida, Inc., Case No. 96-1581-CIV-T-24A.*

Testimony of Stanley M. Besen before the Library of Congress, Copyright Arbitration Royalty Panel on behalf of the Motion Picture Association of America, August 15, 1995. *In the Matter of Distribution of 1990, 1991, and 1992 Cable Royalty Funds.*

Third Declaration of Stanley M. Besen filed on behalf of Turner Broadcasting System, Inc., et al., June 25, 1995. *Turner Broadcasting System, Inc., et al. v. FCC. Civil Action No. 92-2247 (and Consolidated Civil Action Nos. 92-2292, 92-2492, 92-2495, 92-2558) (SFW, TPJ, SS).*

Second Declaration of Stanley M. Besen filed on behalf of Turner Broadcasting System, Inc., et al., June 15, 1995. *Turner Broadcasting System, Inc., et al. v. FCC. Civil Action No. 92-2247 (and Consolidated Civil Action Nos. 92-2292, 92-2492, 92-2495, 92-2558) (SFW, TPJ, SS).*

Declaration of Stanley M. Besen filed on behalf of Turner Broadcasting System, Inc., et al., May 24, 1995. *Turner Broadcasting System, Inc., et al. v. FCC. Civil Action No. 92-2247 (and Consolidated Civil Action Nos. 92-2292, 92-2492, 92-2495, 92-2558) (SFW, TPJ, SS).*

Expert Report of Stanley M. Besen filed on behalf of Plaintiffs Turner Broadcasting System, Inc., et al., April 21, 1995. *Turner Broadcasting System, Inc., et al. v. FCC. Civil Action No. 92-2247 (and Consolidated Civil Action Nos. 92-2292, 92-2492, 92-2495, 92-2558) (SFW, TPJ, SS).*

Report of Stanley M. Besen and Testimony on behalf of McCaw Cellular Communications, Inc., February 7, 1995. *Donald W. DePreist, et al. v. McCaw Cellular Communications, Inc., et al.*

Affidavit of Stanley M. Besen filed before the United States District Court, Southern District of *Indiana*, Indianapolis Division on behalf of TCI of Indiana, Inc., August 2, 1994. *Reporter Times, Inc., Plaintiff, v. TCI of Indiana, Inc. and Tele-Communications, Inc., Defendants, Cause No. IP 93-1287 C.*

Testimony on Behalf of the Motion Picture Association of America *et al.*, *Copyright Royalty Tribunal 1990 Cable Royalty Distribution Proceeding*, August 16, 1993.

Declaration of Stanley M. Besen In Opposition to Plaintiff's Motion for Preliminary Injunction, April 23, 1985, and testimony on behalf of the City of Sacramento, *Pacific West Cable Company v. City of Sacramento*, In the United States District Court in and for the Eastern District of California, 1987.

Testimony of Stanley M. Besen on behalf of Program Suppliers before the Copyright Royalty Tribunal, *1983 Cable Royalty Distribution Proceeding*, November 4, 1985.

## Other selected consulting activities

Why Restricting Participation in Spectrum Auctions Can Increase Bidder Participation, Increase Auction Revenues, and Increase Competition in Wireless Markets (with Serge X. Moresi and Steven C. Salop), filed on behalf of Sprint Nextel Corporation, March 12, 2013. *In the Matter of Expanding the Economic and Innovation Opportunities of Spectrum Through Incentive Auction, GN Docket No. 12-268.*

Joint Reply Declaration of Steven C. Salop, Stanley M. Besen, Stephen D. Kletter, Serge X. Moresi, and John R. Woodbury filed before the Federal Communications Commission on behalf of Sprint Nextel, June 20, 2011. *In the Matter of Applications of AT&T Inc. and Deutsche Telekom AG For Consent to Assign or Transfer Control of Licenses and Authorizations, WT Docket No. 11-65.*

Joint Declaration of Steven C. Salop, Stanley M. Besen, Stephen D. Kletter, Serge X. Moresi, and John R. Woodbury filed before the Federal Communications Commission on behalf of Sprint Nextel, May 31, 2011. *In the Matter of Applications of AT&T Inc. and Deutsche Telekom AG For Consent to Assign or Transfer Control of Licenses and Authorizations, WT Docket No. 11-65.*

Declaration of Stanley M. Besen and Bridger M. Mitchell filed before the Federal Communications Commission on behalf of Time Warner Telecom, Inc., August 10, 2006. *In the Matter of AT&T Inc. and BellSouth Corporation Applications for Approval of Transfer of Control, WC Docket No. 06-74.*

Declaration of Stanley M. Besen and John R. Woodbury filed before the Federal Communications Commission on behalf of the National Cable & Telecommunications Association, March 28, 2006. *In the Matter of Implementation of Section 621 (a) of the Cable Communications Policy Act of 1984 as Amended by the Cable Television Consumer Protection and Competition Act of 1992, MB Docket No. 05-311.*

Joint declaration of Stanley M. Besen, Steven C. Salop and John R. Woodbury; Attachment B to, In re Applications of Nextel Communications, Inc., Transferor, and Sprint Corporation, Transferee, for Consent to the Transfer of Control of Entities Holding Commission Licenses and Authorizations Pursuant to Sections 214 and 310 (d) of the Communications Act, Before the Federal Communications Commission, February 8, 2005.

Verified statement of Steven C. Salop, Kevin Neels, Larry A. Shughart, and Stanley M. Besen on behalf of Trinity Industries Before the Surface Transportation Board in *TTX Company–Application for Approval of Pooling of Car Service with Respect to Flatcars*, Docket No. 27590 (Sub-No. 3), April 12, 2004.

"An Economic Analysis of NOAA's Draft Report *Fair Market Value Analysis for a Submarine Cable Permit in National Marine Sanctuaries* (August 2001). With P.J. DeGraba filed on behalf of Global Crossing Ltd., October 15, 2001. *In the Matter of Fair Market Value Analysis for A Submarine Cable Permit in National Marine Sanctuaries*, US Department of Commerce, National Oceanic and Atmospheric Administration, Docket No. 010712175-1175-01.

"The Incentives of Cable Operators to Carry Multiple ISPs." With P. J. DeGraba and J. R. Woodbury. December 1, 2000, To the Federal Communications Commission on behalf of The National Cable Television Association, *In the Matter of Inquiry Concerning High-Speed Access to the Internet Over Cable and Other Facilities, GN Docket No. 00-185.*

Declaration of Stanley M. Besen, Steven R. Brenner, and Christopher L. Cavanagh filed before the Federal Communications Commission on behalf of Sprint Corporation, June 21, 2000. *In re Applications of Sprint Corporation, Transferor, and MCI WorldCom, Inc., Transferee, for Consent to Transfer Control of Corporations Holding Commission Licenses and Authorizations Pursuant to Sections 214 and 310 (d) of the Communications Act and Parts 1, 21, 24, 25, 63, 73, 78, 90, and 101, FCC, CC Docket No. 99-333.*

Declaration of Stanley M. Besen and Steven R. Brenner filed before the Federal Communications Commission on behalf of Sprint Corporation, March 20, 2000. *In re Applications of Sprint Corporation, Transferor, and MCI WorldCom, Inc., Transferee, for Consent to Transfer Control of Corporations Holding Commission Licenses and Authorizations Pursuant to Sections 214 and 310 (d) of the Communications Act and Parts 1, 21, 24, 25, 63, 73, 78, 90, and 101, FCC, CC Docket No. 99-333.*

Declaration of Stanley M. Besen and Steven R. Brenner filed before the Federal Communications Commission on behalf of Sprint Corporation, November 17, 1999. *In re Applications of Sprint Corporation, Transferor, and MCI WorldCom, Inc., Transferee, for Consent to Transfer Control of Corporations Holding Commission Licenses and Authorizations Pursuant to Sections 214 and 310 (d) of the Communications Act and Parts 1, 21, 24, 25, 63, 73, 78, 90, and 101, FCC, CC Docket No. 99-333.*

"An Economic Analysis of CLEC Access Pricing." With J. P. Acton. Filed on behalf of Sprint Communications, October 28, 1999. *Reply Comments of Sprint Corporation In the Matter of Provision of Directory Listing Information Under the Telecommunications Act of 1994, As Amended, CC Docket No. 99-273.*

"An Economic Analysis of the Effects of the AT&T-MediaOne Merger on Competition in the Supply and Distribution of Video Program Services: Response to the Critics." September 17, 1999. With S. X. Moresi and J. R. Woodbury to the Federal Communications Commission on behalf of AT&T Corp. *In the Matter of Applications for Transfer of Control of Licenses, MediaOne Group, Inc., Transferor To AT&T Corp., Transferee*, CS Docket No. 99-251.

"An Economic Analysis of Regulatory Takings and Just Compensation With an Application to Mobile Satellite Services," With J. P. Acton. Filed on behalf of ICO Global Communications Services before the Federal Communications Commission, June 16, 1999. *In the Matter of the FCC's Proposed Policy for Compensating Parties Displaced by the Entry of Mobile Satellite Services.*

"A Competitive Analysis of the Japan-US Cable Network." With S. R. Brenner. To the Federal Communications Commission on behalf of Japan-US Cable Network, March 8, 1999. *In the Matter of AT&T Corp., et al., Joint Application for a License to Land and Operate a Submarine Cable Network Between the United States and Japan, File No. SCL-LIC-19981117-00025.*

"An Economic Analysis of the Proposed Bell Atlantic/GTE Merger." With J. R. Woodbury and P. Srinagesh. To the Federal Communications Commission on behalf of Sprint Communications Company, L.P., November 23, 1998. *In the Matter of GTE Corporation, Transferor, and Bell Atlantic Corporation, Transferee, for Consent to Transfer of Control, Application for Transfer of Control, Public Interest Statement.*

"Standard Setting for Digital Radio." With J. M. Gale. To the Federal Communications Commission on behalf of USA Digital Radio Partners, L.P., October 7, 1998. *Petition for Rulemaking In the Matter of Amendment of Part 73 of the Commission's Rules to Permit the Introduction of Digital Audio Broadcasting in the AM and FM Broadcast Services.*

"An Economic Analysis of the Proposed SBC/Ameritech Merger." With J. R. Woodbury and P. Srinagesh. To the Federal Communications Commission on behalf of Sprint Communications Company, L.P., October 14, 1998. *In the Matter of the Application for Consent to to the Transfer of Control of Licenses and Section 214 Authorization from Ameritech Corporation to SBC Communications, Inc.*

Declaration of Stanley M. Besen and R. Craig Romaine filed before the Federal Communications Commission on behalf of Sprint Corporation, September 4, 1998. *In the Matter of Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, CC Docket No. 96-128.*

"A Response to Ameritech's New Media's 'Allegations of a Price Squeeze' by Vertically Integrated Cable Operators." With J. R. Woodbury. To the Federal Communications Commission on behalf of Tele-Communications, Inc., September 3, 1998. *In re Comments of Ameritech New Media, Inc., Filed in MM Docket No. 92-264 and CS Docket No. 98-82 (August 14, 1998).*

"Comments on Dertouzos and Wildman, 'Programming Access and Effective Competition in Cable Television.'" With J. R. Woodbury. To the Federal Communications Commission on behalf of Tele-Communications, Inc., September 3, 1998. *In re Comments of Ameritech New Media, Inc., Filed in MM Docket No. 92-264 and CS Docket No. 98-82 (August 14, 1998).*

"An Economic Analysis of the Effects of Partial Ownership Interests in Cable Systems." With J. R. Woodbury, D. P. O'Brien, and S. X. Moresi. To the Federal Communications Commission on behalf of Tele-Communications, Inc., August 14, 1998. *FCC Notice of Proposed Rulemaking In the Matter of Implementation of the Cable Television Consumer Protection and Competition Act of 1992: Review of the Commission's Cable Attribution Rules, CS Docket No. 98-82 (released June 26, 1998).*

"An Economic Analysis of the FCC's Cable Ownership Restrictions." With J. R. Woodbury. To the Federal Communications Commission on behalf of Tele-Communications, Inc., August 14, 1998. *FCC Memorandum Opinion and Order on Reconsideration and Further Notice of Proposed Rulemaking In the Matter of Implementation of Section 11(c) of the Cable Television Consumer Protection and Competition Act of 1992: Horizontal Ownership Limits, MM Docket No. 92-264 (released June 26, 1998).*

"An Economic Analysis of the Efficiency Benefits from Newspaper-Broadcast Station Cross-Ownership." With D. P. O'Brien. To the Federal Communications Commission on behalf of Chronicle Publishing and Gannett Co., Inc., July 21, 1998. *In the Matter of 1998 Biennial Regulatory Review–Review of the Commission's Broadcast Ownership Rules and Other Rules Adopted Pursuant to Section 202 of the Telecommunications Act of 1996.*

"A Further Analysis of the Effects of Cable Diversion, Premium Service Buy Rates, and Volume Discounts on Primestar's Competitive Incentives: A Response to Dr. Rosston." With S. C. Salop, J. R. Woodbury, and E. J. Murdoch. To the Federal Communications Commission on behalf of PRIMESTAR Partners, L.P., May 19, 1998. *In re Application of MCI Telecommunications Corporation and PRIMESTAR LHC, INC. For Consent to Assignment of Direct Broadcast Satellite Authorization.*

"An Economic Analysis of the Impact of the WorldCom-MCI Merger on the Provision of Internet Backbone Services." With J. R. Woodbury and P. Srinagesh. To the Federal Communications Commission and the European Commission on behalf of Sprint Corporation, April 7, 1998. *In re Application of WorldCom, Inc. and MCI Communications Corporation for Transfer of Control of MCI Communications Corporation to WorldCom, Inc., FCC CC Docket No. 97-211.*

"A Comparison of Primestar's Costs with Those of a Standalone Entrant." With Steven C. Salop, J. R. Woodbury, and E. J. Murdoch. To the Federal Communications Commission on behalf of PRIMESTAR Partners, L.P., March 31, 1998. *In re Application of MCI Telecommunications Corporation and PRIMESTAR LHC, INC. For Consent to Assignment of Direct Broadcast Satellite Authorization.*

"An Economic Analysis of Primestar's Competitive Behavior and Incentives: Reply to the Oppositions." With S. C. Salop, J. R. Woodbury, and E. J. Murdoch. To the Federal Communications Commission on behalf of PRIMESTAR Partners, L.P., February 20, 1998. *In re Applications of TCI Satellite Entertainment, Inc. and PRIMESTAR, Inc. For Transfer of Control of TEMPO Satellite, Inc. and MCI Telecommunications Corporation and PRIMESTAR LHC, INC. For Consent to Assignment of Direct Broadcast Satellite Authorization, File Nos. 91-SAT-TC-97 and 106-SAT-AL-97, respectively.*

"An Economic Analysis of Primestar's Competitive Behavior and Incentives." With S. C. Salop, J. R. Woodbury, and E. J. Murdoch. To the Federal Communications Commission on behalf of PRIMESTAR Partners, L.P., January 7, 1998. *In Applications of TCI Satellite Entertainment, Inc. and PRIMESTAR, Inc. For Transfer of Control of TEMPO Satellite, Inc. and MCI Telecommunications Corporation and PRIMESTAR LHC, INC. For Consent to Assignment of Direct Broadcast Satellite Authorization, File Nos. 91-SAT-TC-97 and 106-SAT-AL-97, respectively.*

Declaration of Stanley M. Besen filed before the Federal Communications Commission on behalf of Fox/Liberty Networks, December 19, 1997. *Program Access Complaint In the Matter of EchoStar Communications Corporation, Complainant v. Fox/Liberty Networks, LLC, FX Networks, Defendants, November 24, 1997.*

Declaration of Stanley M. Besen filed before the Federal Communications Commission on behalf of Fox Sports Direct, December 10, 1997. *Program Access Complaint In the Matter of EchoStar Communications Corporation, Complainant v. Fox/Liberty Networks LLC, Fox Sports LLC and Fox Sports Direct, Defendants, October 27, 1997.*

Declaration of Stanley M. Besen filed before the Federal Communications Commission on behalf of Rainbow Media Holdings, November 24, 1997. *Program Access Complaint in the Matter of EchoStar Communications Corporation, Complainant, v. Rainbow Media Holdings, Inc. and Rainbow Programming Holdings, Inc., Defendants, October 14, 1997.*

"A Further Economic Analysis of the Commercial Availability of 'Navigation Devices' Used in Multichannel Video Programming Systems." With J. M. Gale. To the Federal Communications Commission on behalf of General Instrument Corporation, June 23, 1997. *In the Matter of Implementation of Section 304 of the Telecommunications Act of 1996, Commercial Availability of Navigation Devices, CS Docket No. 97-80.*

"An Economic Analysis of the Competitive Effects of TCI's Proposed Expanded Ownership Interest in HSNI." With D. P. O'Brien. To the Federal Communications Commission on behalf of Tele-Communications, Inc., June 20, 1997. *Memorandum Opinion and Order and Notice of Apparent Liability, In re Applications of Roy M. Speer and Silver Management Company, Adopted June 6, 1996, Released June 14, 1996.*

"An Economic Analysis of the Commercial Availability of 'Navigation Devices' Used in Multichannel Video Programming Systems." With J. M. Gale. To the Federal Communications Commission on behalf of General Instrument Corporation, May 16, 1997. *In the Matter of Implementation of Section 304 of the Telecommunications Act of 1996, Commercial Availability of Navigation Devices, CS Docket No. 97-80.*

"The Impact of the FCC's Leased Access Proposal on Cable Television Program Services." With E. J. Murdoch. To the Federal Communications Commission on behalf of Tele-Communications, Inc., May 15, 1996. *FCC, Order on Reconsideration of the First Report and Order and Further Notice of Proposed Rulemaking, In the Matter of Implementation of Sections of the Cable Television and Consumer Protection and Competition Act of 1992: Rate Regulation, Leased Commercial Access, MM Docket No. 92-266, CS Docket No. 96-60, Adopted: March 21, 1996, Released: March 29, 1996.*

"An Economic Analysis of the FCC's Cable Leased Access Proposal." With E. J. Murdoch. To the Federal Communications Commission on behalf of Tele-Communications, Inc., May 15, 1996. *FCC, Order on Reconsideration of the First Report and Order and Further Notice of Proposed Rulemaking, In the Matter of Implementation of Sections of the Cable Television and Consumer Protection and Competition Act of 1992: Rate Regulation, Leased Commercial Access, MM Docket No. 92-266, CS Docket No. 96-60, Adopted: March 21, 1996, Released: March 29, 1996.*

Affidavit of Stanley M. Besen, filed before the Federal Communications Commission on behalf of the Cable News Network, March 18, 1996. *Complaints for Price Discrimination and Unfair Practices brought by Turner Vision, Inc., Consumer Satellite Systems, Inc., Satellite Receivers, Ltd., and Programmers Clearing House, Inc., v. Cable News Network, Inc., filed February 1, 1996.*

"A Game-Theoretic Analysis of the FCC's Proposed Reciprocity Rule." With J. M. Gale. To the Federal Communications Commission on behalf of Sprint Communications Company L.P., April 11, 1995. *In the Matter of Market Entry and Regulation of Foreign-Affiliated Entities, IB Docket No. 95-22, RM-8355, RM-8392.*

Affidavit of Stanley M. Besen, Robert J. Larner, and E. Jane Murdoch filed before the Federal Communications Commission, February 23, 1995. *In the Matter of the Petition of the People of the State of California and the Public Utilities Commission of the State of California to Retain State Regulatory Authority Over Intrastate Cellular Service Rates.*

"Concentration, Competition, and Performance in the Mobile Telecommunications Services Market," Appendix to Comments of GTE Mobilnet September 9, 1994 *In the Matter of Equal Access and Interconnection Obligations Pertaining to Commercial Mobile Radio Services*, Federal Communications Commission CC Docket No. 94-54.

Report of Charles River Associates in the Matter of the Petition of the People of the State of California and the Public Utilities Commission of the State of California to Retain State Regulatory Authority Over Intrastate Cellular Service Rates. With R. J. Larner and E. J. Murdoch. To the Federal Communications Commission on behalf of the Cellular Telecommunications Industry Association, September 19, 1994. *FCC GN Docket No. 93-252, In the Matter of the Petition of the People of the State of California and the Public Utilities Commission of the State of California to Retain State Regulatory Authority over Intrastate Cellular Service Rates, August 8, 1994.*

"A Competitive Markup Approach to Establishing Rates When Adding Cable Program Services," Appendix to Comments of Tele-Communications, Inc. June 29, 1994. With J.R. Woodbury. *In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation, Fifth Notice of Proposed Rulemaking.*

"Results of a Survey of Commercial Rates Charged by Overbuilt Cable Systems," Appendix to Comments of Tele-Communications, Inc. June 29, 1994. With J.R. Woodbury. *In the Matter of Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation, Fifth Notice of Proposed Rulemaking.*

Affidavit of Stanley M. Besen filed before the District of Columbia Office of Cable Television on behalf of District Cablevision, January 4, 1994. *In the Matter of Benchmark Cable Rate Regulation.*

"An Antitrust Analysis of the Market for Mobile Telecommunications Services," Appendix A to Petition for Reconsideration of the Cellular Telecommunications Industry Association. December 8, 1993. With W.B. Burnett. *In the Matter of Amendment of the Commission's Rules to Establish New Personal Communications Services.*

"An Analysis of the FCC's Proposed Cable Cost-of-Service Backstop," Attachment A to Comments of Tele-Communications, Inc. August 25, 1993. With J. R. Woodbury. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation.*

"A Further Analysis of the FCC's Cable Television Benchmark Rates," Attachment to Reply Comments of Tele-Communications, Inc. July 2, 1993. With J.R. Woodbury. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation.*

"An Analysis of the FCC's Cable Television Benchmark Rates," Appendix to Comments of Tele-Communications, Inc. June 17, 1993. With J.R. Woodbury. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation, Further Notice of Proposed Rulemaking.*

"An Economic Analysis of the FCC's Proposed Cable Ownership Restrictions," Attachment to Comments of Tele-Communications, Inc. February 9, 1993. With S.R. Brenner and J.R. Woodbury. *In the Matter of Implementation of Sections 11 and 13 of the Cable Television Consumer Protection and Competition Act of 1992, Horizontal and Vertical Ownership Limits, Cross-Ownership Limitations and Anti-trafficking Provisions.*

"The Cellular Service Industry: Performance and Competition," Appendix to Reply Comments of the Cellular Telecommunications Industry Association. January 1993. With R.J. Larner and J. Murdoch. *In the Matter of Amendment of the Commission's Rules to Establish New Personal Communications Services.*

"An Analysis of Cable Television Rate Regulation," Attachment to Comments of Tele-Communications, Inc. January 27, 1993. With S.R. Brenner and J.R. Woodbury. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Rate Regulation.*

"Exclusivity and Differential Pricing for Cable Program Services," Attachment to Comments of Tele-Communications, Inc. January 25, 1993. With S.R. Brenner and J.R. Woodbury. *Implementation of Sections of the Cable Television Consumer Protection and Competition Act of 1992, Development of Competition and Diversity in Video Programming Distribution and Carriage.*

"An Economic Analysis of Entry by Cellular Operators into Personal Communications Services," Attachment A to Comments of the Cellular Telecommunications Industry Association. November 1992. With R.J. Larner and J. Murdoch. *In the Matter of Amendment of the Commission's Rules to Establish New Personal Communications Services.*

Statement of Stanley M. Besen on behalf of the National Cable Television Association, Federal Communications Commission. August 3, 1989. *Policy and Rules Concerning Rates for Dominant Carriers,* CC Docket No. 87-313.

Declaration of Stanley M. Besen on behalf of Sunbeam Television Corporation, Federal Communications Commission. March 19, 1987. *In re Application of General Electric Property Management Company For Transfer of Control of WBC Associates, L.P. et al.*

Declaration of Stanley M. Besen, on behalf of Turner Broadcasting System, Inc., Federal Communications Commission. June 18, 1985. *In re Applications of Turner Broadcasting System, Inc. For Transfer of Control of CBS Inc.*

Statement of Stanley M. Besen on behalf of the American Telephone and Telegraph Company, Federal Communications Commission. June 4,1984. *In the Matter of Long-Run Regulation of AT&T's Basic Domestic Interstate Service,* CC Docket No. 83-1147.

Economic Analysis of the Showtime/The Movie Channel Joint Venture, submitted to the United States Department of Justice on behalf of the proposed Joint Venture. April 4, 1983. With R. G. Noll, S. R. Brenner, and D. W. Webbink.

"An Economic Analysis of the Hughes Satellite Transponder Sale Proposal," submitted on behalf of Home Box Office, Inc., Federal Communications Commission. March 15, 1982. *In the Matter of Domestic Fixed-Satellite Transponder Sales, CC Docket No. 82-45.*

**Appendix B: Materials Relied On**

**Legal Filings**

Third Amended Class Action Complaint for Violations of the Sherman Antitrust Act, in *Caroline Behrend et al., v. Comcast Corporation, et al.,* In the United States District Court for the Eastern District of Pennsylvania, May 23, 2006.

**Expert Reports and Declarations**

Williams, Michael A. (2013, August 19). "Second Supplemental Expert Declaration of Michael A. Williams, Ph.D., in *Caroline Behrend, et al. v. Comcast Corporation, et al*., in the United States District Court for the Eastern District of Pennsylvania."

Williams, Michael A.  (2009, September 11).  "Supplemental Expert Declaration of Michael A. Williams, Ph.D., in *Caroline Behrend, et al. v. Comcast Corporation, et al*., in the United States District Court for the Eastern District of Pennsylvania."

Williams, Michael A.  (2009, May 11).  "Expert Reply Declaration of Michael A. Williams, Ph.D., in *Caroline Behrend, et al. v. Comcast Corporation, et al*., in the United States District Court for the Eastern District of Pennsylvania."

McClave, James T. (2013, August 19). "Class Re-Certification Report of Dr. James T. McClave, in *Caroline Behrend et al., v. Comcast Corporation, et al.*, In the United States District Court for the Eastern District of Pennsylvania."

Singer, H. "Expert Declaration of Dr. Hal Singer, *Caroline Behrend et al., v. Comcast Corporation, et al.*, Civil Action No. 03-6604, United States District Court for the Eastern District of Pennsylvania."

**FCC Documents**

Federal Communications Commission.  (Adopted: 2001, December 27, Released: 2002, January 14).  "Eighth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming."  (CS Docket No. 01-129).  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-01-389A1.pdf, viewed on January 10, 2014.

Federal Communications Commission.  (Adopted: 2002, December 23, Released: 2002, December 31).  "Ninth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming" (MB Docket No. 02-145).  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-02-338A1.pdf, viewed on January 10, 2014.

Federal Communications Commission.  (Adopted: 2007, November 27, Released: 2009, January 16).  "Thirteenth Annual Report In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming" (MB-Docket No. 06-189).  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/FCC-07-206A1.pdf, viewed on January 10, 2014.

Federal Communications Commission. (Adopted: 2006, December 20, Released: 2007, March 5).  "Report and Order and Further Notice of Proposed Rulemaking, In the Matter of

1

Implementation of Section 621(a)(1) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992" (MB Docket No. 05-311). *Available at* www.mhcrc.org/docs/ops_FCCCFAR.pdf, viewed on January 10, 2014.

Federal Communications Commission.  (Adopted: 1998, July 31, Released: 1998, July 31). "Memorandum Opinion and Order In the Matter of RCN Telecom Services of New Jersey, Inc., Certification to Operate an Open Video System." *Available at* transition.fcc.gov/Bureaus/Cable/Orders/1998/da981530.txt, viewed on January 10, 2014.

Federal Communications Commission.  (Adopted: 1999, September 1, Released: 1999, September 1).  "Memorandum Opinion and Order In the Matter of RCN Telecom Services of Washington, Inc., Certification to Operate an Open Video System."  *Available at* transition.fcc.gov/Bureaus/Cable/Orders/1999/da991772.txt, viewed on January 10, 2014.

Federal Communications Commission.  (Adopted: 2000, February 4, Released: 2000, February 7).  "Memorandum Opinion and Order In the Matter of RCN Telecom Services of Oregon, Inc., Certification to Operate an Open Video System."

Federal Communications Commission.  (Adopted: 2012, April 6, Released: 2012, April 9). "Memorandum Opinion and Order, In the Matter of Petition of the City of Boston, Massachusetts, For Recertification to Regulate the Basic Cable Service Rates of Comcast Cable Communications, LLC (CUID MA0182)," (CSR 8488-R).  *Available at* hraunfoss.fcc.gov/edocs_public/attachmatch/DA-12-553A1.pdf, viewed on January 10, 2014.

Federal Communications Commission.  "Archived Filings for Certification of Open Video Systems." *Available at* www.fcc.gov/encyclopedia/archived-filings-certification-open-video-systems, viewed on November 26, 2013.

Federal Communications Commission.  "FCC Cable Communities Registered." *Available at* www.fcc.gov/encyclopedia/cable-communities-registered-fcc, viewed on November on 26, 2013.

"Initial Comments of RCN Corporation In the Matter of Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming."  (2001, August 3).  (CS Docket No. 01-129).

"Comments of the Greater Metro Telecommunications Consortium, the Rainier Communications Commission, Howard County, Maryland, the Cities of Bellevue and Olympia, Washington, and the Washington Association of Telecommunications Officers and Advisors before the Federal Communications Commission In the Matter of Implementation of Section 62l(a)(l) of the Cable Communications Policy Act of 1984 as amended by the Cable Television Consumer Protection and Competition Act of 1992."  (2006, February 13).  (MB Docket No. 05-311).  *Available at* www.watoa.org/FCC_Franchise_Comments.pdf, viewed on January 10, 2014.

**Bates Stamped Documents**

COM-PA0982329-37.

COM-PA1059444-51.

COM-PA2002234-335.

RCN0001007.

## SEC Filings

RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2000.

RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2001.

RCN Corp., Form 10-K Filing for the fiscal year ended December 31, 2004.

Knology, Inc., Form 10-K Filing for the fiscal year ended December 31, 2002.

Knology, Inc., Form 10-K Filing for the fiscal year ended December 31, 2004.

## Local Franchise Agreements and Reports

"Open Video System Agreement between The City of New York and RCN Telecom Services of New York, Inc." (1997, December 23). *Available at* www.nyc.gov/html/doitt/downloads/pdf/rcn_franchise_agreement.pdf, viewed on January 10, 2014.

Town of Mount Pleasant. (1999, March 9). "Knology Cable Franchise Ordinance and Knology Telecommunications Franchise Ordinance." Available at www.secinfo.com/dsVsf.63K9.b.htm#16thPage, viewed on January 13, 2014.

The City of San Diego, Manager's Report. (2000, October 18). "Grant of Competitive Cable Television Franchise Agreement with RCN Telecom Services." *Available at* docs.sandiego.gov/reportstocouncil/2000/00-214.wpd.pdf, viewed on January 10, 2014.

"Cable Television Franchise Agreement Between The City of Colorado Springs and WideOpenWest Colorado, LLC." (2001, June 22). *Available at* www.springsgov.com/doccenter/internalservices/ wideopenwestcablefranchiseagreement.pdf, viewed on January 9, 2014.

"Report To the Honorable Mayor and City Council From the City Manager of the City of Redwood City, *Amend RCN Franchise Agreement*." (2004, September 13). *Available at* rwcteens.org/government/council/packets/2004/0913/Reg_040913-6-4C.pdf, viewed on January 10, 2014.

"Amendment No. 1 to Cable System Franchise Agreement between the City of Redwood City and RCN Telecom Services, Inc." (2004, September 21).

City and County of Denver, Office of the Auditor. (2006, January). "Champion Broadband, LLC Cable Franchise Agreement Compliance Audit." *Available at* www.denvergov.org/Portals/741/documents/Audits2006/Champion%20Broadband,%20LLC.pdf, viewed on January 13, 2014.

City of Boston Department of Innovation & Technology.  (2010, July 15).  "Report on the Renewal and Transfer of the RCN-BecoCom Inc. Open Video System (OVS) Operating Agreement Between the City of Boston and ABRY Partners VI, L.P., Yankee Cable Acquisition, LLC."  *Available at* www.cityofboston.gov/Images_Documents/Boston%20Report%20on%20RCN%20OVS%20Renewal%20and%20Transfer%20to%20Yankee%20Cable%20ABRY%20Partners%20July%2020 10_tcm3-18924.pdf, viewed on January 10, 2014.

## Other

Berg, C.  (2000, December 16).  "RCN Pulls Back on Plans for Growth."  *The Morning Call*.  *Available at* articles.mcall.com/2000-12-16/business/3328168_1_rcn-mccourt-telephone-and-internet-services, viewed on January 10, 2014.

Bird, A.  (2011, January 7).  "Knology expands service to Mount Pleasant."  *The Post and Courier*.  *Available at* www.postandcourier.com/article/20110107/PC05/301079901, viewed on November 18, 2013.

Botein, M. (2006).  "Open Video Systems: Too Much Regulation Too Late?"  *Federal Communications Law Journal,* Vol.58.

Estrella, J.  (2001, March 4).  "Digital Access Pulls the Plug."  *Multichannel News*.  *Available at* www.multichannel.com/news-article/digital-access-pulls-plug/98802, viewed on November 19, 2013.

Ferrar, R.  (2009, November 30).  "Knoxville City Council Wants Report from Knology."  *Knoxville News Sentinel*.  *Available at* www.knoxnews.com/news/2009/nov/30/councilmen-want-report-from-knology, viewed on November 18, 2013.

Haugsted, L.  (2002, March 10).  "Capital Constraints Cripple WINfirst, Too."  *Multichannel News*.  *Available at* www.multichannel.com/news-article/capital-constraints-cripple-winfirst-too/93393, viewed on January 10, 2014.

Hickman, H.  (2008, February 20).  "Knology to finish work."  Knoxville News Sentinel.  Available at www.knoxnews.com/news/2008/feb/20/knology-finish-work, viewed on January 14, 2014.

Hofmeister, S.  (2002, March 14).  "Council's Plan for Cable Competition Goes Bust."  *Los Angeles Times*.  *Available at* articles.latimes.com/2002/mar/14/local/me-cable14, viewed on January 10, 2014.

Horn, P.  (2000, November 1).  "Phila. Council Panel Questions RCN on Cable Plan."  *Philadelphia Inquirer*.  *Available at* articles.philly.com/2000-11-01/business/25613267_1_rcn-franchise-areas-cable-franchise-contracts, viewed on January 10, 2014.

Horn, P.  (2000, December 12).  "RCN Has Long-term Promise, Immediate Costs with Network the Telecom Firm Bundles Services for Residential Users. But Its Funds are Limited, and It May Scale Back its Goals."  *The Philadelphia Inquirer*.

Willig, Robert D. (2002). "Declaration of Dr. Robert D. Willig on Behalf of EchoStar Communications Corporation, General Motors Corporation, and Hughes Electronics Corporation, CS Docket No. 01-348."

Consolidated Communications.  (2012, July 2).  "Consolidated Communicates completes purchase of SureWest Communications."  *Available at* www.consolidated.com/news/archive/2012/consolidated-communications-completes-purchase-of-surewest-communications, viewed on January 13, 2014.

"Knology seeks Jefferson County franchise."  (2000, November 29).  *Business First*. *Available at* www.bizjournals.com/louisville/stories/2000/11/27/daily23.html, viewed on November 20, 2013.

"RCN Corporation and Astound Broadband Close Sale of RCN's San Francisco Assets."  (2007, March 14).  *Business Wire*. *Available at* www.businesswire.com/news/home/20070314005987/en/RCN-Corporation-Astound-Broadband-Close-Sale-RCNs#.UtA4MJ5dUk0, viewed on November 17, 2013.

"RCN to build broadband network in Boston."  (1999, July 27).  *The Associated Press State & Local Wire*.

"SureWest acquires Winfirst assets."  (2002, July 15).  *Sacramento Business Journal.  Available at* www.bizjournals.com/sacramento/stories/2002/07/15/daily5.html?page=all, viewed on January 13, 2014.

"Voters Approve WideOpenWest Franchises in Denver and Boulder."  (2000, August 9).  *PRNewswire*. *Available at* www.thefreelibrary.com/Voters+Approve+WideOpenWest+Franchises+in+Denver+and+Boulder.-a063969639, viewed on January 9, 2014.

"WideOpenWest to Provide Tucson Service."  (2000, August 8).  *Denver Business Journal*. *Available at* www.bizjournals.com/denver/stories/2000/08/07/daily11.html, viewed on January 9, 2014.

 "WOW Gets 2nd Texas Franchise."  (2000, May 28).  *Multichannel News*. *Available at* www.multichannel.com/news-article/wow-gets-2nd-texas-franchise/69229, viewed on January 9, 2014.

*Advanced TV Factbook*.  Warren Communications News.  *Available at* www.advancedtvfactbook.com, viewed on December 11, 2013.

National Cable and Television Association.  "Industry Data: Top 25 Multichannel Video Service Customers (2012)."  *Available at* www.ncta.com/industry-data, viewed on January 9, 2014.

New York City Information Technology & Telecommunications.  "Frequently Asked Questions: Open Video System."  *Available at* www.nyc.gov/html/doitt/html/faq/video.shtml, viewed on January 8, 2014.

5

RCN.  "Where We Service."  *Available at* www.rcn.com/about-rcn/where-we-service, viewed on January 10, 2014.

"WOW! Locations."  *Available at* www.wowway.com/home-map, viewed on November 24, 2013.

47 C.F.R. § 76.905.