# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Stanford Glaberson, et al., | § | Civ. No. 03-6604 |
| | § | The Honorable John R. Padova |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| Comcast Corporation, et al., | § | |
| | § | |
| Defendants. | § | |

# PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

107497

**TABLE OF CONTENTS**

**PAGE**

I.    INTRODUCTION ................................................................1

II.    ARGUMENT ...................................................................3

    A.    The Court Should Finally Approve the Settlement because it is Fair, Reasonable, Adequate and in the Best Interest of the Settlement Class. .................3

        1.    The *Girsh* Factors weigh strongly in favor of final approval. ....................6

            a.    The complexity, expense and likely duration of the litigation. .......................................6

            b.    The reaction of the class to the settlement. .....................8

            c.    The stage of the proceedings and the amount of discovery completed. ...........................10

            d.    The risks of establishing liability and damages. ............11

            e.    The risk of obtaining and maintaining class certification through trial. ...............13

            f.    The ability of Defendant to withstand a greater judgment. .....................14

            g.    The range of reasonableness of the settlement fund in light of the best possible recovery and all of the attendant risks of litigation. ...............16

        2.    The Relevant *Prudential* Factors Also Favor Final Approval. .................18

            a.    Factors that bear on the maturity of the underlying substantive issues. ...................19

            b.    Whether class or subclass members are accorded the right to opt-out of the settlement. ............19

            c.    Whether any provisions for attorneys' fees are reasonable. ...................20

             d.    Whether the procedure for processing individual claims under the Settlement is fair and reasonable. ...............20

i

B.    Adequate Notice Was Provided to the Settlement Class Pursuant to the
Court's Preliminary Approval Order. ...................................................................21

III.    CONCLUSION...............................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990)....................................................................................... 18

*Bell Atlantic Corp. v. Bolger*,
2 F.3d 1304 (3d Cir. 1993)............................................................................... 6, 9, 10

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
603 F.2d 263 (2d Cir. 1979)...................................................................................... 18

*Boone v. City of Phila.*,
668 F. Supp. 2d 693 (E.D. Pa. 2009) ....................................................................... 10

*Chakejian v. Equifax Info. Servs.*,
275 F.R.D. 201 (E.D. Pa. 2011)................................................................................ 19

*Cullen v. Whitman Med. Corp.*,
197 F.R.D. 136 (E.D. Pa. 2000)................................................................................ 10

*Dryer v. Nat'l Football League*,
Civ. No. 09-2182 (PAM/AJB), 2013 WL 5888231 (D. Minn. Nov. 1, 2013)....................... 15

*Ehrheart v. Verizon Wireless*,
609 F.3d 590 (3d Cir. 2009)........................................................................................ 4

*Fisher Bros. v. Phelps Dodge Indus., Inc.*,
604 F. Supp. 446 (E.D. Pa. 1985) .............................................................................. 6

*Girsh v. Jepson*,
521 F.2d 153 (3d Cir. 1975)............................................................................... passim

*Hall v. Best Buy Co.*,
274 F.R.D. 154 (E.D. Pa. 2011).................................................................................. 5

*Hanrahan v. Britt*,
174 F.R.D. 356 (E.D. Pa. 1997).................................................................................. 4

*In re Aetna Inc. Sec. Litig.*,
No. CIV. A. MDL 1219, 2001 WL 20928 (E.D. Pa. Jan. 4, 2001) ........................ 12

*In re Auto. Refinishing Paint Antitrust Litig.*,
617 F. Supp. 2d 336 (E.D. Pa. 2007) ......................................................................... 6

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001)........................................................................... 6, 11, 17

iii

*In re Elec. Carbon Prods. Antitrust Litig.*,
   447 F. Supp. 2d 389 (D.N.J. 2006) .................................................................. 12, 19

*In re Fasteners Antitrust Litig.*,
   Civ. A. No. 08-md-1921, 2014 WL 285076 (E.D. Pa. Jan. 24, 2014).................................... 19

*In re Fasteners Antitrust Litig.*,
   No. 08-md-1912, 2014 WL 296954 (E.D. Pa. Jan. 27, 2014) ................................. 7

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*,
   55 F.3d 768 (3d Cir. 1995)..................................................................... 11, 16, 19

*In re Hydrogen Peroxide Antitrust Litig.*,
   552 F.3d 308 (3d Cir. 2008)............................................................................. 13

*In re Ikon Office Solutions, Inc. Sec. Litig.*,
   194 F.R.D. 166 (E.D. Pa. 2000).................................................................... 6, 7

*In re Ins. Brokerage Antitrust Litig.*,
   297 F.R.D. 136 (D.N.J. 2013)............................................................................ 8

*In re Linerboard Antitrust Litig.*,
   292 F. Supp. 2d 631 (E.D. Pa. 2003) ............................................................ 4, 19

*In re Linerboard Antitrust Litig.*,
   296 F. Supp. 2d 568 (E.D. Pa. 2003) .................................................................. 7

*In re Pet Food Prods. Liab. Litig.*,
   629 F.3d 333 (3d Cir. 2010)................................................................. 4, 5, 6, 10

*In re Processed Eggs Prods. Antitrust Litig.*,
   284 F.R.D. 249 (E.D. Pa. 2012)................................................................... 7, 13

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998)..................................................... 6, 9, 13, 16, 22

*In re Prudential Ins. Co. of Am. Sales Practices Litig.*,
   962 F. Supp. 450 (D.N.J. 1997) ....................................................................... 12

*In re Remeron Direct Purchaser Antitrust Litig.*,
   No. Civ. 03-0085 FSH, 2005 WL 3008808 (D.N.J. Nov. 9, 2005) ...... 6, 12, 13, 15, 16, 17, 18

*In re Remeron End-Payor Antitrust Litig.*,
   Nos. Civ. 02-2007, 04-5126 FSH, 2005 WL 2230314 (D.N.J. Sept. 13, 2005) .............. 14, 17

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004)................................................... 8, 9, 10, 14, 15, 16, 17

*Lazy Oil, Co. v. Witco Corp.*,
    95 F. Supp. 2d 290 (W.D. Pa. 1997) ............................................................................. 11, 15

*Nichols v. SmithKline Beecham Corp.*,
    No. Civ. A. 00-6222, 2005 WL 950616 (E.D. Pa. Apr. 22, 2005) ......................................... 21

*Perry v. FleetBoston Fin. Corp.*,
    229 F.R.D. 105 (E.D. Pa. 2005) ...................................................................................... 11, 15

*Reibstein v. Rite Aid Corp.*,
    761 F. Supp. 2d 241 (E.D. Pa. 2011) .................................................................................. 14

*Stoetzner v. U.S. Steel Corp.*,
    897 F.2d 115 (3d Cir. 1990) ............................................................................................. 9

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011) .......................................................................... 3, 4, 5, 6, 8, 15, 17, 18

*Sutton v. Medical Serv. Ass'n*,
    No. Civ. A. 92-4787, 1994 WL 246166 (E.D. Pa. June 8, 1994) ........................................... 9

## **Rules**

Fed. R. Civ. P. 23 ..................................................................................................................... 24

Fed. R. Civ. P. 23(c)(2) ............................................................................................................ 23

Fed. R. Civ. P. 23(e) ................................................................................................... 3, 16, 21, 24

## I.    INTRODUCTION

This complex antitrust class action has been strongly contested and litigated since it was filed December 8, 2003. On December 12, 2014, the Court certified the Philadelphia Settlement Class[1] and preliminarily approved the parties' Class Action Settlement Agreement ("Settlement Agreement"). *See* Order-Memorandum, ECF No. 614 ("Preliminary Approval Order" or "Order"). Pursuant to the Court's Order, Plaintiff Stanford Glaberson and Comcast have notified the Philadelphia Settlement Class about the Settlement. *See* Declaration of Katherine Kinsella Regarding Implementation of Class Notice Plan, Declaration of Joel Botzet Regarding Notification and Administration Services and Declaration of Christine McGinty.

The Settlement Agreement provides for substantial benefits to all members of the Philadelphia Settlement Class. Under the settlement, current subscribers of non-basic video programming services from Comcast in any of the five designated counties are entitled to elect either a one-time credit of $15 off their bill, or from the following Comcast services: (a) six free pay-per-view movies (an estimated $35.94 value),[2] or (b) for customers who subscribe to

---

[1] The Philadelphia Settlement Class is defined as:

> All cable television customers who (1) currently subscribe or (2) previously subscribed at any time from January 1, 2003 to December 31, 2008, to video programming services (other than solely to basic cable services) from Comcast, or any of its subsidiaries or affiliates, in the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania. The Class excludes government entities, Defendants, Defendants' subsidiaries and affiliates and this Court.

*See* Settlement Agreement ¶ 3.1 (ECF No. 608-2) (attached as Exhibit 1 to Pl.'s Mot. for Certification of Settlement Class and Prelim. Approval of Class Action Settlement, ECF No. 608-1; *see also* Prelim. Approval Order, at 7 (certifying Settlement Class).

[2] After the Settlement Agreement was entered into, Comcast's Counsel advised Co-Lead Class Counsel that Comcast was not able to provide the pay-per-view movie option to its current commercial subscriber class members due to existing contractual provisions. Comcast was not able to add clarifying language to the notices Comcast's billing vendor mailed to Comcast's commercial subscribers who receive paper invoices, because the mailing process was already underway.  McGinty Decl. ¶ 6.  As a result, based on agreement between the parties, the Claims Administrator, on March 20, 2015, mailed a postcard notice to commercial subscribers, based on a list of addresses provided by Comcast, informing them that the pay-for-view services option was not available to them. *See* Botzet

Xfinity® high speed internet service, four months free upgrade in internet service from Performance Level to Blast!® service (an estimated $40 value), or one free month upgrade from Blast!® service to Extreme 105 service (an estimated $38 value); or (c) two free months of The Movie Channel (an estimated $43.90 value). Settlement Agreement ¶ 8.2. Current subscribers who do not elect on their claim form either the $15 bill credit or from the above services, or who do not file a claim form, will automatically receive two free months of The Movie Channel (an estimated $43.90 value). *Id.* ¶ 8.2.1. Class members who are former subscribers will be entitled, upon submission of a valid claim form, to payment of $15 cash. *Id.* ¶ 8.3.

The Settlement is structured to maximize benefits to Settlement Class members. Cash elections by former subscribers, any attorney fees and expenses awarded by the Court to Class Counsel, and administration costs are to be paid from the cash component of the settlement fund. *Id.* ¶ 8.7. To the extent such sums exceed the $16,670,000 cash component, Comcast agrees to contribute additional cash to the settlement fund to fund such amounts, with the amount of settlement credits for services to current subscribers ($33,330,000) correspondingly reduced.  If such sums are less than the $16,670,000 cash component, Comcast shall pay the remaining cash pro rata to current subscriber members of the Class by issuing a one-time credit off their bills. *Id.* Importantly, the settlement provides that there is no reverter of cash or services to Comcast. *Id.* ¶ 8.1. These provisions ensure that cash and services benefits are fully provided to Class members as required under the settlement.

The Settlement was the result of arm's-length negotiations conducted over several years and included mediation settlement sessions assisted by an experienced mediator, Professor Eric

---

Decl. ¶ 8; Kinsella Decl. ¶ 11; McGinty Decl. ¶ 6.  Those class members will be entitled to all other options provided in the Settlement Agreement, including a choice of a one-time credit of $15 off their bill or a selection from the remainder of the free Comcast services available to all current subscriber Class Members.

Green. The Court has found that "the parties engaged in strongly contested, arm's-length
negotiations that spanned several years over the course of this litigation in which essentially all
issues were tested in the crucible of the adversarial process." Preliminary Approval Order, at 8.
The extensive litigation history of this case fully informed the parties' settlement. Forty-seven
depositions were taken. Millions of pages of documents were reviewed by Class Counsel. The
Court had the benefit of 37 expert reports submitted by the parties. *See* Preliminary Approval
Order, at 9 (finding that "the proposed settlement was reached after extensive litigation,
including comprehensive discovery, which informed the parties' settlement").

The Court preliminarily determined that "the settlement is within the range of settlements
worthy of final approval as fair, reasonable and adequate." Preliminary Approval Order, at 9
(citation omitted). As discussed below, the strong positive reaction of Settlement Class
Members, reflected in the fact that there has been only one request for exclusion and no
objections received to date, reinforces the Court's preliminary conclusion. For the reasons stated
below, the Court should grant final approval of the Settlement and bring this hard-fought
litigation, supervised throughout with careful deliberations and consistent fairness by this Court,
to a close that Co-Lead Class Counsel respectfully submit is in the best interest of the
Philadelphia Settlement Class.

## II.   ARGUMENT

### A.   The Court Should Finally Approve the Settlement because it is Fair, Reasonable, Adequate and in the Best Interest of the Settlement Class.

A settlement must be "fair, reasonable and adequate" to be approved. Fed. R. Civ. P.
23(e). "In this process, 'trial judges bear the important responsibility of protecting absent class
members,'" and must be 'assur[ed] that the settlement represents adequate compensation for the
release of the class claims.'" *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 319 (3d Cir. 2011)

3

(citations omitted). There is an "overriding public interest in settling class action litigation." *In re Pet Food Prods. Liab. Litig.*, 629 F.3d 333, 351 (3d Cir. 2010) (citation and internal quotation marks omitted). The Third Circuit applies a "'strong presumption in favor of voluntary settlement agreements,'" which is "'especially strong in class actions and other complex cases . . . because they promote the amicable resolution of disputes and lighten the increasing load of litigation faced by the federal courts.'" *Sullivan,* 667 F.3d at 311 (quoting *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2009) (*en banc*)).

The Third Circuit has approved use of an initial presumption of fairness where: (1) the negotiations occurred at arm's-length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected. *Sullivan*, 667 F.3d at 320 n.54 (citation omitted); *see also In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) (stating that "'[a] presumption of correctness is said to attach to a class settlement reached in arms-length negotiations between experienced, capable counsel after meaningful discovery'") (quoting *Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)). The Court has already found that the Settlement was a product of arm's-length negotiations, that it "was reached after extensive litigation, including comprehensive discovery" and that Class Counsel "are experienced litigators in antitrust class actions." Preliminary Approval Order, at 8, 9. As of May 7, 2015, the Settlement Administrator had received no objections from the Settlement Class which the parties estimate includes at least 800,000 members. Botzet Decl. ¶ 14; Preliminary Approval Order, at 3 (finding numerosity requirement satisfied based on the parties' estimate that Settlement Class consists of at least 800,000 current and former subscribers within the five counties).

Independent of the presumption of fairness, final approval is supported here by application of the nine *Girsh* factors courts within the Third Circuit use in evaluating the fairness of proposed class action settlements:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; [and] (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Pet Food Prods.*, 629 F.3d at 350 (quoting *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)); *see also Sullivan*, 667 F.3d at 319-20 (same). In applying these factors, no single factor alone is dispositive. *Hall v. Best Buy Co.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011).

Courts may also consider additional factors known as the *Prudential* factors, to the extent they apply:

- the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

- the existence and probable outcome of claims by other classes and subclasses;

- the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved – or likely to be achieved – for other claimants;

- whether class or subclass members are accorded the right to opt out of the settlement;

- whether any provisions for attorneys' fees are reasonable; and

- whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Pet Food Prods.*, 629 F.3d at 350 (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998)); *see also Sullivan*, 667 F.3d at 320 (same).

In evaluating a settlement, "the professional judgment of counsel involved in the litigation is entitled to significant weight." *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985). Courts should avoid holding counsel to "an impossible standard, as a settlement is virtually always a compromise, a yielding of the highest hopes in exchange for certainty and resolution." *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (citations, internal quotations omitted). Additionally, "[b]ecause a settlement represents an exercise of judgment by the negotiating parties, cases have consistently held that the function of a court reviewing a settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues left unresolved by the settlement." *In re Remeron Direct Purchaser Antitrust Litig.*, No. Civ. 03-0085 FSH, 2005 WL 3008808, at *4 (D.N.J. Nov. 9, 2005); *see also Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1315 (3d Cir. 1993) (noting that "'[t]he temptation to convert a settlement hearing into a full trial on the merits must be resisted'") (citation omitted).

Application of the *Girsh* factors, the relevant *Prudential* factors and the judgment of Co-Lead Class Counsel favor final approval.

      **1.**      <u>**The *Girsh* Factors weigh strongly in favor of final approval.**</u>

            **a.  The complexity, expense and likely duration of the litigation**.

The initial *Girsh* factor considers "the probable costs, in both time and money, of continued litigation." *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted). In applying this factor, courts recognize that antitrust class actions are "'arguably the most complex action[s] to prosecute'" as "'[t]he legal and factual issues involved are always numerous and uncertain in outcome.'" *In re Auto. Refinishing Paint*

*Antitrust Litig.*, 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (quoting *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); *see also In re Fasteners Antitrust Litig.*, No. 08-md-1912, 2014 WL 296954, at *5 (E.D. Pa. Jan. 27, 2014) (observing that "[l]ike other antitrust cases, this case has involved complex issues and has been lengthy").

This case is a paradigm example of a complex antitrust action. Extending over a decade, this litigation has required extensive briefing of complex legal and factual issues, exhaustive discovery efforts and extensive motion practice. Highlights of this marathon litigation are set forth in Plaintiff's Memorandum in Support of Motion for Certification of a Settlement Class and Preliminary Approval of Class Action Settlement, ECF No. 608-1, at 6-8.

As the Court's docket reflects, at the time of settlement, Class Counsel had undertaken an enormous amount of work on behalf of the Class, expending thousands of hours and advancing millions of dollars without any assurance of compensation over the more than 11-year prosecution of this case. Nevertheless, if the parties had not settled, significant additional work lay ahead, including briefing and arguing Comcast's *Daubert* motion to strike Plaintiff's supplemental expert reports filed in support of Settlement Class certification. Trial would have involved extensive pretrial briefing and preparation and the marshalling, presentation and consideration of a very substantial evidentiary record. The prospect of a lengthy, complicated trial and the inevitable subsequent appeals underscore the appropriateness of the settlement. *See In re Processed Eggs Prods. Antitrust Litig.*, 284 F.R.D. 249, 269 (E.D. Pa. 2012) (approving settlement where "considerable expenditures of financial resources and hours of attorney time relating to discovery for liability and damages" would be required for trial); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. at 179 (noting that "the extremely large sums of money at

issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed" and that "[t]his factor thus weighs in favor of the proposed settlement").

Having already spanned over 11 years of intense litigation, the case, absent a settlement, would undoubtedly have continued for several more years and required extensive pretrial motion practice, a complicated trial, numerous post-trial motions and highly likely appeals. The Settlement Agreement provides all members of the Settlement Class relief that is both significant and avoids further delay. *See Sullivan*, 667 F.3d at 321 (noting that "[w]e agree with the District Court's conclusion that litigation of the numerous legal and factual issues discussed would have inevitably contributed to the expense and duration of the proceedings" and that "the settlement provided substantial and immediate relief to the class without further expense"); and *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 536 (3d Cir. 2004) (finding first *Girsh* factor favors settlement "because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial" and "it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class"). The initial *Girsh* factor "weighs strongly in favor of the Settlement." *In re Ins. Brokerage Antitrust Litig.*, 297 F.R.D. 136, 145 (D.N.J. 2013) (citation omitted).

### b. The reaction of the class to the settlement.

The deadline for requesting exclusion from the Settlement Class or objecting to the Settlement is June 10, 2015. Class Counsel will update the Court on the total number of opt-outs and objections. However, as of May 7, 2015, out of an estimated class size of over 800,000 persons, the Settlement Administrator has received only one request for exclusion and no objections. Botzet Decl. ¶ 13-14. As of May 7, 2015, the Settlement Administrator has received

17,971 claims from Class Members. *Id.* ¶ 12.  Rust further reports that there have been

approximately 28,406 unique visitors to the settlement website (*id.* ¶ 4) and approximately 5,198

telephone calls have been made to the toll-free telephone support line (*id.* ¶ 5). While the number

of claims submitted to date, the absence of objections and the single opt-out request reflect

positive support by Class members, the Settlement Agreement provides for a $50 million

Settlement Fund which is more than sufficient to pay all claims submitted by any and all Class

Members. Also, current subscribers who do not make an election between the $15 one-time bill

credit or from among the range of free services, will automatically receive two free months of

The Movie Channel (an estimated value of $43.90). Settlement Agreement ¶ 8.2 and 8.2.1. And,

since there is no reversion (of cash or free service benefits) to Comcast, all cash and service

benefits for Class Members in the Settlement will be distributed.

      The strong positive response from Settlement Class Members to date, evidenced by the

absence of a single objection, favors a finding that the settlement is fair, reasonable and

adequate. *See Bell Atlantic Corp.,* 2 F.3d at 1313-14 (noting that "[l]ess than 30 of approximately

1.1 million class members objected" representing an "infinitesimal" fraction of the class);

*Stoetzner v. U.S. Steel Corp.*, 897 F.2d 115, 118-119 (3d Cir. 1990) (noting that "only" 29

objections from a 281 member class "strongly favors settlement"); *In re Prudential Ins. Co. of

Am. Sales Practices Litig.*, 148 F.3d at 318 (affirming determination that class response was

favorable in light of facts that 19,000 policyholders out of 8 million opted out and 300 class

members objected); *Warfarin*, 391 F.3d at 536 (noting that "[o]f the 1.8 million potential class

members, 136 consumers and ten TPP claimants opted out . . . and two TPP claimants objected,"

and "the District Court concluded that the insignificant  number of objections filed weighed in

favor of approving the settlement"); and *Sutton v. Medical Serv. Ass'n,* No. Civ. A. 92-4787,

1994 WL 246166, at *9 (E.D. Pa. June 8, 1994) (stating that "[i]n litigation involving a large class, it would be extremely unusual not to encounter objections").

### c. The stage of the proceedings and the amount of discovery completed.

The procedural stage of a case at the time of settlement provides a lens to focus the question of whether "counsel adequately appreciated the merits of the case before negotiating" the settlement. *Warfarin*, 391 F.3d at 537 (citations omitted). "[C]ourts generally recognize that a proposed class action settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000). Settlements arrived at following discovery "are more likely to reflect the true value of the claim." *Boone v. City of Phila.*, 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing *Bell Atl. Corp.*, 2 F.3d at 1314).

As noted, this litigation of long duration involved extensive discovery, motion practice, multiple trips through appellate courts, a decision by the United States Supreme Court on class certification issues, 47 depositions, the review of millions of pages of party and third-party documents, and the retention of multiple experts by the parties, who issued reports and almost all of whom were deposed. Based upon the voluminous record, this Court previously found "that the level to which this case was litigated supports a conclusion that the settlement was reached with full appreciation by counsel of the merits of the case." Preliminary Approval Order, at 9. At the time of settlement, Class Counsel unquestionably had a full "appreciation of the merits of the case as well as the legal theories and risks." *Pet Food Prods.*, 629 F.3d at 351. The third *Girsh* factor weighs strongly in favor of final approval. *See Warfarin,* 391 F.3d at 537 ("Based on the type and amount of discovery undertaken by the parties, the District Court concluded that class

counsel adequately appreciated the merits of the case before negotiating, and we agree that this factor strongly favors approval of the settlement.").

### d.  The risks of establishing liability and damages.

The fourth and fifth *Girsh* factors further support a finding that the settlement is fair, reasonable and adequate. The fourth factor (the risks of establishing liability) "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them." *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 814 (3d Cir. 1995). The fifth factor similarly "'attempts to measure the expected value of litigating the action rather than settling it at the current time.'" *Cendant*, 264 F.3d at 238-39 (quoting *GMC*, 55 F.3d at 816). In applying these factors, "the Court need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by [Appointed Counsel], who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'" *Perry v. FleetBoston Fin. Corp.*, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (citation omitted). Co-Lead Class Counsel believe that Plaintiff would have prevailed at trial, including in establishing Comcast's liability, based on the extensive evidentiary record. However, they also recognize that class action antitrust cases, like all complex litigation against companies ably represented by teams of talented defense counsel, carry inherent risks. *See Lazy Oil, Co. v. Witco Corp.*, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) (noting that "[h]ere, as in every case, Plaintiffs face the general risk that they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues"). District courts within the Third Circuit have granted final approval to settlements of antitrust class actions where, "[a]s in any antitrust case,

[there are] substantial risks of non-recovery, even after preliminary victories were achieved." *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 400 (D.N.J. 2006).

Co-Lead Class Counsel are similarly confident that Plaintiff and the Class would be able to prove damages at trial. At the same time, they recognize the risks of a limited recovery or no recovery given the significant differences among the parties' competing experts on the issue of overcharge damages. *See, e.g., In re Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *8 (stating that "[t]he determination of damages is a complicated and uncertain process" and noting that given the conflicting damages expert reports, "[i]t is by no means certain that Plaintiffs would have succeeded in recovering the maximum measure of damages estimated by Plaintiffs' expert") (citations omitted); *Elec. Carbon Prods.*, 447 F. Supp. 2d at 401 (discussing risks in proving antitrust damages at trial involving "a battle of experts addressing the measurement of . . . overcharges, which can become an esoteric exercise with unpredictable results"); *In re Aetna Inc. Sec. Litig.*, No. CIV. A. MDL 1219, 2001 WL 20928, at *10 (E.D. Pa. Jan. 4, 2001) (noting that plaintiffs' damages theories were based primarily on testimony and reports of experts, so that plaintiffs risked rejection of its experts by either the court on a *Daubert* challenge or by the jury); and *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 962 F. Supp. 450, 539 (D.N.J. 1997) (observing that "a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials").

In its Preliminary Approval Order, the Court pointed to the vigorous dispute between the parties' experts and Comcast's motion to strike the most recent reports of Dr. McClave and Dr. Williams, underscoring the risks inherent in continued litigation. Order, at 9 ("The parties' recent expert reports continue to reflect both the ongoing core litigation disputes of the parties and the inherent risks of continued litigation, reinforcing the fact that the Settlement falls within the

range of reasonableness"). The Settlement, on the other hand, provides all Settlement Class
Members with significant, certain benefits without further delay. The fourth and fifth *Girsh*
factors support final approval of the Settlement.

> e. **The risk of obtaining and maintaining class certification through trial.**

The sixth *Girsh* factor provides additional support for final approval. Plaintiff's motion to
certify the narrowed Philadelphia Settlement Class was pending at the time the Settlement
Agreement was reached. Co-Lead Class Counsel believe that the extensive evidentiary record
before the Court fully supports class certification and would warrant continued certification
through trial.

While Co-Lead Class Counsel anticipated that a class would have been certified for
litigation purposes, a court may decertify or modify a class action at any time. Indeed, in this
case, the Court did so in decertifying the previously certified Philadelphia area class following
the Third Circuit's decision in *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 308 (3d Cir.
2008). The risk of modification or recertification of a class is inherent in class litigation. *See*,
*e.g.*, *Prudential*, 148 F.3d at 321 (noting that "a district court may decertify or modify a class at
any time during the litigation if it proves to be unmanageable"). Because of this ever-present
risk, courts have found the sixth *Girsh* factor to favor final approval of settlements. *See*
*Processed Egg Prods.*, 284 F.R.D. at 273 (stating that "[t]he Court of Appeals for the Third
Circuit has recognized: There will always be a 'risk' or possibility of decertification, and
consequently the court can always claim this factor weighs in favor of settlement") (citation and
internal quotation marks omitted). The fact that the Court's previous order re-certifying the class
was reversed by the United States Supreme Court further underscores this inherent risk. *See*
*Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *8 (noting that the parties'

13

briefing "indicates that this is a hotly contested issue, with Defendants raising multiple and factual legal arguments in opposition to certification" and that "the risks faced by Plaintiffs with regard to class certification weigh in favor of approving the Settlement").

### f.   The ability of Defendant to withstand a greater judgment.

The seventh *Girsh* factor neither favors nor disfavors the settlement. "[M]any settlements have been approved where a settling defendant has had the ability to pay greater amounts." *In re Remeron End-Payor Antitrust Litig.*, Nos. Civ. 02-2007, 04-5126 FSH, 2005 WL 2230314, at *23 (D.N.J. Sept. 13, 2005). As the Third Circuit noted in affirming certification of a nationwide settlement class and final approval of a settlement, "[a]lthough the plaintiffs do not dispute that DuPont's total resources far exceed the settlement amount, the fact that DuPont could afford to pay more does not mean it is obligated to pay any more than what the consumer and TPP class members are entitled to under the theories of liability that existed at the time a settlement was reached." *Warfarin*, 391 F.3d at 538.  The ability of a defendant to withstand a greater judgment is appropriately considered in cases where the settlement amount is less than what plaintiffs might ordinarily agree to because of a defendant's limited financial circumstances. *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011). Such circumstances do not exist here as there is no record evidence that Comcast is financially unstable. *Id.* at 254 (determining factor was neutral where there was no reason to believe that "Defendants face any financial instability").

Additionally, courts recognize that whether a defendant could pay more in settlement is not relevant when considered in a pure vacuum, divorced from considerations of whether the settlement is fair, reasonable and adequate when viewed in the light of the legal issues and facts involved in the case. *See Warfarin*, 391 F.3d at 538. This case presented difficult legal issues and

14

substantial risks. Plaintiff would have necessarily spent substantial additional time and expenses in pursuing the case through trial and on appeal. As discussed, the settlement provides significant benefits to the Settlement Class. Properly considered in this context, any ability of Defendant to pay more is not relevant in determining the reasonableness of the settlement. *See id.* (finding no error in district court's conclusion "that DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"); *Lazy Oil, Co.,* 95 F. Supp. at 318 (stating that "[t]he Court presumes that Defendants have the financial resources to pay a larger judgment" but that " in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement"); *Perry,* 229 F.R.D. at 116 (observing that defendant "could certainly withstand a much larger judgment" and that "[w]hile that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages"); and *Sullivan,* 667 F.3d at 323 ("At bottom, we agree that, 'in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the settlement.'") (citation omitted). *Cf. Dryer v. Nat'l Football League,* Civ. No. 09-2182 (PAM/AJB), 2013 WL 5888231, at *4 (D. Minn. Nov. 1, 2013) (reasoning that "there is no issue with the NFL's financial condition," that defendant is "fully able to pay what it has committed to pay" and "is also fully able to continue to litigate this matter vigorously and defend itself against the class's claims should it be necessary," and concluding that "[t]his factor [defendant's ability to pay] is neutral in the Court's analysis"). Thus, the seventh *Girsh* factor is neutral here, neither favoring nor disfavoring settlement. *See Remeron Direct Purchaser Antitrust Litig.,* 2005 WL 3008808, at *9.

15

**g.  The range of reasonableness of the settlement fund in light of the best possible recovery and all of the attendant risks of litigation.**

The final pair of *Girsh* factor focuses on "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* (citing *Prudential*, 148 F.3d at 322).

The Third Circuit has been skeptical of demands that a settlement approach the maximum possible recovery, noting that "'after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.'" *Prudential,* 148 F.3d at 317 (quoting *GMC,* 55 F.3d at 806).  Under Rule 23(e), a court "must determine whether the settlement is within a range that responsible and experienced attorneys could accept considering all relevant risks and factors of litigation." *Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *4.

Here, the settlement falls squarely within the range of settlements worthy of final approval as fair, reasonable and adequate. The Court previously determined the settlement to be "within the range of settlements worthy of final approval as fair, reasonable and adequate," noting that "[t]he Settlement Fund amount reflects a sound recovery in relation to the estimated single damages reflected in Dr. McClave's new report." Preliminary Approval Order, at 9. This Court further reasoned:

> We find that Plaintiffs have shown that the relief available under the Settlement falls within the range of reasonableness, and there is a conceivable basis for presuming that the standard applied for final approval – fairness, adequacy, and reasonableness – will be satisfied. The stated $50 million value of the Fund represents approximately 25% of the amount that Dr. McClave now opines is attributable to Comcast's deterrence of overbuilding in the five counties. This is a significant result given the uncertainty whether, absent the Settlement we would accept Dr. McClave's opinion as common proof, and the substantial risk that Plaintiffs would face in persuading a jury to accept Dr. Williams' liability theory and Dr. McClave's damages theory.

16

*Id.* at 10. This reasoning is sound and fully consistent with precedent. *See, e.g., Sullivan*, 667 F.3d at 324, 326 (noting that the class's expert estimated that the indirect purchaser plaintiff settlement fund represented an estimated 10.9% of such plaintiffs' single damages and the direct purchaser fund amounted to approximately 20% of their single damages and finding no abuse of discretion in "the District Court's conclusion that the proposed settlement offered a reasonable recovery"); *Warfarin*, 391 F.3d at 538 (stating that according to plaintiffs' expert's figures, "the $44.5 million settlement fund is approximately 33% of available damages and well within a reasonable settlement range when compared with recovery percentages in other class actions") (citing *Cendant*, 264 F.3d at 241 (approving settlement providing 36% - 37% recovery and noting typical recoveries in securities class actions range from 1.6% to 14%)); and *Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *24 (noting that "an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement was reasonable relative to other factors, such as the risk of no recovery" and concluding that "[t]he Court is satisfied that the settlement agreement accounts for the risks inherent in this complex litigation and provides appropriate relief in light of these risks") (citation omitted).[3]

Additionally, judgment entered in favor of Plaintiff and the Class would likely be challenged on appeal. *See Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *10 (noting that "in light of the highly contested nature of liability, it is likely that any judgment

---

[3] In *Sullivan*, The Third Circuit observed that "[s]ome disagreement exists in the case law as to whether the reasonableness of a settlement amount should be evaluated by comparison to the potential single damages of a class or the trebled damages authorized in certain jurisdictions." 667 F.3d at 324. The Third Circuit concluded that "we cannot label the District Court's adherence to the commonly accepted procedure for assessing the fairness, adequacy, and reasonableness of a settlement [including using single damages as the basis of comparison] an abuse of discretion." *Id.* at 325.

entered would have been the subject of post-trial motions and appeals, further prolonging the litigation and reducing the value of any recovery") (citation omitted). As the district court in *Remeron* further reasoned, "[a]n appeal of a damage award could seriously and adversely affect the scope of an ultimate recovery, if not the recovery itself." *Id. See also Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979) (multi-million dollar judgment following lengthy trial reversed on appeal); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (class obtained jury verdict but judgment reversed on appeal and case dismissed).  Despite Co-Lead Counsel's belief in prevailing at trial and on appeal, the settlement appropriately accounts for the inherent risks in this complex antitrust litigation and provides significant benefits to the Settlement Class. *See* Declaration of Eric Green, ECF No. 608-4, ¶¶ 6, 18 (describing extended mediation process, opining that the settlement "represents an arms-length principled, well-reasoned, and sound resolution of highly uncertain litigation" and concluding that "it is my opinion that the settlement is an excellent result for the Class that reflects the strenuous negotiations between highly professional counsel to secure a result for the Class without the risks of continued litigation where their claims could have been dismissed pre-trial, at trial, or on appeal").

Thus, all relevant *Girsh* factors favor final approval of the Settlement.

## 2.    __The Relevant *Prudential* Factors Also Favor Final Approval.__

In addition to the *Girsh* criteria, the Third Circuit has said that "a district court may consider several other factors 'illustrative of additional inquiries that in many instances will be useful for a thoroughgoing analysis of a settlement's terms.'" *Sullivan*, 667 F.3d at 320 (citation omitted). Consideration of the relevant additional factors, known as the *Prudential* factors, also favors final approval.

18

### a. Factors that bear on the maturity of the underlying substantive issues.

This case settled long after completion of discovery and after more than a decade of vigorously contested litigation. The stage at which settlement occurs reflects "whether counsel had an adequate appreciation of the merits of the case before negotiating." *In re GMC*, 55 F.3d at 813. "Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent." *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d at 400 (citing *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)). The fact that the underlying substantive issues were well-developed and well-known further supports approval of this settlement. *See Chakejian v. Equifax Info. Servs.*, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding that where the underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken," this factor supported settlement approval); *In re Fasteners Antitrust Litig.*, Civ. A. No. 08-md-1921, 2014 WL 285076, at *11 (E.D. Pa. Jan. 24, 2014) (noting that "[a] substantial amount of information has been provided to Settlement Class Counsel such that counsel are capable of making an informed decision about the merits of the case if it were to proceed to trial, and about the fairness of the settlement terms" and concluding that "[w]e are satisfied that the underlying substantive issues were well developed").

### b. Whether class or subclass members are accorded the right to opt-out of the settlement.

All members of the Philadelphia Settlement Class have been provided the opportunity to opt-out. Despite a class estimated by the parties to include at least 800,000 members, only one request for exclusion has been received to date by the Settlement Administrator. Botzet Decl. ¶ 13. The positive response to the Settlement by Class Members, further reflected in the absence of any objections to date (Botzet Decl. ¶ 14), favors final approval.

19

### c. Whether any provisions for attorneys' fees are reasonable.

Co-Lead Counsel, on behalf of Class Counsel, seek an award of attorneys' fees and expenses of $15 million. As detailed in Plaintiff's fee motion and accompanying memorandum, the requested fee and expense award of $15 million (in combination representing 30% of the $50 million settlement fund) consisted of an estimated $8,574,896.16 in expenses (approximately 17.15% of the settlement fund) and $6,425,103.84 in attorneys' fees (approximately 12.85% of the settlement fund). *See* Plaintiff's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Service Award to Class Representative (ECF No. 615); Declaration of David Woodward with Exhibits A-T (ECF Nos. 615-2 - 615-7); and Memorandum in Support (ECF No. 615-1), all filed January 12, 2015. Plaintiff's motion for fees and expenses and request for approval of a $10,000 service award to Class Representative Stanford Glaberson, and the supporting memorandum and Declaration of David Woodward, have been posted on the dedicated settlement website and available to Class Members since January 15, 2015. Botzet Decl. ¶ 4. Co-Lead Counsel respectfully submit that these requests are fair and reasonable under the applicable legal standards and precedent discussed in our motion papers and supporting declarations and exhibits, which are incorporated here by reference, and should be approved. A [Proposed] Order was previously submitted for the Court's consideration (ECF No. 615-8).

### d. Whether the procedure for processing individual claims under the Settlement is fair and reasonable.

The Settlement Administrator, Rust Consulting, Inc., is a highly experienced claims administrator who has implemented the settlement pursuant to the Court's Preliminary Approval Order. *See* Botzet Decl. ¶ 2. The Settlement Agreement provides a simple method for class members to receive benefits under the settlement. Class members who are current Comcast subscribers are able to submit a claim form providing their name, address and Comcast account

20

number. Settlement Agreement ¶ 8.8.1 and Ex. A. Former subscribers who are class members are entitled to submit an equally simple claim form providing their name, the address where they formerly received Comcast service during the class period, their former Comcast account number, if known, and affirming, under penalty of perjury, that they subscribed to video programming services (other than solely to basic cable services) from Comcast at any time between January 1, 2003 and December 31, 2008 in any one of the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania. *Id.* ¶ 8.8.2 and Ex. B. Claims may be submitted electronically or by mail. *Id.* ¶ 8.8.3. The Claims Administrator reports that 17,971 claims have been filed to date, consisting of 13,075 claims from current subscribers and 4,896 claims from former subscribers. Botzet Decl. ¶ 12.

Current subscribers who do no elect on their claim form either a $15 bill credit or from the free services will automatically receive two free months of The Movie Channel (an estimated $43.90 value). Settlement Agreement ¶ 8.2.1. The same is true of current subscribers who do not file a claim form. *Id.* Because there will be no reverter of any portion of the Settlement Fund to Comcast (*id.* ¶ 8.1), cash and service benefits will be provided to class members pursuant to the settlement.

The consumer-friendly nature and fairness of the claims process support final approval.

**B.    Adequate Notice Was Provided to the Settlement Class Pursuant to the Court's Preliminary Approval Order.**

The due process requirements of the Fifth Amendment and the Federal Rules of Civil Procedure mandate that adequate notice of a proposed settlement be given to Settlement Class Members. *Nichols v. SmithKline Beecham Corp.*, No. Civ. A. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr. 22, 2005); Fed. R. Civ. P. 23(e). "The Rule 23(e) notice is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to

inspect the complete settlement documents, papers, and pleadings filed in the litigation."
*Prudential*, 148 F.3d at 327 (citation and internal quotation marks omitted). Due process
requirements are satisfied by the "combination of reasonable notice, the opportunity to be heard
and the opportunity to withdraw from the class." *Id.* at 306.

The Court previously approved a multi-faceted notice program. Preliminary Approval
Order at 11.  Notice expert Katherine Kinsella explains that the "Notice plan was designed to
inform potential Class Members that a proposed Settlement has been reached in this case and
that their rights may be affected." Kinsella Decl. ¶ 5.  Ms. Kinsella confirms that the three-part
Notice Program—consisting of "a) Direct notice by bill insert and email to current Comcast
subscribers; b) Broad notice through the use of paid media, including newspaper publication and
local cable television; and c) Extended notice through an Internet website" —has been
implemented. *Id.* ¶ 6a.-c.

Direct mail notice was achieved as provided by the Court and the approved Notice
Program, by Comcast sending a Summary Notice as part of its ordinary billing procedures to
current subscriber class members during the March 1, 2015 to March 28, 2015 billing cycle.  *Id.*
¶ 8; McGinty Decl. ¶¶ 4, 5. Comcast confirms that its billing vendor has distributed a total of
654,953 individual settlement notices (McGinty Decl. ¶ 5) to Comcast's residential and
commercial subscribers in all of Comcast's cable systems located in the counties of Bucks,
Chester, Delaware, Montgomery and Philadelphia (*id*. ¶ 4).

The Detailed Notice has been distributed via first-class mail to persons who called the
toll-free number or wrote or emailed the Claims Administrator to ask for one, and has been
available via since January 9, 2015, on the Settlement website, www.CableSettlement.com, as a
PDF file in both English and Spanish.  Kinsella Decl. ¶ 10. As discussed, on March 20, 2015,

Rust mailed a follow-up Postcard Notice to 9,170 current commercial subscribers to clarify the benefits available to them. *Id*. ¶ 11; Botzet Decl. ¶ 8.

As explained by Katherine Kinsella, the Media Notice Program, designed to reach former subscribers, used both print and broadcast media, with all advertising containing a toll-free number and the Settlement website for Class Members to request or access the Detailed Notice. Kinsella Decl. ¶ 13.  Ms. Kinsella's declaration lists all of the newspapers in which the Publication Notice appeared. *Id.* ¶ 14. A 30-second TV Spot, prominently featuring the toll-free number and Settlement website, aired from March 16, 2015 to March 29, 2015, was broadcast across local market cable channels in Philadelphia throughout the day to reach the highest number of viewers and delivered "an estimated 12 gross rating points . . . resulting in an estimated 86,923,800 gross impressions." *Id*. ¶ 15. A copy of the TV Spot script is attached as Exhibit 1 to Ms. Kinsella's Declaration.

Ms. Kinsella further explains that the Media Notice Program, including the described print and television advertising, "delivered the following estimated reach and frequency measurements: an estimated 90.8% of Adults 35+ in Philadelphia were reached with an average estimated frequency of 1.5 times." *Id.* ¶ 17.

Kinsella Media applied the plain language requirement of Federal Rule of Civil Procedure 23(c)(2) in developing the class notices. *Id*. ¶ 18. The Settlement website, www.CableSettlement.com, was established on January 9, 2015, enabling Class Members to access additional information on the Settlement and file a claim; an email address was also established on January 9, 2015, at info@cablesettlement.com, to enable Class Members to get Settlement information; and a toll-free number was established on the same date to allow potential Settlement Class Members to obtain information about the Settlement. *Id*. ¶¶ 19-21.

Ms. Kinsella opines "that the reach of our target audience and the number of exposure opportunities to the notice information is the best notice practicable under the circumstances" and that "[t]he Notice Program, as designed and implemented, is fully compliant with Rule 23 of the Federal Rules of Civil Procedure and satisfies due process requirements." *Id.* ¶ 22.

## III.    CONCLUSION

For the reasons detailed above and in Plaintiff's supporting documents, including the Declaration of Katherine Kinsella Regarding Implementation of Class Notice Plan, the Declaration of Joel Botzet Regarding Notification and Settlement Administration Services and the Declaration of Christine McGinty, Plaintiff Stanford Glaberson on behalf of the Settlement Class respectfully requests that the Court enter the proposed Final Judgment (ECF No. 608-2 at Ex. H) which, among other things, grants final approval of the Settlement Agreement pursuant to Federal Rule of Civil Procedure 23(e) and dismisses Plaintiff's claims and the claims of the Settlement Class (except claims of persons who have opted out) as provided in the Settlement Agreement with prejudice against Defendants.

Dated: May 11, 2015                                 Respectfully submitted,

                                                    s/ *David Woodward*
                                                    Samuel D. Heins
                                                    Vincent J. Esades
                                                    David Woodward
                                                    Jessica N. Servais
                                                    HEINS MILLS & OLSON, P.L.C.
                                                    310 Clifton Avenue
                                                    Minneapolis, Minnesota 55403
                                                    Telephone: 612-338-4605
                                                    Facsimile: 612-338-4692
                                                    sheins@heinsmills.com
                                                    vesades@heinsmills.com
                                                    dwoodward@heinsmills.com
                                                    jservais@heinsmills.com

Barry Barnett
LeElle Krompass
SUSMAN GODFREY L.L.P.
901 Main Street, Suite 5100
Dallas, Texas 75202-3775
Telephone: 214-754-1900
Facsimile: 214-754-1933
bbarnett@susmangodfrey.com
lkrompass@susmangodfrey.com

Joseph Goldberg
FREEDMAN BOYD HOLLANDER
GOLDBERG URIAS & WARD, P.A.
20 First Plaza, Suite 700
Albuquerque, New Mexico 87102
Telephone: 505-842-9960
Facsimile: 505-842-0761
jg@fbdlaw.com

**Attorneys for Class Plaintiff and
the Philadelphia Settlement Class**