IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STANFORD GLABERSON, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| COMCAST CORPORATION, et al. | : | NO. 03-6604 |

**MEMORANDUM**

**Padova, J.**                                                    **September 22nd, 2015**

Presently pending before the Court are Plaintiffs' Motion for Final Approval of Class

Action Settlement (Docket Entry 621) and Plaintiffs' Motion for Award of Attorneys' Fees

(Docket Entry 615).[1]  Neither Motion is opposed by Defendants, and the Court has received only

three objections from class members.  A final fairness hearing was conducted on September 9,

2015, at which time no persons appeared to object to the settlement or the award of counsel fees.

For the following reasons, the Motions are granted.

I.      **The Class**

On December 12, 2014, the Court certified a settlement class consisting of:

> All cable television customers who 1) currently subscribe or 2) previously
> subscribed at any time from January 1, 2003 to December 31, 2008, to video
> programming services (other than solely to basic cable services) from Comcast, or
> any of its subsidiaries or affiliates, in the counties of Bucks, Chester, Delaware,
> Montgomery and Philadelphia, Pennsylvania.  The Class excludes governmental
> entities, Defendants, Defendants' subsidiaries and affiliates and this Court.

(Docket Entry 614.)  That same order appointed Stanford Glaberson as representative of the

class, David Woodward, Esq. of Heins, Mills & Olson and Barry Barnett, Esq. of Susman

Godfrey as co-lead class counsel, and Rust Consulting, Inc. as claims administrator.

_____

[1] By Order dated December 12, 2014 (Docket Entry 614), the Court granted Plaintiffs'
unopposed Motion for Certification of a Settlement Class and Preliminary Approval of Class
Action Settlement (the "Preliminary Approval Order").

## II.      The Terms of the Settlement

The settlement is valued at $50 million, comprising a cash component valued at $16,670,000, and a services component valued at $33,330,000.  It provides different options for current and former subscribers.  The essential terms include:

- Current subscribers could choose either (1) a one-time credit of $15 off their bill or (2) credits from a selection of Comcast services including six pay-per-view movies (valued at $35.94), four months of upgraded internet service (valued at either $40 or $38 depending on the subscriber's current level of service), or a two-month subscription to The Movie Channel (valued at $43.90).[2]  Current subscribers who returned a claim form but made no choice, or who did not return a claim form, automatically receive a two month subscription to The Movie Channel.[3]

- Class members who no longer subscribe to Comcast services receive a cash payment of $15.

- The settlement provides that Class Counsel will seek up to $15 million for attorneys' fees, costs and expenses to be paid from the cash component of the settlement fund.  (Id.

---

[2]      Class Counsel advised the Court in their submission that, while the Settlement Agreement provides the choice of the receipt of pay-per-view movies, Comcast has advised them that preexisting contractual provisions prevent offering this alternative to commercial subscribers.  Comcast was unable to include this information in the notices that its billing vender mailed to its commercial subscribers.  On March 20, 2015, the Claims Administrator mailed those subscribers a supplemental postcard notice, advising of this limitation of their choices.  Our consideration of the fairness of the settlement includes this change.

[3]      At the hearing, the Court expressed concern that current subscribers who never returned a claim form would not be aware of their entitlement to a two month subscription to The Movie Channel without some form of supplemental notice advising them of the subscription's commencement.  The parties agreed that Comcast would provide a bill insert to those subscribers containing that information.  Our consideration of the fairness of the settlement includes this change.

¶¶ 8.2.-8.3.)

- If the cash obligations exceed the value of the cash component, Comcast agrees to contribute additional cash to the settlement fund, with the amount of settlement credits for services to current subscribers correspondingly reduced.[4]

- If the cash obligations are less than the value of the cash component, Comcast shall pay the remaining cash pro rata to current subscriber members of the Class by issuing a one-time credit off their bills.  (Id. ¶ 8.7.)

- There is no reverter of cash or services to Comcast.  (Id. ¶ 8.1.)

## III.    MOTION FOR APPROVAL OF FINAL SETTLEMENT

a.        Standard for final approval.

Class action settlements must be approved by the Court.  See Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled . . . only with the court's approval.").  We consider whether the Settlement Agreement is fair, reasonable, and adequate. In re Ins. Brokerage Antitrust Litig., 579 F.3d 241, 258 (3d Cir. 2009) ("'Even if it has satisfied the requirements for certification under Rule 23, a class action cannot be settled without the approval of the court and a determination that the proposed settlement is fair, reasonable and adequate.'" (quoting In re Prudential Ins. Co. Am. Sales Practice Litig., 148 F.3d 283, 316 (3d Cir. 1998))).  Where, as here, "'settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously,'" the Court must protect absentee class members by applying an "even more rigorous, heightened standard." In re Pet Food Prods. Liab. Litig., 629 F.3d 333, 350 (3d Cir. 2010) (quoting In re Warfarin Sodium Antitrust Litig.,

---

[4]        All counsel concur that, in granting Plaintiffs' counsel the full amount of the fees and expenses they request, totaling $15 million, the cash fund would have sufficient resources to satisfy all cash claims that have been made by class members.

391 F.3d 516, 534 (3d Cir. 2004)) (internal quotation marks omitted).  The purpose of this inquiry is "to protect the unnamed members of the class from unjust or unfair settlements." Ehrheart v. Verizon Wireless, 609 F.3d 590, 593 (3d Cir.2010).  In making this determination, the Court acts as a "fiduciary, guarding the claims and rights of the absent class members."  Id.

In determining whether the Settlement Agreement is fair, reasonable, and adequate, we consider the following nine factors ("the Girsh factors"):

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed;  (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Prudential, 148 F.3d at 317 (quoting Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation and editorial marks omitted)).  Whether a settlement is fair under these factors is a discretionary determination committed to the district judge.  See, e.g., Eichenholtz v. Brennan, 52 F.3d 478, 482 (3d Cir. 1995).

In addition to the Girsh factors, we may also consider the following non-exclusive factors ("the Prudential factors"):

> [T]he maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved — or likely to be achieved — for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

Prudential, 148 F.3d at 323 (stating that because of a "sea-change in the nature of class actions"

after Girsh was decided thirty-five years ago, it may be helpful to expand the Girsh factors).

        b.       Application

             1.       The Girsh Factors

                   A.       Complexity, expense and likely duration of the litigation.

The initial Girsh factor considers "the probable costs, in both time and money, of continued litigation." In re Cendant Corp. Litig., 264 F.3d 201, 233 (3d Cir. 2001) (citation and internal quotation marks omitted). In applying this factor, courts recognize that antitrust class actions are "'arguably the most complex action[s] to prosecute'" as "'[t]he legal and factual issues involved are always numerous and uncertain in outcome.'" In re Auto. Refinishing Paint Antitrust Litig., 617 F. Supp. 2d 336, 341 (E.D. Pa. 2007) (quoting In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003)); see also In re Fasteners Antitrust Litig., Civ. A. No. 08-1912, 2014 WL 296954, at *5 (E.D. Pa. Jan. 27, 2014) (observing that "[l]ike many other antitrust cases, this case has involved complex issues and has been lengthy").

The Class argues that this case is a "paradigm example of a complex antitrust action." (Pl. Att'y Fee Mem. at 7.) It has extended over a decade, and required extensive briefing of complex legal and factual issues, exhaustive discovery efforts and extensive motion practice. Counsel undertook eleven years of work and advanced millions of dollars without any assurance of compensation. If the parties had not settled, significant additional work would have been required, including briefing and arguing Comcast's motion to strike Plaintiff's supplemental expert reports filed in support of Settlement Class certification. Trial would have involved extensive pretrial briefing and preparation and the marshalling, presentation and consideration of a very substantial evidentiary record. The Class argues that the prospect of a lengthy, complicated trial and the inevitable subsequent appeals underscore the appropriateness of the

settlement.   See In re Processed Eggs Prods. Antitrust Litig., 284 F.R.D. 249, 269 (E.D. Pa. 2012) (approving settlement where "considerable expenditures of financial resources and hours of attorney time relating to discovery for liability and damages" would be required for trial); In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. 166, 179 (E.D. Pa. 2000) (noting that "the extremely large sums of money at issue almost guarantee that any outcome, whether by summary judgment or trial, would be appealed" and that "[t]his factor thus weighs in favor of the proposed settlement").   Finally, given Comcast's ability to fund the litigation, the Class asserts that, absent a settlement, the case would undoubtedly have continued for several more years and required extensive pretrial motion practice, a complicated trial, numerous post-trial motions and highly likely appeals, while the Settlement provides all members of the Settlement Class relief that is both significant and avoids further delay.   See Sullivan v. DB Invs., Inc., 667 F.3d 273, 321 (3d Cir. 2011) (noting that "[w]e agree with the District Court's conclusion that litigation of the numerous legal and factual issues discussed would have inevitably contributed to the expense and duration of the proceedings" and that "the settlement provided substantial and immediate relief to the class without further expense"); In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 536 (3d Cir. 2004) (finding first Girsh factor favors settlement "because continuing litigation through trial would have required additional discovery, extensive pretrial motions addressing complex factual and legal questions, and ultimately a complicated, lengthy trial" and "it was inevitable that post-trial motions and appeals would not only further prolong the litigation but also reduce the value of any recovery to the class").

We agree that this factor weighs in favor of approval of the settlement.   This litigation has been notably complex, lengthy and expensive.   It has engendered three appeals to the United States Court of Appeals for the Third Circuit and consideration by the United States Supreme

Court.  The result before the Supreme Court essentially placed the Class back to square one in terms of the certification issue, significantly extending the duration of the litigation had a settlement not been reached.

### B.  The reaction of the class to the settlement.

The deadline for requesting exclusion from the Settlement Class or objecting to the Settlement was June 10, 2015.  Of an estimated class size of over 800,000 persons, the Settlement Administrator received only three requests for exclusion and the Court received only three objections.  (Botzet Decl. ¶ 13-14.)  Counsel contend that the number of claims submitted to date, the absence of significant numbers of objections and the small number of opt-outs requests "reflect positive support by Class members."  (Pl. Att'y Fee Mem. at 9.)  They contend that the $50 million Settlement Fund "is more than sufficient to pay all claims submitted by any and all Class Members."  (Id.)  Counsel submit that the strong positive response from Settlement Class Members, evidenced by the lack of substantial numbers of objections, favors a finding that the settlement is fair, reasonable and adequate.  See Bell Atl. Corp. v. Bolger, 2 F.3d 1304, 1313-14 (3d Cir. 1993) (noting that "[l]ess than 30 of approximately 1.1 million class members objected" representing an "infinitesimal" fraction of the class); Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118-119 (3d Cir. 1990) (noting that "only" 29 objections from a 281 member class "strongly favors settlement"); Prudential, 148 F.3d at 318 (affirming determination that class response was favorable in light of facts that 19,000 policyholders out of 8 million opted out and 300 class members objected); Warfarin, 391 F.3d at 536 (noting that "[o]f the 1.8 million potential class members, 136 consumers and ten TPP claimants opted out . . . and two TPP claimants objected," and "[t]he District Court concluded that the insignificant  number of objections filed weighed in favor of approving the settlement"); Sutton v. Med. Serv. Ass'n, Civ.

A. No. 92-4787, 1994 WL 246166, at *9 (E.D. Pa. June 8, 1994) (stating that "[i]n litigation involving a large class, it would be extremely unusual not to encounter objections").

Of the three objections received by the Court and forwarded to Counsel, one is from a current subscriber, one is from a former subscriber, and the third does not specifically state her subscriber status. The current subscriber Objector is Carrie Chandler, who purchases services at two addresses within the Class area, one in Philadelphia and the other in Chester, Pennsylvania. She states:

> I am objecting to the Settlement offers because I believe that I'm entitled to money offer. During that time frame indicated where I had two accounts with Comcast (and still do) I have given them a lot of money for both accounts. I feel as though Comcast package that their offering is definitely not acceptable for the money given for both accounts and years of dedicated service.

(May 20, 2015 Obj. of Carrie Chandler.) The former subscriber Objector is Mark Rhoades of Medford, New Jersey.[5] He states:

> First, the value of the "Settlement Credits" is over-stated given that the actual value of the Settlement Credits depends on the settlement option selected by the consumer. . . . As such, inclusion of "Settlement Credits" as part of the "Settlement Fund" misrepresents the true value of the "Settlement Fund." . . . [T]he use of the misrepresented value . . . as a benchmark to determine the adequacy of counsel fees is improper.
>
> Second, given that the "Settlement Cash Amount" to be paid by Comcast under the settlement totals only $16,670,000, awarding counsel fees in the amount of $15,000,000 is unreasonable.
>
> Third, with only $16,700,000 to be provided for cash rebates to Former Subscribers, and given that the Class Counsel Fees of $15,000,000 are to be paid from the Settlement Fund, there is the possibility of insufficient funds to pay the Former Subscribers under the settlement.
>
> Fourth, given that the Settlement Agreement requires class counsel to provide notice to the Former Subscribers . . ., and given that the attorneys' fees to be paid

---

[5] We note that Medford, New Jersey is not part of the Class area, and Mr. Rhoades does not state whether he received Comcast services at an address within the Class area. We nonetheless consider the merits of his objection.

to class counsel are also to be paid from the Settlement Cash Amount portion of the Settlement Fund, there is the possibility of a conflict of interest between class counsel and Former Subscribers possibly resulting in deficient notice to Former Subscribers.

(June 10, 2015 Obj. of Mark Rhoades.)   The Objector whose subscriber status is not stated is Donna Recupito of Honeybrook, Chester County, Pennsylvania.  She states:

Comcast owes me a lot more than $15 or whatever they are proposing!  I'm sure I'll never see it but it should be known that every month they promised 1 price + came up with much more pricing + of course they always made excuses + were ALWAYS right.  It's ashamed that we even have to pay for TV.

(April 2015 Obj. of Donna Recupito.)

We overrule these objections.  The Court is informed by Class Counsel that Objector Chandler opted for the cash benefit.  Accordingly, the primary basis for her objection has no merit.  We find that the factual assertions underlying the argument posed by Objector Rhodes are untrue.  The record belies the assertion that the "Settlement Credits" misrepresent the true value of the Settlement Fund.  Comcast has committed to provide those services, and the retail cost of those services has been used to value them as credits against the services portion of the Settlement Fund.  His assertion that the "Settlement Cash Amount" will be insufficient to pay counsel fees and the cash settlements, rendering the award of counsel fees unreasonable and raising the possibility of a conflict of interest between counsel and the Class, is also inaccurate.  The cash fund is sufficient to pay all cash claims received by the Settlement Administrator, even if the full amount of attorneys' fees and expenses is awarded by the Court.  Finally, Objector Recupito appears to be dissatisfied with the amount of the cash benefit she will receive.  We overrule this objection based on our overall consideration of the Girsh and Prudential factors as they apply to the amount of the settlement and find that the reaction of the class to the settlement weighs in favor of approving the settlement.

        C.        The stage of the proceedings and the amount of discovery completed.

The procedural stage of a case at the time of settlement provides a means to examine the question of "whether counsel had an adequately appreciation of the merits of the case before negotiating" the settlement. Warfarin, 391 F.3d at 537 (citations omitted). "[C]ourts generally recognize that a proposed class action settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery." Cullen v. Whitman Med. Corp., 197 F.R.D. 136, 144-45 (E.D. Pa. 2000). Settlements arrived at following discovery "are more likely to reflect the true value of the claim." Boone v. City of Phila., 668 F. Supp. 2d 693, 712 (E.D. Pa. 2009) (citing Bell Atl. Corp., 2 F.3d at 1314).

Class Counsel note that this litigation is of long duration, involved extensive discovery, motion practice, multiple trips through appellate courts, a decision by the United States Supreme Court on class certification issues, forty-seven depositions, the review of millions of pages of party and third-party documents, and the retention of multiple experts by the parties, who issued reports and almost all of whom were deposed. Based upon the voluminous record, the Court previously found "that the level to which this case was litigated supports a conclusion that the settlement was reached with full appreciation by counsel of the merits of the case." (Preliminary Approval Order at 9.) Class Counsel assert that they "unquestionably had a full 'appreciation of the merits of the case as well as the legal theories and risks.'" (Pl. Att'y Fee Mem. at 10 (quoting Pet Food Prods., 629 F.3d at 351).) They conclude that the third Girsh factor weighs strongly in favor of final approval. See Warfarin, 391 F.3d at 537 ("Based on the type and amount of discovery undertaken by the parties, the District Court concluded that class counsel adequately appreciated the merits of the case before negotiating, and we agree that this factor

10

strongly favors approval of the settlement.").   We agree that Class Counsel have a full appreciation of the strengths and weaknesses of their litigation position and find that this factor weighs in favor of approving the settlement.

D.      The risks of establishing liability and damages.

Class Counsel argue that the fourth and fifth <u>Girsh</u> factors further support a finding that the settlement is fair, reasonable and adequate.   The fourth factor, the risks of establishing liability, "examine[s] what the potential rewards (or downside) of litigation might have been had class counsel elected to litigate the claims rather than settle them."   <u>In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d 768, 814 (3d Cir. 1995).   The fifth factor similarly "'attempts to measure the expected value of litigating the action rather than settling it at the current time.'"   <u>Cendant</u>, 264 F.3d at 238-39 (quoting <u>GMC</u>, 55 F.3d at 816).   In applying these factors, "the Court need not delve into the intricacies of the merits of each side's arguments, but rather may 'give credence to the estimation of the probability of success proffered by [Class Counsel], who are experienced with the underlying case, and the possible defenses which may be raised to their causes of action.'"   <u>Perry v. FleetBoston Fin. Corp.</u>, 229 F.R.D. 105, 115 (E.D. Pa. 2005) (citation omitted).   Class Counsel assert that the Class would have prevailed at trial, including in establishing Comcast's liability, based on the extensive evidentiary record; however, "they also recognize that class action antitrust cases, like all complex litigation against companies ably represented by teams of talented defense counsel, carry inherent risks."   (Pl. Att'y Fee Mem. at 11 (citing <u>Lazy Oil, Co. v. Witco Corp.</u>, 95 F. Supp. 2d 290, 337 (W.D. Pa. 1997) (noting that "[h]ere, as in every case, Plaintiffs face the general risk that they may lose at trial, since no one can predict the way in which a jury will resolve disputed issues")).)   They assert that District Courts within the Third Circuit have granted final approval to settlements of

11

antitrust class actions where, '"[a]s in any antitrust case, [there are] substantial risks of non-recovery, even after preliminary victories were achieved."'  (Id. (quoting In re Elec. Carbon Prods. Antitrust Litig., 447 F. Supp. 2d 389, 400 (D.N.J. 2006)).)

Class Counsel also assert that the Class would be able to prove damages at trial, while recognizing "the risks of a limited recovery or no recovery given the significant differences among the parties' competing experts on the issue of overcharge damages."  (Id. at 12 (citing In re Remeron Direct Purchaser Antitrust Litig., Civ. A. No. 03-85, 2005 WL 3008808, at *8 (D.N.J. Nov. 9, 2005) (stating that "[t]he determination of damages is a complicated and uncertain process" and noting that given the conflicting damages expert reports, "[i]t is by no means certain that Plaintiffs would have succeeded in recovering the maximum measure of damages estimated by Plaintiffs' expert") (citations omitted); Elec. Carbon Prods., 447 F. Supp. 2d at 401 (discussing risks in proving antitrust damages at trial involving "a battle of experts addressing the measurement of . . . overcharges, which can become an esoteric exercise with unpredictable results"); In re Aetna Inc. Sec. Litig., Civ. A. No. MDL 1219, 2001 WL 20928, at *10 (E.D. Pa. Jan. 4, 2001) (noting that plaintiffs' damages theories were based primarily on testimony and reports of experts, so that plaintiffs risked rejection of its experts by either the court on a Daubert challenge or by the jury); and In re Prudential Ins. Co. of Am. Sales Practices Litig., 962 F. Supp. 450, 539 (D.N.J. 1997) (observing that "a jury's acceptance of expert testimony is far from certain, regardless of the expert's credentials")).)

Counsel note that, in the Preliminary Approval Order, we pointed to the vigorous dispute between the parties' experts and Comcast's motion to strike the most recent reports of Dr. McClave and Dr. Williams, underscoring the risks inherent in continued litigation.  (Preliminary Approval Order, at 9 ("The parties' recent expert reports continue to reflect both the ongoing

core litigation disputes of the parties and the inherent risks of continued litigation, reinforcing the fact that the Settlement falls within the range of reasonableness").)   They argue that the Settlement, on the other hand, provides all Settlement Class Members with significant, certain benefits without further delay, and contend that the fourth and fifth <u>Girsh</u> factors support final approval of the Settlement.   We agree that these factor weighs in favor of approval of the settlement.

E.      The risk of obtaining and maintaining class certification through trial.

Counsel contend that the sixth <u>Girsh</u> factor also provides additional support for final approval.   They note that Plaintiff's motion to certify the narrowed Philadelphia Settlement Class was pending at the time the Settlement Agreement was reached.   While they believe "that the extensive evidentiary record before the Court fully supports class certification and would warrant continued certification through trial . . . [and anticipate] that a class would have been certified for litigation purposes," they also recognize that a court may decertify or modify a class action at any time, as we in fact did following the Third Circuit's decision in <u>In re Hydrogen Peroxide Antitrust Litig.</u>, 552 F.3d 305 (3d Cir. 2008).   (Pl. Att'y Fee Mem. at 13.)   Because of this ever-present risk, courts have found the sixth <u>Girsh</u> factor to favor final approval of settlements.   <u>See Processed Egg Prods.</u>, 284 F.R.D. at 273 (stating that "[t]he Court of Appeals for the Third Circuit has recognized: There will always be a 'risk' or possibility of decertification, and consequently the court can always claim this factor weighs in favor of settlement") (citation and internal quotation marks omitted).   Counsel note that the fact that our previous order re-certifying the class was reversed by the United States Supreme Court further underscores this inherent risk.   (Pl. Att'y Fee Mem. at 13-14 (citing <u>Remeron Direct Purchaser Antitrust Litig.</u>,

2005 WL 3008808, at *8 (noting that the parties' briefing "indicates that this is a hotly contested issue, with Defendants raising multiple and factual legal arguments in opposition to certification" and that "the risks faced by Plaintiffs with regard to class certification weigh in favor of approving the Settlement")).)   We agree that this factor weighs in favor of approval of the settlement.

F.        The ability of Defendant to withstand a greater judgment.

Counsel contend that the seventh <u>Girsh</u> factor neither favors nor disfavors the settlement, noting that "many settlements have been approved where a settling defendant has had the ability to pay greater amounts."  (Pl. Att'y Fee Mem. at 14 (quoting <u>In re Remeron End-Payor Antitrust Litig.</u>, Civ. A. Nos. 02-2007, 04-5126, 2005 WL 2230314, at *23 (D.N.J. Sept. 13, 2005)); <u>see also</u> <u>Warfarin</u>, 391 F.3d at 538 (noting, in affirming certification of a nationwide settlement class and final approval of a settlement, that "[a]lthough the plaintiffs do not dispute that DuPont's total resources far exceed the settlement amount, the fact that DuPont could afford to pay more does not mean it is obligated to pay any more than what the consumer and TPP class members are entitled to under the theories of liability that existed at the time a settlement was reached").)  While the ability of a defendant to withstand a greater judgment is appropriately considered in cases where the settlement amount is less than what plaintiffs might ordinarily agree to because of a defendant's limited financial circumstances, <u>see</u> <u>Reibstein v. Rite Aid Corp.</u>, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011), Counsel contend that such circumstances do not exist here as there is no record evidence that Comcast is financially unstable.  They also argue that courts have recognized that "whether a defendant could pay more in settlement is not relevant when considered in a pure vacuum, divorced from considerations of whether the settlement is fair, reasonable and adequate when viewed in the light of the legal issues and facts involved in the

14

case." (Pl. Att'y Fee Mem. at 14 (citing Warfarin, 391 F.3d at 538).) They assert that this case presented difficult legal issues and substantial risks, the Class would have necessarily spent substantial additional time and expenses in pursuing the case through trial and on appeal, and the settlement provides significant benefits to the Class. They conclude that, given this context, any ability of Comcast to pay more is not relevant in determining the reasonableness of the settlement. See id. (finding no error in district court's conclusion "that DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"); Lazy Oil, Co., 95 F. Supp. 2d at 318 (stating that "[t]he Court presumes that Defendants have the financial resources to pay a larger judgment" but that "in light of the risks that Plaintiffs would not be able to achieve any greater recovery at trial, the Court accords this factor little weight in deciding whether to approve the proposed Settlement"); Perry, 229 F.R.D. at 116 (observing that defendant "could certainly withstand a much larger judgment" and that "[w]hile that fact weighs against approving the settlement, this factor's importance is lessened by the obstacles the class would face in establishing liability and damages"); and Sullivan, 667 F.3d at 323 ("At bottom, we agree that, 'in any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the settlement.'") (citation omitted). Cf. Dryer v. Nat'l Football League, Civ. A. No. 09-2182, 2013 WL 5888231, at *4 (D. Minn. Nov. 1, 2013) (reasoning that "there is no issue with the NFL's financial condition," that defendant is "fully able to pay what it has committed to pay" and "is also fully able to continue to litigate this matter vigorously and defend itself against the class's claims should it be necessary," and concluding that "[t]his factor [defendant's ability to pay] is neutral in the Court's analysis"). Thus, Counsel conclude, the seventh Girsh factor is neutral here, neither favoring nor disfavoring

settlement.

We agree that this is a neutral factor, neither favoring nor disfavoring approval of the settlement. Comcast's financial ability to withstand a larger judgment is offset by the relative strengths and weaknesses of the parties' litigation positions and the uncertainty of a more positive result for the Class had the litigation continued to conclusion.

> G.   The range of reasonableness of the settlement fund in light of the best possible recovery and all of the attendant risks of litigation.

The final pair of <u>Girsh</u> factor focuses on "whether the settlement represents a good value for a weak case or a poor value for a strong case." <u>Warfarin</u>, 391 F.3d at 538. These factors "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." <u>Id.</u> (citing <u>Prudential</u>, 148 F.3d at 322). The Third Circuit has noted that "'after all, settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution.'" <u>Prudential</u>, 148 F.3d at 317 (quoting <u>GMC</u>, 55 F.3d at 806). Under Rule 23(e), a court "must determine whether the settlement is within a range that responsible and experienced attorneys could accept considering all relevant risks and factors of litigation." <u>Remeron Direct Purchaser Antitrust Litig.</u>, 2005 WL 3008808, at *4.

Counsel contend that the settlement falls squarely within the range of settlements worthy of final approval as fair, reasonable and adequate. They note that we previously determined the settlement to be "within the range of settlements worthy of final approval as fair, reasonable and adequate," stating that "[t]he Settlement Fund amount reflects a sound recovery in relation to the estimated single damages reflected in Dr. McClave's new report." (Preliminary Approval Order at 9.)

In the Preliminary Approval Order we stated:

We find that Plaintiffs have shown that the relief available under the Settlement falls within the range of reasonableness, and there is a conceivable basis for presuming that the standard applied for final approval – fairness, adequacy, and reasonableness – will be satisfied. The stated $50 million value of the Fund represents approximately 25% of the amount that Dr. McClave now opines is attributable to Comcast's deterrence of overbuilding in the five counties. This is a significant result given the uncertainty whether, absent the Settlement we would accept Dr. McClave's opinion as common proof, and the substantial risk that Plaintiffs would face in persuading a jury to accept Dr. Williams' liability theory and Dr. McClave's damages theory.

(Id. at 10.)  We find no cause to change our opinion given that the Class has now received notice of the settlement terms and there has been so little opposition expressed to the reasonableness of the settlement.  We also find that the result is eminently reasonable given the clear uncertainty of the Class enjoying a more positive result had the case been litigated to conclusion.  Accord Sullivan, 667 F.3d at 324, 326 (noting that the class's expert estimated that the indirect purchaser plaintiff settlement fund represented an estimated 10.9% of such plaintiffs' single damages and the direct purchaser fund amounted to approximately 20% of their single damages and finding no abuse of discretion in "the District Court's conclusion that the proposed settlement offered a reasonable recovery");  Warfarin, 391 F.3d at 538 (stating that according to plaintiffs' expert's figures, "the $44.5 million settlement fund is approximately 33% of available damages and well within a reasonable settlement range when compared with recovery percentages in other class actions") (citing Cendant, 264 F.3d at 241 (approving settlement providing 36% - 37% recovery and noting typical recoveries in securities class actions range from 1.6% to 14%)); and Remeron End-Payor Antitrust Litig., 2005 WL 2230314, at *24 (noting that "an antitrust class action settlement may be approved even if the settlement amounts to a small percentage of the single damages sought, if the settlement was reasonable relative to other factors, such as the risk of no recovery" and concluding that "[t]he Court is satisfied that the settlement agreement accounts for

the risks inherent in this complex litigation and provides appropriate relief in light of these risks") (citation omitted).

Accordingly, we find that all relevant <u>Girsh</u> factors favor final approval of the Settlement.

2.      The <u>Prudential</u> Factors

A.      Maturity of the underlying substantive issues.

This case settled long after completion of discovery and after more than a decade of vigorously contested litigation.  The stage at which settlement occurs reflects "whether counsel had an adequate appreciation of the merits of the case before negotiating."  <u>In re GMC</u>, 55 F.3d at 813.  "Where [the] negotiation process follows meaningful discovery, the maturity and correctness of the settlement become all the more apparent."  <u>In re Elec. Carbon Prods. Antitrust Litig.</u>, 447 F. Supp. 2d at 400 (citing <u>In re Linerboard Antitrust Litig.</u>, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003)).  The fact that the underlying substantive issues were well-developed and well-known further supports approval of this settlement.  <u>See Chakejian v. Equifax Info. Servs.</u>, 275 F.R.D. 201, 215 (E.D. Pa. 2011) (finding that where the underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken," this factor supported settlement approval); <u>In re Fasteners Antitrust Litig.</u>, Civ. A. No. 08-1921, 2014 WL 285076, at *11 (E.D. Pa. Jan. 24, 2014) (noting that "[a] substantial amount of information has been provided to Settlement Class Counsel such that counsel are capable of making an informed decision about the merits of the case if it were to proceed to trial, and about the fairness of the settlement terms" and concluding that "[w]e are satisfied that the underlying substantive issues were well developed").  We find that this factor weighs in favor of approval of the settlement.

B.      The right to opt-out of the settlement.

All members of the Philadelphia Settlement Class have been provided the opportunity to opt-out.  Counsel assert that, of a class consisting of at least 800,000 members, only three requests for exclusion were received by the Settlement Administrator.  (Botzet Decl. ¶ 13.) Counsel assert that this response is further reflected in the small number of objections to date (id. ¶ 14), and favors final approval.  We agree that this factor weighs in favor of approval of the settlement.

C.       Reasonableness of attorneys' fees provisions.

Class Counsel seek an award of attorneys' fees and expenses of $15 million.  As detailed in Plaintiff's fee Motion, discussed *infra*, the requested fee and expense award of $15 million (in combination representing 30% of the $50 million settlement fund) consists of $8,574,896.16 in expenses (approximately 17.15% of the settlement fund) and $6,425,103.84 in attorneys' fees (approximately 12.85% of the settlement fund).  (See Plaintiff's Motion for an Award of Attorneys' Fees, Reimbursement of Expenses, and Payment of Service Award to Class Representative, Declaration of David Woodward with Exhibits A-T).  Plaintiff's motion for fees and expenses and request for approval of a $10,000 service award to Class Representative Stanford Glaberson, and the supporting memorandum and Declaration of David Woodward, have been posted on the dedicated settlement website and available to Class Members since January 15, 2015.  (Botzet Decl. ¶ 4.)  Counsel submit that these requests are fair and reasonable under the applicable legal standards and precedent discussed in their motion papers and supporting declarations and exhibits.  As detailed in our discussion *infra*, we find that this factor weighs in favor of approval of the settlement.

D.       Reasonableness of the procedure for processing claims.

Counsel assert that the Settlement Administrator, Rust Consulting, Inc., is a highly

experienced claims administrator who implemented the settlement pursuant to the Court's Preliminary Approval Order.  (See id. ¶ 2.)  The Settlement Agreement provided a simple method for class members to receive benefits under the settlement.  Class members who are current Comcast subscribers were able to submit a claim form providing their name, address and Comcast account number.  (See Settlement Agreement ¶ 8.8.1 and Ex. A.)  Former subscribers who are class members were entitled to submit an equally simple claim form providing their name, the address where they formerly received Comcast service during the class period, their former Comcast account number, if known, and affirming, under penalty of perjury, that they subscribed to video programming services (other than solely to basic cable services) from Comcast at any time between January 1, 2003 and December 31, 2008 in any one of the counties of Bucks, Chester, Delaware, Montgomery and Philadelphia, Pennsylvania.  (Id. ¶ 8.8.2 and Ex. B.)  Claims were submitted electronically or by mail.  (Id. ¶ 8.8.3.)

Current subscribers who did not elect on their claim form either a $15 bill credit or from the free services automatically receive two free months of The Movie Channel (an estimated $43.90 value).  (Id. ¶ 8.2.1.)  The same is true of current subscribers who do not file a claim form.  (Id.)  Because there will be no reverter of any portion of the Settlement Fund to Comcast (id. ¶ 8.1), all cash and service benefits will be provided to class members pursuant to the settlement.

Counsel assert that the nature and fairness of the claims process support final approval. We agree that this factor weighs in favor of approval of the settlement.

c.    Conclusion

In conclusion, it must be remembered that a settlement is, by its nature, a compromise. Neither party can expect to receive a perfect outcome.  Rather, each must consider the strengths

and weaknesses of their litigation position, and determine what is an optimal outcome. Applying the Girsh and Prudential factors, we conclude that the settlement is fair and reasonable and represents an optimal outcome for the Class. Accordingly, we grant final approval.

## IV.   MOTION FOR ATTORNEYS' FEES, COSTS, AND SERVICE AWARD

Class Counsel seek an award of attorneys' fees and reimbursement of litigation expenses in the total amount of $15 million. They assert that the total expenses necessarily and reasonably incurred to date by Lead Class Counsel and other Class Counsel in this litigation and for the benefit of the Class are $8,574,896.16.[6]   Class Counsel request partial reimbursement of attorneys' fees reasonably incurred in this matter in the amount representing the difference between $15 million and the amount of total expenses. Thus, the attorneys' fees component of the $15 million requested fees and expenses request is $6,425,103.84 ($15,000,000 less current expenses). Counsel have provided billing records showing the hours expended by Class Counsel and corresponding lodestars. (See Pls.' Mot for an Award of Attorneys' Fees, Woodward Declaration, Ex. A.) The requested fee represents 12.85% of the gross Settlement Fund and 15.51% of the net Settlement Fund ($50 million less expenses and requested service award, if approved). Class Counsel's collective lodestar in this case is $24,927,677.55, representing 61,511.58 hours expended in prosecuting this complex litigation for the benefit of the Class. The requested fee, if granted in full, would amount to a "negative" multiplier of approximately .26 of

---

[6] Not included in Class Counsels' lodestar submission are the fees and expenses incurred by the law firm of Adkins, Kelson & Zavez, P.C., which has submitted its own fee petition (Docket Entry 618). The Zavez firm has expended 879.15 hours on behalf of the Class and submitted a total lodestar of $354,494.50. (May 8, 2015 Decl. of John Peter Zavez ¶ 4.) Lead Class Counsel inform the Court that the Zavez firm's fee will be apportioned from the total amount awarded as fees by the Court, in the same manner as for all other law firms that have performed services for the Class. Accordingly, we will separately grant the Zavez firm's Motion, subject to the provisions contained in the Final Judgment for the apportioning of fees amongst law firms that have performed services for the Class. Our discussion of the attorneys' fee issues addresses all applications that have been made to the Court.

the total lodestar.

    a.       Attorneys' Fees

The Supreme Court has "recognized consistently that . . . a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). See also Boone, 668 F. Supp. 2d at 713; and In re Ikon Office Solutions, Inc. Sec. Litig., 194 F.R.D. at 192 (noting that "there is no doubt that attorneys may properly be given a portion of the settlement fund in recognition of the benefit they have bestowed on class members"). The common fund doctrine is anchored in the inherent powers of federal courts to "prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." Boeing Co., 444 U.S. at 478; see also Fickinger v. C.I. Planning Corp., 646 F. Supp. 622, 632 (E.D. Pa. 1986) (noting that fees in common fund cases "are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant").

The Third Circuit favors the percentage-of-recovery method of calculating fee awards in common fund cases. See In re AT&T Corp., Sec. Litig., 455 F.3d 160, 164 (3d Cir. 2006); In re Rite Aid Corp. Sec. Litig., 396 F.3d 294, 300 (3d Cir. 2005) (citing Prudential, 148 F.3d at 333. Courts within the Third Circuit and elsewhere routinely use this method in antitrust class actions. See, e.g., In re Fasteners Antitrust Litig., 2014 WL 296954, at *3 (stating that "[i]n practice, courts in the Third Circuit assess requests for attorney's fees in antitrust cases using the percentage-of-recovery method, and then cross-check the result with the lodestar method"); In re

Flonase Antitrust Litig., 951 F. Supp. 2d 739, 746 (E.D. Pa. 2013) (noting that "[t]he latter method [percentage-of-recovery], is 'generally favored in cases involving a common fund . . . .'") (quoting Prudential, 148 F.3d at 333); Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *12 (finding that "the percentage of fund method is the proper method for compensating Plaintiffs' Counsel in this common fund case").  The Third Circuit recommends that district courts perform a lodestar cross-check to ensure that application of the percentage method results in an appropriate recovery.   In re Rite Aid Corp. Sec. Litig., 396 F.3d at 305.

The Third Circuit has articulated factors for courts to consider in evaluating the reasonableness of a fee request under the percentage-of-recovery method:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000).  We need not find that all of the Gunter factors are satisfied in order to grant a fee request.  See, e.g., Meijer, Inc. v. 3M, Civ. A. No. 04-5871, 2006 WL 2382718, at *21-22 (E.D. Pa. Aug. 14, 2006) (noting that although time spent litigating the case was relatively low when the case settled after one year, other Gunter factors outweighed that fact).  The Third Circuit has also indicated that other factors from In re Prudential Insurance Co. America Sales Practices Litigation may be considered:

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained; and (3) any "innovative" terms of settlement.

In re AT&T Corp. Sec. Litig., 455 F.3d at 165-66 (citing Prudential, 148 F.3d at 338, 340, 339).  Counsel assert that the application of all relevant factors provides support for their requested fee.

23

1.     Application of the <u>Gunter</u> Factors

A.     Size of the Fund; Number of Persons Benefited

As noted earlier, the Settlement Fund is $50 million and the parties estimate that the Class consists of at least 800,000 persons.  (Settlement ¶ 8.1; Woodward Decl. ¶ 55.)  Counsel argue that the Settlement provides significant, certain benefits to the Class in the form of cash payments or bill credits for services.  For the reasons already discussed, we find that this factor weighs in favor of granting the Motion.

B.     Objections

Also as noted earlier, the Court received only three objections from class members, which we have overruled.  We find this factor weighs in favor of granting the Motion.

C.     Skill and Efficiency of the Attorneys

In appointing Lead Class Counsel for the Settlement Class pursuant to Fed. R. Civ. P. 23(a)(4), we noted that Lead Class Counsel "have extensive experience and expertise in antitrust, class action and complex litigation, and have successfully prosecuted antitrust class actions and similar cases in courts in this district and throughout the United States, including, for the last decade, this Action."  (Preliminary Approval Order at 4.)  Lead Class Counsel assert that they have:

> deep experience prosecuting and trying complex antitrust actions. Lead Class Counsel and other Class Counsel devoted substantial time and resources to this case to perform services including developing the factual basis of the claims, working closely with experts, filing numerous pleadings, defeating multiple challenges to those pleadings, engaging in extensive motion practice, conducting significant discovery and litigating all contested issues before this Court, as well as class certification issues before the Third Circuit and the Supreme Court.

(Pl. Att'y Fee Mem. at 12; Woodward Decl. ¶ 59.)  They note that they faced formidable opposition from nationally recognized law firms with extensive antitrust and class action

24

experience who rigorously defended the case, and argue that this factor further supports Class Counsel's motion.  We find that skill, efficiency, expertise, and professionalism of all counsel involved in this litigation have been exemplary and that this factor weighs in favor of granting the Motion.

D.       Complexity and Duration of the Litigation

The complexity and duration of the litigation is "the first factor a district court can and should consider in awarding fees."  Gunter, 223 F.3d at 197.  Counsel note that courts have recognized that an "antitrust class action [is] perhaps the most complex case[] to litigate," Bradburn Parent Teacher Store, Inc. v. 3M, 513 F. Supp. 2d 322, 338-39 (E.D. Pa. 2007); see also In re Linerboard Antitrust Litig., 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003), and assert that they have diligently prosecuted this litigation on behalf of the Class for almost eleven years in the face of vigorous opposition from Defendants' highly skilled counsel.  (Pl. Att'y Fee Mem. at 10.)  Counsel assert their work involved "careful, thorough research, crafting pleadings that would advance Plaintiff's case through the crucible of extensive litigation of Comcast's several pleading challenges, contested arbitration proceedings at the district and appellate court levels, briefing and arguing Comcast's motion for summary judgment, review of over five million pages of documents, depositions of 47 witnesses, submission by the parties of 37 expert reports and testimony, and highly contested class certification proceedings before this Court, the Third Circuit and the Supreme Court."  (Id.)  They also note that they filed their Motion prior to the completion of their work on the case; that they do not seek additional reimbursement for the time devoted to implementing the Court-approved Class notice program, working with the claims administrator in the settlement administration process, responding to inquiries from Class members, drafting papers in support of final approval of the Settlement, and preparing for and

appearing at the final approval hearing.  We find that this factor weighs in favor of granting the Motion.

E.      Risk of Nonpayment

"A determination of a fair fee must include consideration of the sometimes undesirable characteristics of a contingent antitrust action[], including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high."  Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *14; see also Gunter, 223 F.3d at 195 n.1, 199 (explaining that the risk counsel takes in prosecuting a client's case should also be considered in assessing a fee award).  Lead Class Counsel note that they "undertook this litigation on a wholly contingent basis, understanding from the outset that they were embarking on a long and costly litigation through a shifting legal landscape, all the while confronting highly skilled lawyers who would vigorously advocate Defendants' cause and facing uncertainty about whether they would ever receive any compensation for their enormous investment of time and money in advancing the interests of the Class."  (Woodward Decl. ¶ 63.)  They contend that this case presented a host of risks and uncertainties that could have precluded any recovery.  (Id. ¶ 65.)  Although they continued to believe that the record evidence would establish Defendants' liability and prove damages on a class-wide basis at trial, Lead Class Counsel assert that they "agreed to the Settlement on behalf of the Class after considering a variety of factors, primarily the significant benefits of the $50 million recovery to the Class.  A variety of factors made the outcome at trial uncertain, including the difficulty a jury might have in grasping the economic testimony and deciding highly complex issues, as well as decisions by the Court that impacted Plaintiff's case."  (Id. ¶ 67.)  They note that we have observed that the Settlement represents "a significant result

given the uncertainty whether, absent the Settlement we would accept Dr. McClave's opinion as common proof, and the substantial trial risks that Plaintiffs would face in persuading a jury to accept Dr. Williams' liability theory and Dr. McClave's damages theory."  (Preliminary Approval Order at 10.)  Finally, they note that, even if Class Counsel successfully tried the case, Plaintiff still would have faced likely and lengthy appeals.  They assert that this factor further supports approval of the requested award.[7]  We agree that this factor weighs in favor of granting the Motion.

### F.      Amount of Time Devoted

Class Counsels' collective lodestar is $24,927,677.55, representing 61,511.58 hours expended in prosecuting this case over nearly eleven years.  (Woodward Decl. ¶ 70.)  Counsel note that this amount does not include any amount for ongoing and anticipated future work in responding to Class member inquiries, managing implementation of components of the Class notice program, assisting and monitoring the claims administrator, drafting Plaintiff's memorandum in support of final approval of the Settlement, and participating in the final approval hearing.  As we discuss below, the total lodestar when compared to the amount requested weighs in favor of granting the Motion.

### G.      Awards in Similar Cases

---

[7] The Class has also appended a Declaration from Professor Eric Green, who mediated the settlement, discussing the substantial risks both sides faced in this litigation.  (See Decl. of Eric Green, Docket Entry No. 608-4 at 6 (noting that Defendants "could not be sure of a favorable jury verdict" and faced the risk that "if the Class proved liability at trial, a jury could award damages far in excess of the settlement" and that "the Class faced serious obstacles to establish liability and certifying a class" and faced the risk that "the jury could have awarded damages much less than those sought by the Class or the amount of the settlement.").)  Professor Green appropriately observed that "[b]oth sides also faced the risk that a jury could react unfavorably to the evidence presented" and that "continued litigation posed great risk for both sides.".  (Id.)

Counsel assert that their requested fee award is well below the level of awards made in similar antitrust cases. They note that courts within the Third Circuit frequently award fees of one-third of the value of class action settlements. (Pl. Att'y Fee Mem. at 16 (citing In re Tricor Direct Purchaser Antitrust Litig., Civ. A. No. 05-340, slip op. at 9-10 (ECF No. 543) (D. Del. April 23, 2009) (awarding one-third fee on settlement of $250 million); In re Flonase Antitrust Litig., 951 F. Supp. 2d 739, 751 (E.D. Pa. 2013) (awarding one-third fee on settlement of $150 million); Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *17 (awarding one-third fee on settlement of $75 million); In re Wellbutrin SR Antitrust Litig., C.A. No. 04-5525, slip op. at 14 (ECF No. 413) (E.D. Pa. Nov. 21, 2011) (awarding one-third fee on settlement of $49 million); In re Wellbutrin XL Antitrust Litig., Civ. A. No. 08-2431, slip op. at 8 (ECF No. 485) (E.D. Pa. Nov. 7, 2012) (awarding one-third fee on settlement of $37.5 million); In re Metoprolol Succinate Antitrust Litig., Civ. A. No. 06-52, slip op. at 9 (ECF No. 194) (D. Del. Feb. 21, 2012) (awarding one-third fee on settlement of $20 million); In re Fasteners Antitrust Litig., 2014 WL 296954, at *7 (awarding one-third fee on settlement of $17.55 million); and Rochester Drug Coop., Inc. v. Braintree Labs., Inc., Civ. A. No. 07-142, slip op at 9 (ECF No. 243) (D. Del. May 31, 2012) (awarding one-third fee on settlement of $17.5 million)).)

Counsel note that, in contrast to that benchmark, their requested award represents only 15.51% of the net common fund ($50 million less expenses). We find that this factor weighs in favor of granting the Motion.

           2.      Application of the Prudential Factors

           A.      Value of Benefits

The value of benefits accruing to class members that is attributable to the efforts of class counsel, as opposed to the efforts of others is also a factor to be considered. See Prudential, 148

F.3d at 339-40. Counsel assert that the development and prosecution of this case was based entirely on the investigation and efforts of Class Counsel, and, unlike some antitrust class actions, did not follow on the heels of any government lawsuit or investigation. See AT&T Corp., Sec. Litig., 455 F.3d at 173 (noting that where class counsel was not aided by the efforts of any government group, this strengthened the district court's conclusion that the fee award was fair and reasonable). They assert that the Settlement's substantial benefits to the Class are attributable solely to the efforts of Lead Class Counsel and other Class Counsel. (Woodward Decl. ¶¶ 12 and 72.) We agree that this factor weighs in favor of granting the Motion.

B.      Privately Negotiated Percentage Fee

Counsel argue that the requested fee award is further supported by considerations of the considerably higher fee that would be expected to be privately negotiated in contingency fee litigation. See, e.g., In re Aetna Inc. Sec. Litig., 2001 WL 20928, at *14 (Padova, J.) (stating that "the Court concludes that an award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation") (citations omitted). We agree that this factor weighs in favor of granting the Motion.

3.      Lodestar Cross-Check

The Third Circuit has embraced the use of a lodestar cross-check to ensure that application of the percentage-of-recovery method does not result in too large a fee recovery. Rite Aid, 396 F.3d at 305-06; see also In re Aetna Inc. Sec. Litig., 2001 WL 20928, at *14. Once the lodestar is calculated by multiplying the number of hours counsel reasonably expended by a reasonable billing rate for such services (see Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)), "[t]he total lodestar estimate is then divided into the proposed fee calculated under the percentage method" and "[t]he resulting figure represents the lodestar multiplier to compare to

multipliers in other cases."  Manual for Complex Litigation (Fourth) § 14.122 (2014).  Where the lodestar is greater than the requested fee award, however, the court may dispense with a cross-check.  See Fleisher v. Fiber Composites, LLC, Civ. A. No. 12-1326, 2014 WL 866441, at *15 (E.D. Pa. March 5, 2014) ("Where, as here, counsel requests a fee that represents less than their lodestar, 'there is no need to discuss multipliers and the appropriateness of an increase to the lodestar.'") (citing Chakejian v. Equifax Info. Servs., LLC, 275 F.R.D. 201, 217 (E.D. Pa. 2011) (finding that the provision of attorneys' fees and costs contained in the settlement agreement was "eminently reasonable, judging from the lodestar")).

That is the case here.  Class Counsel's collective lodestar total, $24,927,677.55, exceeds the requested fee award, yielding a multiplier of only 0.26.  (Woodward Decl. ¶ 53.)  Counsel assert that, although a lodestar cross-check "may not be necessary in this case, it is still instructive to note that the 0.26 multiplier here is far less than the multiplier of 1 to 4 or higher commonly approved in other similar class actions."  (Pl. Att'y Fee Mem. at 20 (citing Bradburn, 513 F. Supp. 2d at 341 (stating that "[t]he Third Circuit has recognized that multipliers 'ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied'" (citations omitted)); Segen v. OptionsXpress Holdings Inc., 631 F. Supp. 2d 465, 477 (D. Del. 2009) (multiplier of 2.06); In re Tricor Direct Purchaser Antitrust Litig., Civ. A. No. 05-340, slip op. at 9 (ECF No. 543) (D. Del. April 23, 2009) (multiplier of 3.93); In re Warfarin Sodium Antitrust Litig., 212 F.R.D. 231, 263 (D.Del. 2002) (multiplier of 1.33); Remeron Direct Purchaser Antitrust Litig, 2005 WL 3008808, at *17 (noting that awarded multiplier of 1.86 is on the "low end of the spectrum" (citation omitted)); Nichols v. SmithKline Beecham Corp., Civ. A. No. 00-6222, 2005 WL 950616, *24 (E.D. Pa. Apr. 22, 2005) (approving multiplier of 3.15); In

re Linerboard Antitrust Litig., No. MDL 1261, Civ. A. Nos. 98-5055, 99-1000, 99-1341, 2004
WL 1221350, at *16 (E.D. Pa. June 2, 2004) (approving a 2.66 multiplier)).

Class Counsel have submitted to Lead Class Counsel reports itemizing for each attorney
and paralegal (1) their historical hourly rate; (2) a description of the services rendered; (3) the
number of hours spent performing the services; and (4) the resulting lodestar – i.e., the product
of the hourly rate times the total number of hours. These reports also itemize all expenses
incurred by the firms in prosecuting this litigation.[8]  The following chart summarizes each law
firms' lodestar declarations:

| FIRM | HOURS | LODESTAR |
|------|-------|----------|
| Berger & Montage, P.C. | 445.00 | $153,853.50 |
| Bolognese & Assoc., LLC | 2,564.50 | $1,027,357.50 |
| Cohen & Malad, LLP | 831.40 | $273,245.50 |
| Donner & Co. Law Offices LLC | 80.00 | $17,998.75 |
| Fine, Kaplan and Black, RPC | 907.20 | $302,546.50 |
| Freed Kanner London & Millen LLC | 1,491.10 | $750,576.00 |

---

[8]      Those individual attorney Declarations are attached as Exhibits C-T to the Woodward
Declaration:  David Woodward, Heins Mills & Olson, P.L.C. (Ex. C); Barry Barnett, Susman
Godfrey, L.L.P. (Ex. D); Joseph Goldberg, Freedman Boyd Hollander Goldberg Urias & Ward,
P.A. (Ex. E); Martin I. Twersky, Berger & Montague, P.C. (Ex. F); Anthony J. Bolognese,
Bolognese & Associates, LLC (Ex. G); Scott D. Gilchrist, Cohen & Malad, LLP (Ex. H);
Benjamin J. Brown, Cohen Milstein Sellers & Toll, PLLC (Ex. I); Ted A. Donner, Donner &
Company Law Offices LLC (Ex. J); Roberta D. Liebenberg, Fine, Kaplan and Black, R.P.C. (Ex.
K); Douglas A. Millen, Freed Kanner London & Millen LLC (Ex. L); Marc H. Edelson,
Hoffman & Edelson, LLC (Ex. M); Richard J. Kilsheimer, Kaplan Fox & Kilsheimer, LLP (Ex.
N); Mark A. Griffin, Keller Rohrback L.L.P. (Ex. O); Annika K. Martin, Lieff Cabraser
Heimann & Bernstein, LLP (Ex. P); three Declarations of Jayne A. Goldstein, for time and
expenses incurred while at the law firms of Mager & Goldstein, LLP (Ex. Q), Mager White &
Goldstein, LLP (Ex. R), and Pomerantz, LLP (Ex. S); and Natalie Finkelman Bennett, Shepherd,
Finkelman, Miller & Shah, LLP (Ex. T).

| | | |
|---|---|---|
| Freedman Boyd Hollander Goldberg Urias & Ward, P.A. | 3,453.27 | $929,997.50 |
| Heins Mills & Olson, P.L.C. | 33,145.50 | $13,086,595.00 |
| Hoffman & Edelson, LLC | 1,573.80 | $707,189.00 |
| Kaplan Fox & Kilsheimer LLP | 2,446.25 | $884,111.25 |
| Keller Rohrback L.L.P. | 1,476.10 | $619,273.55 |
| Lieff Cabraser Heimann & Bernstein, LLP | 274.10 | $128,467.00 |
| Mager & Goldstein, LLP | 422.25 | $174,707.50 |
| Mager White & Goldstein, LLP | 48.50 | $21,862.50 |
| Pomerantz, LLP | 7.30 | $5,621.00 |
| Shepherd, Finkleman, Miller & Shah, LLP | 27.90 | $13,361.00 |
| Susman Godfrey, L.L.P. | 11,807.16 | $5,642,067.00 |
| **TOTAL** | **61,511.58** | **$24,927,677.55** |

We find that the lodestar cross-check confirms the reasonableness of Class Counsel's fee request.

      b.     Reimbursement of Expenses

The Third Circuit recognizes that attorneys who create a common fund for the benefit of a class are entitled to reimbursement from the fund of the reasonable litigation expenses advanced on behalf of the class. See, e.g., In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 732 n.12 (3d Cir. 2001) (quoting the 1985 Task Force Report for the conclusion that the "common-fund doctrine . . . allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred"); see also AT&T Corp., Sec. Litig., 455 F.3d at 172 n.8 ("[e]xpenses are generally considered and reimbursed separately from attorneys' fees");

Warfarin, 212 F.R.D. at 263 (approving costs and expenses reimbursements out of litigation fund as reasonable).  Courts routinely approve such expenses incurred in the prosecution of complex cases.  See, e.g. In re OSB Antitrust Litig., Civ. A. No. 06-826, slip op at 9 (ECF No. 947) (E.D. Pa. Dec. 9, 2008) (approving class counsel's fee request because "[t]his complex lengthy matter involved some eighty depositions, the creation and maintenance of a huge case database, and the preparation and review of expert economic analyses and reports"); Remeron Direct Purchaser Antitrust Litig., 2005 WL 3008808, at *17 (finding the following expenses to be reasonable: "'(1) travel and lodging, (2) local meetings and transportation, (3) depositions, (4) photocopies, (5) messengers and express services, (6) telephone and fax, (7) Lexis/Westlaw legal research, (8) filing, court and witness fees, (9) overtime and temp work, (10) postage, (11) the cost of hiring a mediator, and (12) NJ Client Protection Fund — pro hac vice'" (quoting Oh v. AT&T Corp., 225 F.R.D. 142, 154 (D.N.J. 2004))).

Class Counsel have requested reimbursement of $8,574,896.16 for out-of-pocket expenses incurred to date in this litigation.  Class Counsel assert that they have "incurred these reasonable and necessary expenses over the course of more than a decade, all the while having no assurance of repayment."  (Woodward Decl. ¶ 51-52.)  The largest component of these expenses comprises payments to economic experts retained by the Class.  Plaintiff's expert witness fees total $6,703,918.74.  (Pl. Att'y Fee Mem. at 21.)  Other significant expenses include the costs associated with storing millions of pages of documents on secure databases; travel to depositions, court hearings and mediation across the country; court reporting expenses; photo and data copying and computerized legal research.  (See Woodward Decl., Exs. C-T.)

We find that the requested reimbursement is reasonable.

c.      Service Award for Class Representative

Class Counsel also request that the Court approve a service award of $10,000 to Plaintiff Stanford Glaberson, who has served as Class representative since the inception of this litigation. The Court-approved class notice informed the Class that Plaintiff would seek this award.

Courts recognize the purpose and appropriateness of service awards to class representatives.  See, e.g., In re CertainTeed Fiber Cement Siding Litig., 303 F.R.D. 199, 225 (E.D. Pa. 2014) (noting that '[t]he purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws" (citing Sullivan, 667 F.3d at 333 n.65); In re Residential Doors Antitrust Litig., Civ A. Nos. 94-3744, 96-2125, MDL 1039, 1998 WL 151804, at *9 (E.D. Pa. Apr. 2, 1998) (approving awards of $10,000 each to four class representatives); In re Linerboard Antitrust Litig., 2004 WL 1221350, at *19 (approving awards of $25,000 for each of five class representatives); and Mayer v. Driver Solutions, Inc., Civ. A. No. 10-1939, 2012 WL 3578856, at *5 (E.D. Pa. Aug. 17, 2012) (approving $15,000 service award for class representative).

Class Counsel assert that Plaintiff has performed a "'public service of contributing to the enforcement of mandatory laws.'"  (Pl. Att'y Fee Mem. at 23 (quoting Chakejian, 275 F.R.D. at 220).)  They note that Plaintiff has actively participated in the litigation, has provided Class Counsel with documents and information concerning his subscription to non-basic services from Comcast, was deposed twice (on January 26, 2006 and October 18, 2006), has monitored the litigation through contact with counsel, and has attended a hearing before this Court. (Woodward Decl. ¶¶ 78-79.)  Counsel assert that the requested service award is appropriate in light of the risk and sacrifices made by Plaintiff during the more than 10 years this litigation was prosecuted.

We find that a service award of $10,000 to Stanford Glaberson for his service as Class representative is reasonable.

## V.      CONCLUSION

For the reasons stated, the Court finds that the settlement of this highly contested litigation is fair and reasonable, and we grant final approval.   We also (1) approve Class Counsels' attorneys' fee and expense application and enter an order awarding counsel fees and expenses in the amount of $15 million, consisting of $6,425,103.84 in attorneys' fees and $8,574,896.16 in expenses, and (2) approve a service award in the amount of $10,000 for Class Representative Stanford Glaberson.

An appropriate Order and a Final Judgment will be entered.

BY THE COURT:


s/John R. Padova
JOHN R. PADOVA, J.